## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YASSIN MUHIDDIN AREF
USP Marion, CMU
4500 Prison Road
Marion, IL 62959

and

AVON TWITTY (aka Abdul Ali)
FCI Terre Haute, CMU
4200 Bureau Road North
Terre Haute, IN 47808

and

DANIEL MCGOWAN
USP Marion, CMU
4500 Prison Road
Marion, IL 62959

and                                                    CIVIL ACTION NO._____

JENNY SYNAN

and

ROYAL JONES
USP Marion
4500 Prison Road
Marion, IL 62959

and

KIFAH JAYYOUSI
FCI Terre Haute, CMU
4200 Bureau Road North
Terre Haute, IN 47808

 and

HEDAYA JAYYOUSI

        VS.

ERIC HOLDER
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and

HARLEY LAPPIN
Director of the Federal Bureau of Prisons (BOP)
320 First Street, NW
Washington, DC 20534

and

D. SCOTT DODRILL
Assistant Director, Correctional Programs Division
Federal Bureau of Prisons
320 First Street, NW
Washington, DC 20534

and

FEDERAL BUREAU OF PRISONS
320 First Street, NW
Washington, DC 20534

## COMPLAINT

Plaintiffs YASSIN MUHIDDIN AREF, AVON TWITTY, DANIEL

MCGOWAN, ROYAL JONES, and KIFAH JAYYOUSI (collectively "Plaintiffs"), and

JENNY SYNAN and HEDAYA JAYYOUSI (collectively "Family Plaintiffs") by and

through their attorneys, the Center for Constitutional Rights, allege the following:

### NATURE OF ACTION

1.      In 2006 and 2007, the Bureau of Prisons (BOP) secretly created two

experimental prison units designed to isolate certain prisoners from the rest of the BOP

and the outside world.  These units are called "Communications Management Units" or "CMUs."

2.      While euphemistically described by the BOP as "self-contained general population units," the CMUs, alone out of all general population units within the federal system, impose a categorical ban on any physical contact with visiting friends and family, including babies, infants, and minor children.  To further social isolation, the BOP has placed severe restrictions on CMU prisoners' access to phone calls and prison programming.

3.      Although the creation of the CMU – as well as the indefinite nature of these restrictions – marked a dramatic change in policy and contradicts existing regulations, the CMUs were created without the opportunity for notice and comment, in violation of the Administrative Procedures Act (APA).

4.      All Plaintiffs have been classified by the BOP as low or medium security, and were designated to the CMU at the Federal Correctional Institution in Terre Haute, Indiana (hereinafter "FCI Terre Haute"), or the United States Penitentiary in Marion, Illinois (hereinafter "USP Marion") despite having a relatively, and in some cases perfectly, clean disciplinary history.

5.      Not a single Plaintiff has received discipline for any communications-related infraction within the last decade, nor any major disciplinary offense.  Two Plaintiffs' disciplinary histories are completely clean.

6.      Adding to the suspect nature of these units, upwards of two-thirds of the prisoners confined there are Muslim – a figure that over-represents the proportion of

Muslim prisoners in BOP facilities by at least 1,000%. Many of the remaining prisoners have unpopular political views.

7.      Plaintiffs' CMU designation was discriminatory, retaliatory, and/or punitive in nature and not rationally related to any legitimate penological purpose or substantiated information. Instead, their designation was based on their religion and/or perceived political beliefs, or in retaliation for other protected First Amendment activity.

8.      Like all prisoners designated to the CMU, Plaintiffs received no procedural protections related to their designation, and were not allowed to examine or refute the allegations that led to their transfer. Plaintiffs are being held indefinitely at the CMU without any meaningful review process. Many face five, ten, even fifteen more years in prison. They expect to serve their entire sentences in these isolated and punitive units.

9.      Plaintiffs have been placed indefinitely in a setting that imposes atypical and significant curtailments on their ability to communicate with loved ones, including the right to hug, touch, or embrace their family members, including children. As a result, Plaintiffs' familial relationships and rights of association with loved ones have been substantially impaired, and, with respect to relationships with young children, completely destroyed. CMU conditions hamper Plaintiffs' ability to engage in meaningful rehabilitation, and inflict pointless psychological pain.

10.      Family Plaintiffs join in this case to challenge Defendants' interference with their ability to maintain relationships with their loved ones in prison. Those relationships are being irrevocably damaged, without necessity or legitimate penological purpose.

11.     As a result of Defendants' misconduct, all Plaintiffs are suffering severe and unjustifiable emotional distress, psychological injury, and strain on their relationships.  Some Plaintiffs, like Avon Twitty, *see infra*, face a longer prison term due to the stigma attached to CMU placement.  Others have lost meaningful contact with family, including their children.

12.     Defendants, by creating, participating in, and endorsing Plaintiffs' systematic mistreatment, are violating the rights guaranteed to Plaintiffs under the First, Fifth, and Eighth Amendments to the United States Constitution, and the Administrative Procedures Act.

13.     All Plaintiffs seek a judgment declaring that Defendants' actions and those of all persons acting on their behalf violate the constitutional and statutory rights of all Plaintiffs as to each applicable count.  Plaintiffs also seek a declaration that each individual Plaintiff's transfer to and detention in the CMU is and was unjustified, unconstitutional, and unlawful.  Plaintiffs further seek an injunction compelling Defendants to return Plaintiffs to the general population of an appropriate BOP facility and allow them the same opportunity to communicate with their families as other prisoners at their classification level, or enjoining Defendants from operating the CMU in a way that violates all Plaintiffs' rights.  In addition, all Plaintiffs seek an award of costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

14.     This court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act), and 5 U.S.C. § 551 *et seq*. (Administrative Procedures Act).

15.    Venue is proper in the United States District Court for the District of
Columbia pursuant to 28 U.S.C. § 1391(b), because Defendants are headquartered and
work in Washington, DC, and, as illustrated by memoranda and Congressional testimony,
the policies and decisions giving rise to the injuries complained of herein occurred, and
continue to occur, in Washington, DC.

## PARTIES

16.    Plaintiff YASSIN MUHIDDIN AREF is a 39-year-old refugee and
published author from Iraqi Kurdistan who fled Saddam Hussein's regime, moving to
Albany, New York, in 1999.  Following a controversial and well-publicized sting
operation, Mr. Aref was convicted of money laundering, material support for terrorism,
conspiracy, and making a false statement to the FBI.  Mr. Aref is classified as a low
security prisoner.  Despite the fact that Mr. Aref has no history of disciplinary infractions
within the BOP, he was transferred to the CMU at FCI Terre Haute in May 2007.  After
22 months at the FCI Terre Haute CMU, Mr. Aref was transferred to the CMU at USP
Marion, and remains there currently.  Mr. Aref has no affiliation with extremist or
violence-oriented religious or political organizations.  Indeed, Mr. Aref is opposed to
violent or extremist religious and political ideologies.

17.    Plaintiff AVON TWITTY (aka Abdul Ali) is a 55-year-old man from
Washington, DC, an American citizen and a practicing Muslim.  In 1984, Mr. Twitty was
sentenced to 20 years to life imprisonment on one count of murder while armed and three
to ten years imprisonment for one count of carrying a pistol without a license.  He is
classified as a medium security inmate.  Despite the fact that Mr. Twitty has received no
communications-related disciplinary infractions – and received only very minor

disciplinary infractions overall – he was transferred to the CMU at FCI Terre Haute on May 30, 2007, and has been held there ever since. Mr. Twitty has no affiliation with extremist or violence-oriented religious or political organizations. His underlying conviction involved no allegations of terrorism. Indeed, Mr. Twitty is opposed to violent or extremist religious and political ideologies.

18.     Plaintiff DANIEL MCGOWAN is a 35-year-old man from Queens, New York, and is an American citizen. In 2007, Mr. McGowan was sentenced to 7 years imprisonment for conspiracy and arson. He is classified as a low security prisoner. Despite the fact that Mr. McGowan has never received a disciplinary infraction, he was transferred to the CMU at USP Marion in August of 2008. While Mr. McGowan's imprisonment resulted from crimes he committed when associated with the Earth Liberation Front (ELF), he is no longer associated with that organization or any similar organization, and he has not attempted any communication with members of ELF or any similar organization. Mr. McGowan has no affiliation with extremist or violence-oriented religious or political organizations. Indeed, Mr. McGowan is opposed to violent or extremist religious and political ideologies.

19.     Plaintiff JENNY SYNAN is a 35-year-old woman from New York. She is an American citizen, currently lives in Brooklyn, New York, and has been married to Plaintiff Daniel McGowan for close to four years. She has no criminal record.

20.     Plaintiff ROYAL JONES is a 42-year-old man from San Francisco and is an American citizen and a practicing Muslim. In July 2006, Mr. Jones was arrested in Montana for soliciting a crime of violence – bank robbery – and for a probation violation relating to an earlier gun charge. He pled guilty, and was sentenced in 2007 to 94 months

in prison. He is classified as a medium security prisoner. Despite the fact that Mr. Jones received no major disciplinary infractions, and no communications-related disciplinary infractions within the last ten years, he was transferred to the CMU at USP Marion on June 9, 2008. Mr. Jones has no affiliation with extremist or violent religious or political organizations. His underlying conviction involved no allegations of terrorism. Indeed, Mr. Jones is opposed to violent and extremist religious and political ideologies.

21.     Mr. Jones was released from the CMU in March of 2010, without explanation, and is currently in the general population at USP Marion. He has been told that he will remain at USP Marion for at least six months, and will immediately be placed back in the CMU if he engages in any of the conduct that led to his CMU designation. Mr. Jones does not know what that conduct was, and thus does not know how to avoid re-designation to the CMU. He joins in all claims based on his well-founded fear of re-designation to the CMU.

22.     Plaintiff KIFAH JAYYOUSI is a 48-year-old American citizen of Jordanian descent from Detroit, Michigan, and a practicing Muslim. Despite the fact that his alleged criminal conduct primarily involved financial contributions to charities, and his sentencing judge found that he ceased involvement in any criminal conspiracy in 1998, Mr. Jayyousi was convicted of conspiracy to murder, kidnap and maim in a foreign country and conspiracy to provide material support to terrorism in August 2007, and sentenced to 12 years and eight months imprisonment. Although Mr. Jayyousi has received no major disciplinary infractions, and absolutely no communications-related disciplinary infractions, he was transferred to the CMU at Terre Haute in June 2007. Mr. Jayyousi has abandoned any affiliation with extremist or violence-oriented religious or

political organizations. Indeed, Mr. Jayyousi is opposed to violent or extremist religious and political ideologies.

23.     Plaintiff HEDAYA JAYYOUSI is a 50-year-old woman who lives in Detroit, Michigan. Ms. Jayyousi is an American citizen and has been married to Plaintiff Kifah Jayyousi since 1983. They have five children: 23 year-old twin boys and daughters aged 18, 14 and 12. Ms. Jayyousi has no criminal record.

24.     Defendant ERIC HOLDER is the Attorney General of the United States and the head of the United States Department of Justice. BOP is an agency of the United States Department of Justice. As such, Defendant Holder has ultimate authority over BOP decisions, including policy decisions regarding the FCI Terre Haute and USP Marion CMUs, and the promulgation of BOP regulations. *See* 18 U.S.C. § 4042. Holder has affirmatively maintained the policy of confining individuals indefinitely in the CMU, without notice or opportunity to be heard and for no legitimate penological purpose. Defendant Holder's place of work is located in Washington, DC. Defendant Holder is sued in his official capacity.

25.     Defendant HARLEY LAPPIN is, and has been at all times relevant to this case, Director of the BOP. Defendant Lappin exercises authority over all BOP determinations. *See* 18 U.S.C. §§ 4041, 4042. He made the decision to establish the FCI Terre Haute CMU and the USP Marion CMU, and sets the conditions at both units. Defendant Lappin's place of work is located in Washington, DC. Defendant Lappin is sued in his official capacity.

26.     Defendant D. SCOTT DODRILL is, and has been since June 2009, Assistant Director of BOP's Correctional Programs Division. The Correctional Programs

Division sets policies regarding the designation of inmates to the FCI Terre Haute and

USP Marion CMUs and has authored memoranda to this effect. Defendant Dodrill's

place of work is located in Washington, DC. Defendant Dodrill is sued in his official

capacity.

27.      Defendant BOP is a federal agency under the APA and is headquartered in

Washington, DC. BOP created the CMU at FCI Terre Haute and the CMU at USP

Marion in which plaintiffs are confined, and issued the Terre Haute CMU Institution

Supplement and the Marion CMU Institution Supplements. BOP establishes regulations

applicable to federal prisons and prisoners and creates and operates prison units in which

prisoners are confined. *See* 18 U.S.C. § 4042.

## STATEMENT OF FACTS

### I.      General Background

28.      The existence of a CMU at FCI Terre Haute was first disclosed on

December 11, 2006, when seventeen prisoners were transferred there without

explanation, notice or hearing. The publicly-available policies applicable to the unit are

contained in the Terre Haute CMU Institution Supplement, a true and correct copy of

which is attached hereto as Exhibit A and incorporated by reference herein. The

Institution Supplement is dated November 30, 2006, but was not provided to CMU

prisoners nor disclosed to the public until January 2007.

29.      BOP officially established a CMU at USP Marion through an Institution

Supplement dated March 20, 2008. A second Institution Supplement for the Marion

CMU was released on November 13, 2008 ("Marion CMU Institution Supplements"). A

true and correct copy of both of these Marion CMU Institution Supplements are attached

hereto as Exhibit B and incorporated by reference herein.

