| | | | |
|---|---|---|---|
| YASSIN MUHIDDIN AREF *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 10-0539 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: 9, 19, 29 | |
| | : | | |
| ERIC HOLDER *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS;
GRANTING THE DEFENDANTS' SUPPLEMENTAL MOTION FOR PARTIAL DISMISSAL;
DENYING THE APPLICANTS' MOTION TO INTERVENE**

## I. INTRODUCTION

This matter is before the court on the defendants' motion to dismiss and supplemental

motion to dismiss. The plaintiffs are a group of federal prisoners who are or were incarcerated in

specially designated Communication Management Units ("CMUs") established at the Federal

Correctional Institutions ("FCI") in Terre Haute, Indiana ("Terre Haute CMU") and Marion,

Illinois ("Marion CMU") as well as two spouses of the prisoners. They contend that the

defendants – the United States Attorney General, the Federal Bureau of Prisons ("BOP"), the

Director of the BOP and the Assistant Director of the BOP's Correctional Programs Division –

violated their constitutional rights by designating them to the CMUs. The plaintiffs also allege

that the defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*,

by failing to engage in notice and comment rulemaking prior to establishing the CMUs.

In their initial motion to dismiss, the defendants contend that the plaintiffs have failed to

sufficiently plead their constitutional claims, that the plaintiffs' APA claim is moot and that

plaintiff Royal Jones lacks standing. In their supplemental motion for partial dismissal, the

defendants argue that plaintiff Avon Twitty's claims are moot because he is not currently designated to a CMU. For the reasons discussed below, the court grants in part and denies in part the defendants' initial motion to dismiss and grants the defendants' supplemental motion to dismiss.

The matter is also before the court on the motion to intervene filed by four inmates at the Terre Haute CMU ("applicants") who are not currently parties in this action. Because the current plaintiffs adequately represent the interests of the applicants, the court denies the applicants' motion to intervene.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. Communication Management Units

The BOP established the Terre Haute CMU in 2006 and the Marion CMU in 2008. Compl., Ex. A ("BOP Terre Haute CMU Institution Supplement") at 1; *see also id.*, Ex. B ("BOP Marion CMU Institution Supplement") at 1.[1] The BOP describes the CMUs as follows:

> The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of [BOP] facilities, and protect the public.

> The CMU is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit

---

[1]     The Institution Supplements are documents setting forth the policies and procedures of the CMUs. *See* Compl., Ex. A ("BOP Terre Haute CMU Institution Supplement"); *id.*, Ex. B ("BOP Marion CMU Institution Supplement"). The Institution Supplements for both the Terre Haute CMU and the Marion CMU are nearly identical. *Compare* BOP Terre Haute CMU Institution Supplement *with* BOP Marion CMU Institution Supplement. Accordingly, the court will hereinafter cite to the BOP Terre Haute CMU Institution Supplement only.

management, and work programming . . . . Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status.

BOP Terre Haute CMU Institution Supplement at 1. An inmate may be placed in a CMU

because

> (a) [t]he inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;
> (b) [t]he inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;
> (c) [t]he inmate has attempted, or indicates a propensity, to contact victims of the inmate's current offense(s) of conviction;
> (d) [t]he inmate committed prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or
> (e) [t]here is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's unmonitored communication with persons in the community.

Compl., Ex. F ("Notice to Inmates") at 1.

With the exception of attorney visits, all visits with inmates housed in CMUs are "non-contact" visits, meaning that the visit takes place in a room with a partition separating the inmate from the visitor and both must communicate using a telephone. BOP Terre Haute CMU Institution Supplement at 2. All communication during the visits must be in English and the visits are live-monitored by BOP staff and are subject to recording. *Id.* at 2-3. CMU inmates are currently afforded eight visitation hours per month and no single visit may last more than four hours.[2] Compl. ¶ 57. Visiting hours are from 8:30 a.m. to 2:30 p.m. Sunday through Friday. *Id.*

CMU inmates are entitled to at least one phone call per month lasting at least three

---

[2] Prior to January 3, 2010, CMU inmates were allowed one four-hour visit or two two-hour visits per month on weekdays. Compl. ¶ 52.

minutes.  BOP Terre Haute CMU Institution Supplement at 2 (citing 28 C.F.R. §§ 540.100(b), 540.101(d)).  With the exception of legal phone calls, *id.*, CMU inmates are allowed two fifteen-minute phone calls per week,[3] Compl. ¶ 65.  Both the inmate and the call recipient must speak in English only.  BOP Terre Haute CMU Institution Supplement at 2.  The calls are live-monitored by BOP staff and subject to recording.  *Id.*

Within five calendar days of being transferred into a CMU, an inmate must be provided a "Notice to Inmate of Transfer to [CMU]" stating the reasons for his placement in the CMU.  *Id.* at 1.  An inmate may appeal his "transfer to [a CMU], or any conditions of his confinement, through the [BOP's] Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.18, and corresponding policy."  *Id.* at 5.

### B.  The Plaintiffs

#### 1.  Yassin Aref

Yassin Aref is an Iraqi refugee who is serving a fifteen-year sentence for money laundering, providing material support for terrorism, conspiracy and making a false statement to the FBI.  Compl. ¶¶ 16, 107.  Prior to his convictions he served as an Imam of the Masjid-As-Salam Mosque in Albany, New York.  *Id.* ¶ 104.  His conviction arose from his participation in a loan transaction that would have helped to finance the purchase of a surface-to-air missile to a terrorist group called Jaish-e-Mohammed ("JEM").  *Id.* ¶ 107.

At the time his incarceration began in 2007, the BOP classified Aref as a "low security" inmate.  *Id.* ¶¶ 107, 112.  He has no disciplinary history and "has never received an infraction of

---

[3]     Prior to January 3, 2010, CMU inmates were allowed one fifteen-minute phone call per week.  Compl. ¶ 64.

any kind at a BOP facility." *Id*. ¶ 110. Aref was transferred from the Rensselaer County Jail in Troy, New York to the Terre Haute CMU in May 2007. *Id*. ¶ 113. After arriving at the CMU, he received a Notice of Transfer purporting to explain the reasons for his transfer:

> Your current offense of conviction includes Providing Material Support & Resources to a Foreign Terrorist Organization, & Conspiracy to Use a Weapon of Mass Destruction. Your offense conduct included significant communication, association and assistance to Jaish-e-Mohammed (JeM), a group which has been designated as a foreign terrorist organization.

*Id*. Aref challenged his designation to the CMU through the prison's grievance system, arguing that the Notice of Transfer "mischaracterized his offense conduct." *Id*. ¶ 114. He applied for a transfer and was eventually sent to the Marion CMU. *Id*. ¶ 116.