30.     Unlike most prisons, where day-to-day conditions and operations are set

by the prison warden, the CMUs are controlled by Defendants Lappin and Dodrill. The

Wardens at both FCI Terre Haute and USP Marion lack authority to change conditions at

the CMU, or order prisoners transferred from the unit. The conditions at both units are

identical, with changes in policy occurring simultaneously. Even operational minutia,

such as approval for individual visits and telephone calls, is determined by officials in

Washington, DC. For example, email, visits and phone calls were temporarily suspended

at the CMU in Marion, Illinois in early February 2010 due to snowstorms in Washington,

DC. By contrast, wardens at other facilities exercise discretion over such decisions as

long as they act within BOP guidelines.

31.     Defendant Lappin and the former Assistant Director of BOP's

Correctional Programs Division, Joyce K. Conley, ordered and assented to the

establishment of both CMUs and the issuance of the Institution Supplements pursuant to

new United States Department of Justice policy. The stated purpose of the new units was

to hold dangerous terrorists and other high-risk inmates who require heightened

communications monitoring and control. *See* U.S. Dep't of Justice, Office of the

Inspector General (OIG), THE FEDERAL BUREAU OF PRISONS' MONITORING OF MAIL FOR

HIGH-RISK INMATES, REPORT NO. I-2006-009 (Sept. 2006), at xi (noting that the BOP had

"several ongoing and proposed initiatives to improve the monitoring of communications

for terrorist and other high-risk inmates. The initiatives include . . . consolidating all

terrorist inmates in a few institutions in order to concentrate the resources required to

monitor them [and] limiting the volume of mail and other types of communication available to terrorists or other high-risk inmates.")

32.     Defendants Lappin and Holder continue to publicly characterize the CMUs as filled with "terrorists."

33.     Subsequent to the issuance of the OIG Report, however, the BOP expanded the types of prisoners who may be housed at the CMUs to include: (1) those convicted of, or associated with, international or domestic terrorism; (2) those convicted of sex offenses who repeatedly attempt to contact their victims; (3) those who attempt to coordinate illegal activities while incarcerated via approved communication methods; (4) those who have received extensive disciplinary actions due to their continued misuse/abuse of approved communication methods; and (5) those with a history of making threats against judicial officers. *See* Bureau of Prisons' 2007 State of the Bureau Report, *available at* http://www.bop.gov/news/PDFs/sob07.pdf, and other BOP documents.

34.     Thousands of prisoners within the BOP fit into these categories. For example, according to one OIG report, as of July 2006, the BOP categorized 19,720 inmates within the federal system as "high-risk" based on gang, international or domestic terrorist associations. And in 2009, Director Lappin informed Congress that the BOP has custody of 1,200 international and domestic terrorists. Thousands of other federal prisoners are presumably eligible for transfer to the CMU based on prison infractions involving communications. For example, in 2008 the BOP staff confiscated 1,519 unauthorized cell phones from federal prison camps and 255 cell phones from secure federal prisons.

35.     As described in detail *infra*, Defendants have neglected to implement any controls or criteria to determine who is designated to the CMU, and to review that designation.  Plaintiffs simply have no means to demonstrate that they do not belong in a CMU.  The direct and predictable result of this lack of process is a pattern of transfers for illegitimate, discriminatory, and/or retaliatory reasons.  Thus, Defendants have allowed for Plaintiffs to be designated to the CMU based solely on their constitutionally-protected religious or political beliefs, and/or as a result of retaliation.  Indeed, several Plaintiffs do not even fit within any of the five broad categories outlined above.  Of course, designation based on religious or political identity and speech is arbitrary and impermissible, and lacks any legitimate penological purpose.

## II.     Policies, Practices, and Conditions at the CMU

36.     The CMU is an experiment in social isolation.  Practices and conditions within the CMU are, however, without legitimate penological purpose.  Plaintiffs are allowed no physical contact with their family and friends, and extremely limited opportunity for non-contact visitation and other communication.  They are completely segregated from the rest of the prison population.

### a.     Categorical Ban on Contact Visits

37.     As a general matter, the BOP encourages contact visitation by family, friends, and community groups to maintain the morale of the inmate and to aid rehabilitation.  Plaintiffs however, are banned from any physical contact during social visitation.  The BOP categorizes the CMU as a "self-contained general population unit."  Yet it is the only "general population" unit Plaintiffs are aware of within the entire BOP that prohibits all contact visitation.

13

38.     The BOP has established procedures to prevent the passage of contraband and to ensure the security and good order of the institution. In that context, the BOP permits limited physical contact, such as handshaking, embracing, and kissing, between an inmate and a visitor, unless there is clear and convincing evidence that such contact would jeopardize the safety or security of the institution. The CMU ban on contact visits directly contradicts this explicit BOP policy.

39.     BOP prisoners are rarely denied contact visits even after being found guilty of serious disciplinary offenses. BOP prisoners in administrative detention or disciplinary segregation, for example, retain visiting privileges under the same rules and regulations as prisoners in the general population. Visiting may be restricted or disallowed only when a prisoner is charged with, or has been found to have committed, a prohibited act that is directly related to visitation, or where the prisoner acted in a way that would reasonably indicate that the she or he would be a threat to the orderliness or security of the visiting room. Loss of visiting privileges for any other reason requires a hearing, where a Discipline Hearing Officer (DHO) must find that the inmate committed a prohibited act *and* that there is no other appropriate sanction.

40.     At oral argument before the Supreme Court of the United States in the case of *Overton v. Bazetta,* then Assistant to the Solicitor General, Jeffrey Lamken, characterized these procedural protections related to visitation as "extensive."

41.     By contrast, CMU inmates are categorically denied contact visits, potentially for the entire period of their incarceration, without any hearing, the showing of a prohibited act, or any other security justification. CMU inmates may not touch, hug, kiss, shake hands, or have any physical contact whatsoever with their children, wives,

14

siblings, pastors, or friends – including infants.  This is so despite a complete lack of any

evidence or allegation that providing Plaintiffs with contact visits would jeopardize the

safety or security of the prison.  Indeed, all Plaintiffs had access to contact visits prior to

their designation to the CMU, and no incidents or violations occurred.

42.     Because contact visitation by Plaintiffs poses no security concern, the

categorical ban serves no legitimate penological purpose.  According to the BOP, the

purpose of the CMU restrictions is to allow for effective *monitoring* of communications.

Even presuming the legitimacy of this purpose, there are ready alternatives at each Unit

that would allow for effective monitoring of visits at *de minimis* cost to the prison,

without a ban on physical contact.

43.     Each CMU has a contact visitation room, currently available for attorney-

client contact visits.  As only one social or attorney-client visit may currently take place

in the CMU at any given time, and all the visits are monitored live by Unit staff, effective

monitoring of communication could occur by allowing the visit to take place in the

attorney-client contact visitation room, and requiring Plaintiffs and their visitors to speak

audibly.  A simple tape-recorder could be placed on the table in the visiting room if

recording of communication for future analysis is desirable.  Other easy solutions also

exist.  Many areas in each CMU are currently wired for audio and video recording.  Thus,

it is reasonable to assume that a visitation area could be similarly set up at little cost.

Indeed, according to a 2006 OIG report, eight BOP facilities are already set up to audio-

record contact visits.

44.     The prohibition on contact visitation is exceptionally harsh.  For example,

Plaintiff Aref's children are 4, 9, 11, and 13.  Because Mr. Aref will not be released until

2018, he will next be able to hug his 4-year-old daughter when she is 12. A ban on physical contact for this lengthy period, for no legitimate penological purpose, is cruel and unusual, and an atypical hardship.

45.     The prolonged and indefinite ban on physical contact is extremely deleterious to Plaintiffs' emotional and mental health and rehabilitation, and to maintenance of family integrity. While Plaintiffs do have access to email through a BOP pilot program, this non-real time method of communication does not substitute for physical contact, or otherwise mitigate the ill-effects of the blanket ban. Psychological research shows a consistent correlation between quantity and quality of touch and relationship integrity.[1] Physical contact is a basic human need essential to one's mental health, and the maintenance of close family relationships, especially those between husbands and wives, and parents and children. With respect to young children, it is the *only* means of effective association. Physical contact in the context of prison visitation is of central importance—as non-contact visitation leads to emotional stress and interferes with the positive role visitation can play in maintaining family integrity.[2]

**b.     Limitations on Number and Duration of Visits**

46.     While Plaintiffs can receive non-contact visits, those too are severely circumscribed without legitimate penological purpose.

---

[1] *See generally,* Matthew J. Hertenstein, Julie Verkamp, Alyssa M. Kerestes, Rachel M. Holmes, *The Communicative Functions of Touch in Humans, Nonhuman Primates, and Rats: A Review and Synthesis of the Empirical Research,* 132 GENETIC, SOC. & GEN. PSYCHOL. MONOGRAPHS 34 (2006) (*available at* http://www.depauw.edu/learn/lab/publications/documents/touch/2006_Touch_The%20communicative_functions_of_touch_in_humans.pdf); *see also,* JUDEE K. BURGOON, DAVID B. BULLER, & W. GILL WOODALL, NONVERBAL COMMUNICATION: THE UNSPOKEN DIALOGUE, McGraw-Hill (1996) (arguing that people rely more heavily on nonverbal communication, especially in times of stress, because nonverbal communication preceded language in evolution of the species, and thus has phylogenetic primacy).
[2] *See* Joyce Arditti, *Locked Doors and Glass Walls: Family Visiting at a Local Jail,* 8 J.LOSS & TRAUMA 115 (2003).

47.     In recognition of the important role visitation plays in rehabilitation, morale, and maintenance of family integrity, the BOP places no cap on the number or duration of visits that BOP inmates may generally receive.  The only limit is based on available visiting hours and chronic overcrowding.  Existing Regulations, applicable to all BOP prisoners, emphasize that, "at a minimum, the Warden shall establish visiting hours at the institution on Saturdays, Sundays, and holidays." 28 C.F.R. § 540.42(a) (noting also that the "restriction of visiting to these days may be a hardship for some families and arrangements for other suitable hours shall be made to the extent practicable").

48.     Neither the Terre Haute CMU Institution Supplement nor the Marion CMU Institution Supplement amended existing Regulations regarding visitation through notice and comment rulemaking.  *See* Section V, *infra*.

49.     As at most federal prisons, non-CMU prisoners in the general population at USP Marion may receive visits each weekday evening, from 5:00 p.m. to 8:00 p.m., and all day on weekends and holidays, from 8:30 a.m. to 3:00 p.m.  Even prisoners in administrative and disciplinary segregation may receive weekend visits.  There is no apparent limitation on the number or duration of visits that non-CMU inmates at USP Marion may receive per month.

50.     Visiting hours and frequency are similar for prisoners in the general population at Terre Haute, where visits may occur on Fridays through Sundays and on federal holidays from 8:00 a.m. to 3:00 p.m.  General population inmates at Terre Haute are allowed seven visits during a calendar month, and there is no limit on the duration of

the visit. Therefore, BOP policy allows inmates in general population up to 49 hours of visits a month.

51.    These regulations are typical of the entire federal system. The situation at the CMU stands in sharp contrast.

52.    Until January 3, 2010, Plaintiffs were allowed only one four-hour visit or two two-hour visits per month, and could only receive those visits on weekdays, during work/school hours. They were not allowed to receive any visits on weekends, holidays, or evenings. These restrictions made it extremely difficult for Plaintiffs to receive visits from family members who worked or were in school, and thus placed a substantial burden on their ability to maintain the integrity of their familial relationships.

53.    In October 2009, after three years of these restrictions being in effect, the BOP announced incremental changes at the CMUs in apparent response to current and threatened litigation.

54.    In January 2009, Sabri Benkahla, an inmate at the Terre Haute CMU, filed a federal lawsuit in the Southern District of Indiana alleging that the CMU was established in violation of the APA. Mr. Benkahla is represented by the National Prison Project of the American Civil Liberties Union. Mr. Benkahla's APA claim is analogous to the claim asserted here, but he asserts none of the constitutional claims raised by Plaintiffs.

55.    Throughout 2009, undersigned counsel communicated extensively with Plaintiffs and other CMU inmates and arranged to visit Plaintiffs and other CMU prisoners in contemplation of the present litigation.

56.     An unsigned and undated Notice to Inmates was posted at both the Marion and Terre Haute CMUs in October 2009.  A true and correct copy of the Notice to Inmates is attached hereto as Exhibit C.  The Notice announced that the visiting hours for CMU prisoners would be expanded on January 3, 2010.

57.     As of January 3, 2010, CMU prisoners are now allowed eight hours of visiting time per month.  No single visit can be scheduled for a period longer than four hours.  Visits are permitted Sunday through Friday, 8:30 a.m. to 2:30 p.m.  No visiting is allowed on Saturdays.

58.     These incremental changes to CMU policy, though welcome, are not sufficiently substantial to correct the harm done to Plaintiffs' familial relationships over the past several years.  Nor do they bring the unit in line with what is typical for federal prisoners throughout the country, and what the Constitution requires.

59.     Moreover, the changes have not been codified into either institution supplement, which continue to cite the old policy as controlling.  There has been no indication as to the permanency of the changes.  And, as it is reasonable to assume they have been made in reaction to threatened and existent litigation, they may not be relied upon to continue.

60.     Even as voluntarily-expanded, the visitation policy at the CMU remains the most restrictive for general population prisoners in the federal system.