### 2. Avon Twitty

In 1984, Avon Twitty was sentenced to a term of imprisonment of twenty years to life for murder and three to ten years for carrying a pistol without a license. *Id*. ¶¶ 17, 127. He was designated to the Terre Haute CMU in May 2007. *Id*. ¶ 132. On October 20, 2010, Twitty was placed in a halfway house in Washington, D.C. Defs.' Supplemental Mot. to Dismiss on Mootness Grounds ("Defs.' Suppl. Mot.") at 2. He was paroled on January 21, 2011. Pls.' Notice Regarding Change in Confinement Status of Avon Twitty ("Pls.' 1st Notice") at 1.

### 3. Daniel McGowan & Jenny Synan

Daniel McGowan[4] is a former member of the Earth Liberation Front ("ELF"), Compl. ¶ 18, a domestic terrorist organization, Defs.' Mot. at 4. In 2006, he pled guilty to two counts of arson and, in 2007, he was sentenced to seven years of incarceration. Compl. ¶ 151. Like Aref, McGowan has been classified by the BOP as "low security" and has had no disciplinary history

during his incarceration.  *Id.* ¶¶ 154, 159.

In August 2008, McGowan was transferred to the Marion CMU.  *Id.* ¶ 160.  Ten days after the transfer, he received a Notice of Transfer stating as follows:

> Your offense conduct included acts of arson, destruction of an energy facility, attempted arson, and conspiracy to commit arson.  You have been identified as a member and leader in the Earth Liberation Front (ELF) and Animal Liberation Front (ALF), groups considered domestic terrorist organizations.  Your offense conduct included communicating in code and teaching others how to commit crimes of arson.  Your actions had the primary purpose to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion.  Your contact with persons in the community requires heightened controls and review.

*Id.*

McGowan administratively appealed his transfer.  *Id.* ¶¶ 162, 164.  This effort ultimately proved unfruitful.  *Id.*  In October 2010, McGowan was transferred from the CMU into the general population at the Marion facility.  Defs.' Suppl. Mot. at 2.  He was, however, transferred to the Terre Haute CMU on February 24, 2011.  Defs.' Notice Regarding Govt's Supplemental Mot. To Dismiss ("Defs.' Notice") at 1.

### 4. Royal Jones

Royal Jones was convicted of solicitation of bank robbery, which also constituted a probation violation for an earlier gun possession conviction.  Compl. ¶ 184.  He was sentenced in 2007 to ninety-four months of incarceration.  *Id.* ¶¶ 184-85.  Jones has had "no serious disciplinary infractions" and only "one minor communications[-]related infraction" during this period of incarceration.  *Id.* ¶ 186.

---

[4]  McGowan is married to plaintiff Jenny Synan.  *Id.* ¶ 175.

Jones was transferred to the Marion CMU in June 2008. *Id.* ¶ 189. His Notice of

Transfer, which he received shortly after his transfer, stated as follows:

> Your current offense of conviction is solicitation to commit a crime of violence. Reliable evidence indicates your crimes and incarceration conduct have included involvement in recruitment and radicalization efforts, including other inmates, through extremist, violence[-]oriented indoctrination methods to intimidate or coerce others.

*Id.* ¶ 189.

Jones's efforts to administratively appeal his transfer were unsuccessful. *Id.* ¶ 194. Jones

filed a *pro se* complaint in the United States District Court for the Southern District of Illinois,

challenging, *inter alia*, his transfer to the CMU. *Id.* ¶ 195. Jones explains, however, that he

voluntarily dismissed that complaint in August 2009 because CMU staff told him that such a

dismissal would result in his transfer out of a CMU and to a facility where he could see his

family. *Id.* In March 2010, Jones was transferred out of the Marion CMU and into the general

population at the Marion facility. *Id.* ¶ 196.

### 5. Kifah Jayyousi & Hedaya Jayyousi

Kifah Jayyousi[5] was convicted in August 2007 of conspiracy to murder, kidnap and

maim in a foreign country and conspiracy to provide material support to terrorism. *Id.* ¶ 205.

Upon his incarceration, the BOP classified him as a "low security" prisoner. *Id.* ¶ 210.

Jayyousi was transferred into the Terre Haute CMU in June 2008. *Id.* ¶ 212. Upon

arriving there, he received a Notice of Transfer, which stated as follows:

> Your current offenses of conviction are for Conspiracy to Murder in a Foreign Country; Conspiracy to Kidnap, Maim, and Torture; and Provide Material Support to a Terrorist Organization. You acted in a criminal conspiracy to raise

---

[5]     Jayyousi is married to plaintiff Hedaya Jayyousi. *Id.* ¶ 221.

money to support mujahideen operations and used religious training to recruit other individuals in furtherance of criminal acts in this country as well as many countries abroad. Your offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization.

*Id.* Jayyousi pursued administrative remedies, arguing that the Notice of Transfer contained inaccurate and erroneous information. *Id.* ¶ 213. His attempts have been "summarily rejected." *Id.*

### C. Procedural History

In their complaint, filed on April 1, 2010, the plaintiffs allege that their procedural due process rights were violated because they did not receive adequate Notices of Transfer or an opportunity to challenge their designation to the CMUs. *See* Compl. ¶ 253. The plaintiffs also allege that their substantive due process rights have been violated because the conditions at the CMU "intentionally or recklessly interfer[e] with [their] interests in family integrity without legitimate penological purpose." *Id.* ¶ 258. Similarly, the plaintiffs allege that communications restrictions in the CMU interfere with their free speech and free association rights. *Id.* ¶ 263.

The plaintiffs also bring an equal protection claim, arguing that there is "a pattern and practice throughout the BOP of designating individuals, including Plaintiffs, to the CMU in retaliation for their protected political and religious speech and beliefs, or based on their religion, national origin, and perceived political and/or ideological beliefs." *Id.* ¶ 273. Further, the plaintiffs assert that the conditions of confinement in the CMUs, "including [the] prolonged and complete denial of any opportunity for physical contact with their loved ones," constitutes cruel and unusual punishment. *Id.* ¶ 268. Lastly, the plaintiffs submit that the defendants' failure to engage in notice and comment rulemaking prior to establishing the CMUs constitutes a violation

of the APA.  *Id.* ¶ 281.  The plaintiffs seek a declaration that the defendants' violated their First,

Fifth and Eighth Amendment rights and the APA, an order requiring the defendants to transfer

the plaintiffs out of the CMUs or to provide each plaintiff with constitutionally sufficient due

process and an order requiring the defendants to provide the plaintiffs with the same

communication privileges as "all other general population prisoners."  *Id.* at 76

On April 19, 2010, four inmates at the Terre Haute CMU filed a motion to intervene in

this action pursuant to Federal Rule of Civil Procedure 24(a).  *See generally* Mot. to Intervene.