61.     Prisoners at the Administrative Maximum (ADX) facility USP Florence, the only "supermaximum" security facility in the federal system, are allowed significantly more visitation time than CMU prisoners.  BOP policy allows those "max" security prisoners up to five visits per month, each of which may last for seven hours –

for a total of 35 hours of visitation a month.  This is more than four times the amount of visitation time CMU prisoners currently receive.

62.      There is no legitimate penological purpose for the limited hours and number of visits allowed to CMU prisoners.  A weekend visit poses no different security concerns than does a weekday visit, and each visitor is screened prior to entrance into the facility.  The policy is needlessly cruel and serves only to interfere with Plaintiffs' ability to maintain meaningful relationships with their families and loved ones.

      **c.**     **Limitations on Phone Calls**

63.      As with visits, the BOP recognizes that telephone calls are extremely important to rehabilitation, morale, and the maintenance of family integrity.  Indeed, because so many prisoners in the federal system are incarcerated far from their family and friends, telephone communication is the only way many BOP prisoners can stay connected with their loved ones.  For this reason, BOP prisoners in general population are allowed 300 minutes of outgoing telephone calls per month.  *See* Telephone Regulations for Inmates, *available at* http://www.bop.gov/policy/progstat/5264_007.pdf, at 4.  They may use these minutes at their discretion, generally between 6:00 a.m. and 11:30 p.m., with few restrictions.  *Id*. at 14.

64.      Until January 3, 2010, by contrast, CMU inmates were entitled to only one 15-minute telephone call per week, and could only make those calls on weekdays, during school and work hours.  This rendered telephone communication with school-age children exceptionally difficult.  While these restrictions have been minimally loosened, Plaintiffs have no reason to believe the recent change is permanent, nor does it correct the severe impairment of Plaintiffs' relationships.

65.     CMU prisoners are now allowed two 15-minute telephone calls per week. *See* Exhibit C. Plaintiffs thus receive a total of 120 minutes of telephone calls a month, in contrast to the 300 minutes almost all other federal prisoners receive.

66.     Unlike other federal prisoners, CMU prisoners may only make a call if they sign up and designate the call recipient and the exact timing of the call one week in advance. If the recipient does not pick up the phone, or the call is cut off for some reason, CMU prisoners may not try the number again, nor are they allowed to call someone else instead.

67.     The severe restrictions on the number and duration of phone calls have placed a substantial burden on Plaintiffs' ability to maintain relationships with their family and friends. Plaintiffs with large families face difficult decisions each week over who to call, and who not to call.

68.     There is no legitimate penological purpose for the needlessly cruel limitation on Plaintiffs' hours and duration of telephone calls, as each call is live monitored. Such limitation serves only to interfere in Plaintiffs' ability to maintain meaningful relationships with their families and loved ones.

**d.     Segregation from General Population & Lack of Release Preparation Programming**

69.     Although described as a "general population housing unit," prisoners in the CMU are segregated from other prisoners at both FCI Terre Haute and USP Marion and not allowed to have contact with non-CMU prisoners. The units are known and referred to throughout both prisons (and the BOP as a whole) as "terrorist units." The stigma of "terrorist" follows plaintiffs and other CMU prisoners even after their release.

70.     For some Plaintiffs, this stigma will lead to an increase in the period of

their incarceration.  For example, as described *infra*, Plaintiff Twitty was approved for

nine months of pre-release placement at a halfway house in his home town of

Washington, DC, making him eligible for release to that halfway house in April 2010.

However, the halfway house will not accept him until August 2010 because his

assignment to the CMU suggests that he is a management problem.  Thus, the stigma

attached to CMU designation will keep Mr. Twitty incarcerated for an extra four months.

71.     The remaining Plaintiffs fear that their post-release prospects will be

similarly compromised.  The BOP requires that all eligible prisoners receive the

opportunity to engage in release preparation programming to facilitate their ability to gain

employment post-release.  *See generally* 28 C.F.R. 571.10 – 571.13; BOP Program

Statement 5325.07 Release Preparation Program ("RPP").  Such programming is a

mandatory requirement for prisoners within 30 months of release.  Plaintiff Twitty is

required by BOP regulations to engage in RPP, and would like the benefit of these

classes, yet he has been unable to participate due to a complete lack of such programming

at the CMUs.  Other plaintiffs would also like the opportunity to participate in release

preparation programming as well.  Denial of this important tool for rehabilitation is

contrary to mandatory BOP rules, and has a significant negative impact on Plaintiffs'

ability to gain placement at a halfway house, gain employment post-release, and

successfully reenter free society.

### III.    Denial of Due Process

#### a.    Lack of Procedural Protections

72.    Despite the profound deprivations that have resulted from Plaintiffs'
designation and transfer to the CMU, that designation, along with Plaintiffs' continued
confinement in the CMU, is completely devoid of any procedural protections. In some
cases it is also contrary to the professional judgment of the prison officials who have
direct contact with Plaintiffs.

73.    The way prisoners are selected for placement in the CMU is a mystery,
and is apparently without any paper trail. According to a Memorandum from the
Assistant Director of the BOP Correctional Programs Division (a true and correct copy of
which is attached hereto as Exhibit D and incorporated by reference herein), a prisoner
may be nominated for CMU designation by regional staff who believe the prisoner
requires enhanced monitoring. Regional Directors and their staff may nominate inmates
of their choice for CMU placement by contacting Les Smith, the Chief of the
Counterterrorism Unit in Martinsburg, West Virginia. Plaintiffs are also aware of
prisoners nominated to the CMU by wardens and other facility staff. Mr. Smith also
personally elects certain prisoners for transfer to the CMU. For example, with respect to
one prisoner, Mr. Smith instructed a case manager to request the prisoners' transfer to the
CMU and even specified the language that request should utilize.

74.    Typically, when designation to a special unit will deprive a prisoner of
rights or benefits, the BOP issues detailed regulations regarding criteria and
documentation of the reason for referral. *See, e.g.,* BOP Program Statement P5217.01
Special Management Units at 2 (describing referral criteria and contents of referral

packet); BOP Program Statement 5212.07 Control Unit Programs at 3-6 (same). Yet the BOP has provided only the most general guidance to staff on criteria for CMU placement, and has not indicated any need to detail and document the reason for referral.

75.     Unlike prisoners designated for Special Management Units or Control Units, Plaintiffs did not receive prior notice, an opportunity to be heard, a meaningful description of the information that led to their referral, or the right to an appeal. This lack of process is absolutely unparalleled in the BOP, and establishes a situation ripe for abuse through retaliatory and discriminatory designation and transfer to the CMU. Transfers to Special Management Units and Control Units all come with a hearing, a detailed pre-hearing notice, a detailed post-hearing explanation and the right to appeal. *See* BOP Program Statement P5217.01 Special Management Units at 2-4; BOP Program Statement 5212.07 Control Unit Programs at 7-10.

76.     In place of meaningful process, after their transfer to the CMU each Plaintiff received a one-page Notice of Transfer stating the following:

> This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications . . . . Your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public.

A true and correct copy of each Plaintiff's Notice of Transfer is attached hereto as Exhibit E and incorporated by reference herein.

77.     The one-page notice provided to each Plaintiff also includes language purporting to explain why each Plaintiff was designated to the CMU. For some

Plaintiffs, like Mr. McGowan, the information included in this notice is factually erroneous. For others, the statements are so vague and generic as to provide no notice at all as to the factual premise that led to CMU designation. Plaintiffs Jones and Twitty's transfer notices, for example, include identical and vague sentences, with no reference to any underlying factual allegations. Thus none of these Plaintiffs is aware of why he was designated to the CMU.

78.     Each Plaintiff has sought to discover from the BOP the factual information underlying their designation and transfer. No such information has been forthcoming.

79.     CMU designation is especially mysterious for those Plaintiffs, like Jones and Twitty, who do not even fit any of the five alleged bases for CMU designation set out at paragraph 33, *supra*. And those Plaintiffs, like McGowan, Jayyousi, and Aref, who arguably fit into the first criterion because their conviction is related to terrorism, have not attempted to contact or communicate with any terrorists while in prison nor acted in any other way to threaten prison security. No Plaintiff has made judicial threats, or even stood accused of attempting to coordinate illegal activity via approved communication methods. No Plaintiff was convicted of a sex crime. And no Plaintiff has a significant history of disciplinary infractions or communications-related infractions.

80.     Because Plaintiffs have no meaningful opportunity to challenge their designation to, and continued incarceration in, the CMU, most expect to be held at the CMU for the duration of their sentences. The one Plaintiff who has gained release from the CMU, Mr. Jones, does not know how or why.

81.     Plaintiffs have not been informed of any way they can change their behavior, otherwise earn release, or stay out of the CMU if released. This too, is unique

within the BOP.  In contrast, Special Management Unit placement is intended to last only 18-24 months, and is based upon set steps each prisoner may take to receive benefits through compliance with set behavioral expectations.  Similarly, the propriety of continued placement in a Control Unit is reviewed by the unit team every 30 days, and by an Executive Panel (including the regional director and the Assistant Director of the Correctional Programs Division) every 60 to 90 days.  *See* BOP Program Statement P5217.01 Special Management Units at 1, 8; BOP Program Statement 5212.07 Control Unit Programs at 20.

82.     The one page CMU transfer notice provided to each Plaintiff states:

Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of inmates.

83.     But according to the Notices of Transfer, each Plaintiff's designation to the CMU was based either on their conviction or offense conduct, or upon undisclosed behavior that presumably occurred at a prior institution.  Because CMU designation is not based on any ongoing misbehavior, the reason for designation will never change or diminish.  Indeed, Plaintiff Jayyousi has been directly told by his Unit Manager that he will serve the rest of his twelve year and eight month sentence at the CMU.

84.     Contrary to the Notice of Transfer and referenced BOP policy,  Plaintiffs have been repeatedly informed by members of their unit team that neither the unit team nor the warden has power to have a prisoner transferred from the CMU, and that these decisions are instead made in Washington, DC, at the Central level.  *Compare* BOP Program Stmt 5100.008 Classification at 55 ("unit team and/or warden" is final authority

on custody classification, to be determined at program reviews; intent of policy is to allow staff to utilize professional judgment within specific guidelines).

85.     No meaningful review of the appropriateness of CMU placement occurs at the program reviews.  For years, Plaintiffs who sought to discuss transfer from the CMU at their program reviews were told by their unit team that the only possible way out of the CMU is a request for a "nearer release" transfer.  This type of transfer may not be sought until a prisoner has served 18 consecutive months with clear conduct at a given facility. Any disciplinary report, even for a minor rule violation like failing to stand for count, restarts the 18 month clock.

86.     Moreover, a nearer relief transfer is *completely* discretionary, and may be denied without reason or explanation.  Plaintiff Jayyousi, for example, waited the requisite 18 months and then sought a nearer release transfer.  He was denied without explanation.  Other prisoners, like Plaintiff Aref, were transferred from one CMU to the other after 18 months.  This also restarts the clock on the possibility of requesting transfer from the CMU.

87.     In October 2009, an undated, unsigned Notice to Inmates was posted at both the Terre Haute and Marion CMUs, detailing a new process by which the unit team would review inmates for continued CMU placement at program reviews.  According to the BOP's response to a request for informal remedy filed by Plaintiff Jones, the memo was authored by Assistant Director Dodrill and was issued on October 15, 2009.  A true and correct copy of the Notice to Inmates is attached hereto as Exhibit F and incorporated by reference herein.

88.    The Notice indicates that inmates will be provided with 48 hours notice prior to the review, are expected to attend, and can "personally raise questions and concerns with Unit Team regarding their placement in the CMU." *See* Exhibit F at 1.  By its own description, the process does not serve as a review of, or opportunity to contest, the original reasons individual inmates were transferred to the CMU; rather, the Notice presumes that CMU designation was initially appropriate, indicating that the Unit Team "will consider whether the original reasons for CMU placement *still exist*." *Id.* (emphasis supplied).

89.    The Notice specifies five factors that will be considered: 1) offense of conviction and offense conduct; 2) whether offense of conviction or offense conduct, or activity while incarcerated, indicates a "propensity" to encourage, coordinate, facilitate, or further illegal activity through communication with persons in the community; 3) whether the inmate has attempted, or "indicates a propensity," to contact victims of current offense of conviction; 4) whether the inmate committed prohibited activity related to the misuse of communication methods while incarcerated; and 5) whether there is other evidence of a potential threat to prison or public safety as a result of the inmate's "unmonitored communication" with persons in the community.  The Notice states that the Unit Team will forward its recommendation to the Warden, who, if in concurrence, will forward that recommendation to the BOP's Counter Terrorism Unit (CTU) for review. *Id.*  The CTU will forward the final recommendation to the Regional Director of the North Central Region "for further review and consideration." *Id.*  According to the Notice to Inmates, the Regional Director of the North Central Region has final authority to approve "an inmate's re-designation from a CMU." *Id.*

90.     This purported review process is illusory.  Contrary to the notice, but
consistent with past practice, the Unit Teams at both Terre Haute and Marion have
continued to fail to review the propriety of CMU placement at program reviews, and
continue to state that the responsibility for decisions about CMU placement occur at the
Central rather than facility level.  Plaintiffs Jayyousi, McGowan, and Jones each attended
a program review since the Notice was posted.  They were not provided with any
information at the review regarding which of the stated criteria led to their CMU
designation, nor were they provided with factual information underlying the designation.
At Plaintiff Aref's last review he was explicitly told that he was categorically ineligible
for a transfer until he had spent 18 months at the Marion CMU, pursuant to general BOP
policy.