The defendants filed a motion to dismiss on July 21, 2010, asserting that Jones does not have

standing and that the other plaintiffs have not stated claims upon which relief can be granted, *see*

*generally* Defs.' Mot. to Dismiss.  On November 9, 2010, filed a supplemental motion to dismiss

Twitty's claims as moot because he is no longer housed in a CMU, *see generally* Defs.' Suppl.

Mot.  With the motions fully briefed, the court turns now to the applicable legal standards and

the parties' arguments.

### III.  ANALYSIS

#### A.  The Defendants' Motions to Dismiss

#### 1.  The Court Denies the Defendants' Motion to Dismiss
#### Jones's Claims for Lack of Standing

##### a.  Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or

controversies.  U.S. Const. art. III, § 2, cl. 1.  These prerequisites reflect the "common

understanding of what it takes to make a justiciable case."  *Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing 'is an essential and unchanging' predicate to any exercise of [a court's] jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Put slightly differently, "Article III standing must be resolved as threshold matter." *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co.*, 523 U.S. at 96-102).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002).

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Lujan*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* This Circuit has made clear that no standing exists if the plaintiff's allegations are "purely 'speculative[, which is] the ultimate label for injuries too implausible to support standing.'" *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001) (quoting *Advanced Mgmt. Tech., Inc. v. Fed. Aviation Admin.*, 211 F.3d 633, 637 (D.C. Cir. 2000)). Nor does standing exist where the court "would have to accept a number of very speculative inferences and assumptions

in any endeavor to connect [the] alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

### b. Plaintiff Jones Has Standing to Pursue His Claims

The defendants argue that Jones lacks standing because he is not currently designated to a CMU and, accordingly, is not suffering an injury in fact for which relief can be provided. *See* Defs.' Mot. at 9-10. The defendants note that, in March 2010, Jones was transferred to the general population at the Marion facility and is not currently designated to a CMU. *Id.* at 9; *see also* Compl. ¶ 21. The plaintiffs respond that Jones was placed in a CMU without proper explanation or process and, as a result, he has no idea what conduct to refrain from in order to avoid being sent back. Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n") at 69. Moreover, the plaintiffs note that McGowan was designated to a CMU, transferred back into the general population and then redesignated to a CMU without receiving sufficient notice or an opportunity to be heard. *See generally* Pls.' Notice in Resp. to Defs.' Feb. 25, 2011 Notice ("Pls.' 2d Notice"). This, the plaintiffs contend, is evidence that Jones faces a realistic threat of being redesignated to a CMU. *See id.* at 5. The defendants reply that Jones's injury is only hypothetical because has not demonstrated that there is a "sufficient likelihood" that he will be returned to a CMU. Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") at 2.

The Supreme Court has explained that "application of the constitutional standing requirement [is not] a mechanical exercise, and that when standing is challenged on the basis of the pleadings[,] we accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party." *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988). "[A] prediction of injury based on experience suffices to show injury in fact to the extent that

'past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.'" *Biggerstaff v. Fed. Commc'n Comm'n*, 511 F.3d 178, 183 (D.C. Cir. 2007) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

Viewed through this prism, Jones has plainly stated facts that, accepted as true, demonstrate a realistic threat that he might be redesignated to a CMU. Jones's Notice of Transfer indicated that he was placed in the CMU because of the nature of his underlying conviction and because of his alleged efforts to radicalize other inmates. Compl. ¶ 189. These facts are not going to change; thus, it appears entirely plausible that Jones will be redesignated to the CMU for the very reasons he was sent there in the first place. Indeed, as noted by the plaintiffs, McGowan who, like Jones, has also raised a claim of retaliation, was transferred out of the Marion CMU and placed in the general prison population only to be redesignated to the Terre Haute CMU four months later. *See generally* Pls.' 2d Notice. The court, thus, determines that the plaintiffs have advanced sufficient evidence suggesting that Jones faces a realistic threat of redesignation to a CMU. *See Pennell*, 485 U.S. at 7-8 (explaining that the owners of a building subject to a City Ordinance satisfied standing by alleging that they were subject to the Ordinance even though no enforcement of the Ordinance had yet been sought against the owners); *Biggerstaff*, 511 F.3d at 183 (holding that the plaintiff had demonstrated standing based on his experience that it is "definitely likely" that the challenged agency order will be applied to him) *cf. Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (ruling that a plaintiff did not have standing because "the odds that [a plaintiff seeking an injunction barring the use of chokeholds by police officers] would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are [in]sufficient to make out a federal case for

equitable relief"). Accordingly, at this stage in the litigation, the court holds that Jones has standing.

## 2. The Court Grants the Defendants' Supplemental Motion for Partial Dismissal

### a. Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *See Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227,

13

241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

### b. Legal Standard for Mootness

Under Rule 12(b)(1), a party may move to dismiss a case on grounds of mootness. *Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995); *Am. Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1308 (D.D.C. 1995). Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions or decisions based on hypothetical facts or abstract issues. *Flast v. Cohen*, 392 U.S. 83, 96 (1968). "The doctrine of mootness is a logical corollary of the case or controversy requirement[.]" *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986). In cases where challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated . . . it becomes impossible for the court to grant any effectual relief whatever to the prevailing party, and any opinion as to the legality of the challenged action would be advisory." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Accordingly, a court may not rule on the merits of a case in which the claim for relief is moot.

Courts must evaluate mootness "through all stages" of the litigation in order to ensure that a live controversy remains. *21st Century Telesis Joint Venture v. Fed. Commc'ns Comm'n*, 318 F.3d 192, 198 (D.C. Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

14

*(TOC), Inc.*, 528 U.S. 167, 191 (2000) and *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). As a result, "[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Id.* (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990)).

A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie*, 529 U.S. at 287 (internal quotations omitted). An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations. *Pharmachemie B.V. v. Barr Labs,, Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992). A case is not moot, however, so long as any single claim for relief remains viable, as the remaining live issues satisfy the case-or-controversy requirement. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 978 (D.C. Cir. 1991) (internal quotations and citations omitted). The burden of establishing mootness rests on the party raising the issue, and it is a heavy burden. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458-59 (D.C. Cir. 1998).

### c.  Plaintiff Twitty's Claims Are Moot

The defendants argue that because Twitty was placed in a halfway house in October 2007 and paroled in January 2011, he is no longer in BOP custody and his claims are therefore moot.[6] *See generally* Defs.' Suppl. Mot.; Defs.' Notice.  The plaintiffs oppose dismissal of Twitty's claims, arguing that the defendants' voluntary transfer of Twitty to a halfway house does not render his claim moot pursuant to the "voluntary cessation" exception to the mootness doctrine. Pls.' Opp'n to Defs.' Suppl. Mot. at 2; *see also* Pls.' 1st Notice at 1.  The defendants respond that the voluntary cessation exception does not apply here because Twitty had been approved for halfway house placement prior to the filing of this lawsuit.  *See* Defs.' Suppl. Reply at 3-8, 12-15.