91.     By its own terms, the new process is merely an assessment of whether the
"original reasons for CMU placement still exist." *See* Exhibit E at 1.  As designation is
based on past, rather than continuing conduct, nothing can change.  Plaintiffs have no
way to meaningfully contest their ongoing placement in the CMU because the allegations
underlying those factors, and the factors themselves, have never been disclosed or
reviewed.

**b.      Retaliatory and Discriminatory Transfers Resulting from Lack of
        Process**

92.     The lack of criteria, documentation, and review establishes a situation ripe
for abuse through retaliatory or discriminatory designation to the CMU.

93.     For example, in the absence of any history of communications-related
violations or significant disciplinary infractions, and as described in further detail *infra*, it

appears that Plaintiffs Twitty and Jones were transferred to the CMU in retaliation for grieving and litigating disputes over their treatment in prison.

94.    Similarly, it appears as though Plaintiff McGowan was transferred to the CMU because of his political beliefs and continued involvement in lawful social justice movements while incarcerated.

95.    Meanwhile, the population breakdown of the CMUs leads to the inescapable inference that the CMUs were created to allow for the segregation and restrictive treatment of Muslim prisoners based on Defendants' discriminatory belief that Muslim prisoners are more likely than others to pose a threat to institution security.

96.    Of the first 17 prisoners transferred to the Terre Haute CMU, 15 were Muslim. The population grew quickly. By March 2007, CMU prisoners reported that there were 48 prisoners in the Terre Haute CMU, and 37 of them were Muslim. In the last several years, subsequent to media scrutiny of Defendants' targeting of Muslims, more non-Muslims have been moved to the CMU. Guards on the units have referred to these non-Muslim prisoners as balancers.

97.    Pursuant to a FOIA request, the BOP has provided statistics on prisoners confined at the Terre Haute and Marion CMUs. According to those statistics, a total of 36 prisoners had been held in the Marion CMU by April 2009, 26 of whom were classified by the BOP as Muslim (making the unit 72% Muslim). There had been 63 prisoners at the Terre Haute CMU, only 14 of whom were allegedly classified as Muslim or of a religion related to Islam (making the unit 22% Muslim). 13 prisoners were listed as having "no preference" in the Terre Haute CMU statistics.

98.     These BOP statistics appear to significantly minimize the disproportionate
number of Muslim prisoners at the Terre Haute CMU, and in fact contradict other
statistics supplied by the BOP and Terre Haute CMU staff.  For example, in a list of
Ramadan participants created and posted by Terre Haute CMU staff in August 2008, 38
prisoners' names appear – a number which potentially undercounts the number of
Muslim prisoners (as some Muslim prisoners may have chosen not to fast for Ramadan)
and yet is almost triple the number the BOP reported in April 2009.  Moreover, according
to an October 13, 2009 letter from the Associate Director of the DOJ Office of
Information Policy, 25 prisoners declared Islam as their religious affiliation at the Terre
Haute CMU, and 20 have done so at the Marion CMU.

99.     According to Plaintiffs and other CMU prisoners' self-reporting, the
proportion of Muslim prisoners at the Terre Haute CMU is far greater than the BOP
reports.  In November 2009, a prisoner at the Terre Haute CMU reported that 24 of 40
prisoners (or 65% of the prisoner population) were Muslim.  Two months previously, in
September 2009, another Terre Haute CMU prisoner reported that 25 of 37 prisoners (or
68% of the prisoner population) were Muslim.

100.    These numbers (and indeed even the BOP numbers) represent a vast
overrepresentation of Muslim prisoners at the two CMUs when compared to the overall
population of BOP facilities.  Of 150,000 prisoners in BOP facilities nationwide in 2004,
approximately 9,000 prisoners (or 6% of the total prisoner population) sought Islamic
religious services.  *See* U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of the
Federal Bureau of Prisons' Selection of Muslim Religious Service Providers*, at 5 (2004)

This encompasses prisoners who identify as Sunni and Shiite, or are affiliated with Nation of Islam and the Moorish Science Temple of America.

101.    BOP statistics themselves demonstrate that the Marion CMU is 72% Muslim – a 1,200% overrepresentation compared against the national average.  Even if BOP statistics about the population of the Terre Haute CMU are taken at face value, *but see* ¶¶ 98-99, *supra*, the population of Muslim prisoners at that unit is 367% higher than the national average.  More reliable estimates, however, suggest that the CMU at Terre Haute includes an overrepresentation of Muslim prisoners at a rate of over 1,000% of the national average.

102.    This discrepancy cannot be explained by any non-discriminatory reason, as no Plaintiff has engaged in any behavior while incarcerated to indicate his communication requires monitoring or he otherwise poses a unique threat to prison security.

**IV.    Facts Specific to Individual Plaintiffs**

**a.    Yassin Aref**

103.    Before his arrest in August 2004, Yassin Aref was living in Albany, New York.  Mr. Aref is married and has four children ages 4, 10, 12, and 14.  Prior to his confinement in the CMU, Mr. Aref lived with and maintained a very close relationship with his wife and children, although he has been in custody since his wife was six months pregnant with his youngest.

104.    Mr. Aref is a practicing Muslim and served as an Imam of the Masjid-As-Salam Mosque in Albany prior to his incarceration.

105.    Mr. Aref is a refugee from Iraqi Kurdistan.  His village, Hashazini, was destroyed by Saddam Hussein's regime in 1988.  In 1995, Mr. Aref and his family fled to Syria and were granted refugee status under a United Nations program.  In October 1999, Mr. Aref, his wife, and their three children relocated to Albany.  His youngest child was born in the United States.

106.    As reflected in the numerous letters of support that were submitted to the sentencing court on his behalf, Mr. Aref counseled innumerable members of his mosque, teaching classes and offering them support and advice.  He is also an author, whose memoir, *Son of Mountains*, focuses on his quest for a free and peaceful life in the United States.

107.    Mr. Aref was convicted of money laundering, material support, conspiracy, and making a false statement to the FBI in 2007, and was sentenced to a total of 15 years imprisonment.  His conviction arose from a controversial and well-publicized sting operation wherein an undercover officer offered to loan money to Mr. Aref's co-defendant, Mohammed Mosharref Hossain, in exchange for checks, telling Hossain that the money was made from buying a Chinese surface to air missile, which was to be provided to a group called Jaish-e-Mohammed (JEM).  Needing a witness to the loan, as is obligatory for Muslims, the men brought Mr. Aref into the arrangement, solely as a witness to the loan transactions.  The government arrested both men, alleging that Mr. Aref chose to support money laundering by witnessing the loan.  The prosecution acknowledged during its summations at trial that it was not seeking to establish or prove that Mr. Aref was a terrorist.  After Mr. Aref's conviction, *The Times Union* and the *Daily Gazette*, Albany's two main daily newspapers, both ran editorials urging leniency

in sentencing. On March 8, 2007, Mr. Aref was sentenced to 15 years in prison, half the sentence called for under the Federal Sentencing Guidelines.

108.    Mr. Aref has been in the custody of BOP for the entire duration of his sentence. He is due to be released on October 4, 2018.

109.    From September 2005 until March 2007, Mr. Aref was housed at the Rensselaer County Jail in Troy, New York. There, he was able to make daily telephone calls and received two contact visits per week. These visits and calls allowed him to maintain a close and supportive connection with his family, and particularly his young children. Mr. Aref's wife and children visited him regularly, and Mr. Aref met his newborn baby twice while he was at the jail. There, he was able to hold his baby daughter in his arms.

110.    While an inmate at Rensselaer County Jail, Mr. Aref had no disciplinary infractions involving visitation or his use of the telephone or the mail. Mr. Aref has never received an infraction of any kind at a BOP facility.

111.    Upon sentencing Mr. Aref, Judge McAvoy, district judge for the Northern District of New York, recommended that Mr. Aref be placed at a facility as close to Albany, New York, as possible.

112.    The BOP did not follow the Court's recommendation and, despite classifying Mr. Aref as "low security," it transferred him to the CMU at FCI Terre Haute (a medium security prison). The BOP informed Judge McAvoy by letter that it had not followed his recommendation because of unspecified "security concerns."

113.     Shortly after arriving at the CMU at FCI Terre Haute, Mr. Aref received a

Notice of Transfer, dated May 11, 2007, that, by way of explanation for his transfer,

states:

> Your current offense of conviction includes Providing Material Support &
> Resources to a Foreign Terrorist Organization, & Conspiracy to Use a
> Weapon of Mass Destruction.  Your offense conduct included significant
> communication, association and assistance to Jaish-e-Mohammed (JeM), a
> group which has been designated as a foreign terrorist organization.

Mr. Aref has received no further explanation of his designation to the CMU.

114.     Mr. Aref spent 22 months at the CMU at FCI Terre Haute, exhausting the

prison grievance system and trying to convince BOP officials that the allegations in his

Notice of Transfer mischaracterized his offense conduct.

115.     Mr. Aref applied for a nearer release transfer at his Team Review

meetings when he was at the Terre Haute CMU, and was told by his case manager that

she was recommending his transfer.  However, his case manager told Mr. Aref that

transfer was not up to her, but instead was a decision that would be made in Washington,

DC.

116.     Mr. Aref's hopes for a transfer were raised by this recommendation.

However, rather than receiving a transfer to general population, Mr. Aref was transferred,

once again without notice or explanation, to the CMU at USP Marion on March 27, 2009.

He has been incarcerated there ever since.

117.     Mr. Aref had a team review meeting in late 2009.  At that meeting, he

asked how he could obtain a transfer out of the CMU, and he was told that he had to wait

for 18 months to be eligible for a transfer pursuant to general BOP policy.

118.     Mr. Aref's confinement in the CMU has severely interfered with his ability to maintain a meaningful relationship with his family.

119.     Mr. Aref's confinement in the CMU, and their lack of contact, has caused his wife considerable stress and emotional harm. Until January 2010, Mr. Aref was forced to talk to his children while they were at school because phone calls were available only during school hours. The children's principal arranged for them to receive Mr. Aref's call during their lunch recess.

120.     Since his access to the phone has increased, Mr. Aref now also calls his children at home once a week. However, Mr. Aref has found that his children are too young to communicate with him in a truly meaningful and bonding way on the telephone.

121.     It is very difficult for Mr. Aref to communicate with his children via email because his family does not have internet access at home. Instead, his children must travel to a public library in order to communicate with their father by email.

122.     Because Mr. Aref uses most of his limited phone calls to speak with his children, he is only able to speak with each of his five siblings every six or seven months.

123.     The CMU's "no contact" visitation policy also means that Mr. Aref is not allowed to touch, hold, hug, or even shake hands with his young children. When his children did visit him at the CMU, Mr. Aref found the pain of being divided by a barrier and speaking to them on a telephone to be unbearable. Mr. Aref's wife is no longer willing to bring his children to the CMU for a non-contact visit because she fears it is too traumatizing to their children, and Mr. Aref agrees that the non-contact visits are very upsetting. Rather than subject himself and his young children to such restrictive and

taxing visiting conditions, Mr. Aref has foregone receiving visits from his family.  For

this reason, Mr. Aref has not received a visit from his family for almost two years.

124.    Due to the youth of Mr. Aref's younger children, his only way to

meaningfully associate with them is through physical contact.  Because that contact has

been denied pursuant to BOP policy, his relationship with them has been severely

damaged and he has been denied the opportunity to form any relationship at all with his

youngest child.  The restrictions have been extremely detrimental to the children as well.

One son has even become physically ill with a stress-related condition.  Mr. Aref is

confident that his children could and would visit him should his access to contact visits

be restored.

125.    Mr. Aref's designation to the CMU has also had a profound effect on his

psychological and emotional health.  He has experienced symptoms of anxiety and

depression and is obsessed with questions about why he has been singled out for such

restrictive confinement, and why he is perceived as dangerous.  This question eats away

at him constantly.  He also suffers from feelings of extreme guilt, sadness and self-

loathing over the impact that his confinement at the CMU is having on his wife and

children.  His limited interaction with them causes him to become deeply emotional, and

he cries frequently after speaking to them.  He fears that being cut off from his children to

such an extent will have a detrimental effect on their emotional well-being and

development.

     **b.**    **Avon Twitty (aka Abdul Ali)**

126.    Avon Twitty is an African American man and a practicing Muslim.  Prior

to his arrest on June 14, 1982, Mr. Twitty was living in Washington DC, where he

maintained a close relationship with his children. Mr. Twitty has two daughters, aged 26

and 28, and a son, aged 35. His younger daughter was born while he was imprisoned, so

he relied on visits, letters, and phone calls to develop a relationship with her.

127.   In 1984, Mr. Twitty was sentenced to a term of 20 years to life for murder

and three to ten years for carrying a pistol without a license. There was no allegation

whatsoever that Mr. Twitty's offense involved terrorism, or was motivated by extremist

religious or ideological beliefs. Mr. Twitty is due to be released in January 2011.

128.   Mr. Twitty is a DC prisoner, but has spent a portion of his time in BOP

custody pursuant to an agreement between the DC Department of Corrections and the

BOP. He has also been housed in facilities operated by the Corrections Corporation of

America.

129.   Beginning in June 2005, Mr. Twitty was housed in general population at

USP Hazelton, in Bruceton Mills, West Virginia. A Progress Report issued on April 20,

2007 indicates that Mr. Twitty was assigned to the kitchen detail, received good work

performance ratings, and was *not* considered to be a management problem. The Report

indicates that Mr. Twitty had a "good rapport" with both staff and inmates, and had clear

conduct since September 2005. The Report makes no mention whatsoever of

involvement in recruitment or radicalization of other inmates.