"[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Friends of the Earth, Inc.*, 528 U.S. at 189.  "[I]n order for this exception to apply, the defendant's voluntary cessation must have arisen *because of* the litigation."  *Pub. Util. Comm'n of Cal. v. Fed. Energy Regulatory Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996).

There is no dispute that prior to the commencement of this lawsuit, the BOP had already determined that Twitty was eligible for placement in a halfway house.  Compl. ¶ 70 ("Twitty was approved for nine months pre-release placement at a halfway house."); Defs.' Suppl. Mot. at 2. Because the decision to release Twitty preceded this lawsuit, it is clear that the cessation of his

---

[6]     The defendants initially argued that McGowan's claims are also moot because at the time the defendants filed their motion in July 2010, McGowan had been transferred out of the Marion CMU.  *See generally* Defs.' Suppl. Mot.  Since that time, however, McGowan has been reassigned to the Terre Haute CMU and, accordingly, the defendants have withdrawn their argument that his claims are moot.  *See* Defs.' Notice.

designation to a CMU was not the result of this litigation. Accordingly, the defendants have demonstrated that Twitty was not transferred "because of" this lawsuit and the voluntary cessation exception to mootness does not apply. *See Pub. Util. Comm'n*, 100 F.3d at 1460. The court, therefore, dismisses Twitty's claims as moot.

### 3. The Court Grants in Part and Denies in Part the Defendants' Motion to Dismiss the Plaintiffs' Claims Pursuant to Rule 12(b)(6)

#### a. Legal Standard for a Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Yet, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 562 (2007) (abrogating the oft-quoted language from *Conley*, 355 U.S. at 45-46, instructing courts not to dismiss for failure to state a claim unless it appears beyond doubt that "no set of facts in support of his claim [] would entitle him to relief"). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning*, 292 F.3d at 242. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

### b. The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Substantive Due Process Claim

The plaintiffs allege that that the defendants have violated their First Amendment right to "family integrity" through the restrictions placed on the plaintiffs' communications. Compl. ¶ 258; *see also* Pls.' Opp'n at 39 (arguing that the defendants have violated their right "to maintain

vital relationships with family members and members of the community both through visitation and through phone calls").  The defendants argue that no such right exists and that, even if it did, the CMU restrictions "are valid because they are reasonably related to legitimate penological goals."  Defs.' Mot. at 24.

As an initial matter, the court notes that although the Supreme Court has acknowledged that "the Constitution protects certain kinds of highly personal relationships," it is unclear to what extent such a right survives incarceration.  *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (internal quotation omitted).  Regardless, because, as discussed below, the CMU regulations are rationally related to legitimate penological interests, the plaintiffs' substantive due process claim fails.

It is well settled that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  In determining whether this standard is met, the court looks to four considerations.  *See id*.  "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."  *Id*. (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).  Second, the court examines "whether there are alternative means of exercising the right that remain open to prison inmates."  *Id*. at 90. Third, the court must assess "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id*. Fourth, the court must consider the availability of alternatives.  *Id*.  "Although [these] factors are intended as guides to a single reasonableness standard, the first factor looms especially large.  Its rationality inquiry tends to encompass the remaining factors, and some of its criteria are

19

apparently necessary conditions." *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998) (internal citations omitted).

According to the defendants, the penological interest furthered by the restrictions imposed by the CMUs is the "effective monitoring of the communications of high-risk inmates . . . to protect the safety, security and orderly operation of Bureau facilities, and to protect the public." Defs.' Mot. at 25. The plaintiffs do not dispute that this is a legitimate interest. Pls.' Opp'n at 46 ("Plaintiffs agree that protection of the safety and operations of a prison and protection of the public are legitimate penological interests . . . [and] that effective monitoring of the communications of high-risk inmates could serve those interests."). Indeed, the weight of the relevant case law supports the conclusion that the types of communications restrictions imposed by the CMUs are rationally related to the legitimate penological interest of promoting the safety of correctional institutions and the public. *See, e.g.*, *Block*, 468 U.S. at 588 (holding that a prohibition on contact visits is rationally related to the legitimate goal of promoting institutional security); *Williams v. Mierzejewski*, 401 F. App'x 142, 145 (7th Cir. 2010) ("We give considerable deference to a prison official's determination that a communication between a prisoner and the outside world constitutes a security threat." (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989))); *Maze v. Tafolla*, 369 F. App'x 532, 535 (5th Cir. 2010) (applying *Block* and upholding a ban on contact visits for a pretrial detainee as rationally related to a legitimate penological interest); *Perez v. Fed. Bureau of Prisons*, 229 F. App'x 55, 57 (3rd Cir. 2007) (holding that "restrict[ing] telephone calls to one per week [for] prisoners who have a history of using the telephone to conduct criminal activity is clearly reasonable because it relates to the legitimate penological goal of public and institutional safety"); *Pope v. Hightower*, 101

F.3d 1382, 1385 (11th Cir. 1996) (explaining that the imposition of a ten-person calling list is rationally related to the legitimate governmental objective of reducing criminal activity); *Stojanovic v. Humphreys*, 309 F. App'x 48, 51 (7th Cir. 2009) ("Safety and security are legitimate penological interests, and this is equally true in the visitation context."); *Searcy v. United States*, 668 F. Supp. 2d 113, 122 (D.D.C. 2009) (holding that "regulations restricting inmates' telephone use are reasonable as long as they further the government's legitimate penological interests, including the safety and security of correctional institutions, inmates, staff, and the public" (citing *Arney v. Simmons*, 26 F. Supp. 2d 1288, 1293 (D. Kan. 1998))).

Accordingly, because the plaintiffs have not adequately alleged that the CMU restrictions are not rationally related to the legitimate penological interest in monitoring the communication of high-risk inmates, the court dismisses the plaintiffs' substantive due process claim. *See Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990) (explaining that "[t]he first [*Turner*] factor constitutes a *sine qua non*"); *Amatel*, 156 F.3d at 196 (noting that the first rationality factor "tends to encompass the remaining factors").

### c. The Court Denies the Defendants' Motion to Dismiss the Plaintiffs' Procedural Due Process Claim

The defendants contend that the plaintiffs have not articulated the deprivation of a constitutional or government-created liberty interest as required to state a viable procedural due process claim. *See* Defs.' Mot. at 10-20. According to the defendants, the BOP's "transfer of Plaintiffs to a CMU and the imposition of the subject communication restrictions do not impose significant or 'unduly harsh' restrictions," as required to trigger a government-created liberty interest in the prison context. Defs.' Reply at 10. Furthermore, the defendants argue that even if

the plaintiffs have a liberty interest at stake, the plaintiffs were not deprived of procedural due process because they received proper notice of the reasons for their CMU designation after arriving at the CMUs, as well as an opportunity to contest that designation. Defs.' Mot. at 20-21.