130.   The Report notes that Mr. Twitty's only disciplinary infractions

throughout his decades in BOP custody were for failing to stand count and interfering

with taking count on August 27, 2005. Aside from the 180-day loss of commissary and

telephone privileges associated with this minor incident, Mr. Twitty had no telephone,

mail, or visitation restrictions at USP Hazelton or any other BOP facility. Mr. Twitty has

only one other disciplinary infraction in his 26 years of imprisonment, and that was for a

minor assault in 1999. Mr. Twitty's disciplinary history is devoid of any serious

misconduct or infractions.

131.    However, prior to his designation to the CMU, Mr. Twitty was involved in

two ongoing disputes with the BOP, one about good time credits and another regarding

missing program documentation that led directly to his denial of parole in 2004.

Throughout 2005 and 2006, Mr. Twitty filed grievances and federal litigation over these

issues. The litigation was ongoing until July 2008, when his Petition was ultimately

denied.

132.    On May 30, 2007, in the midst of this advocacy on his own behalf, Mr.

Twitty was abruptly, and without notice or a hearing, transferred to the CMU at USP

Terre Haute. Shortly after arriving at the CMU at USP Terre Haute, he received a Notice

of Transfer that, by way of explanation for his transfer, states that "[r]eliable evidence

indicates your incarceration conduct has included involvement in recruitment and

radicalization of other inmates through extremist, violence oriented indoctrination

methods to intimidate or coerce others." The document does not substantiate these

allegations in any way.

133.    Mr. Twitty has scant history of disciplinary infractions in general, and no

disciplinary infractions or incidents related to recruitment or radicalization of other

inmates. Thus, he sought to discover through the prison grievance system what "reliable

evidence" existed regarding alleged recruitment and radicalization. He was told that such

information is protected by the Freedom of Information Act, and that he could seek it

through filing a FOIA request. Mr. Twitty followed these instructions, and promptly

filed a FOIA request seeking access to all documents directly or indirectly related to his

designation to the CMU.

134.    The documents that were released contained absolutely no information

regarding Mr. Twitty's alleged involvement in recruitment and radicalization.

135.    However, Mr. Twitty did learn through the FOIA that his designation was

accomplished through a May 21, 2007 referral for transfer to the CMU for "close

supervision" issued by the Warden at USP Hazelwood.  A close supervision transfer is

disciplinary in nature, and BOP policy indicates that it is to be based on a documented act

of misconduct. *See* BOP Program Statement P5100.08 Chapter 7, Page 5.   In direct

contradiction to Mr. Twitty's April 20, 2007 Progress Report one month earlier, the

referral noted that Mr. Twitty "is considered to be a management problem due to his

involvement in the recruitment and radicalization of other inmates.  He has established an

average rapport with both inmates and staff since his arrival at USP Hazelton."

136.    The transfer form also stated that Mr. Twitty received a disciplinary report

for a serious assault at USP Lewisburg but Mr. Twitty's custody classification form

incorrectly showed a score of "no history of violence." The Warden wrote that he

updated this form to reflect the assault.

137.    Mr. Twitty never received a disciplinary report for an assault at USP

Lewisburg.

138.    Upon gaining access to the transfer document, Mr. Twitty filed two

informal resolution forms.  In the first, Mr. Twitty alerted the BOP to the incorrect

information included on the referral for transfer, directing the BOP to an October 18,

1991 Progress Report, indicating that he had maintained clear conduct, and did not

receive a single incident report during his incarceration at USP Lewisburg. Mr. Twitty

asked that the BOP investigate this discrepancy, and correct his custody classification

form.

139.    In the official response, Mr. Twitty's case manager ignored the question of

how this mistake was made, and instead indicated that Mr. Twitty's history of violence

rating on his custody classification form was based not on the fabricated Lewisburg

assault, but on his conviction of assault for a fistfight in 1970, and a 1999 disciplinary

infraction in which Mr. Twitty pushed a correctional officer with an open hand.

However, neither of these incidents constitutes a serious history of violence under BOP

standards. *See* BOP Program Statement P5100.08, Chapter 6, Page 6-7. Indeed, there is

significant evidence in Mr. Twitty's records (including statements by the officer in

question) that the 1999 infraction resulted from Mr. Twitty's attempt to assist a

correctional officer during an attack by another inmate.

140.    In a second request for informal resolution, Mr. Twitty asked that, to the

extent the Lewisburg assault infraction was relied upon in labeling him a terrorist and

designating him to the CMU, the mistake be corrected and for him to be transferred out

of the CMU. Mr. Twitty's case manager once again ignored the question of the

fabricated USP Lewisburg assault, repeated that reliable evidence indicated his

involvement in recruitment and radicalization, and stated that, based on this evidence,

Mr. Twitty would remain in the CMU for a minimum of 18 months.

141.    In response to Mr. Twitty's subsequent administrative appeal of this

response to the Central Level, the BOP indicated that Mr. Twitty's designation to the

CMU was based solely on recruitment and radicalization, *not* any disciplinary report

(although one is required for the type of transfer at issue) and described the Warden's wholesale invention of the serious assault as a "typographical error."

142.    Mr. Twitty believes that his designation to the CMU was based on discriminatory notions about Muslims, and made in retaliation for his filing grievances and a lawsuit regarding his unjust loss of good time credit and the missing file that led to his parole denial.  Given his lack of any serious or communications-related disciplinary infractions, and the fact that his crime of conviction is in no way related to terrorism or communications-related offenses, there is no other plausible explanation for his transfer to the CMU.

143.    Mr. Twitty has requested a transfer from the CMU three times, and each time been summarily denied.  He has also availed himself of the administrative grievance process to request an explanation of the criteria he must meet to be transferred from the CMU.  The BOP has not responded with any criteria to earn transfer.

144.    Mr. Twitty's relationships with his children and their mothers have suffered due to the restrictions imposed upon him in the CMU.  At previous institutions, Mr. Twitty called his children frequently, sometimes placing several telephone calls in a day.  However, because his access to the telephone is so limited, he is unable to remain in touch with his children.  While he was able to receive visitors in the past, he has had no visits while at the CMU.  Mr. Twitty feels that it would be selfish and unreasonable to subject his family members to the hardship of spending hundreds of dollars to travel from Washington DC to visit him, only to communicate with him through a glass barrier and over a telephone.

145.    Mr. Twitty has also suffered from the stigma of his confinement in the
CMU.  On January 6, 2009, Mr. Twitty had a parole reconsideration hearing.  The CMU
case manager forwarded to the parole board information that Mr. Twitty was being held
in the CMU for "close supervision."  This information may have had an impact on the
decision by the parole commission to deny Mr. Twitty's request for parole.

146.    His CMU status has also had an impact on Mr. Twitty's ability to prepare
for his imminent release from prison.  BOP policy mandates prisoner participation in
release preparation programming in the months before release.  In violation of BOP
policy, no such programming is available to CMU prisoners.  Thus, Mr. Twitty will not
be able to take part in this essential means of preparing to reenter free society after two
decades in prison.

147.    Finally, CMU designation has prolonged the duration of Mr. Twitty's
confinement.  In July 2009, Mr. Twitty was approved for nine months of pre-release
placement in a Washington, DC "halfway house" by Regional Director Michael K.
Nalley.  Mr. Twitty's parole date is January 23, 2011, so he is eligible to be placed at a
halfway house in April 2010.  However, Mr. Twitty was told by staff at the CMU that the
pre-release program into which he was to be placed, Hope Village, Inc., will not accept
him for that entire period because his assignment to the CMU suggests that he is a
management problem.  Hope Village will not accept Mr. Twitty until August 2010,
meaning that he must serve an additional four months in prison.

148.    Conditions at the CMU are so restricted and isolated that Mr. Twitty
worries about making the transition to free life.  At his last two program reviews, Mr.
Twitty's unit team recommended that he "maintain and strengthen family ties through

43

written, and verbal communication, and visiting as appropriate," yet he is in a unit that places severe restrictions on these outlets.

149.    Mr. Twitty has been seriously affected by the conditions of his confinement in the CMU, and the lack of explanation for his placement. He is full of anger and frustration, and fears that he will bring these negative feelings with him into free society. He is extremely concerned that his short transition time and lack of any reentry programming will negatively affect his ability to successfully reenter free society.

c.    **Daniel McGowan**

150.    Daniel Gerard McGowan is a 35-year-old man from Queens, New York. Before his arrest in 2005, Mr. McGowan was living with his wife, Jenny Synan, in New York City. Mr. McGowan moved back to New York in 2002 after several years on the west coast specifically to be closer to his family, all of whom live in the vicinity of New York and New Jersey. Mr. McGowan maintained a very close relationship with his entire family, visiting his sisters weekly and his parents several times a month, as well as speaking to them on the phone and emailing constantly. Mr. McGowan had an especially close relationship with his young niece (now five), for whom he babysat frequently.

151.    On December 7, 2005, Mr. McGowan was arrested at his work, a non-profit organization that assists women in abusive situations with their legal needs. He pled guilty on November 9, 2006 to conspiracy and two counts of arson. On June 4, 2007 he was sentenced to seven years in prison.

152.    Mr. McGowan's charges resulted from arsons at two lumber companies in Oregon in 2001, both credited to the Earth Liberation Front (ELF). No one was injured in either action. Shortly after these arsons, Mr. McGowan distanced himself from ELF,

and disavowed involvement with the group.  Mr. McGowan has not had any involvement

with ELF since 2001, nor has he partaken in any form of property destruction since that

time.

153.    After his arrest, but prior to beginning to serve his sentence, Mr.

McGowan was released from custody on bail, and spent seven months on house-arrest,

living with his wife, his sister, his brother-in-law, and his young niece.  While on house-

arrest, Mr. McGowan was allowed to use the phone freely, and meet with friends and

family who chose to visit him.

154.    Mr. McGowan's sentencing judge recommended that he serve his time

close to his family, in Fort Dix, New Jersey.  Indeed, at sentencing the Court emphasized

the important role Mr. McGowan's loving relationship with his wife, Ms. Synan, might

play in his rehabilitation.  Mr. McGowan was classified by the BOP as low security.  His

security point level has continued to drop due to his clean institutional conduct.

155.    After spending a few weeks each at several different correctional

institutions, Mr. McGowan was transferred in September of 2007 to FCI Sandstone, a

low security prison in Minnesota.

156.    At FCI Sandstone, Mr. McGowan was placed in the general population,

and was able to spend up to 300 minutes a month on the telephone.  He frequently used

all of his telephone minutes, so that he could maintain his close relationship with his

wife, sisters, and parents.  Mr. McGowan especially enjoyed speaking with his young

niece, who was two and a half at the time, in an attempt to maintain that relationship.

157.    At FCI Sandstone, despite being far removed from his family in New

York, Mr. McGowan was also able to enjoy contact visits.  He received approximately 15

visits while there, from his wife, sisters, father, in-laws, friends, and nieces. These visits were immensely important to Mr. McGowan, allowing him to maintain his family relationships and get to know a new niece who was too young to communicate by telephone.

158.   Mr. McGowan was not placed on a telephone or mail alert list at FCI Sandstone, nor was he placed under any other communication restrictions.

159.   Mr. McGowan has not received a single incident report in his entire period of incarceration. His final program review at FCI Sandstone, prior to CMU designation, indicated clean conduct and no management problems, and resulted in a reduction of his security classification.

160.   In August 2008, Mr. McGowan was transferred to the CMU at USP Marion. He did not receive any prior written notice or explanation for this transfer. Nor was he told where he was going or why. Ten days after arriving at the CMU, Mr. McGowan was given a Notice of Transfer dated September 3, 2008, stating the following explanation for his transfer:

> Your offense conduct included acts of arson, destruction of an energy facility, attempted arson, and conspiracy to commit arson. You have been identified as a member and leader in the Earth Liberation Front (ELF) and Animal Liberation Front (ALF), groups considered domestic terrorist organizations. Your offense conduct included communicating in code and teaching others how to commit crimes of arson. Your actions had the primary purpose to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion. Your contact with persons in the community requires heightened controls and review.

161.   Much of this information is demonstrably false. Mr. McGowan was never a "leader" of ELF or ALF, and has not been a "member" of either organization for over

seven years.  He did not destroy an energy facility, nor did he teach others to commit arson.

162.   Within one week of receiving this notice, Mr. McGowan filed an Administrative Remedy Informal Request form (BP 8) at the institution, challenging his transfer to the CMU.  Mr. McGowan informed the BOP that the information included in his Notice of Transfer was inaccurate, and asked to see underlying documentation regarding the reasons for his placement in the CMU.  When no information was forthcoming, Mr. McGowan filed a BP 9 Request for Administrative Remedy, with the same requests.  Warden Hollingsworth denied the request, but stated that he could file a FOIA to gain access to the BOP records related to his placement in the CMU.  Mr. McGowan appealed this denial to the Regional Level.  The response from BOP Regional Director Nalley denied the transfer request, and indicated that the information in the notice regarding Mr. McGowan's "involvement in arson" and association with ELF and ALF came from Mr. McGowan's Pre-Sentence Investigation Report (PSR).  The response included no information as to the source for the remaining information in the notice.

163.   However, Mr. McGowan's PSR supports his claim that the information on his Notice of Transfer is false.  The PSR includes no statement that Mr. McGowan taught others to commit arson, although it does include an allegation that several other named individuals, not Mr. McGowan, trained others about arson.  Mr. McGowan's PSR indicates there is *no* evidence suggesting that he played a leadership role, in contrast to three of his co-conspirators, for whom the prosecution sought role enhancements, and/or characterized as leaders.  Finally, the PSR shows that Mr. McGowan was charged and

pled guilty to one count of "*conspiracy* to commit arson and destroy an energy facility" (emphasis added). He was not convicted of destroying an energy facility. Indeed, allegations regarding his co-defendants' involvement in targeting an energy facility pre-date Mr. McGowan's entry into the conspiracy. Mr. McGowan subsequently appealed this response to the Central Office.