The plaintiffs maintain that they have a government-created liberty interest in avoiding the conditions of confinement that exist in the CMUs because those conditions impose an "atypical and significant hardship on the [plaintiffs] in relation to the ordinary incidents of prison life." Pls.' Opp'n at 9 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Furthermore, the plaintiffs assert that any procedures the defendants have provided are insufficient to protect these rights. *Id*. at 20-25. Additionally, the plaintiffs contend that the BOP's purported "reviews" of the plaintiffs' designation to the CMUs "are merely an assessment of whether the 'original reasons for CMU placement still exist'" and thus, meaningless because those original reasons "cannot change." Pls.' Opp'n at 23.

The Fifth Amendment requires that no person be deprived of his liberty without due process of law. U.S. Const. amend. V. To establish an actionable due process claim, the plaintiffs must show that (1) they have a constitutionally-protected life, liberty or property interest and (2) the defendants deprived the plaintiffs of that interest without constitutionally adequate procedure. *See Propert v. Dist. of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991); *Soeken v. Herman*, 35 F. Supp. 2d 99, 104-105 (D.D.C. 1999). Liberty interests are generally derived from the Constitution, but "[t]he government may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin*, 515 U.S. at 484; *see also Marshall v. Fed. Bureau of Prisons*, 518 F. Supp. 2d 190, 194 (D.D.C. 2007) (citing *Ellis v. Dist. of Columbia*, 84 F.3d 1413, 1415 (D.C. Cir. 1996)).

Once a liberty interest is implicated, a "fundamental requirement" of due process is that

an individual receive "the opportunity to be heard at a meaningful time and in a meaningful

manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see also Propert*, 948 F.2d at 1331.

In determining whether "an appropriate hearing has been provided at a meaningful time and in a

meaningful matter," the court considers three factors:

> [f]irst, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirements would entail.

*Mathews*, 424 U.S. at 335. All the while, the court must remain mindful that "due process is

flexible and calls for such procedural protections as the particular situation demands." *Mathews*,

424 U.S. at 334 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

### i. The Plaintiffs Have Plausibly Alleged a Liberty Interest Protected by Procedural Due Process

This Circuit has observed that

> a deprivation in prison implicates a [government-created] liberty interest
> protected by the Due Process Clause only when it imposes an "atypical and
> significant hardship" on an inmate in relation to the most restrictive confinement
> conditions that prison officials, exercising their administrative authority to ensure
> institutional safety and good order, routinely impose on inmates serving similar
> sentences.

*Hatch v. Dist. of Columbia*, 184 F.3d 846, 856 (D.C. Cir. 1999) (quoting *Sandin*, 515 U.S. at

484).

At present, the plaintiffs designated to a CMU are allowed two fifteen-minute phone calls

per week and eight hours of non-contact visits per month. Compl. ¶¶ 57, 65. Each visit may not

exceed four hours and must be held in a partitioned room; no physical contact is permitted between the inmate and his visitor and visitors and inmates must communicate verbally using telephone handsets. *Id.* ¶ 57; BOP Terre Haute CMU Institution Supplement at 2. Pursuant to the "guidelines and procedures" articulated in the Institution Supplements, while housed at the CMUs, the plaintiffs are only entitled to one three-minute telephone call per month. BOP Terre Haute CMU Institution Supplement at 2.

By contrast, BOP prisoners housed in the general population are typically allowed 300 phone minutes per month. Compl. ¶ 63; Defs.' Mot. at 6. BOP regulations governing visitation for prisoners housed in the general population provide no specific cap on the number or duration of visits, but do indicate that each inmate shall be allowed at least four hours of visiting time per month, 28 C.F.R. § 540.43, and that the visits should be contact visits "unless there is clear and convincing evidence that such contact would jeopardize the safety or security of the institution," *id.* § 540.51(h)(2). Indeed, the plaintiffs allege that inmates at "the Administrative Maximum facility USP Florence, the only 'supermaximum' security facility in the federal system" are allowed up to five visits a month with each visit lasting for up to seven hours. Compl. ¶ 61.

The plaintiffs note that at this early stage in the litigation – prior to discovery – they are unable to cite specific examples of the most restrictive conditions of confinement routinely imposed on inmates serving sentences similar to those being served by the plaintiffs. Pls.' Opp'n at 15; *see also Brown v. Plaut*, 131 F.3d 163, 170 (D.C. Cir 1997) (explaining that the comparison of prison conditions is a "complex and fact-specific inquiry"). Nonetheless, the aforementioned allegations are specific and detailed and plausibly suggest a significant disparity in the treatment of CMU inmates and those housed in the general population. Compl. ¶¶ 37-68.

The defendants for their part do not engage in any qualitative comparative analysis of the conditions of confinement faced by inmates with similar sentences to those of the plaintiffs. *See generally* Defs.' Mot.; Defs.' Reply. Although the defendants suggest that the restrictions in the CMU are no harsher than those found in solitary confinement, Defs.' Reply at 9, the defendants do not address whether prisoners with similar sentences are routinely placed in solitary confinement. *See generally* Defs.' Mot.; Defs.' Reply. Thus, drawing all factual inferences in favor of the plaintiff, *see Holy Land Found.*, 333 F.3d at 165, the court determines that it is plausible that the conditions of confinement in the CMUs constitute an atypical and significant hardship on the plaintiffs, *Iqbal*, 129 S. Ct. at 1949; *Hatch*, 184 F.3d at 856. Accordingly, the plaintiffs have plausibly alleged that they have a liberty interest in avoiding designation to a CMU and the confinements related to such a designation. *See Wilkinson v. Austin*, 545 U.S. 209, 228 (2005) (recognizing that inmates have a liberty interest in not being assigned to a "supermax" facility because the conditions – prohibition of almost all human contact, constant lighting and minimal exercise in confined quarters – imposed a "atypical and significant hardship" on the inmates).

### ii. The Plaintiffs Have Plausibly Alleged That They Were Denied Procedural Due Process

As discussed, *Mathews* delineates a three-factor test for determining whether a plaintiff has received an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews*, 424 U.S. at 333. In this case, the first factor requires the court to consider the significance of the plaintiffs' interest in avoiding erroneous placement in a CMU. *See Wilkinson*, 545 U.S. at 225. The plaintiffs assert, and the defendants do not contest, that the plaintiffs have an interest in avoiding designation to a CMU. Pls.' Opp'n at 23; *see generally* Defs.' Mot.;

Defs.' Reply. Although the plaintiffs' interest in their liberty is legitimately impacted by virtue of their imprisonment, their liberty interest is not "minimal" and merits procedural due process so long as it is evaluated "within the context of the prison system." *Wilkinson*, 545 U.S. at 225.