164. As directed in the administrative responses, Mr. McGowan filed a FOIA request to the BOP in October of 2008, seeking "all relevant documents and information related to [his] designation and transfer to the Communications Management Unit." On February 10, 2009, he received three pages in response to this request. The documents did not include any further information regarding the reason for his designation, and indicated only that McGowan was transferred to the CMU for "program participation."

165. At his one year review of his incarceration at the CMU, in August of 2009, Mr. McGowan was informed that he would be considered for a transfer out of the CMU only after 18 to 24 months of clear conduct.

166. On February 5, 2010, at his 18 month review, Mr. McGowan requested a transfer out of the CMU. In disregard of the new process for designation from the CMU created in October 2009, Mr. McGowan's unit team failed to address the criteria listed in the CMU designation notice, but recommended a transfer nonetheless based on Mr. McGowan's clear conduct and programming. However, they explained that the decision lay not with them, but with the regional director, and they could not predict the outcome.

167. Mr. McGowan poses no danger to prison security, and, since his incarceration, has made no attempts to communicate with anyone to further illegal activity or otherwise threaten security. However, during his incarceration he has

continued to speak out about social justice issues and the rights of political prisoners and to communicate with law abiding activists involved in these movements. His designation to the CMU seems based not on any legitimate penological need, but rather in retaliation for Mr. McGowan's continued lawful communication and speech. Conditions at the CMU are designed to stifle that lawful political speech.

168.    The silencing of political speech at the CMU is not just effectuated by limiting Mr. McGowan's ability to communicate with lawful activists outside prison (through restrictions on phone calls, visits, etc), but also by limiting his ability to receive information regarding developments in progressive causes. For example, at the CMU, Mr. McGowan is consistently prohibited from receiving written material regarding lawful environmental and political prisoner advocacy. Toward this end, he is frequently banned from receiving publications like Earth First Journal and the Jericho Freedom Times, which pose no threat to prison security, and which Mr. McGowan routinely received at other BOP facilities.

169.    Mr. McGowan's incarceration in the CMU also interferes with his ability to maintain a meaningful relationship with his family. He has received four non-contact visits from his wife, Ms. Synan, but those visits took place in a cramped and dirty booth, with thick plexiglass between them. Mr. McGowan's inability to have any physical contact with his wife during the visits was isolating, painful and depressing, and has burdened their ability to maintain their relationship.

170.    Mr. McGowan's sisters and father have also visited him on several occasions, and those visits have also been negatively affected by the lack of physical contact. Visits with other family members have proved impossible. Mr. McGowan's

mother, now deceased, was ill throughout his incarceration and on a liver donor list, so she was unable to travel to Illinois to visit him. While he received visits from his young nieces at FCI Sandstone, they have been unable to visit him at the CMU because the non-contact visiting room was too small to accommodate the children and their mother, and the play area is beyond the sight range of a prisoner in the visiting booth. A larger non-contact visiting room has recently been provided, but Mr. McGowan still will not be able to see his nieces, as Mr. McGowan's sister has determined that the older child, who was able to hug and play with her uncle during contact visits at FCI Sandstone, would be scared and confused by the more restrictive conditions at the CMU.

171.    The restrictions on phone calls have also placed a severe burden on Mr. McGowan's ability to maintain family connections. In the past, Mr. McGowan used his weekly phone call to speak to his wife, in an attempt to maintain that central relationship. Because of this choice, his relationship with other family members suffered. Mr. McGowan, for example, had no way to meaningfully communicate with his young nieces, as they are too young for written communication. Moreover, even with using his one call each week to speak to his wife, that relationship too has suffered, as both Mr. McGowan and his wife are unable to keep each other informed of the day-to-day experiences in their lives in such a short period of time.

172.    Since calls were increased to two per week, Mr. McGowan has attempted to reestablish contact with family members and friends. His sisters, nieces, and father gather together once every other week to receive his call. While his elder niece is able to communicate somewhat over the telephone, his youngest niece is unable to do so. Mr.

McGowan has found that his attempt to meaningfully reconnect with family and friends is exceedingly difficult given the 15-minute time limit on his telephone calls.

173.    In July of 2008, en route to the CMU, Mr. McGowan was subpoenaed to appear before a grand jury. He did not testify, and was held in contempt. Mr. McGowan was transferred to the CMU after indictments issued from that grand jury. In October of 2008 he was again subpoenaed, this time as a witness in the trial, and confined in MCC Chicago and Columbia County Jail. At both places, he was placed in general population, and received unrestricted access to phone calls and visits. At MCC Chicago, where Mr. McGowan spent only nine days, he was so relieved to again have access to his family members he used almost 400 telephone minutes talking to his wife, family, and friends, attempting to repair some of the damage done to his relationships during his previous time in the CMU.

174.    The isolation and complete lack of physical contact has also proved detrimental to Mr. McGowan's mental, emotional and physical health. Since his confinement in the CMU, he has experienced symptoms of anxiety and depression, included increased heart-rate, obsessive thoughts, impatience, and feelings of isolation, pessimism, and being trapped. He feels confused when interacting with individuals outside the CMU and worries that he places unnecessary emphasis on minor annoyances, and angers more quickly than in the past. He has also suffered disruptions in his sleep, such as waking up frequently and grinding his teeth.

**d.    Jenny Synan**

175.    Plaintiff Jenny Synan lives in New York City, and works as Director of Technology for a non-profit arts organization. She has been married to Plaintiff Daniel

McGowan for over three years. Ms. Synan and Mr. McGowan met in New York City in 2002.

176.    Ms. Synan has made substantial efforts to maintain her relationship with Mr. McGowan since his incarceration. At FCI Sandstone, where Mr. McGowan had unrestricted phone access, the couple spoke nightly on the phone, and for lengthy periods each weekend. By speaking so regularly, they were able to keep each other up-to-date on the minutia of their lives, thus maintaining the closeness of their relationship.

177.    At the CMU, the restrictions on phone access make regular communication impossible. The two speak once or twice a week, for fifteen minutes. Prior to January 3, 2010, the calls had to happen during work hours, so Ms. Synan would leave her desk, and go into an empty conference room. Several times, she had to leave meetings or otherwise interrupt her work responsibilities to accept Mr. McGowan's call. The short duration of the call makes deep communication impossible. By the time the two have warmed up, the call is almost over.

178.    Despite feeling frustrated and unfulfilled by the short duration of each call, Ms. Synan experiences significant anxiety about the possibility of missing Mr. McGowan's call. She constantly worries about unlikely events like being stuck in an elevator, or losing her cell phone, such that she would miss her one chance to speak to her husband that week.

179.    While Ms. Synan is able to email Mr. McGowan regularly, it is no substitute for live communication. For example, when Mr. McGowan's mother died in December of 2009, Mr. McGowan and Ms. Synan had already had their one phone call of the week, so Ms. Synan had to tell Mr. McGowan over email that his mother had passed

away. Ms. Synan was distressed at having to convey this information over email, and over her inability to subsequently comfort her husband through live conversation.

180.    While incarceration itself has been a burden on their relationship, Ms. Synan relied heavily on frequent phone calls and contact visits to maintain their relationship. The visits were especially important. While at FCI Sandstone, Ms. Synan regularly visited Mr. McGowan for three days at a time, spending eight hours each day at the facility. During the visits, Ms. Synan was able to embrace Mr. McGowan upon greeting and goodbye, and hold his hand throughout. They played cards, shared food, joked, and laughed. The normalcy of their environment and interactions, along with the ability to touch each other, played an essential role in the maintenance of their relationship.

181.    The infrequent, short, non-contact visits at the CMU do not allow for the couple to maintain their marital relationship in the same manner. Ms. Synan visits Mr. McGowan as much as is allowed, regularly spending $600 per trip to fly to Illinois, and spend two days in a row visiting Mr. McGowan for four hours each day in a small booth, through plexiglass. They cannot touch, embrace, share food or play cards. The lack of contact, along with the stark and uncomfortable conditions in the visiting booth, leaves Ms. Synan feeling unfulfilled at the end of the visit. She leaves the prison feeling as though the whole visit barely happened, and depressed that she will now have to wait months to see her husband again. Ms. Synan has calculated that, over the past year, she has seen her husband only 20 hours, less than one full day.

182.    These restrictions, which serve no penological purpose, have significantly impaired Ms. Synan's ability to maintain her relationship with Mr. McGowan, and have severely strained that relationship.

**e.    Royal Jones**

183.    Before his arrest in 2006, Plaintiff Royal Jones was living in Great Falls, Montana, and working at a hospice graveyard. At that time, Mr. Jones maintained a close relationship with his three daughters, now ages 19, 20, and 24, and his two sons, ages 16 and 18. He also has five grandchildren, ranging in age from several months to three years old. Three of Mr. Jones's grandchildren were born after his transfer to the CMU at USP Marion, thus he has never met them.

184.    Mr. Jones was convicted in Helena, Montana of solicitation of bank robbery and a probation violation stemming from a 1995 charge of gun possession. He was sentenced to a total of 94 months in prison. His conviction involved no allegations of terrorism, nor did it involve allegations of extremist religious or ideological motives. Mr. Jones has been in the custody of BOP for the entire duration of his sentence. He is due to be released pursuant to good time conduct on May 13, 2013.

185.    After his sentencing in 2007, Mr. Jones was placed in general population at FCI Englewood in Littleton, Colorado, where, like all other inmates, he received up to 300 minutes on the telephone per month. Mr. Jones frequently used the telephone to stay in touch with his family, including his sister, his mother, and his five children. At Englewood, there were no restrictions on his ability to receive contact visits. In February 2008, Mr. Jones was moved to the SHU in Englewood without explanation, and his access to the phones was limited.

186.    While an inmate at FCI Englewood, Mr. Jones had no serious disciplinary infractions, and absolutely no infractions involving visitation or his use of the telephone or the mail. Mr. Jones did have one minor communications related infraction during his first incarceration: in 1997 he called a family member and asked them to make a three-way call to the parents of a fellow prisoner. Mr. Jones was placed on a 90-day phone restriction as punishment for that infraction.

187.    Mr. Jones has always been a productive inmate, earning Certificates of Completion in various areas, including word processing, drug education, radiological emergency management, and obtaining a commercial driver's license.

188.    Mr. Jones is a practicing Muslim, and played an active leadership role in the Muslim community at previous federal facilities. He is also an outspoken and litigious prisoner. He has written several books, and has repeatedly attempted to correspond with various politicians and other public figures regarding unfair treatment in prison. While at FCI Englewood, staff at that facility threatened Mr. Jones that he would be "sent east" if he continued to file complaints. Mr. Jones filed a complaint about being subjected to this threat, and continued to advocate on his own behalf.

189.    On June 6, 2008, Mr. Jones was abruptly, and without notice or a hearing, transferred to the CMU at USP Marion. Shortly after arriving at the CMU he received a Notice of Transfer, dated June 17, 2008, that, by way of explanation for his transfer, states:

> Your current offense of conviction is solicitation to commit a crime of
> violence. Reliable evidence indicates your crimes and incarceration
> conduct have included involvement in recruitment and radicalization
> efforts, including other inmates, through extremist, violence oriented
> indoctrination methods to intimidate or coerce others.

Mr. Jones has received no further explanation of his designation to the CMU.  Responses

to the various administrative remedies that Mr. Jones has filed have indicated only that

his designation to the CMU is "not punitive in nature," and that there is "no requirement

to afford [him] the opportunity" to challenge his placement in the CMU at a hearing.

190.    A referral for Mr. Jones's transfer to the CMU, dated May 1, 2008, was

issued by Warden Blake R. Davis at FCI Englewood.  The referral indicates that Mr.

Jones "has not presented any management problems."  However, the referral goes on to

note that "[r]eliable evidence indicates his crimes and incarceration conduct has included

involvement in recruitment and radicalization efforts of other inmates through extremist,

violence oriented indoctrination methods to intimidate or coerce others."  The document

does not substantiate these allegations in any way, and Mr. Jones has been unable to

contest any of these allegations or discover their basis.  The referral concludes: "the

inmate need not concur with the transfer request nor should the inmate be consulted or

notified of the transfer application."

191.    Like Mr. McGowan (but unlike Mr. Twitty) Mr. Jones' transfer was

classified as a code 324 transfer for "program participation."  However, BOP policy

explicitly restricts program transfers to those intended to facilitate participation in four

specific national programs, including (a) Residential Drug Treatment; (b) the Life

Connections Program; (c) Special Management Unit; and (d) Sex Offender Programs.

*See* BOP Program Statement 5100.08 Chapter 7, Page 7.

192.    En route to the CMU at USP Marion from FCI Englewood, Mr. Jones was

briefly housed at FTC Oklahoma.  Holdover Unit Team documents generated at FTC

Oklahoma state: "Violation or Reason: Terrorist."  The document does not substantiate or

explain this allegation in any way, and Mr. Jones has been unable to contest this allegation or discover its basis.

193.   In response to Mr. Jones' attempts to discover the reason for his placement in the CMU through the administrative remedy process, he was told only that he could file a FOIA request.

194.   Mr. Jones followed these instructions, and filed a FOIA request seeking documents related to his placement in the CMU. The BOP responded to this request by indicating that the records Mr. Jones sought would cost $5,131.00 to disclose, and that Mr. Jones' indigence does not qualify him for a FOIA fee waiver. Mr. Jones could not afford the fee, and thus did not receive access to any documents responsive to his request.