Next, the court considers the risk that procedures used by the defendants resulted in the erroneous deprivation of the plaintiffs' liberty interest, as well as the "probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. "To insure that [a] review does not become simply a sham, the content and substance of that review must be scrutinized under the illumination" of the Fifth Amendment, *Mims v. Shapp*, 744 F.2d 946, 954 (3d Cir. 1984), and "prison officials must be prepared to offer evidence that the . . . reviews held are substantive and legitimate, not merely a sham," *Giano v. Kelly*, 869 F. Supp. 143, 150 (W.D.N.Y. 1994).

The defendants insist that the BOP's standard administrative remedies are available to the plaintiffs designated to the CMU and contain a process for review of "an issue relating to any aspect of [the plaintiffs'] confinement." Defs.' Mot. at 21 n.5. The defendants further assert that the plaintiffs have "received reviews of their continued confinement in the CMU by the CMU's Unit Team in connection with regularly scheduled program reviews." *Id*. at 21. The plaintiffs allege that administrative remedies and periodic reviews are "illusory," *id*. ¶ 90, and that the Notices of Transfer are "so vague and generic" that they effectively provide no notice at all. *Id*. ¶ 77. The plaintiffs allege that the administrative and periodic review process is insufficient because those procedures involve review at the institutional or regional level, but the decisions for CMU designation are only made by officials in Washington, D.C., *id*. ¶ 84, 90. The plaintiffs also argue that "[b]ecause CMU designation is not based on any ongoing misbehavior, the reason

for designation will never change or diminish." Compl. ¶ 83. Moreover, according to Jayyousi, his unit manager informed him that, apparently despite the periodic review procedures, he would serve the rest of his sentence at the CMU. *Id.* Accordingly, the plaintiffs seek procedures assuring that they receive detailed Notices of Transfer and ongoing reviews by officials with decision-making power who will review whether their continued placement in the CMU is still appropriate, *see id.* ¶¶ 73-91.

In light of the plaintiffs factual allegations supporting their contention that reviews provided by the defendants are "illusory" and meaningless, the court determines that they have adequately alleged there is a high risk that the procedures used by the defendants have resulted in erroneous deprivations of their liberty interests. *See Mathews*, 424 U.S. at 335; *see also Williams v. Norris*, 277 F. App'x 647, 649 (8th Cir. 2008) (noting that the reason for segregation should "not only be valid at outset but must continue to subsist during period of segregation" and reversing the lower court's grant of summary judgment because there remained unresolved issues of fact as to whether the prisoner "received meaningful reviews, rather than sham reviews, as he contend[ed]"); *Lira v. Cate*, 2009 U.S. Dist. Lexis 91292, at *90 (N.D. Cal. Sept. 30, 2009) (denying the defendant's motion to dismiss because the plaintiff provided evidence that reviews of his administrative segregation were "largely perfunctory" and the prison "provided no substantive review of the propriety of [his] retention in administrative segregation"); *Hogan v. Epps*, 2009 U.S. Dist. Lexis 128449, at *6 (S.D. Miss. July 6, 2009) (denying summary judgment because the defendants did not provide any evidence to contradict the plaintiff's claim that review of administrative segregation in prison was not meaningful nor explained "the circumstances under which an inmate may be removed from . . . segregation").

The third *Mathews* factor addresses the government's interest and the burden that additional or substitute procedures would impose on the government. *Mathews*, 424 U.S. at 335. The defendants note that the BOP's goal is "providing both increased and effective monitoring of high-risk inmates," Defs.' Mot. at 26, but neglect to address how the procedures sought by the plaintiffs – detailed Notices of Transfer and meaningful reviews – would create an unwarranted burden on the BOP's resources, *see generally id.*; Defs.' Reply. Without more, the court cannot conclude that the defendants cannot both accommodate the government's interest while affording the plaintiffs their requested procedural due process.

Accordingly, the court determines that at this stage in the proceedings, the plaintiffs have adequately alleged facts sufficient to satisfy the three *Mathews* factors. As a result, the plaintiffs have plausibly alleged that the defendants violated their procedural due process rights, *see Iqbal*, 129 S. Ct. at 1949 (internal citation omitted), and the court denies the defendants' motion to dismiss the plaintiffs' procedural due process claim.

### d. The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Eighth Amendment Claims

The defendants argue that the plaintiffs have not adequately alleged that they have been denied "the minimal civilized measure of life's necessities" as required to sustain a cruel and unusual punishment claim under the Eighth Amendment. Defs.' Mot. at 32. The plaintiffs respond that they have been deprived of "the essential human need for meaningful contact with one's family," and that accordingly, they have alleged a viable Eighth Amendment claim. Pls.' Opp'n at 52.

To establish an Eighth Amendment violation, a prisoner must make an objective and a subjective showing. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Objectively, the alleged deprivation must be "sufficiently serious;" subjectively, the prison officials' actions, must demonstrate a "deliberate indifference" to the prisoner's health or safety. *See id.* A deprivation is "sufficiently serious" if it denies a prisoner the "minimum civilized measures of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992) (stating that "extreme deprivations are required to make out a conditions-of-confinement claim"). These necessities are typically "food, shelter, health care, and personal security." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 839 (D.C. Cir. 1988).

The plaintiffs' allegations are based on the conditions of their confinement in the CMUs – namely the visitation and telephone restrictions imposed on their contact with their families. *See* Compl. ¶ 268; Pls.' Opp'n at 52-53. It is far from clear, however, that family contact is a basic life necessity for Eighth Amendment purposes. Indeed, the Supreme Court has stated that a two-year ban on visitation did not "deprive inmates of basic necessities, or fail to protect their health or safety." *Overton*, 539 U.S. at 136-37. Similarly, another court in this district has recently explained that "[d]eprivations such as infrequent or no visits from family . . . do not meet the threshold of 'extreme deprivations' required to state an Eighth Amendment claim regarding conditions of prison confinement." *Simmons v. Wolff*, 594 F. Supp. 2d. 6, 9 (D.D.C. 2009); s*ee also Perez v. Fed. Bureau of Prisons*, 229 F. App'x 55, 57 (3rd Cir. 2007) ("An altered security classification that allows limits on telephone privileges certainly does not rise to [the] level [of extreme deprivation]." (citing *Inmates of Occoquan*, 844 F.2d at 836)); *Wirsching*

*v. Colo.*, 360 F.3d 1191, 1205 (10th Cir. 2004) ("[V]isitation with a particular person does not

constitute basic necessity, the denial of which would violate the Eighth Amendment." (citing *Ky.*

*Dep't of Corrections v. Thompson*, 490 U.S. 454, 461 (1989))); *Phillips v. Norris*, 320 F.3d 844,

848 (8th Cir. 2003) (determining that thirty-seven days without contact visitation or religious

services did not involve "life's necessities," such as water, food or shelter and as such did not

constitute an Eighth Amendment violation); *Saleem v. Helman*, 1997 WL 527769, at *2 (7th Cir.