195.   In December of 2008, Mr. Jones filed a *pro se* complaint in the Federal District Court for the Southern District of Illinois, raising many claims similar to those raised in the instant complaint. *See Jones v. Mukasey*, No. 08-881 (WDS). Mr. Jones voluntarily dismissed that action in August of 2009, after being told by CMU staff that he needed to drop his complaint because it had "upset the big shots" and that things were going to get bad for him. Mr. Jones was promised that if he withdrew his *pro se* action, he would be transferred to FCI Herlong, were he could see his children and grandchildren.

196.   Several months later, Mr. Jones became the first CMU prisoner Plaintiffs are aware of to be transferred from the CMU to a normal general population unit. Mr. Jones was moved to the main compound at Marion in early March 2010, and is no longer subject to the communications restrictions described in this case. He was given no written or verbal explanation for the transfer, but was told that if he misbehaved or

engaged in the conduct that led to his CMU designation, he would be immediately transferred back to the CMU.  CMU staff further informed Mr. Jones that, after six months of clear conduct on the compound, he would be eligible for a transfer from Marion to a prison, like FCI Herlong, that is closer to his family.  Because Mr. Jones does not know what conduct resulted in his transfer to the CMU, he does not know how to avoid being sent back.

197.    While Mr. Jones did request a nearer release transfer at his last team review based on 18 months of clear conduct and successful programming, Plaintiffs believe his transfer was based not on that discretionary process, but rather in exchange for withdrawing his *pro se* complaint.  Upon transfer, Mr. Jones was warned by CMU staff once more to cease complaining about the CMU.  He has disregarded that instruction by filing this lawsuit, and faces re-designation to the CMU.

**f.    Kifah Jayyousi**

198.    Kifah Jayyousi is a 48-year-old man from Detroit, Michigan.  He is a United States citizen of Jordanian descent.  Mr. Jayyousi is married and has three daughters, ages 12, 14, and 18, and twin sons age 23.  Prior to his arrest and incarceration, Mr. Jayyousi maintained a close and loving relationship with his wife and their five children.

199.    From 1999 to 2001, Mr. Jayyousi served as the Chief Facilities Director of the Washington, DC public school system.  In April 2001, he and his family relocated to Detroit, where Mr. Jayyousi served as an adjunct professor at the College of Engineering at Wayne State University, teaching classes in the Civil and Environmental Engineering Department.

200.    In September 2003, Mr. Jayyousi took a sabbatical from his teaching job and relocated to Doha, Qatar, for a contract engineering job. His wife and their daughters accompanied him to Doha, while his sons enrolled in college in Detroit.

201.    In March 2005, Mr. Jayyousi returned to Detroit to visit his father, who was scheduled to have open-heart surgery.

202.    Mr. Jayyousi had been subject to an ongoing investigation into his involvement with the Global Relief Foundation and had been interviewed by the FBI on numerous occasions. Before he left for his job in Doha, Jayyousi contacted federal authorities, reported his plans, and offered to meet with government representatives. Federal officials then searched Jayyousi's home before returning his passport to him.

203.    When Mr. Jayyousi returned to Detroit in March 2005, he was arrested at the airport and charged with providing material support to terrorists, mostly through charitable donations.

204.    U.S. District Judge Marcia Cooke granted bail to Mr. Jayyousi on January 5, 2006.

205.    In August 2007, Mr. Jayyousi was convicted in Federal District Court in Miami of conspiracy to murder, kidnap and maim in a foreign country and conspiracy to provide material support to terrorism. On January 22, 2008, he was sentenced to 12 years, eight months imprisonment, and the court recommended that he be housed at FCI Milan in Michigan, so that he could be near his family.

206.    At sentencing, Judge Marcia G. Cooke noted on the record that there was no evidence linking Mr. Jayyousi to specific acts of violence anywhere. The Court also pointed out that Mr. Jayyousi has honorably served in the United States Navy; was highly

educated and "exhibited excellent competence level in all of his employment;" was a

devout Muslim who was "willing to discuss religion with others without conflict" and

"celebrated the peace efforts in the Middle East." The Court further noted that Mr.

Jayyousi "provided assistance to people in his mosque and in the Muslim community"

and "is the kind of neighbor that people would want in a community, and many wrote

letters of support."

207.    The Court also stated: "Raised in a refugee camp, [Mr. Jayyousi] saw

firsthand how the sufferers of armed conflict affected communities. When he heard of

the armed conflict in the Middle East, Africa and Eastern Europe, he provided financial

and other resources to assist those abroad. There is no evidence that Mr. Jayyousi

continued his involvement in the instant offense after 1998 . . . and there are no intercepts

of Mr. Jayyousi. He totally withdrew from the instant conspiracy in this case."

208.    After sentencing, Mr. Jayyousi was incarcerated at FDC Miami and

detained in the Special Housing Unit (SHU). Though initially denied them because of his

confinement in SHU, he was eventually allowed contact visits in the regular visiting area

of the facility. He received no communications-related disciplinary infractions while

incarcerated at FDC Miami.

209.    Indeed, Mr. Jayyousi has received only two disciplinary infractions during

his entire period of incarceration. One, which was issued at the CMU, was dismissed

after he grieved it, and was unrelated to communications. The other, which dates from

his incarceration at FDC Miami, was issued after Mr. Jayyousi pressed the call button in

his cell because he was scheduled to speak to his wife following their daughter's surgery,

but had not been fetched from his cell in time to make that call. Mr. Jayyousi was issued

an infraction for tampering with a mechanical device as a result of this incident – which is classified as a moderate category offense. However, when Mr. Jayyousi was shown a copy of his records at the CMU, the record related to this infraction had been modified, elevating the offense to interfering with a security device – which is classified as a high category offense. Despite the fact that all high category offense charges must be submitted to a Disciplinary Hearing Officer (DHO) for a hearing, the incident was never submitted to a DHO, and Mr. Jayyousi was never punished for the infraction. Mr. Jayyousi is currently challenging the modification of this infraction.

210.   Mr. Jayyousi is a low-security prisoner, and his Custody Classification Form, dated December 14, 2009, indicates that he is being considered for a decrease in security level.

211.   On or around April 30, 2008, Mr. Jayyousi learned that he was to be transferred to the CMU at Terre Haute. On May 5, 2008, his attorney filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida in an effort to enjoin Mr. Jayyousi's transfer. The court denied Mr. Jayyousi's motion for a preliminary injunction on June 11, 2008.

212.   In June 2008, Mr. Jayyousi was transferred to the CMU at Terre Haute. He did not receive any prior written notice or explanation for this transfer. On June 18, 2008, upon arriving at the CMU, he was given a "Notice to Inmate of Transfer to Communications Management Unit." The notice stated the following explanation for Mr. Jayyousi's transfer:

> Your current offenses of conviction are for Conspiracy to Commit Murder
> in a Foreign Country; Conspiracy to Kidnap, Maim, and Torture; and
> Providing Material Support to a Terrorist Organization. You acted in a
> criminal conspiracy to raise money to support mujahideen [sic] operations

and used religious training to recruit other individuals in furtherance of criminal acts in this country as well as many countries abroad. Your offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization.

213.    Mr. Jayyousi immediately informed the Unit Team at the CMU that the information included in the Notice of Transfer was inaccurate and erroneous, and consisted largely of allegations that were made but not proven at trial. He requested administrative remedy forms so that he could correct this erroneous information and discover more information about the basis for his transfer to the CMU. Despite these efforts, Mr. Jayyousi has been given no information about why he was sent to the CMU, and his grievances have been summarily rejected.

214.    Mr. Jayyousi participated in a program review in December 2009. The review was identical to those he attended prior to the BOP's announcement of new process regarding CMU designation. It was clear to Mr. Jayyousi that the Unit Team had not and did not plan to engage in any independent analysis of the suitability of Mr. Jayyousi's continued designation to the CMU. He was told that the authority for transfer out of the CMU resides in Washington, DC. Mr. Jayyousi requested re-designation anyway, and the Unit Manager told him that, based on his offense conduct, he will serve the rest of his sentence at the CMU.

215.    Mr. Jayyousi told his counselor that he would request a transfer to a facility closer to his home. The written request he subsequently made was rejected by the Unit Manager and the Warden.

216.    Mr. Jayyousi has found the restrictions placed on his visitation and telephone access to be extremely painful and onerous. Mr. Jayyousi has struggled to

maintain a close relationship with his wife and children since his confinement in the CMU. His family drive from Detroit to visit him approximately every three months, but the lack of contact visits is very difficult on all of them. Mr. Jayyousi misses being able to hug his wife and children and has not done so since he was at FDC Miami in June 2007, where he had access to contact visits. The lack of physical contact with his family for such a long period of time has been painful. His two elderly parents, who live in Detroit, have not visited him due to the non-contact policy.

217.   Because Mr. Jayyousi expects to be confined in the CMU for the duration of his sentence, his teenaged children will be fully grown adults when he is next able to hug, embrace, or hold them.

218.   Moreover, the telephone restrictions have made it very hard for the family to stay in regular touch. When Mr. Jayyousi was only able to make one call a week, he called his wife and children and his elderly parents on alternate weeks. However, Mr. Jayyousi found it hard to have a meaningful conversation in 15 minutes, particularly when attempting to communicate with his wife and five children within the confines of a single call every other week. Since the policy has changed, Mr. Jayyousi has used his one extra call a week to speak to his wife and children. However, even on the weeks when he can call them twice, the combined time of 30 minutes is not enough to have meaningful conversation with his wife and five children.

219.   The timing restrictions on calls have also been very difficult to navigate. Because calls were only available during school and work hours, Mr. Jayyousi's wife had to take the children out of school, meet up with their working sons outside the school, and receive his call in the parking lot. Under these conditions, it was extremely difficult for

Mr. Jayyousi to engage in anything but the most fleeting and cursory of conversations with his family.

220.    Designation to the CMU has caused Mr. Jayyousi significant psychological and emotional harm. Besides the damage done to his relationships, he feels tense all the time, is unable to sleep several nights a week, has trouble concentrating, and his hands frequently shake, among other symptoms of anxiety and depression.

**g.    Hedaya Jayyousi**

221.    Hedaya Jayyousi lives in Detroit, Michigan, where she works part-time as a substitute teacher in the Dearborn public school system. Ms. Jayyousi was raised in Saudi Arabia, and married Kifah Jayyousi there on April 5, 1983. Ms. Jayyousi moved to the United States to join Mr. Jayyousi in California a year later, after completing her undergraduate degree in economics.

222.    After settling down in San Diego, Ms. Jayyousi and her husband had three children: twin boys, who were born in April 1986, and a daughter who was born in October 1991. The Jayyousi family then moved to Irvine, where Mr. and Ms. Jayyousi's two youngest daughters were born in November 1995 and May 1997, respectively.

223.    Ms. Jayyousi was in Qatar when she learned of her husband's arrest. She and her daughters returned to the United States. By the time she returned, Mr. Jayyousi had been transferred to Miami, where his trial was to be held. Ms. Jayyousi and her three daughters moved to Fort Lauderdale to be near Mr. Jayyousi.

224.    At FCI Miami, Mr. Jayyousi was held in a Special Housing Unit. SHU policy forbade contact visits, and children were not allowed in the non-contact visitation

room, but the prison made special arrangements to allow Mr. Jayyousi's daughters weekly contact visits with their father. In January 2006, Mr. Jayyousi was released from jail, and placed on house arrest. Before and during his trial, Ms. Jayyousi and her daughters lived with Mr. Jayyousi in a rented apartment in Florida.

225.    In August 2007, Mr. Jayyousi was convicted. Ms. Jayyousi and her daughters moved back to Detroit to be near her sons, and to wait for Mr. Jayyousi's designation to an FCI. Over the nine months he remained at FDC Miami, the family visited Mr. Jayyousi every couple of months, and enjoyed regular contact visits. During these visits, the family was able to sit with Mr. Jayyousi at a table in a large visiting room, hug him when they arrived, hold his hand, and share food with him.

226.    In May 2007, Ms. Jayyousi heard from her husband that he had been transferred to the CMU at Terre Haute. She and her five children visited him a month later, and have visited him there six or seven times since then. Ms. Jayyousi describes their visits as torturous for her children. The family is separated by a glass window and must take turns communicating over a telephone. The visiting room is tiny, cramped and poorly ventilated, and there are no vending machines available. If one of the children has to use the bathroom during a visit, Ms. Jayyousi is forced to urge them to hold off so the visit is not shortened.

227.    More than anything, the lack of physical contact is devastating to the younger children. At the end of their first visit, Ms. Jayyousi's youngest daughter, then ten years old, screamed that she wanted to hug her father, and began to cry uncontrollably. Ms. Jayyousi tried to calm her daughter down, hugging her and saying that it was the same as her father doing so. Her daughter pushed her away and screamed

for her father, who began crying as well as he was forced to watch his family's pain and was unable to comfort them.

228.    The lack of contact is heartbreaking for Ms. Jayyousi as well, but she struggles to prevent herself from crying at the visits so as not to upset her daughters.