Aug. 21, 1997) ("[D]enial of contact visitation altogether does not violate the Eighth

Amendment." (citing *Caldwell v. Miller*, 790 F.2d 589, 601 n.16 (7th Cir. 1986))); *Ademola v.*

*Bureau of Prisons*, 2006 WL 2466840, at *4 (D.N.J. Aug. 23, 2006) (holding that the telephone

restrictions challenged by the plaintiff did not constitute a "basic human need" (citing *Wilson v.*

*Seiter*, 501 U.S. 294, 298 (1991))).  Accordingly, because the plaintiffs have not plausibly

alleged that they have been denied a basic life necessity, the court grants the defendants' motion

to dismiss this claim.

### e.  The Court Denies the Defendants' Motion to Dismiss the Plaintiffs' Retaliation Claims

The plaintiffs allege that the defendants transferred Jones into the CMU in retaliation for

his continued litigation against the BOP and that they transferred McGowan into the CMU in

retaliation for his vocalization "about social justice issues and the rights of political prisoners."

Compl. ¶¶ 167, 188.  The defendants contend that the plaintiffs have failed to allege that

retaliation was the "but for" cause of their transfer.  *See* Defs.' Mot. at 34-39.

A prisoner alleging a First Amendment claim of retaliation must allege that "(1) he

engaged in conduct protected under the First Amendment; (2) the defendant took some

retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007) (citing *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the "but for" cause of the defendants' retaliatory action. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "Evidence that actions by correctional officers were taken in retaliation for the exercise of protected conduct may be inferred from the fact that the acts occurred shortly after the filing of a grievance, and that the inmate previously had a good disciplinary record." *Garcia v. Dist. of Columbia*, 56 F. Supp. 2d 1, 13 (D.D.C. 1998) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995); *Smith v. Deckelbaum,* 1998 WL 433926 (S.D.N.Y. July 27, 1998)).

Here, the plaintiffs allege that Jones is "an outspoken and litigious prisoner" and that he has written books about improper prison conditions and filed grievances and complaints on his own behalf. Compl. ¶ 188. They further allege that his prison record contains "no serious disciplinary infractions" and "one minor communications[-]related infraction" from 1997. *Id*. ¶ 186. Although the timeline is somewhat unclear with respect to this plaintiff, it appears that he filed a complaint in 2007 after he was placed in FCI Englewood in Littleton, Colorado. *See id*. ¶¶ 185, 188-89. While there, he alleges that staff told him he would be "sent east" if he continued filing complaints. *Id*. ¶ 188. He filed a complaint about this alleged threat and, on June 6, 2008, he was transferred to the Marion CMU. *Id*. ¶¶ 188-89. In light of the plaintiffs' allegation regarding Jones's relatively clean disciplinary history, his history of complaints and the threat allegedly directed at him by staff at FCI Englewood, Jones has plausibly alleged that

he was transferred to the CMU in retaliation for his continued litigation against the BOP.  *See Garcia*, 56 F. Supp. 2d at 13.

Similarly, the plaintiffs allege that McGowan has a clean disciplinary record and has been "active in social justice movements during his incarceration."  Compl. ¶ 159; *see also* Pls.' Opp'n at 32.  He was placed in the Marion CMU in August 2008.  Compl. ¶ 160.  The plaintiffs assert that the information in his Notice of Transfer is patently untrue and that the BOP has been unresponsive to his attempts to correct his record.  *Id*. ¶¶ 462-64.  Moreover, McGowan was released into the general population at FCI Marion in October 2010, *see* Defs.' Suppl. Mot. at 2, but was redesignated to the Terre Haute CMU in February 2011, *see* Defs.' Notice at 1.  The plaintiffs allege that this redesignation was in direct response to a telephone conversation that he had with his wife, after being placed back in the general population, in which he requested that she ask his attorneys to send him certain legal documents.  *See* Pls.' 2d Notice at 3.  In light of these allegations, the court concludes that McGowan has also stated a plausible claim of retaliation.  *See Garcia*, 56 F. Supp. 2d at 13.  Accordingly, the court denies the defendants' motion to dismiss the plaintiffs' retaliation claims.

### f.  The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Discrimination Claims

The plaintiffs allege that the defendants transferred Aref, Jayyousi and Jones into CMUs because they are Muslim and therefore unlawfully discriminated against them in violation of the First and Fifth Amendment.  Compl. ¶ 273.  The plaintiffs base their claim entirely on statistics they allege they received from the BOP pursuant to a Freedom of Information Act request and from an article published by the BOP.  *Id*. ¶¶ 97-100.  According to the plaintiffs, the statistics

demonstrate that in 2004, six percent of the total BOP prison population sought Islamic religious services, *id.* ¶ 100, while between sixty-five and sixty-eight percent of the inmates designated to the Terre Haute CMU are Muslim, *id.* ¶ 99, and seventy-two percent of the inmates designated to the Marion CMU are Muslim, *id.* ¶ 101. The defendants assert that "[t]he Complaint is devoid of allegations of any act, statement or other conduct that indicates any hostility whatsoever to Muslims on the part of [the defendants]." *See* Defs.' Mot. at 39.

Where, as here, a plaintiff claims that he was discriminated against in violation of the First and Fifth Amendments, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 129 S. Ct. at 1948. "Under extant precedent purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences[;]' . . . [i]t instead involves a decisionmaker's undertaking a course of action 'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'" *Id.* (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Although "[p]roof of discriminatory intent must necessarily usually rely on objective factors[,] [t]he inquiry is practical." *Feeney*, 442 U.S. at 279 n.24.