229.    Efforts to stay in touch with Mr. Jayyousi using the telephone are similarly difficult and upsetting because calls are so brief. The Jayyousi's sons alternate giving up their portion of the calls so that their younger sisters have more time to talk to their father. Ms. Jayyousi, one son, and her three daughters split up the 15 minute calls, so that they each have three minutes. The time limit makes meaningful conversation impossible. Ms. Jayyousi usually limits her conversation with her husband so that her three daughters can speak to their father for slightly more time. The girls frequently cry and argue over whose turn it is to talk to their father and how much time they each get. The entire family is left upset and distressed by the calls. Ms. Jayyousi is pained by seeing her daughters fight and cry over getting to talk to their father for a few minutes apiece.

230.    Now that calls can be made in evening hours, the family is able to speak to their father at home. However, before January 2010, because calls had to occur during school hours, Ms. Jayyousi would go to the girls' school, remove them from class, and wait for Mr. Jayyousi's call in the car. Ms. Jayyousi then moved to an apartment nearer the school so that her daughters could come home in the middle of the school day in order to talk to their father.

231.    Ms. Jayyousi's own relationship with her husband has been burdened by these communication restrictions and Ms. Jayyousi has experienced substantial anxiety as a result. However, Ms. Jayyousi feels that she must bear these hardships, and worries

more about her children's well-being.  Ms. Jayyousi reports that her daughters are sad

and distressed much of the time and show symptoms of stress.  One talks frequently in

her sleep, mentioning her father constantly.  One of her sons is depressed, has dropped

out of college, and is uncommunicative.  He refuses to communicate with his father over

email because it is too painful.  Her other son is angry and frustrated by the situation and

has refused to visit his father because of the painful and arduous nature of non-contact

visits.

232.    These communication restrictions, which serve no penological purpose,

have significantly impaired Ms. Jayyousi's and her children's relationships with Mr.

Jayyousi, and have caused them emotional and psychological injury.

**V.      Lack of Rulemaking Procedures**

233.    The BOP publishes three levels of rules and policy statements: (1) at the

highest level, substantive regulations promulgated through notice and comment

rulemaking and codified in the Code of Federal Regulations; (2) at the intermediate level,

national Program Statements, issued without notice and comment rulemaking, which

reproduce the rules contained in the Code of Federal Regulations and provide additional

interpretation and commentary regarding national policies; and (3) at the lowest level,

Institution Supplements, also issued without notice and comment rulemaking, which

apply the policies contained in Program Statements to single facilities.

234.    In this case, BOP evaded public scrutiny by issuing substantive rules,

which require full notice and comment rulemaking, via Institution Supplements.  This

violates the APA.

### a.    Initial Effort at Rulemaking and its Abandonment

235.    Prior to issuing the Terre Haute CMU Institution Supplement, and then subsequently issuing the Marion CMU Institution Supplement, BOP began a notice and comment proceeding for a similar rule, also aimed at restricting the communications of inmates charged or convicted of terrorist offenses. *Limited Communication for Terrorist Inmates*, 71 Fed. Reg. 16520 (Apr. 3, 2006) ("Notice of Proposed Rule").

236.    Just as the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement severely restricts communications and visitation, the proposed rule would have severely restricted non-legal telephone calls and visitation. *See* 71 Fed. Reg. at 16524 (Proposed 28 C.F.R. §§ 540.203(a), 540.204(a)(1) (limiting inmates to one 15-minute telephone call to immediate family members per month, and one visit of one hour by immediate family members per month, but allowing contact visits "at the discretion of the Warden.")).

237.    On June 2, 2006, comments on the proposed rule were filed by 18 civil rights and civil liberties groups, including the American Civil Liberties Union, the Center for National Security Studies, the Legal Aid Society, and the National Lawyers Guild. The comments advised that the regulation should be withdrawn, and stated that the proposed regulation "is poorly conceived, almost certainly unconstitutional, and entirely unnecessary."

238.    BOP abandoned this rulemaking following the submission of comments. BOP has not taken final action on the Notice of Proposed Rule or finalized the proposed rule since.

239.    Less than six months after comments criticizing the original proposed rule were submitted, on November 30, 2006, BOP simply issued the Terre Haute CMU Institution Supplement without notice and comment proceedings.  Approximately fifteen months later, BOP then established another CMU at USP Marion.

### b.    Failure to Comply with the APA

#### 1.    The APA's Notice and Comment Requirement

240.    The Terre Haute and Marion CMU Institution Supplements contain rules as defined by the APA – i.e., agency statements of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.  *See* 5 U.S.C. § 551(4).

241.    None of the circumstances that excuse notice and comment rulemaking apply here, in that the rules contained in both Institution Supplements do not involve a military or foreign affairs function of the United States or a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.  *See* 5 U.S.C. § 553(a)(1)-(2).

242.    Nor are the Institution Supplements interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.  *See* 5 U.S.C. § 553(b)(3)(A).

243.    Finally, neither Institution Supplement contains a finding that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.  *See* 5 U.S.C. § 553(b)(3)(B).

### 2. Lack of Notice of Proposed Rulemaking

244. Prior to issuing the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement, and establishing those facilities, the BOP did not publish the general notice of proposed rulemaking in the Federal Register. *See* 5 U.S.C. § 553(b).

245. Nor did the BOP publish in the Federal Register: (1) a statement of the time, place, and nature of public rule making proceedings related to the establishment of CMUs; (2) reference to the legal authority under which a rule regarding CMUs was proposed; or (3) either the terms or substance of a proposed rule regarding CMUs or a description of the subjects and issues involved. *See* 5 U.S.C. § 553(b)(1)-(3).

246. The BOP did not name, personally serve, or otherwise give notice to all persons subject to the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement. *See* 5 U.S.C. § 553(b).

### 3. Failure to Request and Consider Public Comments

247. Prior to issuing the CMU Institution Supplements and establishing those facilities, the BOP did not give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments, with or without opportunity for oral presentation. *See* 5 U.S.C. § 553(c). Nor did the BOP consider such relevant information. *See* 5 U.S.C. § 553(c).

### 4. Failure to Publish a Final Rule

248. The BOP did not publish either Institution Supplement 30 days before its effective date, or at any time thereafter. *See* 5 U.S.C. §§ 552(a)(1), 553(d).

249.     None of the exceptions to the publication for a final rule requirement

apply in that: (1) neither Institution Supplement granted or recognized an exemption or

relieved a restriction; (2) both contained substantive rules, and contained neither

interpretative rules nor statements of policy; and (3) neither contained a finding of good

cause that would exempt the documents from publication in the Federal Register. *See* 5

U.S.C. § 553(d)(1)-(3).

## VI.     Exhaustion

250.     Plaintiffs have exhausted their administrative remedies.

**FIRST CAUSE OF ACTION**
**(Fifth Amendment: Procedural Due Process)**

251.     Plaintiffs incorporate by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

252.     Plaintiffs bring this claim against all individual Defendants.

253.     By transferring Plaintiffs to the CMU without notice, a hearing, the ability

to present evidence to contest that transfer, regular review of their ongoing placement in

the CMU, notice of the projected duration of their confinement in the CMU, and notice of

any criteria for release, Defendants, acting under color of law and their authority as

federal officers, are intentionally or recklessly subjecting Plaintiffs to an atypical and

significant hardship, and depriving Plaintiffs of liberty without due process of law and

without legitimate penological purpose, in violation of the Fifth Amendment to the

United States Constitution.

254.     Plaintiffs have no effective means of enforcing their Fifth Amendment due

process rights other than by seeking declaratory and injunctive relief from the Court.

255.    As a result of Defendants' unlawful conduct, Plaintiffs are suffering

emotional distress, psychological injury, and destruction of family ties.

## SECOND CAUSE OF ACTION
### (Fifth Amendment: Substantive Due Process)

256.    Plaintiffs and Family Plaintiffs incorporate by reference each and every

allegation contained in the preceding paragraphs as if set forth fully herein.

257.    Plaintiffs and Family Plaintiffs bring this claim against all individual

Defendants.

258.    By unreasonably and excessively restricting all Plaintiffs' access to visits

and to telephone calls, and imposing arbitrary and unjustified rules regarding the

scheduling of such communication, Defendants, acting under color of law and their

authority as federal officers, are intentionally or recklessly interfering with all Plaintiffs'

interests in family integrity without legitimate penological purpose, in violation of the

Fifth Amendment to the United States Constitution.

259.    Plaintiffs and Family Plaintiffs have no adequate remedy at law or other

effective means of enforcing their Fifth Amendment due process rights other than by

seeking declaratory and injunctive relief from the Court.

260.    As a result of Defendants' unlawful conduct, all Plaintiffs are suffering

psychological injury, emotional distress, and destruction of their familial relationships.

## THIRD CAUSE OF ACTION
### (First Amendment: Free Association)

261.    Plaintiffs and Family Plaintiffs incorporate by reference each and every

allegation contained in the preceding paragraphs as if set forth fully herein.

262.    Plaintiffs and Family Plaintiffs bring this claim against all individual
Defendants.

263.    In subjecting all Plaintiffs to unreasonably and excessively restricted
access to visits and to telephone calls with family members, and imposing arbitrary and
unjustified rules regarding the scheduling of such communication, Defendants, without
legitimate penological purpose, and acting under color of law and their authority as
federal officers, are intentionally or recklessly interfering with all Plaintiffs' right to free
speech and association in violation of the First Amendment to the United States
Constitution.

264.    Plaintiffs and Family Plaintiffs have no adequate remedy at law or other
effective means of enforcing their First Amendment free association rights other than by
seeking declaratory and injunctive relief from the Court.

265.    As a result of Defendants' unlawful conduct, all Plaintiffs are suffering
psychological injury, emotional distress, and destruction of their familial relationships.

### FOURTH CAUSE OF ACTION
**(Eighth Amendment: Cruel and Unusual Punishment)**

266.    Plaintiffs incorporate by reference each and every allegation contained in
the preceding paragraphs as if set forth fully herein.

267.    Plaintiffs bring this claim against all individual Defendants.

268.    By willfully and maliciously subjecting Plaintiffs to excessive, cruel,
inhuman, and degrading conditions of confinement, including prolonged and complete
denial of any opportunity for physical contact with their loved ones, excessive restriction
of other means of communication with family members; and extended detention in a unit
segregated from other inmates, without legitimate penological purpose, Defendants,

acting under color of law and their authority as federal officers, are denying Plaintiffs the minimal civilized measure of life's necessities, and subjecting Plaintiffs to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

269.    Plaintiffs have no adequate remedy at law or other effective means of enforcing their Eighth Amendment rights other than by seeking declaratory and injunctive relief from the Court.

270.    As a result of Defendants' unlawful conduct, Plaintiffs are suffering psychological injury, emotional distress, and destruction of their familial relationships.

### FIFTH CAUSE OF ACTION
### (First & Fifth Amendment: Equal Protection, Retaliation)

271.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

272.    Plaintiffs bring this claim against all individual Defendants.

273.    By creating and maintaining a policy whereby individuals are designated to the CMU without procedural protections, and by failing to effectively oversee implementation of that policy, Defendants have allowed for and encouraged the development of a pattern and practice throughout the BOP of designating individuals, including Plaintiffs, to the CMU in retaliation for their protected political and religious speech and beliefs, or based on their religion, national origin, and perceived political and/or ideological beliefs.  In this way, Defendants, acting under color of law and their authority as federal officers, are violating Plaintiffs' rights to freedom of speech and religion, and equal protection of the law under the First and Fifth Amendments to the United States Constitution.

274.    Plaintiffs have no effective means of enforcing these rights other than by seeking declaratory and injunctive relief from the Court.

275.    As a result of Defendants' unlawful conduct, Plaintiffs are suffering psychological injury, emotional distress, and destruction of their familial relationships

## SIXTH CAUSE OF ACTION
### (Administrative Procedures Act)

276.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

277.    Plaintiffs bring this claim against Defendant BOP.

278.    The issuance of the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement, and the creation of the Terre Haute CMU and Marion CMU, constitute final agency action under the APA.

279.    The Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement contain substantive rules that require notice and comment rulemaking under 5 U.S.C. § 553, and publication in the Federal Register under 5 U.S.C. §§ 553 and 552(a).

280.    The provisions contained in the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement are wholly inconsistent with existing regulations regarding control units, administrative detention, disciplinary segregation, and weekend visitation, confirming their status as new provisions and substantive rules that require notice and comment rulemaking.

281.    The BOP had the authority to engage in notice and comment rulemaking under 5 U.S.C. § 553 and to publish final rules in the Federal Register under 5 U.S.C. § 553 and 552(a).  Defendant BOP failed to do either.

282.    Plaintiffs have no effective means, or adequate remedy at law, of

enforcing provisions of the APA other than by seeking declaratory and injunctive relief

from the Court.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request the Court:

a.      Declare that Defendants' actions violate Plaintiffs' First, Fifth and Eighth

        Amendment rights, and the Administrative Procedures Act; and

b.      Order Defendants to transfer each Plaintiff from the CMU to the general

        population at a federal prison appropriate for each Plaintiffs' security

        classification *or* provide each Plaintiff with due process to ensure their

        designation to the CMU was appropriate and devoid of discriminatory animus;

        and

c.      Order Defendants to award Plaintiffs the same opportunities for communication

        as all other general population prisoners in the BOP, i.e. 300 phone minutes a

        month, and contact visitation pursuant to the rules of the facility to which they are

        designated; and

d.      Award Plaintiffs attorney's fees and costs; and

e.      Order such other relief as this Court deems just and proper.

Dated: New York, New York
       March 29, 2010

Respectfully submitted,

Shayana D. Kadidal (D.C. Bar No. 454248)
Alexis Agathocleous
Rachel Meeropol

CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Tel: (212) 614-6438
Fax: (212) 614-6499
kadidal@ccrjustice.org

*Attorneys for Plaintiffs*