The statistics proffered by the plaintiff, without more, are not minimally sufficient to survive a motion to dismiss. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 213 (5th Cir. 2009) (holding that plaintiffs' statistics, even combined with allegations that the defendants used racial epithets, did not allege sufficient facts to survive a motion to dismiss its § 1983 claims); *see also Segar v. Smith*, 738 F.2d 1249, 1273-74 (D.C. Cir. 1984) (explaining that "to be legally sufficient" the proffered statistics must demonstrate not just a disparity of treatment, but they must "eliminate the most common nondiscriminatory explanations of the disparity, and thus

33

permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination"); *Hollander v. Am. Cyanamid Co.*, 999 F. Supp. 252, 260 (D. Conn. 1998) (noting that plaintiffs using statistics in disparate treatment cases must "take into account nondiscriminatory explanations for numerical disparities" (citing *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996))).  That is, even accepting as true the fact that there are a statistically disproportionate amount of Muslim prisoners designated to the CMUs, this fact alone does not "state a claim to relief that is plausible on its face," *Iqbal*, 129 S. Ct. at 1949, because the plaintiffs have not alleged that the defendants acted with any discriminatory purpose, *see generally* Compl.  The court also notes that Aref and Jayyousi were convicted of terrorism-related offenses – one of the grounds an inmate may place designated to a CMU, *see* Compl. ¶¶ 16, 107, 205; Notice to Inmates at 1 – a fact which provides an "obvious alternative explanation" for their designation to a CMU, *Iqbal*, 129 S. Ct. at 1951 (explaining that there was an "obvious alternative explanation" to discrimination for the increase in arrests of Arab Muslims after the September 11 terrorist attacks).  Accordingly, the court grants the defendants' motion to dismiss the plaintiffs' discrimination claims.

### g.  The Court Dismisses Without Prejudice the Plaintiffs' APA Claims

The plaintiffs also challenge the creation of the CMUs, arguing that the defendants did not engage in prior notice and comment rulemaking as required by the APA.  Compl. ¶¶ 276-282.  Although the defendants assert that notice and comment rule making were not required because the APA does not apply to the Marion and Terre Haute Institution Supplements that created the CMUs, they note that the BOP has, nevertheless, began the process for rulemaking as it pertains to the CMUs.  Defs.' Mot. at 39-43.  In fact, the proposed rule was published in the

Federal Register on April 6, 2010, and the comment period closed on June 7, 2010. *See* 75 Fed.

Reg. 17324. Thus, as it now appears that the defendants have begun the process sought by the

plaintiffs, the plaintiffs' APA claim is moot. *See Natural Res. Def. Council, Inc. v. U.S. Nuclear*

*Regulatory Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982) (rendering a claim seeking full notice

and comment rulemaking moot where a rule was promulgated without affording a comment and

notice period, but was subsequently "repromulgated" in accordance with notice and comment

requirements effectively curing any initial deficiencies in the rulemaking process). Accordingly,

the court dismisses the plaintiffs' APA claim without prejudice, allowing the plaintiffs' to renew

such a claim in the event that the defendants again abandon the rulemaking process.

### B.  The Motion to Intervene

### 1.  Legal Standard for a Rule 24(a) Motion to Intervene

Federal Rule of Civil Procedure 24(a) sets forth the requirements for intervention as of

right. FED. R. CIV. P. 24(a); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir.

2003). Rule 24(a) provides for intervention of right, stating that

> [o]n timely motion, the court must permit anyone to intervene who: (1) is given
> an unconditional right to intervene by a federal statute; or (2) claims an interest
> relating to the property or transaction that is the subject of the action, and is so
> situated that disposing of the action may as a practical matter impair or impede
> the movant's ability to protect its interest, unless existing parties adequately
> represent that interest.

FED. R. CIV. P. 24(a).

This Circuit has identified "four prerequisites to intervene as of right: '(1) the application

to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the

action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an

adequate representative of the applicant's interests.'" *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *Sec. Exch. Comm'n v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)). In addition, an applicant must demonstrate that it has standing. *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1017-18 (D.C. Cir. 2003).

### 2. The Court Denies the Motion to Intervene

Four inmates at the Terre Haute CMU ("applicants") seek leave to intervene as a matter of right in this action pursuant to Rule 24(a). *See generally* Applicants' Mot. to Intervene. They argue that their "interest is not being adequately articulated nor represented nor protected by the existing parties." *Id.* at 1. The plaintiffs assert that they have and will adequately represent the applicants' interests, as well as the interests of all of the inmates currently designated to the two CMUs. *See generally* Pls.' Opp'n to Mot. to Intervene. The applicants respond that their interests differ from those of the plaintiffs and, thus, intervention is required. Applicants' Reply in Supp. of Mot. to Intervene at 1-2.

The applicants bear the burden of demonstrating that the plaintiffs will inadequately represent their interests. *See Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). Although this burden is not onerous, *see Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986), the applicants "must produce something more than speculation as to the purported inadequacy," *Moosehead Sanitary Dist. v. S.G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979).

Other than generally arguing that their interests are not being adequately represented, the applicants state only that the "existing parties['] representation may use bad or poor judgment in conducting or settling the cause of action." Applicants' Mot. to Intervene at 3. These allegations are insufficient to demonstrate inadequate representation for the purposes of intervention. *See*

*Jones*, 348 F.3d at 1019-20 (explaining that "fil[ing] suit in an inappropriate forum, advanc[ing] a disadvantageous choice-of-law position, and fail[ing] to bring a state-law claim" does not rise to the level of inadequate representation necessary for intervention); *Moosehead Sanitary Dist.*, 610 F.2d at 54-55 (holding that the applicant's argument that the plaintiff may be tempted to settle a claim in a way unfavorable to the applicant, where the applicant made no indication that "any such settlement was in the offing," was insufficient to demonstrate inadequate representation).

Indeed, the applicants have not stated what their interests are or how they differ from those of the plaintiffs. *See generally* Applicants' Mot. to Intervene; Applicants' Reply. Although they allege that they have constitutional claims that have not been addressed by the plaintiffs, Applicants' Reply at 2, the applicants do not state the nature of these claims, *see generally id.*; Mot. to Intervene at 3 (indicating that the applicants, like the plaintiffs, are seeking injunctive relief and removal from the CMU); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994) (holding that, where the applicant "offered no argument not also pressed by the defendant" intervention was not appropriate); *Va. v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (denying intervention because the applicant sought the same relief as the plaintiff). Accordingly, because the applicants have not demonstrated that the plaintiffs will inadequately represent their interests, the court denies the motion to intervene as a

matter of right.[7]

## III.  CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the defendants'

motion to dismiss, grants the defendants' supplemental motion for partial dismissal and denies

the applicants' motion to intervene.  An Order consistent with the Memorandum Opinion is

separately and contemporaneously issued this 30th day of March, 2011.

RICARDO M. URBINA
United States District Judge

---

[7]  The court notes that, in their reply, the applicants suggest for the first time that they also seek permissive intervention pursuant to Rule 24(b).  *See* Applicants' Reply in Supp. of Mot. to Intervene at 1 (stating that "[a]ll that is required in any Intervenor's claim and the main action[] is that they have a question of law or fact in common").  The court does not address this argument which was raised for the first time in the reply.  *See Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008) (noting that "it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief" (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992))).