**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

YASSIN MUHIDDIN AREF
FCI Allenwood Low
Route 15
White Deer, PA 17887

and

DANIEL MCGOWAN
FCI Terre Haute, CMU
4200 Bureau Road North
Terre Haute, IN 47808

and                                          CIVIL ACTION NO.10-cv-539
                                             (RWR)(DAR)

ROYAL JONES
FCI Oxford
County Road G & Elk Avenue
Oxford, WI 53952

and

KIFAH JAYYOUSI
USP Marion, CMU
4500 Prison Road
Marion, IL 62959

          VS.

ERIC HOLDER
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

and

CHARLES E. SAMUELS
Director of the Federal Bureau of Prisons (BOP)
320 First Street, NW
Washington, DC  20534

and

D. SCOTT DODRILL
Assistant Director, Correctional Programs Division
Federal Bureau of Prisons
320 First Street, NW
Washington, DC  20534

and

LESLIE S. SMITH
Chief, Counter Terrorism Unit
Federal Bureau of Prisons
███████████████████████
██████████████████

and

FEDERAL BUREAU OF PRISONS
320 First Street, NW
Washington, DC  20534

## FIRST AMENDED COMPLAINT

Plaintiffs YASSIN MUHIDDIN AREF, DANIEL MCGOWAN, ROYAL JONES, and KIFAH JAYYOUSI (collectively "Plaintiffs"), by and through their attorneys, the Center for Constitutional Rights, allege the following:

## NATURE OF ACTION

1.      In 2006 and 2007, the Bureau of Prisons (BOP) secretly created two experimental prison units designed to isolate certain prisoners from the rest of the BOP and the outside world.  These units are called "Communications Management Units" or "CMUs."

2.      While euphemistically described by the BOP as "self-contained general population units," the CMUs, alone out of all general population units within the federal system, impose a categorical ban on any physical contact with visiting friends and family,

2

including babies, children and spouses.  To further social isolation, the BOP has placed severe restrictions on CMU prisoners' access to phone calls and prison programming.

3.      Although the creation of the CMU – as well as the indefinite nature of these restrictions – marked a dramatic change in policy and contradicts existing regulations, the CMUs were created without the opportunity for notice and comment, in violation of the Administrative Procedures Act (APA).

4.      All Plaintiffs have been classified by the BOP as low or medium security, and were designated to the CMU at the Federal Correctional Institution in Terre Haute, Indiana (hereinafter "FCI Terre Haute"), or the United States Penitentiary in Marion, Illinois (hereinafter "USP Marion") despite having a relatively, and in some cases perfectly, clean disciplinary history.

5.      Not a single Plaintiff has received discipline for any communications-related infraction within the last decade, nor any major disciplinary offense.  Two Plaintiffs' disciplinary histories are completely clean.

6.      Adding to the suspect nature of these units, upwards of two-thirds of the prisoners confined there are Muslim – a figure that over-represents the proportion of Muslim prisoners in BOP facilities by at least 1,000%.  Many of the remaining prisoners have unpopular political views.

7.      Plaintiffs' CMU designation was discriminatory, retaliatory, and/or punitive in nature and not rationally related to any legitimate penological purpose or substantiated information.  Instead, it was based on their religion and/or perceived political beliefs, or in retaliation for other protected First Amendment activity.

8.      Like all prisoners designated to the CMU, Plaintiffs received no procedural protections related to their designation, and were not allowed to examine or refute the allegations that led to their transfer.  Some plaintiffs and other CMU prisoners are being held indefinitely at the CMU without any meaningful review process.  Many face five, ten, even fifteen more years in prison.  They fear serving their entire sentences in these isolated and punitive units.

9.      Plaintiffs have been placed indefinitely in a setting that imposes atypical and significant curtailments on their ability to communicate with loved ones, including the right to hug, touch, or embrace their family members, including children.  As a result, Plaintiffs' familial relationships and rights of association with loved ones have been substantially impaired, and, with respect to relationships with young children, completely destroyed.  CMU conditions hamper Plaintiffs' ability to engage in meaningful rehabilitation, and inflict pointless psychological pain.

10.      As a result of Defendants' misconduct, all Plaintiffs are suffering severe and unjustifiable emotional distress, psychological injury, and strain on their relationships.  Some have lost meaningful contact with family, including their children.

11.      Defendants, by creating, participating in, and endorsing Plaintiffs' systematic mistreatment, are violating the rights guaranteed to Plaintiffs under the First and Fifth Amendments to the United States Constitution, and the Administrative Procedures Act.

12.      All Plaintiffs seek a judgment declaring that Defendants' actions and those of all persons acting on their behalf violate the constitutional and statutory rights of all Plaintiffs as to each applicable count.  Plaintiffs also seek a declaration that each

individual Plaintiff's transfer to and detention in the CMU is and was unjustified, unconstitutional, and unlawful.  Plaintiffs further seek an injunction compelling Defendants to return Plaintiffs to the general population of an appropriate BOP facility and allow them the same opportunity to communicate with their families as other prisoners at their classification level, or enjoining Defendants from operating the CMU in a way that violates all Plaintiffs' rights.  Plaintiffs also seek to have their prison records expunged of any mention of the CMU.  Plaintiffs Daniel McGowan and Kifah Jayyousi seek compensatory and punitive damages against Defendant Leslie S. Smith.  In addition, all Plaintiffs seek an award of costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

13.     This court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act), 5 U.S.C. § 551 *et seq*. (Administrative Procedures Act), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

14.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b), because Defendants are headquartered and work in Washington, DC, a substantial part of the events or omissions giving rise to the claim occurred in Washington, DC, and, as illustrated by memoranda and Congressional testimony, the policies and decisions giving rise to the injuries complained of herein occurred, and continue to occur, in Washington, DC.

## PARTIES

15.     Plaintiff YASSIN MUHIDDIN AREF is a 42-year-old refugee and published author from Iraqi Kurdistan who fled Saddam Hussein's regime, moving to

Albany, New York, in 1999.  Following a controversial and well-publicized sting

operation, Mr. Aref was convicted of money laundering, material support for terrorism,

conspiracy, and making a false statement to the FBI.  Mr. Aref is classified as a low

security prisoner.  Despite the fact that Mr. Aref has no history of disciplinary infractions

within the BOP, he was transferred to the CMU at FCI Terre Haute in May 2007.  After

22 months at the FCI Terre Haute CMU, Mr. Aref was transferred to the CMU at USP

Marion.  In April 2011, almost four years after he was first sent there, he was finally

transferred out of the CMU, and placed into general population. Mr. Aref has no

affiliation with extremist or violence-oriented religious or political organizations.  Indeed,

Mr. Aref is opposed to violent or extremist religious and political ideologies.

      16.     Plaintiff DANIEL MCGOWAN is a 38-year-old man from Queens, New

York, and is an American citizen.  In 2007, Mr. McGowan was sentenced to 7 years

imprisonment for conspiracy and arson.  He is classified as a low security prisoner.

Despite the fact that Mr. McGowan has never received a disciplinary infraction, he was

transferred to the CMU at USP Marion in August of 2008.  In October 2010, Mr.

McGowan was transferred from the CMU to general population at USP Marion.  He

remained there until February 2011, incurring no disciplinary infractions.  But in

February 2011, he was abruptly redesignated to the Terre Haute CMU.  While Mr.

McGowan's imprisonment resulted from crimes he committed when associated with the

Earth Liberation Front (ELF), he is no longer associated with that organization or any

similar organization, and he has not attempted any communication with members of ELF

or any similar organization.  Mr. McGowan has no affiliation with extremist or violence-

oriented religious or political organizations.  Indeed, Mr. McGowan is opposed to violent or extremist religious and political ideologies.

17.     Plaintiff ROYAL JONES[1] is a 42-year-old man from San Francisco and is an American citizen and a practicing Muslim.  In July 2006, Mr. Jones was arrested in Montana for soliciting a crime of violence – bank robbery – and for a probation violation relating to an earlier gun charge.  He pled guilty, and was sentenced in 2007 to 94 months in prison.  He is classified as a medium security prisoner.  Despite the fact that Mr. Jones received no major disciplinary infractions, and no communications-related disciplinary infractions within the last ten years, he was transferred to the CMU at USP Marion on June 9, 2008.   Mr. Jones has no affiliation with extremist or violent religious or political organizations.  His underlying conviction involved no allegations of terrorism.  Indeed, Mr. Jones is opposed to violent and extremist religious and political ideologies.

18.     Mr. Jones was released from the CMU in March of 2010, without explanation, and is currently in the general population at USP Marion.  He has been told that he will remain at USP Marion for at least six months, and will immediately be placed back in the CMU if he engages in any of the conduct that led to his CMU designation.  Mr. Jones does not know what that conduct was, and thus does not know how to avoid re-designation to the CMU.  He joins in all claims based on his well-founded fear of re-designation to the CMU.

---

[1] Mr. Jones is currently housed at a halfway house in Montana.  Counsel for Plaintiffs have filed a Motion to Withdraw as Counsel for Plaintiff Royal Jones (Docket # 52), which was fully briefed as of November 8, 2011 (see Docket # 53, 54, 56, 57) but has not yet been decided.  Plaintiffs' counsel have been unable to ethically advise Mr. Jones during the pendency of this motion. For this reason, the allegations in this proposed First Amended Complaint that pertain to Mr. Jones have not been amended or altered.

19.     Plaintiff KIFAH JAYYOUSI is a 50-year-old American citizen of Jordanian descent from Detroit, Michigan, and a practicing Muslim.  Despite the fact that his alleged criminal conduct primarily involved financial contributions to charities, and his sentencing judge found that he ceased involvement in any criminal conspiracy in 1998, Mr. Jayyousi was convicted of conspiracy to murder, kidnap and maim in a foreign country and conspiracy to provide material support to terrorism in August 2007, and sentenced to 12 years and eight months imprisonment.  Although Mr. Jayyousi has received no major disciplinary infractions, and absolutely no communications-related disciplinary infractions, he was transferred to the CMU at Terre Haute in June 2008.  He was then transferred to the CMU at Marion in October 2010, and has been there ever since.  Mr. Jayyousi has abandoned any affiliation with extremist or violence-oriented religious or political organizations.  Indeed, Mr. Jayyousi is opposed to violent or extremist religious and political ideologies.

20.     Defendant ERIC HOLDER is the Attorney General of the United States and the head of the United States Department of Justice.  BOP is an agency of the United States Department of Justice.  Defendant Holder has ultimate authority over BOP decisions, including policy decisions regarding the FCI Terre Haute and USP Marion CMUs, and the promulgation of BOP regulations.  *See* 18 U.S.C. § 4042.  Holder has affirmatively maintained the policy of confining individuals indefinitely in the CMU, without notice or opportunity to be heard and for no legitimate penological purpose. Defendant Holder's place of work is located in Washington, DC.  Defendant Holder is sued in his official capacity.

21.     Defendant CHARLES E. SAMUELS is the Director of the BOP.

Defendant Samuels exercises authority over all BOP determinations.  *See* 18 U.S.C. §§

4041, 4042.  The former director of the BOP made the decision to establish the FCI Terre

Haute CMU and the USP Marion CMU, and set the conditions at both units, and

Defendant Samuels has continued those policies.  Defendant Samuels' place of work is

located in Washington, DC.  Defendant Samuels is sued in his official capacity.

22.     Defendant D. SCOTT DODRILL is, and has been since June 2009,

Assistant Director of BOP's Correctional Programs Division.  The Correctional Programs

Division sets policies regarding the designation of inmates to the FCI Terre Haute and

USP Marion CMUs and has authored memoranda to this effect.  Defendant Dodrill's

place of work is located in Washington, DC.  Defendant Dodrill is sued in his official

capacity.

23.     Defendant LESLIE S. SMITH is the Chief of the Counter Terrorism Unit

(CTU) for the BOP, Washington, DC.  The CTU is located in Martinsburg, WV, 65 miles

from Washington, DC.  In his capacity as chief of the CTU, Defendant Smith reviews

inmates who are nominated for CMU designation, nominates inmates for CMU

designation, determines and authors memoranda articulating the rationale for CMU

designations, and makes final recommendations regarding CMU designation.  Defendant

Smith also reviews, and makes recommendations regarding transfers from the CMU.

Defendant Smith was responsible for determining and explaining the reasons and

justifications for Plaintiffs' designation to the CMU, recommending their designation to

the CMU, and making recommendations against their transfer out of the CMU.  Mr.

Smith is sued in his official and individual capacities.

24.    Defendant BOP is a federal agency under the APA and is headquartered in Washington, DC.  BOP created the CMU at FCI Terre Haute and the CMU at USP Marion in which plaintiffs are confined, and issued the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplements.  BOP establishes regulations applicable to federal prisons and prisoners and creates and operates prison units in which prisoners are confined.  *See* 18 U.S.C. § 4042.

## STATEMENT OF FACTS

### I.    General Background

25.    The existence of a CMU at FCI Terre Haute was first disclosed on December 11, 2006, when seventeen prisoners were transferred there without explanation, notice or hearing.  The publicly-available policies applicable to the unit are contained in the Terre Haute CMU Institution Supplement, a true and correct copy of which is attached hereto as Exhibit A and incorporated by reference herein.  The Institution Supplement is dated November 30, 2006, but was not provided to CMU prisoners nor disclosed to the public until January 2007.

26.    BOP officially established a CMU at USP Marion through an Institution Supplement dated March 20, 2008.  A second Institution Supplement for the Marion CMU was released on November 13, 2008 ("Marion CMU Institution Supplements").  A true and correct copy of both of these Marion CMU Institution Supplements are attached hereto as Exhibit B and incorporated by reference herein.

27.    Unlike most prisons, where day-to-day conditions and operations are set by the prison warden, the CMUs are controlled by Defendants Samuels and Dodrill.  The Wardens at both FCI Terre Haute and USP Marion lack authority to change conditions at

the CMU, or order prisoners transferred from the unit.  The conditions at both units are identical, with changes in policy occurring simultaneously.  Even operational minutia, such as approval for individual visits and telephone calls, is determined by officials in Washington, DC.  For example, email, visits and phone calls were temporarily suspended at the CMU in Marion, Illinois in early February 2010 due to snowstorms in Washington, DC.  By contrast, wardens at other facilities exercise discretion over such decisions as long as they act within BOP guidelines.

28.     Former Director of the BOP Lappin and the former Assistant Director of BOP's Correctional Programs Division, Joyce K. Conley, ordered and assented to the establishment of both CMUs and the issuance of the Institution Supplements pursuant to new United States Department of Justice policy.  The stated purpose of the new units was to hold dangerous terrorists and other high-risk inmates who require heightened communications monitoring and control.  *See* U.S. Dep't of Justice, Office of the Inspector General (OIG), THE FEDERAL BUREAU OF PRISONS' MONITORING OF MAIL FOR HIGH-RISK INMATES, REPORT NO. I-2006-009 (Sept. 2006), at xi (noting that the BOP had "several ongoing and proposed initiatives to improve the monitoring of communications for terrorist and other high-risk inmates.  The initiatives include . . . consolidating all terrorist inmates in a few institutions in order to concentrate the resources required to monitor them [and] limiting the volume of mail and other types of communication available to terrorists or other high-risk inmates.")

29.     Former Defendant Lappin characterized, and Defendant Holder continues to publicly characterize, the CMUs as filled with "terrorists."

30.     Subsequent to the issuance of the OIG Report, however, the BOP
expanded the types of prisoners who may be housed at the CMUs to include: (1) those
convicted of, or associated with, international or domestic terrorism; (2) those convicted
of sex offenses who repeatedly attempt to contact their victims; (3) those who attempt to
coordinate illegal activities while incarcerated via approved communication methods; (4)
those who have received extensive disciplinary actions due to their continued
misuse/abuse of approved communication methods; and (5) those with a history of
making threats against judicial officers.  *See* Bureau of Prisons' 2007 State of the Bureau
Report, *available at* http://www.bop.gov/news/PDFs/sob07.pdf, and other BOP
documents.

31.     Thousands of prisoners within the BOP fit into these categories.  For
example, according to one OIG report, as of July 2006, the BOP categorized 19,720
inmates within the federal system as "high-risk" based on gang, international or domestic
terrorist associations.  And in 2009, then Director Lappin informed Congress that the
BOP has custody of 1,200 international and domestic terrorists.  Thousands of other
federal prisoners are presumably eligible for transfer to the CMU based on prison
infractions involving communications.  For example, in 2008 the BOP staff confiscated
1,519 unauthorized cell phones from federal prison camps and 255 cell phones from
secure federal prisons.

32.     As described in detail *infra*, Defendants have neglected to implement any
controls or criteria to determine who is designated to the CMU, and to review that
designation.  Plaintiffs simply have no means to demonstrate that they do not belong in a
CMU.  The direct and predictable result of this lack of process is a pattern of transfers for

illegitimate, discriminatory, and/or retaliatory reasons.  Thus, Defendants have allowed

for Plaintiffs to be designated to the CMU based solely on their constitutionally-protected

religious or political beliefs, and/or as a result of retaliation.  Indeed, several Plaintiffs do

not even fit within any of the five broad categories outlined above.  Of course,

designation based on religious or political identity and speech is arbitrary and

impermissible, and lacks any legitimate penological purpose.

## II.      Policies, Practices, and Conditions at the CMU

33.      The CMU is an experiment in social isolation.  Practices and conditions

within the CMU are, however, without legitimate penological purpose.  Plaintiffs are

allowed no physical contact with their family and friends, and extremely limited

opportunity for non-contact visitation and other communication.  They are completely

segregated from the rest of the prison population.

### a.      Categorical Ban on Contact Visits

34.      As a general matter, the BOP encourages contact visitation by family,

friends, and community groups to maintain the morale of the inmate and to aid

rehabilitation.  CMU prisoners, however, are banned from any physical contact during

social visitation.  The BOP categorizes the CMU as a "self-contained general population

unit."  Yet it is the only "general population" unit Plaintiffs are aware of within the entire

BOP that prohibits all contact visitation.

35.      The BOP has established procedures to prevent the passage of contraband

and to ensure the security and good order of the institution.  In that context, the BOP

permits limited physical contact, such as handshaking, embracing, and kissing, between

an inmate and a visitor, unless there is clear and convincing evidence that such contact

would jeopardize the safety or security of the institution. The CMU ban on contact visits directly contradicts this explicit BOP policy.

36.     BOP prisoners are rarely denied contact visits even after being found guilty of serious disciplinary offenses.  BOP prisoners in administrative detention or disciplinary segregation, for example, retain visiting privileges under the same rules and regulations as prisoners in the general population.  Visiting may be restricted or disallowed only when a prisoner is charged with, or has been found to have committed, a prohibited act that is directly related to visitation, or where the prisoner acted in a way that would reasonably indicate that the she or he would be a threat to the orderliness or security of the visiting room.  Loss of visiting privileges for any other reason requires a hearing, where a Discipline Hearing Officer (DHO) must find that the inmate committed a prohibited act *and* that there is no other appropriate sanction.

37.     At oral argument before the Supreme Court of the United States in the case of *Overton v. Bazetta,* then Assistant to the Solicitor General, Jeffrey Lamken, characterized these procedural protections related to visitation as "extensive."

38.     By contrast, CMU inmates are categorically denied contact visits, potentially for the entire period of their incarceration, without any hearing, the showing of a prohibited act, or any other security justification.  CMU inmates may not touch, hug, kiss, shake hands, or have any physical contact whatsoever with their children, wives, siblings, pastors, or friends – including infants.  This is so despite a complete lack of any evidence or allegation that providing Plaintiffs with contact visits would jeopardize the safety or security of the prison.  Indeed, all Plaintiffs had access to contact visits prior to their designation to the CMU, and no incidents or violations occurred.

39.     Because contact visitation by Plaintiffs poses no security concern, the categorical ban serves no legitimate penological purpose.  According to the BOP, the purpose of the CMU restrictions is to allow for effective *monitoring* of communications.  Even presuming the legitimacy of this purpose, there are ready alternatives at each Unit that would allow for effective monitoring of visits at *de minimis* cost to the prison, without a ban on physical contact.

40.     Each CMU has a contact visitation room, currently available for attorney-client contact visits.  As only one social or attorney-client visit may currently take place in the CMU at any given time, and all the visits are monitored live by Unit staff, effective monitoring of communication could occur by allowing the visit to take place in the attorney-client contact visitation room, and requiring Plaintiffs and their visitors to speak audibly.  A simple tape-recorder could be placed on the table in the visiting room if recording of communication for future analysis is desirable.  Other easy solutions also exist.  Many areas in each CMU are currently wired for audio and video recording.  Thus, it is reasonable to assume that a visitation area could be similarly set up at little cost.  Indeed, according to a 2006 OIG report, eight BOP facilities are already set up to audio-record contact visits.

41.     The prohibition on contact visitation is exceptionally harsh.  Plaintiff Jayyousi has five children.  Because Mr. Jayyousi will not be released until 2016, he will next be able to hug his children in four years, and has not done so for five years.  Plaintiff Aref was unable to touch or comfort his four young children, including one toddler, for the entire four years he spent at the CMU.  A ban on physical contact for this lengthy

period, for no legitimate penological purpose, is cruel and unusual, and an atypical hardship.

42.     The prolonged and indefinite ban on physical contact is extremely deleterious to Plaintiffs' emotional and mental health and rehabilitation, and to maintenance of family integrity.  While Plaintiffs do have access to email through a BOP pilot program, this non-real time method of communication does not substitute for physical contact, or otherwise mitigate the ill-effects of the blanket ban.  Psychological research shows a consistent correlation between quantity and quality of touch and relationship integrity.[2]  Physical contact is a basic human need essential to one's mental health, and the maintenance of close family relationships, especially those between husbands and wives, and parents and children.  With respect to young children, it is the *only* means of effective association.  Physical contact in the context of prison visitation is of central importance—as non-contact visitation leads to emotional stress and interferes with the positive role visitation can play in maintaining family integrity.[3]

**b.     Limitations on Number and Duration of Visits**

43.     While Plaintiffs can receive non-contact visits, those too are severely circumscribed without legitimate penological purpose.

44.     In recognition of the important role visitation plays in rehabilitation, morale, and maintenance of family integrity, the BOP places no cap on the number or

---

[2] *See generally,* Matthew J. Hertenstein, Julie Verkamp, Alyssa M. Kerestes, Rachel M. Holmes, *The Communicative Functions of Touch in Humans, Nonhuman Primates, and Rats: A Review and Synthesis of the Empirical Research,* 132 GENETIC, SOC. & GEN. PSYCHOL. MONOGRAPHS 34 (2006) (*available at* http://www.depauw.edu/learn/lab/publications/documents/touch/2006_Touch_The%20communicative_fun ctions_of_touch_in_humans.pdf); *see also,* JUDEE K. BURGOON, DAVID B. BULLER, & W. GILL WOODALL, NONVERBAL COMMUNICATION: THE UNSPOKEN DIALOGUE, McGraw-Hill (1996) (arguing that people rely more heavily on nonverbal communication, especially in times of stress, because nonverbal communication preceded language in evolution of the species, and thus has phylogenetic primacy).
[3] *See* Joyce Arditti, *Locked Doors and Glass Walls: Family Visiting at a Local Jail,* 8 J.LOSS & TRAUMA 115 (2003).

duration of visits that BOP inmates may generally receive.  The only limit is based on

available visiting hours and chronic overcrowding.  Existing Regulations, applicable to

all BOP prisoners, emphasize that, "at a minimum, the Warden shall establish visiting

hours at the institution on Saturdays, Sundays, and holidays."  28 C.F.R. § 540.42(a)

(noting also that the "restriction of visiting to these days may be a hardship for some

families and arrangements for other suitable hours shall be made to the extent

practicable").

45.     Neither the Terre Haute CMU Institution Supplement nor the Marion

CMU Institution Supplement amended existing Regulations regarding visitation through

notice and comment rulemaking.  *See* Section V, *infra*.

46.     As at most federal prisons, non-CMU prisoners in the general population

at USP Marion may receive visits each weekday evening, from 5:00 p.m. to 8:00 p.m.,

and all day on weekends and holidays, from 8:30 a.m. to 3:00 p.m.  Even prisoners in

administrative and disciplinary segregation may receive weekend visits.  There is no

apparent limitation on the number or duration of visits that non-CMU inmates at USP

Marion may receive per month.

47.     Visiting hours and frequency are similar for prisoners in the general

population at Terre Haute, where visits may occur on Fridays through Sundays and on

federal holidays from 8:00 a.m. to 3:00 p.m.  General population inmates at Terre Haute

are allowed seven visits during a calendar month, and there is no limit on the duration of

the visit.  Therefore, BOP policy allows inmates in general population up to 49 hours of

visits a month.

48.     These regulations are typical of the entire federal system.  The situation at the CMU stands in sharp contrast.

49.     Until January 3, 2010, Plaintiffs were allowed only one four-hour visit or two two-hour visits per month, and could only receive those visits on weekdays, during work/school hours.  They were not allowed to receive any visits on weekends, holidays, or evenings.  These restrictions made it extremely difficult for Plaintiffs to receive visits from family members who worked or were in school, and thus placed a substantial burden on their ability to maintain the integrity of their familial relationships.

50.     In October 2009, after three years of these restrictions being in effect, the BOP announced incremental changes at the CMUs in apparent response to current and threatened litigation.

51.     In January 2009, Sabri Benkahla, an inmate at the Terre Haute CMU, filed a federal lawsuit in the Southern District of Indiana alleging that the CMU was established in violation of the APA.  Mr. Benkahla is represented by the National Prison Project of the American Civil Liberties Union.  Mr. Benkahla's APA claim is analogous to the claim asserted here, but he asserts none of the constitutional claims raised by Plaintiffs.

52.     Throughout 2009, undersigned counsel communicated extensively with Plaintiffs and other CMU inmates and arranged to visit Plaintiffs and other CMU prisoners in contemplation of the present litigation.

53.     An unsigned and undated Notice to Inmates was posted at both the Marion and Terre Haute CMUs in October 2009.  A true and correct copy of the Notice to

Inmates is attached hereto as Exhibit C.  The Notice announced that the visiting hours for CMU prisoners would be expanded on January 3, 2010.

54.     As of January 3, 2010, CMU prisoners are now allowed eight hours of visiting time per month.  No single visit can be scheduled for a period longer than four hours.  Visits are permitted Sunday through Friday, 8:30 a.m. to 2:30 p.m.  No visiting is allowed on Saturdays.

55.     These incremental changes to CMU policy, though welcome, are not sufficiently substantial to correct the harm done to Plaintiffs' familial relationships over the past several years.  Nor do they bring the unit in line with what is typical for federal prisoners throughout the country, and what the Constitution requires.

56.     Moreover, the changes have not been codified into either institution supplement, which continue to cite the old policy as controlling.  There has been no indication as to the permanency of the changes.  And, as it is reasonable to assume they have been made in reaction to threatened and existent litigation, they may not be relied upon to continue.

57.     Even as voluntarily-expanded, the visitation policy at the CMU remains the most restrictive for general population prisoners in the federal system.

58.     Prisoners at the Administrative Maximum (ADX) facility USP Florence, the only "supermaximum" security facility in the federal system, are allowed significantly more visitation time than CMU prisoners.  BOP policy allows those "max" security prisoners up to five visits per month, each of which may last for seven hours – for a total of 35 hours of visitation a month.  This is more than four times the amount of visitation time CMU prisoners currently receive.

59.     There is no legitimate penological purpose for the limited hours and number of visits allowed to CMU prisoners.  A weekend visit poses no different security concerns than does a weekday visit, and each visitor is screened prior to entrance into the facility.  The policy is needlessly cruel and serves only to interfere with Plaintiffs' ability to maintain meaningful relationships with their families and loved ones.

**c.      Limitations on Phone Calls**

60.     As with visits, the BOP recognizes that telephone calls are extremely important to rehabilitation, morale, and the maintenance of family integrity.  Indeed, because so many prisoners in the federal system are incarcerated far from their family and friends, telephone communication is the only way many BOP prisoners can stay connected with their loved ones.  For this reason, BOP prisoners in general population are allowed 300 minutes of outgoing telephone calls per month.  *See* Telephone Regulations for Inmates, *available at* http://www.bop.gov/policy/progstat/5264_007.pdf, at 4.  They may use these minutes at their discretion, generally between 6:00 a.m. and 11:30 p.m., with few restrictions.  *Id*. at 14.

61.     Until January 3, 2010, by contrast, CMU inmates were entitled to only one 15-minute telephone call per week, and could only make those calls on weekdays, during school and work hours.  This rendered telephone communication with school-age children exceptionally difficult.  While these restrictions have been minimally loosened, Plaintiffs have no reason to believe the recent change is permanent, nor does it correct the severe impairment of Plaintiffs' relationships.

62.     CMU prisoners are now allowed two 15-minute telephone calls per week. *See* Exhibit C.  Plaintiffs thus receive a total of 120 minutes of telephone calls a month, in contrast to the 300 minutes almost all other federal prisoners receive.

63.     Unlike other federal prisoners, CMU prisoners may only make a call if they sign up and designate the call recipient and the exact timing of the call one week in advance.  If the recipient does not pick up the phone, or the call is cut off for some reason, CMU prisoners may not try the number again, nor are they allowed to call someone else instead.

64.     The severe restrictions on the number and duration of phone calls have placed a substantial burden on Plaintiffs' ability to maintain relationships with their family and friends.  Plaintiffs with large families face difficult decisions each week over who to call, and who not to call.

65.     There is no legitimate penological purpose for the needlessly cruel limitation on Plaintiffs' hours and duration of telephone calls, as each call is live monitored.  Such limitation serves only to interfere in Plaintiffs' ability to maintain meaningful relationships with their families and loved ones.

**d.      Segregation from General Population & Lack of Release Preparation Programming**

66.     Although described as a "general population housing unit," prisoners in the CMU are segregated from other prisoners at both FCI Terre Haute and USP Marion and not allowed to have contact with non-CMU prisoners.  The units are known and referred to throughout both prisons (and the BOP as a whole) as "terrorist units."  The stigma of "terrorist" follows plaintiffs and other CMU prisoners even after their release.

67.     For some Plaintiffs, this stigma will lead to an increase in the period of their incarceration.  For example, as described *infra*, former Plaintiff Twitty was approved for nine months of pre-release placement at a halfway house in his home town of Washington, DC, making him eligible for release to that halfway house in April 2010.  However, the halfway house would not accept him until August 2010 because his assignment to the CMU suggested that he was a management problem.  Thus, the stigma attached to CMU designation kept Mr. Twitty incarcerated for an extra four months.

68.     The remaining Plaintiffs fear that their post-release prospects will be similarly compromised.  The BOP requires that all eligible prisoners receive the opportunity to engage in release preparation programming to facilitate their ability to gain employment post-release.  *See generally* 28 C.F.R. 571.10 – 571.13; BOP Program Statement 5325.07 Release Preparation Program ("RPP").  Such programming is a mandatory requirement for prisoners within 30 months of release.  Plaintiffs would like the opportunity to participate in release preparation programming.  Denial of this important tool for rehabilitation is contrary to mandatory BOP rules, and has a significant negative impact on Plaintiffs' ability to gain placement at a halfway house, gain employment post-release, and successfully reenter free society.

## III.     Denial of Due Process

### a.     Lack of Procedural Protections

69.     Despite the profound deprivations that have resulted from Plaintiffs' designation and transfer to the CMU, that designation, along with Plaintiffs' continued confinement in the CMU, is completely devoid of any procedural protections.  In some

cases it is also contrary to the professional judgment of the prison officials who have direct contact with Plaintiffs.

70.     According to a Memorandum from the Assistant Director of the BOP Correctional Programs Division (a true and correct copy of which is attached hereto as Exhibit D and incorporated by reference herein), a prisoner may be nominated for CMU designation by regional staff who believe the prisoner requires enhanced monitoring. Regional Directors and their staff may nominate inmates of their choice for CMU placement by contacting Defendant Leslie S. Smith, who describes his position as "the Chief of the Counter Terrorism Unit ('CTU') for the Federal Bureau of Prisons ('BOP'), Washington, D.C."  Plaintiffs are also aware of prisoners nominated to the CMU by wardens and other facility staff.  Defendant Smith also personally elects certain prisoners for transfer to the CMU.  For example, with respect to one prisoner, Defendant Smith instructed a case manager to request the prisoners' transfer to the CMU and even specified the language that request should utilize. In his capacity as chief of the CTU, Defendant Smith reviews inmates who are nominated for CMU designation, determines and authors memoranda articulating the rationale for the CMU designation, and makes final recommendations regarding CMU designation.  Defendant Smith is also empowered to make recommendations about the continued retention of prisoners at the CMU, even where facility-level staff has recommended their transfer out of the CMU.

71.     Typically, when designation to a special unit will deprive a prisoner of rights or benefits, the BOP issues detailed regulations regarding criteria and documentation of the reason for referral.  *See, e.g.,* BOP Program Statement P5217.01 Special Management Units at 2 (describing referral criteria and contents of referral

packet); BOP Program Statement 5212.07 Control Unit Programs at 3-6 (same).  Yet the

BOP has provided only the most general guidance to staff on criteria for CMU

placement, and has not indicated any need to detail and document the reason for referral.

72.     Unlike prisoners designated for Special Management Units or Control

Units, Plaintiffs did not receive prior notice, an opportunity to be heard, a meaningful

description of the information that led to their referral, or the right to an appeal.  This lack

of process is absolutely unparalleled in the BOP, and establishes a situation ripe for abuse

through retaliatory and discriminatory designation and transfer to the CMU.  Transfers to

Special Management Units and Control Units all come with a hearing, a detailed pre-

hearing notice, a detailed post-hearing explanation and the right to appeal.  *See* BOP

Program Statement P5217.01 Special Management Units at 2-4; BOP Program Statement

5212.07 Control Unit Programs at 7-10.

73.     In place of meaningful process, after their transfer to the CMU each

Plaintiff received a one-page Notice of Transfer stating the following:

> This notice informs you of your transfer to a Federal Bureau of Prisons
> (Bureau) facility that allows greater management of your communication
> with persons in the community through more effective monitoring of your
> telephone use, written correspondence, and visiting.  Your communication
> by these methods may be limited as necessary to allow effective
> monitoring.  Your general conditions of confinement in this unit may also
> be restricted as necessary to provide greater management of your
> communications . . . . Your transfer to this facility for greater
> communication management is necessary to the safe, secure, and orderly
> operation of Bureau institutions, or protection of the public.

A true and correct copy of each Plaintiff's Notice of Transfer is attached hereto as

Exhibit E and incorporated by reference herein.

74.     The one-page notice provided to each Plaintiff also includes language

purporting to explain why each Plaintiff was designated to the CMU.  For some

Plaintiffs, like Mr. McGowan, the information included in this notice is factually

erroneous.  For others, the statements are so vague and generic as to provide no notice at

all as to the factual premise that led to CMU designation.  Plaintiff Jones and former

Plaintiff Twitty's transfer notices, for example, include identical and vague sentences,

with no reference to any underlying factual allegations.  Thus none of these Plaintiffs is

aware of why he was designated to the CMU.

75.     Each Plaintiff has sought to discover from the BOP the factual information

underlying their designation and transfer.  No such information has been forthcoming.

76.     CMU designation is especially mysterious for those Plaintiffs, like Jones

and former Plaintiff Twitty, who do not even fit any of the five alleged bases for CMU

designation set out at paragraph 30, *supra*.   And Plaintiffs McGowan, Jayyousi, and

Aref, who arguably fit into the first criterion because their conviction is related to

terrorism, have not attempted to contact or communicate with any terrorists while in

prison nor acted in any other way to threaten prison security.  No Plaintiff has made

judicial threats, or even stood accused of attempting to coordinate illegal activity via

approved communication methods.  No Plaintiff was convicted of a sex crime.  And no

Plaintiff has a significant history of disciplinary infractions or communications-related

infractions.

77.     Because Plaintiffs have no meaningful opportunity to challenge their

designation to, and continued incarceration in, the CMU, they fear being held at the CMU

for the duration of their sentences.  Prior to the threat of this litigation, no CMU prisoner

had been transferred from the CMU except for medical or disciplinary reasons, or upon

release.  Since the pendency of this suit, transfers have become commonplace, but

Plaintiffs who have gained release from the CMU do not know how or why.  Similarly, there is no reason to believe that transfers from the CMU will continue once judicial scrutiny of the CMU ceases.

78.     Plaintiffs have not been informed of any way they can change their behavior, otherwise earn release, or stay out of the CMU if released.  This too, is unique within the BOP.  In contrast, Special Management Unit placement is intended to last only 18-24 months, and is based upon set steps each prisoner may take to receive benefits through compliance with set behavioral expectations.  Similarly, the propriety of continued placement in a Control Unit is reviewed by the unit team every 30 days, and by an Executive Panel (including the regional director and the Assistant Director of the Correctional Programs Division) every 60 to 90 days.  *See* BOP Program Statement P5217.01 Special Management Units at 1, 8; BOP Program Statement 5212.07 Control Unit Programs at 20.

79.     The one page CMU transfer notice provided to each Plaintiff states:

> Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of inmates.

80.     But according to the Notices of Transfer, each Plaintiff's designation to the CMU was based either on their conviction or offense conduct, or upon undisclosed behavior that presumably occurred at a prior institution.  Because CMU designation is not based on any ongoing misbehavior, the reason for designation will never change or diminish.   Indeed, Plaintiff Jayyousi has been directly told by his Unit Manager that he will serve the rest of his twelve year and eight month sentence at the CMU.

81.     Contrary to the Notice of Transfer and referenced BOP policy, Plaintiffs have been repeatedly informed by members of their unit team that neither the unit team nor the warden has power to have a prisoner transferred from the CMU, and that these decisions are instead made by higher-ups in the BOP hierarchy.  *Compare* BOP Program Stmt 5100.008 Classification at 55 ("unit team and/or warden" is final authority on custody classification, to be determined at program reviews; intent of policy is to allow staff to utilize professional judgment within specific guidelines).

82.     No meaningful review of the appropriateness of CMU placement occurs at the program reviews.  For years, Plaintiffs who sought to discuss transfer from the CMU at their program reviews were told by their unit team that the only possible way out of the CMU is a request for a "nearer release" transfer.  This type of transfer may not be sought until a prisoner has served 18 consecutive months with clear conduct at a given facility.  Any disciplinary report, even for a minor rule violation like failing to stand for count, restarts the 18 month clock.

83.     Moreover, a nearer relief transfer is *completely* discretionary, and may be denied without reason or explanation.  Plaintiff Jayyousi, for example, waited the requisite 18 months and then sought a nearer release transfer.  He was denied without explanation, and has since between transferred from one CMU to the other.  Other prisoners, like Plaintiff Aref, were transferred from one CMU to the other after 18 months.  This also restarts the clock on the possibility of requesting transfer from the CMU.

84.     In October 2009, an undated, unsigned Notice to Inmates was posted at both the Terre Haute and Marion CMUs, detailing a new process by which the unit team

would review inmates for continued CMU placement at program reviews.  According to

the BOP's response to a request for informal remedy filed by Plaintiff Jones, the memo

was authored by Assistant Director Dodrill and was issued on October 15, 2009.  A true

and correct copy of the Notice to Inmates is attached hereto as Exhibit F and incorporated

by reference herein.

85.     The Notice indicates that inmates will be provided with 48 hours notice

prior to the review, are expected to attend, and can "personally raise questions and

concerns with Unit Team regarding their placement in the CMU."  *See* Exhibit F at 1.  By

its own description, the process does not serve as a review of, or opportunity to contest,

the original reasons individual inmates were transferred to the CMU; rather, the Notice

presumes that CMU designation was initially appropriate, indicating that the Unit Team

"will consider whether the original reasons for CMU placement *still exist*."  *Id*. (emphasis

supplied).

86.     The Notice specifies five factors that will be considered: 1) offense of

conviction and offense conduct; 2) whether offense of conviction or offense conduct, or

activity while incarcerated, indicates a "propensity" to encourage, coordinate, facilitate,

or further illegal activity through communication with persons in the community; 3)

whether the inmate has attempted, or "indicates a propensity," to contact victims of

current offense of conviction; 4) whether the inmate committed prohibited activity related

to the misuse of communication methods while incarcerated; and 5) whether there is

other evidence of a potential threat to prison or public safety as a result of the inmate's

"unmonitored communication" with persons in the community.  The Notice states that

the Unit Team will forward its recommendation to the Warden, who, if in concurrence,

will forward that recommendation to the BOP's Counter Terrorism Unit (CTU) for review. *Id.* The CTU will forward the final recommendation to the Regional Director of the North Central Region "for further review and consideration." *Id.* According to the Notice to Inmates, the Regional Director of the North Central Region has final authority to approve "an inmate's re-designation from a CMU." *Id.*

87.     This purported review process is illusory. Contrary to the notice, but consistent with past practice, the Unit Teams at both Terre Haute and Marion have continued to fail to review the propriety of CMU placement at program reviews, and continue to state that the responsibility for decisions about CMU placement occur at the Central rather than facility level. Plaintiffs Jayyousi, McGowan, and Jones each attended a program review since the Notice was posted. They were not provided with any information at the review regarding which of the stated criteria led to their CMU designation, nor were they provided with factual information underlying the designation. Plaintiff Aref was explicitly told at one such review that he was categorically ineligible for a transfer until he had spent 18 months at the Marion CMU, pursuant to general BOP policy.

88.     By its own terms, the new process is merely an assessment of whether the "original reasons for CMU placement still exist." *See* Exhibit E at 1. As designation is based on past, rather than continuing conduct, nothing can change. Plaintiffs have no way to meaningfully contest their ongoing placement in the CMU because the allegations underlying those factors, and the factors themselves, have never been disclosed or reviewed.

**b.     Retaliatory and Discriminatory Transfers Resulting from Lack of Process**

89.     The lack of criteria, documentation, and review establishes a situation ripe for abuse through retaliatory or discriminatory designation to the CMU.

90.     For example, in the absence of any history of communications-related violations or significant disciplinary infractions, and as described in further detail *infra*, it appears that former Plaintiff Twitty and Plaintiff Jones were transferred to the CMU in retaliation for grieving and litigating disputes over their treatment in prison.

91.     Similarly, Plaintiff McGowan was originally designated, and subsequently redesignated to the CMU because of his political beliefs and continued involvement in lawful social justice movements while incarcerated.

92.     Plaintiff Jayyousi, meanwhile, has been denied transfer from the CMU based on his political and religious speech, despite the fact that facility staff have requesting that Mr. Jayyousi be transferred out of the CMU

93.     Meanwhile, the population breakdown of the CMUs leads to the inescapable inference that the CMUs were created to allow for the segregation and restrictive treatment of Muslim prisoners based on Defendants' discriminatory belief that Muslim prisoners are more likely than others to pose a threat to institution security.

94.     Of the first 17 prisoners transferred to the Terre Haute CMU, 15 were Muslim.  The population grew quickly.  By March 2007, CMU prisoners reported that there were 48 prisoners in the Terre Haute CMU, and 37 of them were Muslim.  In the last several years, subsequent to media scrutiny of Defendants' targeting of Muslims, more non-Muslims have been moved to the CMU.  Guards on the units have referred to these non-Muslim prisoners as balancers.

95.     Pursuant to a FOIA request, the BOP has provided statistics on prisoners confined at the Terre Haute and Marion CMUs.  According to those statistics, a total of 36 prisoners had been held in the Marion CMU by April 2009, 26 of whom were classified by the BOP as Muslim (making the unit 72% Muslim).  There had been 63 prisoners at the Terre Haute CMU, only 14 of whom were allegedly classified as Muslim or of a religion related to Islam (making the unit 22% Muslim).  13 prisoners were listed as having "no preference" in the Terre Haute CMU statistics.

96.     These BOP statistics appear to significantly minimize the disproportionate number of Muslim prisoners at the Terre Haute CMU, and in fact contradict other statistics supplied by the BOP and Terre Haute CMU staff.  For example, in a list of Ramadan participants created and posted by Terre Haute CMU staff in August 2008, 38 prisoners' names appear – a number which potentially undercounts the number of Muslim prisoners (as some Muslim prisoners may have chosen not to fast for Ramadan) and yet is almost triple the number the BOP reported in April 2009.  Moreover, according to an October 13, 2009 letter from the Associate Director of the DOJ Office of Information Policy, 25 prisoners declared Islam as their religious affiliation at the Terre Haute CMU, and 20 have done so at the Marion CMU.

97.     According to Plaintiffs and other CMU prisoners' self-reporting, the proportion of Muslim prisoners at the Terre Haute CMU is far greater than the BOP reports.  In November 2009, a prisoner at the Terre Haute CMU reported that 24 of 40 prisoners (or 65% of the prisoner population) were Muslim.  Two months previously, in September 2009, another Terre Haute CMU prisoner reported that 25 of 37 prisoners (or 68% of the prisoner population) were Muslim.

98.     These numbers (and indeed even the BOP numbers) represent a vast overrepresentation of Muslim prisoners at the two CMUs when compared to the overall population of BOP facilities.  Of 150,000 prisoners in BOP facilities nationwide in 2004, approximately 9,000 prisoners (or 6% of the total prisoner population) sought Islamic religious services.  *See* U.S. Dep't of Justice, Off. of the Inspector Gen., *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Service Providers*, at 5 (2004) This encompasses prisoners who identify as Sunni and Shiite, or are affiliated with Nation of Islam and the Moorish Science Temple of America.

99.     BOP statistics themselves demonstrate that the Marion CMU is 72% Muslim – a 1,200% overrepresentation compared against the national average.  Even if BOP statistics about the population of the Terre Haute CMU are taken at face value, *but see* ¶¶ 98-99, *supra*, the population of Muslim prisoners at that unit is 367% higher than the national average.  More reliable estimates, however, suggest that the CMU at Terre Haute includes an overrepresentation of Muslim prisoners at a rate of over 1,000% of the national average.

100.    This discrepancy cannot be explained by any non-discriminatory reason, as no Plaintiff has engaged in any behavior while incarcerated to indicate his communication requires monitoring or he otherwise poses a unique threat to prison security.

## IV.     Facts Specific to Individual Plaintiffs

### a.      Yassin Aref

101.    Before his arrest in August 2004, Yassin Aref was living in Albany, New York.  Mr. Aref is married and has four children who were, as of 2010, ages 4, 10, 12,

and 14.  Prior to his confinement in the CMU, Mr. Aref lived with and maintained a very close relationship with his wife and children, although he has been in custody since his wife was six months pregnant with his youngest.

102.    Mr. Aref is a practicing Muslim and served as an Imam of the Masjid-As-Salam Mosque in Albany prior to his incarceration.

103.    Mr. Aref is a refugee from Iraqi Kurdistan.  His village, Hashazini, was destroyed by Saddam Hussein's regime in 1988.  In 1995, Mr. Aref and his family fled to Syria and were granted refugee status under a United Nations program.  In October 1999, Mr. Aref, his wife, and their three children relocated to Albany.  His youngest child was born in the United States.

104.    As reflected in the numerous letters of support that were submitted to the sentencing court on his behalf, Mr. Aref counseled innumerable members of his mosque, teaching classes and offering them support and advice.  He is also an author, whose memoir, *Son of Mountains*, focuses on his quest for a free and peaceful life in the United States.

105.    Mr. Aref was convicted of money laundering, material support, conspiracy, and making a false statement to the FBI in 2007, and was sentenced to a total of 15 years imprisonment.  His conviction arose from a controversial and well-publicized sting operation wherein an undercover officer offered to loan money to Mr. Aref's co-defendant, Mohammed Mosharref Hossain, in exchange for checks, telling Hossain that the money was made from buying a Chinese surface to air missile, which was to be provided to a group called Jaish-e-Mohammed (JEM).  Needing a witness to the loan, as is obligatory for Muslims, the men brought Mr. Aref into the arrangement, solely as a

witness to the loan transactions.  The government arrested both men, alleging that Mr.
Aref chose to support money laundering by witnessing the loan.  The prosecution
acknowledged during its summations at trial that it was not seeking to establish or prove
that Mr. Aref was a terrorist.  After Mr. Aref's conviction, *The Times Union* and the
*Daily Gazette*, Albany's two main daily newspapers, both ran editorials urging leniency
in sentencing.  On March 8, 2007, Mr. Aref was sentenced to 15 years in prison, half the
sentence called for under the Federal Sentencing Guidelines.

106.    Mr. Aref has been in the custody of BOP for the entire duration of his
sentence.  He is due to be released on October 4, 2018.

107.    From September 2005 until March 2007, Mr. Aref was housed at the
Rensselaer County Jail in Troy, New York.  There, he was able to make daily telephone
calls and received two contact visits per week.  These visits and calls allowed him to
maintain a close and supportive connection with his family, and particularly his young
children.  Mr. Aref's wife and children visited him regularly, and Mr. Aref met his
newborn baby twice while he was at the jail.  There, he was able to hold his baby
daughter in his arms.

108.    While an inmate at Rensselaer County Jail, Mr. Aref had no disciplinary
infractions involving visitation or his use of the telephone or the mail.  Mr. Aref has
never received an infraction of any kind at a BOP facility.

109.    Upon sentencing Mr. Aref, Judge McAvoy, district judge for the Northern
District of New York, recommended that Mr. Aref be placed at a facility as close to
Albany, New York, as possible.

110.    The BOP did not follow the Court's recommendation and, despite classifying Mr. Aref as "low security," it transferred him to the CMU at FCI Terre Haute (a medium security prison).  The BOP informed Judge McAvoy by letter that it had not followed his recommendation because of unspecified "security concerns."

111.    Shortly after arriving at the CMU at FCI Terre Haute, Mr. Aref received a Notice of Transfer, dated May 11, 2007, that, by way of explanation for his transfer, states:

> Your current offense of conviction includes Providing Material Support & Resources to a Foreign Terrorist Organization, & Conspiracy to Use a Weapon of Mass Destruction.  Your offense conduct included significant communication, association and assistance to Jaish-e-Mohammed (JeM), a group which has been designated as a foreign terrorist organization.

Mr. Aref has received no further explanation of his designation to the CMU.

112.    Mr. Aref spent 22 months at the CMU at FCI Terre Haute, exhausting the prison grievance system and trying to convince BOP officials that the allegations in his Notice of Transfer mischaracterized his offense conduct.

113.    Mr. Aref applied for a nearer release transfer at his Team Review meetings when he was at the Terre Haute CMU, and was told by his case manager that she was recommending his transfer.  However, his case manager told Mr. Aref that transfer was not up to her, but instead was a decision that would be made in Washington, DC.

114.    Mr. Aref's hopes for a transfer were raised by this recommendation. However, rather than receiving a transfer to general population, Mr. Aref was transferred, once again without notice or explanation, to the CMU at USP Marion on March 27, 2009.

He was incarcerated there until April 2011, when he was transferred to general population.

115.    Mr. Aref had a team review meeting in late 2009.  At that meeting, he asked how he could obtain a transfer out of the CMU, and he was told that he had to wait for 18 months to be eligible for a transfer pursuant to general BOP policy.  Though eventually released from the CMU, Mr. Aref received no explanation for his redesignation, and thus does not know how to ensure that he will not be returned to the CMU in the future.

116.    Mr. Aref's confinement in the CMU severely interfered with his ability to maintain a meaningful relationship with his family.

117.    Mr. Aref's confinement in the CMU, and their lack of contact, caused his wife considerable stress and emotional harm.  Until January 2010, Mr. Aref was forced to talk to his children while they were at school because phone calls were available only during school hours.  The children's principal arranged for them to receive Mr. Aref's call during their lunch recess.

118.    When his access to the phone was increased at the CMU, Mr. Aref also called his children at home once a week. However, Mr. Aref found that his children are too young to communicate with him in a truly meaningful and bonding way on the telephone.

119.    It was very difficult for Mr. Aref to communicate with his children via email because his family does not have internet access at home.  Instead, his children had to travel to a public library in order to communicate with their father by email.

120.    Because Mr. Aref used most of his limited phone calls to speak with his children, he was only able to speak with each of his five siblings every six or seven months.

121.    The CMU's "no contact" visitation policy also means that Mr. Aref was not allowed to touch, hold, hug, or even shake hands with his young children.  When his children did visit him at the CMU, Mr. Aref found the pain of being divided by a barrier and speaking to them on a telephone to be unbearable.  Mr. Aref's wife was no longer willing to bring his children to the CMU for a non-contact visit because she feared it was too traumatizing to their children, and Mr. Aref agreed that the non-contact visits were very upsetting.  Rather than subject himself and his young children to such restrictive and taxing visiting conditions, Mr. Aref gave up receiving visits from his family.  For this reason, Mr. Aref did not receive a visit from his family for over two years.

122.    Due to the youth of Mr. Aref's younger children, his only way to meaningfully associate with them is through physical contact.  Because that contact was denied pursuant to BOP policy, his relationship with them has been severely damaged and he has been denied the opportunity to form any relationship at all with his youngest child.  The restrictions have been extremely detrimental to the children as well.  One son has even become physically ill with a stress-related condition.

123.    Mr. Aref's designation to the CMU has also had a profound effect on his psychological and emotional health.  He has experienced symptoms of anxiety and depression and is obsessed with questions about why he has been singled out for such restrictive confinement, and why he is perceived as dangerous.  This question eats away at him constantly.  He also suffers from feelings of extreme guilt, sadness and self-

loathing over the impact that his confinement at the CMU  had on his wife and children.

His limited interaction with them caused him to become deeply emotional, and he cried

frequently after speaking to them.  He fears that being cut off from his children to such an

extent will have a detrimental effect on their emotional well-being and development.

### b.    Daniel McGowan

124.    Daniel Gerard McGowan is a 38-year-old man from Queens, New York.

Before his arrest in 2005, Mr. McGowan was living with his wife, Jenny Synan, in New

York City.  Mr. McGowan moved back to New York in 2002 after several years on the

west coast specifically to be closer to his family, all of whom live in the vicinity of New

York and New Jersey.  Mr. McGowan maintained a very close relationship with his entire

family, visiting his sisters weekly and his parents several times a month, as well as

speaking to them on the phone and emailing constantly.  Mr. McGowan had an especially

close relationship with his young niece for whom he babysat frequently.

125.    On December 7, 2005, Mr. McGowan was arrested at his work, a non-

profit organization that assists women in abusive situations with their legal needs.  He

pled guilty on November 9, 2006 to conspiracy and two counts of arson.  On June 4, 2007

he was sentenced to seven years in prison.

126.    Mr. McGowan's charges resulted from arsons at two lumber companies in

Oregon in 2001, both credited to the Earth Liberation Front (ELF).  No one was injured

in either action.  Shortly after these arsons, Mr. McGowan distanced himself from ELF,

and disavowed involvement with the group.  Mr. McGowan has not had any involvement

with ELF since 2001, nor has he partaken in any form of property destruction since that

time.

127.     After his arrest, but prior to beginning to serve his sentence, Mr. McGowan was released from custody on bail, and spent seven months on house-arrest, living with his wife, his sister, his brother-in-law, and his young niece.  While on house-arrest, Mr. McGowan was allowed to use the phone freely, and meet with friends and family who chose to visit him.

128.     Mr. McGowan's sentencing judge recommended that he serve his time close to his family, in Fort Dix, New Jersey.  Indeed, at sentencing the Court emphasized the important role Mr. McGowan's loving relationship with his wife, Ms. Synan, might play in his rehabilitation.  Mr. McGowan was classified by the BOP as low security.  His security point level has continued to drop due to his clean institutional conduct.

129.     After spending a few weeks each at several different correctional institutions, Mr. McGowan was transferred in September of 2007 to FCI Sandstone, a low security prison in Minnesota.

130.     At FCI Sandstone, Mr. McGowan was placed in the general population, and was able to spend up to 300 minutes a month on the telephone.  He frequently used all of his telephone minutes, so that he could maintain his close relationship with his wife, sisters, and parents.  Mr. McGowan especially enjoyed speaking with his young niece, who was two and a half at the time, in an attempt to maintain that relationship.

131.     At FCI Sandstone, despite being far removed from his family in New York, Mr. McGowan was also able to enjoy contact visits.  He received approximately 15 visits while there, from his wife, sisters, father, in-laws, friends, and nieces.  These visits were immensely important to Mr. McGowan, allowing him to maintain his family

relationships and get to know a new niece who was too young to communicate by telephone.

132.     Mr. McGowan was not placed on a telephone or mail alert list at FCI Sandstone, nor was he placed under any other communication restrictions.

133.     Mr. McGowan has not received a single incident report in his entire period of incarceration.  His final program review at FCI Sandstone, prior to CMU designation, indicated clean conduct and no management problems, and resulted in a reduction of his security classification.

134.     In a Memorandum authored on March 27, 2008, and made available to Mr. McGowan for the first time in February 2012 in discovery, Defendant Smith recommended that Mr. McGowan be designated to a CMU.  The following rationales, among other information, were provided by Defendant Smith for Mr. McGowan's CMU designation:

> In a letter published on the Portland Independent Media, inmate McGowan described the cooperation with government authorities by his co-defendants and complained about support provided to these cooperating defendants, from the environmental community, for persons who he claimed were responsible for the, "betrayal of (their) friends and allies."
>
> For an interview in the Earth First! Journal, inmate McGowan described "snitches," particularly his co-defendants, and made statements to discourage others from cooperating.  He attempted to educate new members to the movement on what he considered errors of the past by cooperators.  On direct action, inmate McGowan stated such tactics may not be the best option, but often have the most desired effect and detailed his support for such actions by members of the community.  Regarding direct action, inmate McGowan stated: "We need to have serious conversations about whether militancy is truly effective in all situations.  Certainly, direct action is a wonderful tool, but from my experience, it may not be the most effective one at all times or in all situations."  "In some instances, direct action is the most effective tactic."  "Actions that are understood by the public and seen as logical can have a positive impact on pre-existing campaigns and struggles."  "Despite the fact that my particular case is over, it's imperative that

we discuss tactics and strategies in a way that people can actually hear and listen to what each other is saying."

In an article for Earth First! Journal, inmate McGowan discussed the movement, tactics and cooperators as related to the so-called "Green Scare." Inmate McGowan was critical of cooperating defendants and supportive of direct action: "As things get worse in our society and as our demands for ecological sanity and compassion for animals get ignored, many people inevitably lose faith in polite ways of effective change and choose more radical methods."

. . .

In a social letter, inmate McGowan discussed bringing unity to the radical environmental movement by focusing on larger, global issues. Inmate McGowan has been publishing his points of view on the internet in an attempt to act as a spokesman for the movement . . . . Below are some web sites which have published his writings.

The Memorandum goes on to list Earth First! Journal, Bite Back, and Portland

Independent Media as websites on which Mr. McGowan had published his writings.

135.    In August 2008, Mr. McGowan was transferred to the CMU at USP

Marion.  He did not receive any prior written notice or explanation for this transfer.  Nor

was he told where he was going or why.  Ten days after arriving at the CMU, Mr.

McGowan was given a Notice of Transfer dated September 3, 2008, stating the following

explanation for his transfer:

> Your offense conduct included acts of arson, destruction of an energy facility, attempted arson, and conspiracy to commit arson.  You have been identified as a member and leader in the Earth Liberation Front (ELF) and Animal Liberation Front (ALF), groups considered domestic terrorist organizations.  Your offense conduct included communicating in code and teaching others how to commit crimes of arson.  Your actions had the primary purpose to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion.  Your contact with persons in the community requires heightened controls and review.

136.     Much of this information is demonstrably false.  Mr. McGowan was never a "leader" of ELF or ALF, and has not been a "member" of either organization for over seven years.  He did not destroy an energy facility, nor did he teach others to commit arson.  The truthful information about Mr. McGowan's First Amendment protected political activity, relied on by Defendant Smith and listed above, was not disclosed to Mr. McGowan.

137.     Within one week of receiving this notice, Mr. McGowan filed an Administrative Remedy Informal Request form (BP 8) at the institution, challenging his transfer to the CMU.  Mr. McGowan informed the BOP that the information included in his Notice of Transfer was inaccurate, and asked to see underlying documentation regarding the reasons for his placement in the CMU.  When no information was forthcoming, Mr. McGowan filed a BP 9 Request for Administrative Remedy, with the same requests.  Warden Hollingsworth denied the request, but stated that he could file a FOIA to gain access to the BOP records related to his placement in the CMU.  Mr. McGowan appealed this denial to the Regional Level.  The response from BOP Regional Director Nalley denied the transfer request, and indicated that the information in the notice regarding Mr. McGowan's "involvement in arson" and association with ELF and ALF came from Mr. McGowan's Pre-Sentence Investigation Report (PSR).  The response included no information as to the source for the remaining information in the notice.

138.     However, Mr. McGowan's PSR supports his claim that the information on his Notice of Transfer is false.  The PSR includes no statement that Mr. McGowan taught others to commit arson, although it does include an allegation that several other named

42

individuals, not Mr. McGowan, trained others about arson.  Mr. McGowan's PSR

indicates there is *no* evidence suggesting that he played a leadership role, in contrast to

three of his co-conspirators, for whom the prosecution sought role enhancements, and/or

characterized as leaders.  Finally, the PSR shows that Mr. McGowan was charged and

pled guilty to one count of "*conspiracy* to commit arson and destroy an energy facility"

(emphasis added).  He was not convicted of destroying an energy facility.  Indeed,

allegations regarding his co-defendants' involvement in targeting an energy facility pre-

date Mr. McGowan's entry into the conspiracy.   Mr. McGowan subsequently appealed

this response to the Central Office.

139.    As directed in the administrative responses, Mr. McGowan filed a FOIA

request to the BOP in October of 2008, seeking "all relevant documents and information

related to [his] designation and transfer to the Communications Management Unit."  On

February 10, 2009, he received three pages in response to this request.  The documents

did not include any further information regarding the reason for his designation, and

indicated only that McGowan was transferred to the CMU for "program participation."

140.    At his one year review of his incarceration at the CMU, in August of 2009,

Mr. McGowan was informed that he would be considered for a transfer out of the CMU

only after 18 to 24 months of clear conduct.

141.    On February 5, 2010, at his 18 month review, Mr. McGowan requested a

transfer out of the CMU.  In disregard of the new process for designation from the CMU

created in October 2009, Mr. McGowan's unit team failed to address the criteria listed in

the CMU designation notice, but recommended a transfer nonetheless based on Mr.

McGowan's clear conduct and programming.  However, they explained that the decision

lay not with them, but with the regional director, and they could not predict the outcome.

142.    On March 9, 2010, the Warden at USP Marion and the Unit Manager at

the Marion CMU requested in writing that Mr. McGowan be transferred from the CMU

to general population.  In a March 9, 2010 Memorandum, they noted that, since his

arrival at the CMU, Mr. McGowan had "maintained clear conduct and a good rapport

with staff and other inmates . . . . While he has had several incoming publications and

letters rejected based on content, USP Marion staff have noted no continuation of actions

which precipitated his placement in the CMU."

143.    In a subsequent Memorandum authored on March 22, 2010, Defendant

Smith acknowledged that the Warden at USP Marion had submitted a recommendation

that Mr. McGowan should be transferred from the CMU.  However, Defendant Smith

opposed the recommendation, and recommended that Mr. McGowan remain at the CMU.

Explaining his rationale, Mr. Smith noted:

> Through his communications, inmate McGowan continues to provide guidance,
> leadership and direction for activities, publications and movement practices in
> order to further the goals of radical environmental groups.  Inmate McGowan
> receives an enormous amount of communication material each month, through
> social mail, e-mail, phone calls and visiting.  A number of these communications
> have been recommended and approved for rejection based on advocating criminal
> activity.

144.    Following Defendant Smith's recommendation, Mr. McGowan was not

transferred out of the CMU, despite the Warden and Unit Manager's request.

145.    In August 2010, CMU staff once again recommended Mr. McGowan's

transfer from the CMU to general population, and in October 2010, Mr. McGowan was

transferred from the CMU to general population at USP Marion.  He remained there until February 2011, incurring no disciplinary infractions.

146.     On February 1, 2011, Defendant Smith authored a Memorandum recommending that Mr. McGowan be redesignated to a CMU.  *See* Docket #35.  In this Memorandum, made available to Plaintiff McGowan for the first time in February 2012 in the context of this litigation, Defendant Smith explained his rationale for Mr. McGowan's redesignation.  Defendant Smith claimed that Mr. McGowan had directed his wife to "circumvent inmate communication monitoring by having documents mailed to him under the guise of attorney-client privileged communication."  Defendant Smith referred to CTU reports that were leaked to the public through the website www.publicintelligence.net.  According to Defendant Smith's Memorandum, Mr. McGowan allegedly asked his wife to ask undersigned counsel whether they would mail him a copy of the documents.  According to Defendant Smith, this constituted an act of "circumventing monitoring through the use of legal mail from an identified attorney."  In addition, Defendant Smith noted that:

> Further, inmate McGowan's communication with persons in the community since his release from MAR CMU has continued to demonstrate his support for anarchist and radical environmental terrorist groups, and presented his desire to remain in an influential and leadership position among these groups.
>
> . . .
>
> Prior to the completion of his 6 months [sic] step-down from the CMU, inmate McGowan has demonstrated the conditions for his original designation still exist through his espousing support for anarchist and radical environmental terrorist groups.
>
> . . .

Inmate McGowan's actions and behavior indicate the original rationale for CMU designation has not been mitigated, and that he continues to present a risk which requires the degree of monitoring and controls afforded at a CMU.

147.    Shortly thereafter, on February 24, 2011, Mr. McGowan was abruptly redesignated to the CMU at Terre Haute, where he has been held ever since.  A few days after his arrival at the Terre Haute CMU, Mr. McGowan was provided with a Notice of Transfer that contains no reference to his purported support for anarchist and radical groups, but instead repeats many of the same allegations as his first Notice of Transfer, adding only: "Your incarceration conduct has included attempts to circumvent communication monitoring policies, specifically those governing attorney-client privileged correspondence."  Mr. McGowan remains at the CMU to this day.

148.    Mr. McGowan was not disciplined for any mail or telephone violation, nor did he receive any warning from BOP officials about his alleged conversation with his wife.

149.    Mr. McGowan poses no danger to prison security, and, since his incarceration, has made no attempts to communicate with anyone to further illegal activity or otherwise threaten security.  However, during his incarceration he has continued to speak out about social justice issues and the rights of political prisoners and to communicate with law abiding activists involved in these movements.  His designation to the CMU is based not on any legitimate penological need, but rather in retaliation for Mr. McGowan's continued lawful communication and speech.  Conditions at the CMU are designed to stifle that lawful political speech.

150.    The silencing of political speech at the CMU is not just effectuated by limiting Mr. McGowan's ability to communicate with lawful activists outside prison

46

(through restrictions on phone calls, visits, etc), but also by limiting his ability to receive information regarding developments in progressive causes.  For example, at the CMU, Mr. McGowan is consistently prohibited from receiving written material regarding lawful environmental and political prisoner advocacy.  Toward this end, he is frequently banned from receiving publications like Earth First Journal and the Jericho Freedom Times, which pose no threat to prison security, and which Mr. McGowan routinely received at other BOP facilities.

151.    Mr. McGowan's incarceration in the CMU also interferes with his ability to maintain a meaningful relationship with his family.  He has received non-contact visits from his wife, Ms. Synan, but these visits take place in a cramped and dirty booth, with thick plexiglass between them.  Mr. McGowan's inability to have any physical contact with his wife during the visits is isolating, painful and depressing, and has burdened their ability to maintain their relationship.

152.    Mr. McGowan's sisters and father have also visited him on several occasions, and those visits have also been negatively affected by the lack of physical contact.  Visits with other family members have proved impossible.  Mr. McGowan's mother, now deceased, was ill throughout his incarceration and on a liver donor list, so she was unable to travel to Illinois to visit him.  While he received visits from his young nieces at FCI Sandstone, they are unable to visit him at the CMU because the non-contact visiting room was too small to accommodate the children and their mother, and the play area was beyond the sight range of a prisoner in the visiting booth.  Mr. McGowan is not be able to see his nieces, as Mr. McGowan's sister has determined that the older child,

who was able to hug and play with her uncle during contact visits at FCI Sandstone, would be scared and confused by the more restrictive conditions at the CMU.

153.    The restrictions on phone calls have also placed a severe burden on Mr. McGowan's ability to maintain family connections.  In the past, Mr. McGowan used his weekly phone call to speak to his wife, in an attempt to maintain that central relationship. Because of this choice, his relationship with other family members suffered.  Mr. McGowan, for example, had no way to meaningfully communicate with his young nieces, as they are too young for written communication.  Moreover, even with using his one call each week to speak to his wife, that relationship too has suffered, as both Mr. McGowan and his wife are unable to keep each other informed of the day-to-day experiences in their lives in such a short period of time.

154.    Since calls were increased to two per week, Mr. McGowan has attempted to reestablish contact with family members and friends.  His sisters, nieces, and father gather together once every other week to receive his call.  While his elder niece is able to communicate somewhat over the telephone, his youngest niece is unable to do so.  Mr. McGowan has found that his attempt to meaningfully reconnect with family and friends is exceedingly difficult given the 15-minute time limit on his telephone calls.

155.    In July of 2008, en route to the CMU, Mr. McGowan was subpoenaed to appear before a grand jury.  He did not testify, and was held in contempt.  Mr. McGowan was transferred to the CMU after indictments issued from that grand jury.  In October of 2008 he was again subpoenaed, this time as a witness in the trial, and confined in MCC Chicago and Columbia County Jail.  At both places, he was placed in general population, and received unrestricted access to phone calls and visits.  At MCC Chicago, where Mr.

McGowan spent only nine days, he was so relieved to again have access to his family members he used almost 400 telephone minutes talking to his wife, family, and friends, attempting to repair some of the damage done to his relationships during his previous time in the CMU.

156.     The isolation and complete lack of physical contact has also proved detrimental to Mr. McGowan's mental, emotional and physical health.  Since his confinement in the CMU, he has experienced symptoms of anxiety and depression, included increased heart-rate, obsessive thoughts, impatience, and feelings of isolation, pessimism, and being trapped.  He feels confused when interacting with individuals outside the CMU and worries that he places unnecessary emphasis on minor annoyances, and angers more quickly than in the past.  He has also suffered disruptions in his sleep, such as waking up frequently and grinding his teeth.

### c.     Royal Jones

157.     Before his arrest in 2006, Plaintiff Royal Jones was living in Great Falls, Montana, and working at a hospice graveyard.  At that time, Mr. Jones maintained a close relationship with his three daughters, now ages 19, 20, and 24, and his two sons, ages 16 and 18.  He also has five grandchildren, ranging in age from several months to three years old.  Three of Mr. Jones's grandchildren were born after his transfer to the CMU at USP Marion, thus he has never met them.

158.     Mr. Jones was convicted in Helena, Montana of solicitation of bank robbery and a probation violation stemming from a 1995 charge of gun possession.  He was sentenced to a total of 94 months in prison.  His conviction involved no allegations of terrorism, nor did it involve allegations of extremist religious or ideological motives.

Mr. Jones has been in the custody of BOP for the entire duration of his sentence.  He is

due to be released pursuant to good time conduct on May 13, 2013.

159.    After his sentencing in 2007, Mr. Jones was placed in general population

at FCI Englewood in Littleton, Colorado, where, like all other inmates, he received up to

300 minutes on the telephone per month.  Mr. Jones frequently used the telephone to stay

in touch with his family, including his sister, his mother, and his five children.  At

Englewood, there were no restrictions on his ability to receive contact visits.  In February

2008, Mr. Jones was moved to the SHU in Englewood without explanation, and his

access to the phones was limited.

160.    While an inmate at FCI Englewood, Mr. Jones had no serious disciplinary

infractions, and absolutely no infractions involving visitation or his use of the telephone

or the mail.  Mr. Jones did have one minor communications related infraction during his

first incarceration: in 1997 he called a family member and asked them to make a three-

way call to the parents of a fellow prisoner.  Mr. Jones was placed on a 90-day phone

restriction as punishment for that infraction.

161.    Mr. Jones has always been a productive inmate, earning Certificates of

Completion in various areas, including word processing, drug education, radiological

emergency management, and obtaining a commercial driver's license.

162.    Mr. Jones is a practicing Muslim, and played an active leadership role in

the Muslim community at previous federal facilities.  He is also an outspoken and

litigious prisoner.  He has written several books, and has repeatedly attempted to

correspond with various politicians and other public figures regarding unfair treatment in

prison.  While at FCI Englewood, staff at that facility threatened Mr. Jones that he would

be "sent east" if he continued to file complaints.  Mr. Jones filed a complaint about being

subjected to this threat, and continued to advocate on his own behalf.

163.    On June 6, 2008, Mr. Jones was abruptly, and without notice or a hearing,

transferred to the CMU at USP Marion.  Shortly after arriving at the CMU he received a

Notice of Transfer, dated June 17, 2008, that, by way of explanation for his transfer,

states:

> Your current offense of conviction is solicitation to commit a crime of
> violence.  Reliable evidence indicates your crimes and incarceration
> conduct have included involvement in recruitment and radicalization
> efforts, including other inmates, through extremist, violence oriented
> indoctrination methods to intimidate or coerce others.

Mr. Jones has received no further explanation of his designation to the CMU.  Responses

to the various administrative remedies that Mr. Jones has filed have indicated only that

his designation to the CMU is "not punitive in nature," and that there is "no requirement

to afford [him] the opportunity" to challenge his placement in the CMU at a hearing.

164.    A referral for Mr. Jones's transfer to the CMU, dated May 1, 2008, was

issued by Warden Blake R. Davis at FCI Englewood.  The referral indicates that Mr.

Jones "has not presented any management problems."  However, the referral goes on to

note that "[r]eliable evidence indicates his crimes and incarceration conduct has included

involvement in recruitment and radicalization efforts of other inmates through extremist,

violence oriented indoctrination methods to intimidate or coerce others."  The document

does not substantiate these allegations in any way, and Mr. Jones has been unable to

contest any of these allegations or discover their basis.  The referral concludes: "the

inmate need not concur with the transfer request nor should the inmate be consulted or

notified of the transfer application."

165.    Like Mr. McGowan (but unlike Mr. Twitty) Mr. Jones' transfer was classified as a code 324 transfer for "program participation."  However, BOP policy explicitly restricts program transfers to those intended to facilitate participation in four specific national programs, including (a) Residential Drug Treatment; (b) the Life Connections Program; (c) Special Management Unit; and (d) Sex Offender Programs. *See* BOP Program Statement 5100.08 Chapter 7, Page 7.

166.    En route to the CMU at USP Marion from FCI Englewood, Mr. Jones was briefly housed at FTC Oklahoma.  Holdover Unit Team documents generated at FTC Oklahoma state: "Violation or Reason: Terrorist."  The document does not substantiate or explain this allegation in any way, and Mr. Jones has been unable to contest this allegation or discover its basis.

167.    In response to Mr. Jones' attempts to discover the reason for his placement in the CMU through the administrative remedy process, he was told only that he could file a FOIA request.

168.    Mr. Jones followed these instructions, and filed a FOIA request seeking documents related to his placement in the CMU.  The BOP responded to this request by indicating that the records Mr. Jones sought would cost $5,131.00 to disclose, and that Mr. Jones' indigence does not qualify him for a FOIA fee waiver.   Mr. Jones could not afford the fee, and thus did not receive access to any documents responsive to his request.

169.    In December of 2008, Mr. Jones filed a *pro se* complaint in the Federal District Court for the Southern District of Illinois, raising many claims similar to those raised in the instant complaint.  *See Jones v. Mukasey*, No. 08-881 (WDS).  Mr. Jones voluntarily dismissed that action in August of 2009, after being told by CMU staff that he

needed to drop his complaint because it had "upset the big shots" and that things were

going to get bad for him.  Mr. Jones was promised that if he withdrew his *pro se* action,

he would be transferred to FCI Herlong, were he could see his children and

grandchildren.

170.     Several months later, Mr. Jones became the first CMU prisoner Plaintiffs

are aware of to be transferred from the CMU to a normal general population unit.  Mr.

Jones was moved to the main compound at Marion in early March 2010, and is no longer

subject to the communications restrictions described in this case.  He was given no

written or verbal explanation for the transfer, but was told that if he misbehaved or

engaged in the conduct that led to his CMU designation, he would be immediately

transferred back to the CMU.  CMU staff further informed Mr. Jones that, after six

months of clear conduct on the compound, he would be eligible for a transfer from

Marion to a prison, like FCI Herlong, that is closer to his family.   Because Mr. Jones

does not know what conduct resulted in his transfer to the CMU, he does not know how

to avoid being sent back.

171.     While Mr. Jones did request a nearer release transfer at his last team

review based on 18 months of clear conduct and successful programming, Plaintiffs

believe his transfer was based not on that discretionary process, but rather in exchange

for withdrawing his *pro se* complaint.  Upon transfer, Mr. Jones was warned by CMU

staff once more to cease complaining about the CMU.   He has disregarded that

instruction by filing this lawsuit, and faces re-designation to the CMU.

**d.     Kifah Jayyousi**

172.     Kifah Jayyousi is a 50-year-old man from Detroit, Michigan.  He is a United States citizen of Jordanian descent.  Mr. Jayyousi is married and has three daughters, who, as of 2010, were ages 12, 14, and 18, and twin sons who, as of 2010, were age 23.  Prior to his arrest and incarceration, Mr. Jayyousi maintained a close and loving relationship with his wife and their five children.

173.     From 1999 to 2001, Mr. Jayyousi served as the Chief Facilities Director of the Washington, DC public school system.  In April 2001, he and his family relocated to Detroit, where Mr. Jayyousi served as an adjunct professor at the College of Engineering at Wayne State University, teaching classes in the Civil and Environmental Engineering Department.

174.     In September 2003, Mr. Jayyousi took a sabbatical from his teaching job and relocated to Doha, Qatar, for a contract engineering job.  His wife and their daughters accompanied him to Doha, while his sons enrolled in college in Detroit.

175.     In March 2005, Mr. Jayyousi returned to Detroit to visit his father, who was scheduled to have open-heart surgery.

176.     Mr. Jayyousi had been subject to an ongoing investigation into his involvement with the Global Relief Foundation and had been interviewed by the FBI on numerous occasions.  Before he left for his job in Doha, Jayyousi contacted federal authorities, reported his plans, and offered to meet with government representatives.  Federal officials then searched Jayyousi's home before returning his passport to him.

177.    When Mr. Jayyousi returned to Detroit in March 2005, he was arrested at the airport and charged with providing material support to terrorists, mostly through charitable donations.

178.    U.S. District Judge Marcia Cooke granted bail to Mr. Jayyousi on January 5, 2006.

179.    In August 2007, Mr. Jayyousi was convicted in Federal District Court in Miami of conspiracy to murder, kidnap and maim in a foreign country and conspiracy to provide material support to terrorism.  On January 22, 2008, he was sentenced to 12 years, eight months imprisonment, and the court recommended that he be housed at FCI Milan in Michigan, so that he could be near his family.

180.    At sentencing, Judge Marcia G. Cooke noted on the record that there was no evidence linking Mr. Jayyousi to specific acts of violence anywhere.  The Court also pointed out that Mr. Jayyousi has honorably served in the United States Navy; was highly educated and "exhibited excellent competence level in all of his employment;" was a devout Muslim who was "willing to discuss religion with others without conflict" and "celebrated the peace efforts in the Middle East."  The Court further noted that Mr. Jayyousi "provided assistance to people in his mosque and in the Muslim community" and "is the kind of neighbor that people would want in a community, and many wrote letters of support."

181.    The Court also stated: "Raised in a refugee camp, [Mr. Jayyousi] saw firsthand how the sufferers of armed conflict affected communities.  When he heard of the armed conflict in the Middle East, Africa and Eastern Europe, he provided financial and other resources to assist those abroad.  There is no evidence that Mr. Jayyousi

continued his involvement in the instant offense after 1998 . . . and there are no intercepts of Mr. Jayyousi.  He totally withdrew from the instant conspiracy in this case."

182.    After sentencing, Mr. Jayyousi was incarcerated at FDC Miami and detained in the Special Housing Unit (SHU).  Though initially denied them because of his confinement in SHU, he was eventually allowed contact visits in the regular visiting area of the facility.  He received no communications-related disciplinary infractions while incarcerated at FDC Miami.

183.    Indeed, Mr. Jayyousi has received only two disciplinary infractions during his entire period of incarceration.  One, which was issued at the CMU, was dismissed after he grieved it, and was unrelated to communications.  *See* ¶ 192, *supra*.  The other, which dates from his incarceration at FDC Miami, was issued after Mr. Jayyousi pressed the call button in his cell because he was scheduled to speak to his wife following their daughter's surgery, but had not been fetched from his cell in time to make that call.  Mr. Jayyousi was issued an infraction for tampering with a mechanical device as a result of this incident – which is classified as a moderate category offense.  However, when Mr. Jayyousi was shown a copy of his records at the CMU, the record related to this infraction had been modified, elevating the offense to interfering with a security device – which is classified as a high category offense.  Despite the fact that all high category offense charges must be submitted to a Disciplinary Hearing Officer (DHO) for a hearing, the incident was never submitted to a DHO, and Mr. Jayyousi was never punished for the infraction.  Mr. Jayyousi is currently challenging the modification of this infraction.

184.    Mr. Jayyousi is a low-security prisoner, and his Custody Classification Form, dated December 14, 2009, indicates that he is being considered for a decrease in security level.

185.    On March 24, 2008, Defendant Smith authored a memorandum regarding Mr. Jayyousi entitled "Justification for CIM Separation."  Plaintiffs have not been supplied with an unredacted copy of the Memorandum, but the document appears to recommend Mr. Jayyousi's designation to the CMU.  On March 31, 2008, the CTU also emailed the North Central Regional Office indicating the Mr. Jayyousi was being referred for CMU designation.  On April 30, 2008, the North Central Regional Office emailed the CTU indicating that Mr. Jayyousi had been cleared for CMU designation.

186.    On or around April 30, 2008, Mr. Jayyousi learned that he was to be transferred to the CMU at Terre Haute.  On May 5, 2008, his attorney filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Florida in an effort to enjoin Mr. Jayyousi's transfer.  The court denied Mr. Jayyousi's motion for a preliminary injunction on June 11, 2008.

187.    In June 2008, Mr. Jayyousi was transferred to the CMU at Terre Haute. He did not receive any prior written notice or explanation for this transfer.  On June 18, 2008, upon arriving at the CMU, he was given a "Notice to Inmate of Transfer to Communications Management Unit."  The notice stated the following explanation for Mr. Jayyousi's transfer:

> Your current offenses of conviction are for Conspiracy to Commit Murder in a Foreign Country; Conspiracy to Kidnap, Maim, and Torture; and Providing Material Support to a Terrorist Organization.  You acted in a criminal conspiracy to raise money to support mujahideen [sic] operations and used religious training to recruit other individuals in furtherance of criminal acts in this country as well as many countries abroad.  Your

offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization.

188.    Mr. Jayyousi immediately informed the Unit Team at the CMU that the information included in the Notice of Transfer was inaccurate and erroneous, and consisted largely of allegations that were made but not proven at trial.  He requested administrative remedy forms so that he could correct this erroneous information and discover more information about the basis for his transfer to the CMU.  Despite these efforts, Mr. Jayyousi was given no information about why he was sent to the CMU, and his grievances have been summarily rejected.

189.    In August 2008, Mr Jayyousi served as a Muslim prayer leader for Jumah prayer.  Mr. Jayyousi's sermon was transcribed by the BOP.  According to that transcript, at no point in the sermon did Mr. Jayyousi advocate violence, terrorism or intimidation, or use any speech that that condemned any religious, ethnic, racial, or regional group.

190.    However, Mr. Jayyousi was charged with a disciplinary infraction for Conduct with Disrupts the Ordinary Running of the Institution as a result of the incident. After Mr. Jayyousi filed an administrative grievance, the infraction was returned by the Regional Director to the institution for reconsideration because of errors in the disciplinary process.

191.    Another incident report was drafted, this time charging Mr. Jayyousi with Encouraging a Group Demonstration.  A disciplinary hearing was held.  The charge was dismissed and expunged from Mr. Jayyousi's disciplinary record.

192.    Mr. Jayyousi participated in a program review in December 2009.  The review was identical to those he attended prior to the BOP's announcement of new

process regarding CMU designation.  It was clear to Mr. Jayyousi that the Unit Team had

not and did not plan to engage in any independent analysis of the suitability of Mr.

Jayyousi's continued designation to the CMU.  He was told that the authority for transfer

out of the CMU resides in Washington, DC.  Mr. Jayyousi requested re-designation

anyway, and the Unit Manager told him that, based on his offense conduct, he will serve

the rest of his sentence at the CMU.

193.    Mr. Jayyousi told his counselor that he would request a transfer to a

facility closer to his home.  The written request he subsequently made was rejected by the

Unit Manager and the Warden.

194.    In October 2010, Mr. Jayyousi was abruptly transferred from the CMU at

Terre Haute to the CMU at Marion after his former co-defendant was involved in a

disciplinary incident and was transferred to the Terre Haute CMU.

195.    On February 22, 2011, the Marion CMU Unit Manager authored a

Memorandum requesting that Mr. Jayyousi be transferred out of the CMU.  The Unit

Manager noted that "[s]ince his arrival in the Terre Haute CMU and continuing while at

USP Marion, Jayyousi has maintained clear conduct and a good rapport with staff and

other inmates.  He has completed numerous ACE/Education courses.  USP Marion staff

have [sic] noted no continuation of actions which precipitated his placement in the

CMU."  In the same memorandum, the USP Marion Warden noted that "in the time he

has been here, he has acted within the regulations set forth. He has not presented issues

which cause [illegible] concern."

196.    In a March 22, 2011 Memorandum, Defendant Smith acknowledged that

the Warden at USP Marion had submitted a recommendation that Mr. Jayyousi should be

transferred from the CMU.  However, Defendant Smith disagreed with the

recommendation, and recommended that Mr. Jayyousi be kept at the CMU.  In so doing,

Mr. Smith relied on the events at issue in the expunged 2008 disciplinary proceedings,

described above at ¶¶ 189-91.

197.    Mr. Smith asserted in his March 22, 2011 Memorandum:

While in THA CMU, inmate Jayyousi was the rotational Muslim prayer leader for
Jumah prayer.  During one such prayer, which was directly observed by staff,
inmate Jayyousi made statements which were aimed at inciting and radicalizing
the Muslim inmate population in THA CMU.  Characteristics, behaviors and
unacceptable activities which describe an individual involved in prison
radicalization and recruitment were displayed by inmate Jayyousi and included: a
charismatic individual, who makes highly inflammatory commentaries which
elicit violence, terrorism or intimidation, and speech that disrespects or condemns
other religious, ethnic, racial, or regional groups.

Inmate Jayyousi's comments encouraged activities which would lead to a group
demonstration and are detrimental to the security, good order, or discipline of the
institution.  Specifically, inmate Jayyousi claimed the inmates were sent to CMU
[sic] because they were Muslim, and not that they were criminals.  Inmate
Jayyousi purported that the unit was created by something evil, and not even the
staff understood or accepted the purpose of the unit.  Inmate Jayyousi directed the
Muslim inmates to stand together in response to being sent to CMU, that Muslims
should not compromise their faith by cooperating with the government and
Muslims should martyr themselves to serve Allah and meet hardships in their
lives.  Claiming Muslim inmates in CMU are being tortured psychologically,
inmate Jayyousi further purported that criminal cases against Muslim inmates
were fabricated, intended to destroy good U.S. citizens and to tear them away
from their families.

Defendant Smith's Memorandum notes that "[w]hile in the CMU program at both THA

CMU and MAR CMU, inmate Jayyousi has not been sanctioned for an incident report."

198.    As noted above, all allegations of misconduct arising from the incident

described above were dismissed and expunged.

199.    Until receiving discovery through litigation, Mr. Jayyousi was never informed that his political and religious speech was responsible for his retention in the CMU.

200.    Mr. Jayyousi has found the restrictions placed on his visitation and telephone access to be extremely painful and onerous.  Mr. Jayyousi has struggled to maintain a close relationship with his wife and children since his confinement in the CMU.  His family drive from Detroit to visit him approximately every three months, but the lack of contact visits is very difficult on all of them.  Mr. Jayyousi misses being able to hug his wife and children and has not done so since he was at FDC Miami in June 2007, where he had access to contact visits.  The lack of physical contact with his family for such a long period of time has been painful.  His two elderly parents, who live in Detroit, have not visited him due to the non-contact policy, and his mother has died since he has been at the CMU.

201.    Because Mr. Jayyousi expects to be confined in the CMU for the duration of his sentence, his teenaged children will be fully grown adults when he is next able to hug, embrace, or hold them.

202.    Moreover, the telephone restrictions have made it very hard for the family to stay in regular touch.  When Mr. Jayyousi was only able to make one call a week, he called his wife and children and his elderly parents on alternate weeks.  However, Mr. Jayyousi found it hard to have a meaningful conversation in 15 minutes, particularly when attempting to communicate with his wife and five children within the confines of a single call every other week.  Since the policy has changed, Mr. Jayyousi has used his one extra call a week to speak to his wife and children.  However, even on the weeks

when he can call them twice, the combined time of 30 minutes is not enough to have meaningful conversation with his wife and five children.

203.    The timing restrictions on calls have also been very difficult to navigate. Because calls were only available during school and work hours, Mr. Jayyousi's wife had to take the children out of school, meet up with their working sons outside the school, and receive his call in the parking lot.  Under these conditions, it was extremely difficult for Mr. Jayyousi to engage in anything but the most fleeting and cursory of conversations with his family.

204.    Designation to the CMU has caused Mr. Jayyousi significant psychological and emotional harm.  Besides the damage done to his relationships, he feels tense all the time, is unable to sleep several nights a week, has trouble concentrating, and his hands frequently shake, among other symptoms of anxiety and depression.

## V.      Lack of Rulemaking Procedures

205.    The BOP publishes three levels of rules and policy statements: (1) at the highest level, substantive regulations promulgated through notice and comment rulemaking and codified in the Code of Federal Regulations; (2) at the intermediate level, national Program Statements, issued without notice and comment rulemaking, which reproduce the rules contained in the Code of Federal Regulations and provide additional interpretation and commentary regarding national policies; and (3) at the lowest level, Institution Supplements, also issued without notice and comment rulemaking, which apply the policies contained in Program Statements to single facilities.

206.     In this case, BOP evaded public scrutiny by issuing substantive rules, which require full notice and comment rulemaking, via Institution Supplements.  This violates the APA.

**a.     Initial Effort at Rulemaking and its Abandonment**

207.     Prior to issuing the Terre Haute CMU Institution Supplement, and then subsequently issuing the Marion CMU Institution Supplement, BOP began a notice and comment proceeding for a similar rule, also aimed at restricting the communications of inmates charged or convicted of terrorist offenses.  *Limited Communication for Terrorist Inmates*, 71 Fed. Reg. 16520 (Apr. 3, 2006) ("Notice of Proposed Rule").

208.     Just as the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement severely restricts communications and visitation, the proposed rule would have severely restricted non-legal telephone calls and visitation.  *See* 71 Fed. Reg. at 16524 (Proposed 28 C.F.R. §§ 540.203(a), 540.204(a)(1) (limiting inmates to one 15-minute telephone call to immediate family members per month, and one visit of one hour by immediate family members per month, but allowing contact visits "at the discretion of the Warden.")).

209.     On June 2, 2006, comments on the proposed rule were filed by 18 civil rights and civil liberties groups, including the American Civil Liberties Union, the Center for National Security Studies, the Legal Aid Society, and the National Lawyers Guild. The comments advised that the regulation should be withdrawn, and stated that the proposed regulation "is poorly conceived, almost certainly unconstitutional, and entirely unnecessary."

210.    BOP abandoned this rulemaking following the submission of comments.
BOP has not taken final action on the Notice of Proposed Rule or finalized the proposed
rule since.

211.    Less than six months after comments criticizing the original proposed rule
were submitted, on November 30, 2006, BOP simply issued the Terre Haute CMU
Institution Supplement without notice and comment proceedings.  Approximately fifteen
months later, BOP then established another CMU at USP Marion.

 **b.**  **Failure to Comply with the APA**

  **1.**  **The APA's Notice and Comment Requirement**

212.    The Terre Haute and Marion CMU Institution Supplements contain rules
as defined by the APA – i.e., agency statements of general or particular applicability and
future effect designed to implement, interpret, or prescribe law or policy or describing the
organization, procedure, or practice requirements of an agency.  *See* 5 U.S.C. § 551(4).

213.    None of the circumstances that excuse notice and comment rulemaking
apply here, in that the rules contained in both Institution Supplements do not involve a
military or foreign affairs function of the United States or a matter relating to agency
management or personnel or to public property, loans, grants, benefits, or contracts.  *See*
5 U.S.C. § 553(a)(1)-(2).

214.    Nor are the Institution Supplements interpretive rules, general statements
of policy, or rules of agency organization, procedure, or practice.  *See* 5 U.S.C.
§ 553(b)(3)(A).

215.    Finally, neither Institution Supplement contains a finding that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.  *See* 5 U.S.C. § 553(b)(3)(B).

### 2.    Lack of Notice of Proposed Rulemaking

216.    Prior to issuing the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement, and establishing those facilities, the BOP did not publish the general notice of proposed rulemaking in the Federal Register.  *See* 5 U.S.C. § 553(b).

217.    Nor did the BOP publish in the Federal Register: (1) a statement of the time, place, and nature of public rule making proceedings related to the establishment of CMUs; (2) reference to the legal authority under which a rule regarding CMUs was proposed; or (3) either the terms or substance of a proposed rule regarding CMUs or a description of the subjects and issues involved.  *See* 5 U.S.C. § 553(b)(1)-(3).

218.    The BOP did not name, personally serve, or otherwise give notice to all persons subject to the Terre Haute CMU Institution Supplement and the Marion CMU Institution Supplement.  *See* 5 U.S.C. § 553(b).

### 3.    Failure to Request and Consider Public Comments

219.    Prior to issuing the CMU Institution Supplements and establishing those facilities, the BOP did not give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments, with or without opportunity for oral presentation.  *See* 5 U.S.C. § 553(c).  Nor did the BOP consider such relevant information.  *See* 5 U.S.C. § 553(c).

### 4.      Failure to Publish a Final Rule

220.    The BOP did not publish either Institution Supplement 30 days before its effective date, or at any time thereafter.  *See* 5 U.S.C. §§ 552(a)(1), 553(d).

221.    None of the exceptions to the publication for a final rule requirement apply in that: (1) neither Institution Supplement granted or recognized an exemption or relieved a restriction; (2) both contained substantive rules, and contained neither interpretative rules nor statements of policy; and (3) neither contained a finding of good cause that would exempt the documents from publication in the Federal Register.  *See* 5 U.S.C. § 553(d)(1)-(3).

### 5.      Reopening of the Proposed Rulemaking Process

222.    On April 6, 2010, approximately one week after the filing of the instant lawsuit, the BOP once again published a proposed rule seeking to describe and codify the procedures governing the CMUs.  A true and correct copy of the proposed rule is attached hereto as Exhibit G and incorporated by reference herein.  The proposed rule allows for significantly harsher communications restrictions than those currently in place at the CMU.  Under the proposed rule, written correspondence at the CMU may be limited to three pieces of paper, double sided, once per week to and from a single recipient; telephone communication may be limited to a single completed call per calendar month for up to 15 minutes; and visiting may be limited to one hour each calendar month.

223.    The comment period closed on June 7, 2010, *see* 75 Fed. Reg. 17324, and hundreds of comments were submitted by members of the public.

224.    In March 2011, this Court dismissed Plaintiffs' APA claim without prejudice, noting, "as it now appears that the defendants have begun the process sought by the plaintiffs, the plaintiffs' APA claim is moot . . . . Accordingly, the court dismisses the plaintiffs' APA claim without prejudice, allowing the plaintiffs' [sic] to renew such a claim in the event that the defendants again abandon the rulemaking process."

225.    The BOP indicated on the Office of Information and Regulatory Affiars website that the deadline for final action on the proposed rule was October 2011.

226.    Though the comment period closed over two years ago and the self-imposed October 2011 deadline expired almost a year ago, the BOP has not responded to the hundreds of comments submitted in response to the notice, or issued and published a final rule in the Federal Register.

## VI.    Exhaustion

227.    Plaintiffs have exhausted their administrative remedies.

**FIRST CAUSE OF ACTION**
**(Fifth Amendment: Procedural Due Process)**

228.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

229.    Plaintiffs bring this claim against all individual Defendants.

230.    By transferring Plaintiffs to the CMU without notice, a hearing, the ability to present evidence to contest that transfer, regular review of their ongoing placement in the CMU, notice of the projected duration of their confinement in the CMU, and notice of any criteria for release, Defendants, acting under color of law and their authority as federal officers, are intentionally or recklessly subjecting Plaintiffs to an atypical and significant hardship, and depriving Plaintiffs of liberty without due process of law and

without legitimate penological purpose, in violation of the Fifth Amendment to the

United States Constitution.

231.     Plaintiffs have no effective means of enforcing their Fifth Amendment due

process rights other than by seeking declaratory and injunctive relief from the Court.

232.     As a result of Defendants' unlawful conduct, Plaintiffs are suffering

emotional distress, psychological injury, and destruction of family ties.

**SECOND CAUSE OF ACTION**
**(First Amendment: Retaliation)**

233.     Plaintiffs incorporate by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

234.     Plaintiffs McGowan, Jayyousi, and Jones bring a claim for declaratory and

injunctive relief against all individual Defendants.

235.     Plaintiffs McGowan and Jayyousi bring a claim for monetary relief against

Defendant Leslie S. Smith in his individual capacity.

236.     By creating and maintaining a policy whereby individuals are designated

to the CMU without procedural protections, and by failing to effectively oversee

implementation of that policy, Defendants have allowed for and encouraged the

development of a pattern and practice throughout the BOP of designating individuals,

including Plaintiffs, to the CMU, and keeping them there, in retaliation for their protected

political and religious speech and beliefs.  In this way, Defendants, acting under color of

law and their authority as federal officers, are violating Plaintiffs' rights to freedom of

speech and religion under the First Amendment to the United States Constitution.

237.     By recommending that Plaintiff McGowan be designated and re-

designated to the CMU on the basis of his protected political speech and beliefs, rather

than any misconduct in prison, Defendant Smith unlawfully retaliated against Plaintiff

McGowan.  Such recommendations and subsequent placement in the CMU, under the

restrictions and conditions described herein, is so punitive as to chill a reasonable person

from exercising his First Amendment rights.  In this way, Defendant Smith, acting under

color of law and his authority as a federal officer, violated Plaintiff McGowan's right to

freedom of speech under the First Amendment to the United States Constitution.

238.    By recommending that Plaintiff Jayyousi be retained at the CMU, on the

basis of his protected political and religious speech and beliefs, Defendant Smith

unlawfully retaliated against Plaintiff Jayyousi.  Such recommendation and subsequent

retention in the CMU, under the restrictions and conditions described herein, is so

punitive as to chill a reasonable person from exercising his First Amendment rights.  In

this way, Defendant Smith, acting under color of law and his authority as a federal

officer, violated Plaintiff Jayyousi's rights to freedom of speech and religion under the

First Amendment to the United States Constitution.

239.     Plaintiffs have no effective means of enforcing these rights other than by

seeking declaratory, injunctive, and monetary relief from the Court.

240.     As a result of Defendants' unlawful conduct, Plaintiffs are suffering

psychological injury, emotional distress, destruction of their familial relationships, and

monetary damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request the Court:

a.      Declare that Defendants' actions violate Plaintiffs' First and Fifth Amendment

        rights; and

b.      Order Defendants to transfer each Plaintiff from the CMU to the general population at a federal prison appropriate for each Plaintiffs' security classification *or* provide each Plaintiff with due process to ensure their designation to the CMU was appropriate and devoid of discriminatory animus; and

c.      Order Defendants to award Plaintiffs the same opportunities for communication as all other general population prisoners in the BOP, i.e. 300 phone minutes a month, and contact visitation pursuant to the rules of the facility to which they are designated;

d.      Award Plaintiffs McGowan and Jayyousi compensatory and punitive damages in an amount to be determined at trial;

e.      Award Plaintiffs attorney's fees and costs; and

f.      Order such other relief as this Court deems just and proper.

Dated: New York, New York
       September 5, 2012

Respectfully submitted,

Alexis Agathocleous_____
ALEXIS AGATHOCLEOUS, *pro hac vice*
RACHEL MEEROPOL, *pro hac vice*
SHAYANA D. KADIDAL
(D.C. Bar No. 454248)
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6478
Fax: (212) 614-6499
aagathocleous@ccrjustice.org

GREGORY SILBERT
JOHN GERBA
LARA VEBLEN
EILEEN CITRON (D.C. Bar No. 995117)
ANDREY SPEKTOR
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-1000
Fax: (212) 310-8007
gregory.silbert@weil.com

KENNETH A. KREUSCHER
Portland Law Collective, LLP
1130 SW Morrison Street, Suite 407
Portland, OR 97205
Tel: 503-228-1889
Fax: 503-223-4518
kenneth@portlandlawcollective.com

*Attorneys for Plaintiffs*

# EXHIBIT A



**U.S. Department of Justice**
Federal Bureau of Prisons
U.S. Penitentiary
Terre Haute, IN   47808

Number:   THX-5270.07A
Date:     November 30, 2006
Subject:  Operation & Security of
          the Communication
          Management Unit (D-Unit
          - FCC Terre Haute)

## INSTITUTION SUPPLEMENT

1.  **PURPOSE**: This supplement establishes guidelines and procedures for operation and security of the Communication Management Unit (CMU) in D-Unit, FCC Terre Haute, Indiana.

The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and protect the public.

The CMU is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming within the confines of D-Unit. Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status.

2.  **ADMISSION & ORIENTATION / CLASSIFICATION AND REVIEWS**: The Unit Manager is responsible for administering the Admission and Orientation program (A&O) in compliance with national policy. The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior, and programs available. All items on the A&O checklist will be covered and utilized for verification of participation. As part of A&O, D-Unit inmates will receive a copy of this Institution Supplement and an A&O Handbook.

Classification and reviews of D-Unit inmates will occur according to national policy. Additionally, within five calendar days of arrival, D-Unit inmates will be provided a **"NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT"** form indicating the reasons for their placement in the unit. A blank copy of the form is included with this Institution Supplement as Attachment `A.`"

3.  **CONTACT WITH PERSONS IN THE COMMUNITY**: The purpose of the CMU in D-Unit is to provide increased monitoring of communication of the inmates assigned to it. By operating a self-contained housing unit, staff may adequately regulate and monitor all communications between inmates and persons in the community. All contact between D-Unit inmates and persons in the community may

occur according to national policy, with necessary adjustments
indicated herein.  **Under no circumstances will privileged
attorney-client communication be monitored, as prohibited by
national policy.**

   **(a) Written General Correspondence.**  All incoming and outgoing
written general correspondence must be reviewed by staff prior to
delivery to the inmate or further processing to the post office.

   **(b) Telephone Communication.**  All telephone communication
between inmates and persons in the community (except properly
placed, unmonitored legal calls) will be:
      (1) conducted using monitored ITS phone lines;
      (2) be live-monitored by staff;
      (3) be subject to recording by staff; and
      (4) occur in English-only (by both the inmate and community
      call-recipient) unless previously scheduled for and
      conducted through simultaneous translation monitoring.

Persons for whom an inmate requests placement on the approved
telephone list must complete the **"Acknowledgment of Conditions
for Telephone Contact with Inmates in the Communication
Management Unit, FCC Terre Haute,"** form included with this
Institution Supplement as Attachment "B," as proof of their
acknowledgment and acceptance of these conditions.  Monitored
calls where either party speaks in non-English will be
immediately terminated by the staff monitor unless previously
scheduled and conducted through simultaneous translation
monitoring.  In the event of terminated calls, inmates may be
subject to disciplinary action, and the person may be removed
from the inmate's approved telephone list.

In no event will the frequency or duration of telephone calls
placed by D-Unit inmates be limited to less than one telephone
call per month (28 C.F.R. § 540.100(b)) of at least three minutes
duration (28 C.F.R. § 540.101(d)).  Unmonitored legal calls are
not affected, and will continue to be managed according to
national policy.

   **(c) Visiting.**  All visiting between inmates and persons in the
community (except properly scheduled, unmonitored legal visits)
will be:
      (1) conducted using non-contact facilities (i.e., secure
      partitioned rooms, telephone voice contact);
      (2) be live-monitored by staff;
      (3) be subject to recording by staff; and

(4) occur in English-only (by both the inmate and visitor) unless previously scheduled for and conducted through simultaneous translation monitoring.

Persons for whom an inmate requests placement on the approved visiting list must complete the **"Acknowledgment of Conditions for Visiting with Inmates in the Communication Management Unit, FCC Terre Haute,"** form included with this Institution Supplement as Attachment "C," as proof of their acknowledgment and acceptance of these conditions. Monitored visiting where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted through simultaneous translation monitoring. Ordinarily, visiting will be scheduled to occur on weekdays for two-hour periods.

4. <u>**HOUSING CONDITIONS / UNIT PROGRAMS / SERVICES**</u>: D-Unit is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming within the confines of D-Unit. All national policies apply to administration of D-Unit, except as otherwise modified in this supplement as necessary to effect the unit's mission of increased monitoring of communications, and pursuant to the Warden's authority to make the necessary changes to protect the safety, security, and good order of the facility, or to protect the public.

   **(a) Cell Assignments.** D-Unit inmates will ordinarily be housed in double bunked cells. Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status. Cells #8-13 are designated as segregation housing for D-Unit inmates placed in administrative detention status or disciplinary segregation status.

   **(b) Health Services.** Health Services staff will provide sick call in the unit four days a week (Mondays, Tuesdays, Thursdays and Fridays). Medications will be delivered and/or administered in the unit twice daily. Inmates may request to be seen by a physician in the unit's medical examination room. Specialized services may be provided in the institution's main health services units as needed, under conditions which ensure D-Unit inmates' lack of contact with non-D-Unit inmates.

   **(c) Mental Health Services.** Psychology staff will provide D-Unit inmates an initial psychological assessment within 14 days of arrival in the unit for new commitments and within 30 days for

transfers.  Mental health services thereafter will occur
according to national policy.  Inmates may request to be seen by
a psychology staff member in the unit's medical examination room.

**(d) Meals.**  All inmate meals will be served and consumed in the
unit dining area.

**(e) Education / Recreation Services.**  National education
policies will be implemented in D-Unit.  Inmates will ordinarily
be permitted to leave their cells and participate in activities
in the unit daily from 6:00am to 9:15pm, except during counts.

Leisure and law library services will be provided to inmates
daily.  Photocopies may be obtained by submitting a Request to
Staff to the law librarian or the Unit Team.

Inmates will be provided table games such as chess, checkers and
cards.  Hobbycraft opportunities will also be provided.

There are four televisions available in the unit common areas for
viewing.  Movies will be shown using closed-circuit televisions.

The inside recreation rooms will contain various recreation
activities to include handball, stationary biking, stair-stepping
machines, and walking.  No exercise equipment will be permitted
in outside recreation areas.

**(f) Religious Services.**  National religious services policies
will be implemented in D-Unit.  All communication with religious
services providers from the community will be monitored as
indicated in Section 3 of this Institution Supplement, depending
on the means of communication used.

**(g) Personal Property.**  National personal property policies
will be implemented in D-Unit.  Inmates are allowed to maintain
up to three cubic feet of legal material in their cell.
Temporary additional space for active litigation material may be
requested from the Unit Manager.

**(h) Commissary / Trust Fund Operations.**  National commissary
and trust fund operation policies will be implemented in D-Unit.
Each inmate will be afforded the opportunity to purchase
allowable items from the commissary if funds are available in the
inmate's commissary account.  Commissary purchase forms will be
issued on Tuesdays of each week, and after completion of the
forms they will be forwarded to the commissary for processing by
COB Wednesdays.  The commissary items will be delivered to the

unit by commissary staff on Thursdays of each week. Any special purchases (personal radios, etc.) must be approved by the Unit Manager.

   **(i) Sanitation.** D-Unit inmates are responsible for sanitation of their living areas. Unit orderly job assignments will be made by the Unit Manager. Inmate showers will be available daily. Clean, serviceable clothing will be issued to each inmate upon his arrival to the unit. Unit laundry service will be available for issued clothing on Mondays, Wednesday, and Fridays. D-Unit inmates are responsible for laundering their own personal clothing. Barber services in D-Unit will be conducted within the unit. Inmates should submit an inmate request to staff at least one week in advance of the desired time for a haircut.

   **(j) Work Assignments.** Work assignments will include orderlies for unit sanitation, food service, laundry and recreation, and will be assigned by the Unit Manager.

5. **ADMINISTRATIVE REMEDY PROGRAM**: You may appeal your transfer to D-Unit, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.


R.V. Veach, Warden


DISTRIBUTION
Warden
Division Heads
Department Heads
President AFGE Local 720

THX-5270.07A
Attachment A

NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| Warden (print and signature): | Institution: |

NOTICE: This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting.  Your communication by these methods may be limited as necessary to allow effective monitoring.  Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications.  Your transfer to this unit, by itself, will have no effect on the length of your incarceration.  You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:




Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public.  Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

OPPORTUNITY TO APPEAL TRANSFER DECISION - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy.  A member of your Unit Team will provide you with the necessary form upon request.

INSTRUCTIONS TO STAFF - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): | Staff Member (signature): | Date Issued: |
|---|---|---|

THX-5270.07A
Attachment B

**Acknowledgment of Conditions for
Telephone Contact Inmates in the Communication Management Unit,
FCC Terre Haute**

_____, _____, an inmate housed in the CMU
   (Inmate Name)    (Reg. No.)

at the Federal Correctional Complex (FCC), Terre Haute, Indiana, requests
your name be placed on his approved telephone list.

As a condition of being placed on this inmate's approved telephone list,
you agree to the following conditions:

(1)   All telephone communication between you and the inmate will be subject
to monitoring and recording by Bureau of Prisons staff;

(2)   Your telephone conversation with the inmate will occur in English-
only, unless previously scheduled for, and conducted through,
simultaneous translation monitoring; and

(3)   Monitored calls where either party speaks in non-English will be
immediately terminated by the staff monitor unless previously
scheduled and conducted through simultaneous translation monitoring.
In such cases, inmates may be subject to disciplinary action, and you
may be removed from the inmate's approved telephone list.

_____

Signature                            Date Signed

_____

Printed Name                          Phone Number

THX-5270.07A
Attachment C

### Acknowledgment of Conditions for
### Visiting with Inmates in the Communication Management Unit,
### FCC Terre Haute

_____, _____, an inmate housed in the CMU
 (Inmate Name)      (Reg. No.)

at the Federal Correctional Complex (FCC), Terre Haute, Indiana, requests
your name be placed on his approved visiting list.

As a condition of being placed on this inmate's approved visiting list, you
agree to the following conditions:

(1)  All communication between you and the inmate during the visit will be
     subject to monitoring and recording by Bureau of Prisons staff;

(2)  Your conversations with the inmate during the visit will occur in
     English-only, unless previously scheduled for, and conducted through,
     simultaneous translation monitoring; and

(3)  Monitored conversations where either party speaks in non-English will
     be immediately terminated by the staff monitor unless previously
     scheduled and conducted through simultaneous translation monitoring.
     In such cases, inmates may be subject to disciplinary action, and you
     may be removed from the inmate's approved visiting list.


_____         _____
Signature                            Date Signed



_____
Printed Name

# EXHIBIT B



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*U.S. Penitentiary*
*Marion, IL 62959*

| | | |
|---|---|---|
| **Institution Supplement** | **OPI:** | Communication Management Unit |
| | **NUMBER:** | MAR-5270.07A |
| | **DATE:** | March 20, 2008 |
| | **SUBJECT:** | Operation & Security of the Communication Management Unit ( I Unit) |

1. **PURPOSE AND SCOPE**  This Institution Supplement establishes guidelines and procedures for the operation and security of the Communication Management Unit (CMU) in I Unit, at the United States Penitentiary, Marion, Illinois.

   The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and protect the public.

   The CMU is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, unit management, and work programming within the confines of I Unit.  Additionally, the unit contains a block of cells located on B Range which are dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status.

2. **DIRECTIVES AFFECTED**

   A.  Directives Referenced

       P.S. 5270.07, Inmate Discipline & Special Housing Units (December 29, 1987)

   B.  Directives Rescinded

3. **RESPONSIBILITY AND AUTHORITY**

   **A. ADMISSION & ORIENTATION / CLASSIFICATION AND REVIEWS**:  The East Corridor Unit Manager is responsible for administering the Admission and Orientation Program (A&O) in compliance with national policy.  The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior, and programs available.  All items on the A&O Checklist will be covered and utilized for verification of participation.  As part of A&O, I-Unit inmates will receive a copy of this Institution Supplement and an A&O Handbook.

   Classification and reviews of I-Unit inmates will occur according to national policy.  Additionally, within five calendar days of arrival, I-Unit inmates will be provided a "NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT" form indication the reasons for their placement in the unit.  A blank copy of the form is included with this Institution Supplement, Attachment "A".

**B. CONTACT WITH PERSONS IN THE COMMUNITY**: The purpose of the CMU in I Unit is to provide increased monitoring of communication of the inmates assigned to it. By operating a self-contained housing unit, staff may adequately regulate and monitor all communications between inmates and persons in the community. All contact between I-Unit inmates and persons in the community may occur according to national policy, with necessary adjustments indicated herein. **Under no circumstances will privileged attorney-client communication be monitored, as prohibited by national policy**.

(a) **Written General Correspondence**. All incoming and outgoing written general correspondence must be reviewed by staff prior to delivery to the inmate or further processing to the post office.

(b) **Telephone Communication**. All telephone communication between inmates and persons in the community (except properly placed, unmonitored legal calls) will be:

        (1) conducted using monitored ITS phone lines;

        (2) be live-monitored by staff;

        (3) be subject to recording by staff; and

        (4) occur in English-only (by both the inmate and community call-recipient) unless previously scheduled for and conducted through simultaneous translation monitoring.

Persons from whom an inmate requests placement on the approved telephone list must complete the **"Acknowledgment of Conditions for Telephone Contact with Inmates in the Communication Management Unit, USP Marion,"** form included with this Institution Supplement as Attachment "B", as proof of their acknowledgment and acceptance of these conditions. Monitored calls where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted through simultaneous translation monitoring. In the event of terminated calls, inmates may be subject to disciplinary action, and the person may be removed from the inmate's approved telephone list.

In no event will the frequency or duration of telephone calls placed by I-Unit inmates be less than one telephone call per month (28 C.F.R. 540.100 (b) of at least three minutes duration ( 28 CFR 540.101 (d). Unmonitored legal calls are not affected, and will continue to be managed according to national policy.

(c) **Visiting.** All visiting between inmates and persons in the community (except properly scheduled, unmonitored legal visits) will be:

        (1) conducted in the main visiting room using non-contact facilities (i.e., secure partitioned rooms, telephone voice contact;

        (2) be live-monitored by staff;

        (3) be subject to recording by staff;

        (4) occur in English-only (by both inmate and visitor) unless previously scheduled for and conducted through simultaneous translation monitoring.

Persons for whom an inmate requests placement on the approved visiting list must complete the **"Acknowledgment of Conditions for Visiting with Inmates in the Communication Management Unit, USP Marion,"** form included with this Institution Supplement as Attachment "C," as proof of their acknowledgment and acceptance of these conditions. Monitored visiting where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted

through simultaneous translation monitoring. Ordinarily, visiting will be scheduled to occur on weekdays for two-hour periods. Each inmate is authorized four hours of visiting each month (two 2-hour visits or one 4-hour visit.)

4.    **HOUSING CONDITIONS / UNIT PROGRAMS / SERVICES:** I Unit is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, unit management, and work programming within the confines of I Unit. All national policies apply to administration of I Unit, except as otherwise modified in this supplement as necessary to affect the unit's mission of increased monitoring of communications, and pursuant to the Warden's authority to make the necessary changes to protect the safety, security, and good order of the facility, or to protect the public.

(a) **Cell Assignments:** I-Unit inmates will be housed in single bunk cells. Additionally, the unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status. Cells I02-010L thru I02-016L are designated as segregation housing for I-Unit inmates placed in administrative detention status or disciplinary segregation status.

(b) **Health Services:** Health Services staff will provide sick call in the morning within the unit five days a week (M-F). Medications will be delivered and/or administered in the unit twice daily. Inmates may request to be seen by a physician in the unit's medical examination room. Specialized services may be provided in the institutions's main health services unit as needed, under conditions which ensure I-Unit inmates' lack of contact with non-I-Unit inmates. Inmates who require examination will be seen in the examination room.

(c) **Mental Health Services:** Psychology staff will provide I-Unit inmates an initial psychological assessment within 14 days of arrival in the unit for new commitments and within 30 days for transfers. Mental health services thereafter will occur according to national policy. Inmates may request to be seen by a psychology staff member in the unit's medical examination room.

(d) **Meals:** All inmate meals will be served and consumed in the unit.

(e) **Education/Recreation Services**: National education policies will be implemented in I Unit. Inmates will ordinarily be permitted to leave their cells and participate in activities in the unit daily from 6:00 a.m. to 10:00 p.m., except during counts.

Leisure and law library services will be provided to inmates daily. Photocopies may be obtained by submitting a Request to Staff Member form to the law librarian or the Case Manager.

Inmates will be provided table games such as chess, checkers and cards. Hobby craft opportunities will also be provided.

There are 11 televisions available in the unit for viewing. The recreational areas will contain various

recreation activities to include handball, stationary biking, stair-stepping machines, and walking.

**(f) Religious Services.** National religious services policies will be implemented in I Unit. All communication with religious services providers from the community will be monitored as indicated in Section 3 of this Institution Supplement.

**(g) Personal Property.** National personal property policies will be implemented in I Unit. Inmates are allowed to maintain up to three cubic feet of legal material in their cell. Temporary additional space for active litigation material may be requested from the Case Manager.

**(h) Commissary/Trust Fund Operations.** National commissary and trust fund operation policies will be implemented in I Unit. Each inmate will be afforded the opportunity to purchase allowable items from the commissary if funds are available in the inmate's commissary account. Commissary purchase forms will be issued on Tuesday of each week by the Case Manager, and after completion of the forms they will be hand-delivered by the Case Manager to the commissary for processing by COB Wednesday. The commissary items will be delivered to the unit and handed out by commissary staff on Thursday of each week. Any special purchases (personal radios, etc.) must be approved by the Case Manager.

**(i) Sanitation.** I-Unit inmates are responsible for sanitation of their living areas. Unit orderly job assignments will be made by the Case Manager. Inmate showers will be available daily. Clean, serviceable clothing will be issued to each inmate upon his arrival to the unit. Unit laundry service will be available for issued clothing on Monday, Wednesday and Friday. I-Unit inmates are responsible for laundering their own personal clothing. Barber services for I Unit will be conducted within the unit. Inmates should submit an Inmate Request to Staff form at least one week in advance of the desired time for a haircut. An inmate from within the unit will be the barber.

**(j) Work Assignments.** Work assignments will include orderlies for unit sanitation, Food Service, laundry and recreation, and will be assigned by the Case Manager.

5. **ADMINISTRATIVE REMEDY PROGRAM**: You may appeal your transfer to I Unit, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. 542.10 through 542.19, and corresponding policy. Your case manager will provide you with the necessary form upon request.

6. **EFFECTIVE DATE:** This supplement is effective upon issuance.

_____                                _____//s//_____
Date                                                                      B. A. Bledsoe, Warden

MAR-5270.07A
Attachment C

## ACKNOWLEDGMENT OF CONDITIONS FOR VISITING
## WITH INMATES IN THE COMMUNICATION MANAGEMENT UNIT,
## USP MARION, ILLINOIS

_____, _____, an inmate housed in the CMU
(Inmate Name)                (Reg. No.)

at the United States Penitentiary, Marion, Illinois, requests your name be placed on his
approved visiting list.

As a condition of being placed on this inmate's approved visiting list, you agree to the
following conditions:

(1)     All communication between you and the inmate will be subject to
        monitoring and recording by Bureau of Prisons' staff;

(2)     Your conversations with the inmate during the visit will occur in English-
        only, unless previously scheduled for, and conducted through,
        simultaneous translation monitoring; and

(3)     Monitored conversations where either party speaks in non-English will be
        immediately terminated by the staff monitor unless previously scheduled
        and conducted through simultaneous translation monitoring.  In such
        cases, inmates may be subject to disciplinary action, and you may be
        removed from the inmate's approved visiting list.

_____        _____

Signature                                Date Signed

_____

Printed Name

BP-S629.052 **VISITOR INFORMATION** CDFRM
MAR 2002
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| Addressee | Institution | Date |
|---|---|---|
|  | Re: (Inmate's Name and Register No.) |  |

Dear _____:

   I am requesting that you be included among my approved visitors.  In order to establish your suitability as a visitor, it may be necessary for institution officials to send an inquiry to an appropriate law enforcement or crime information agency to ascertain whether or not placing you on my visiting list would present a management problem for the institution, or have other possible adverse effects.  The information obtained will be used to determine your acceptability as a visitor.  The Bureau of Prisons' authority to request background information on proposed visitors is contained in Title 18 U.S.C. § 4042.

   In order for you to be considered for the visiting privilege with me, it will be necessary for you to fill out the questionnaire and release form below and return it to the following address: (Institution address).

   You are not required to supply the information requested.  However, if you do not furnish the information, the processing of your request will be suspended, and you will receive no further consideration.  If you furnish only part of the information required, the processing of your request may be significantly delayed.  If the information withheld is found to be essential to the processing of your request, you will be informed, and your request will receive no further consideration unless you supply the missing information.  Although no penalties are authorized if you do not supply the information requested, failure to supply such information could result in your not being considered for admittance as a visitor.  The criminal penalty for making false statements is a fine of not more than $250,000 or imprisonment for not more than five years or both (See 18 U.S.C. § 1001).

                                        Sincerely,

| 1. Legal Name | 2. Date of Birth | 3. Address (Including Zip Code) |
|---|---|---|
| 4. Telephone Number (Including Area Code) | 5. Race and Sex of Visitor |  |

| 6. Are you a U.S. Citizen? | 6a. If yes, provide Social Security No: _____ |
|---|---|
| ___ Yes ___ No | 6b. If no, provide Alien Registration No: _____ |
|  | 6c. Provide Passport No: _____ |

| 7. Relationship to above-named inmate | 8. Do you desire to visit him/her? ___ Yes ___ No |
|---|---|

9. Did you know this person prior to his/her current incarceration? ___ Yes ___ No

10. If the answer to #9 is yes, indicate the length of time you have known this person and where the relationship developed.

11. Have you ever been convicted of a crime?  If so, state the number, date, place, and nature of the conviction/s:

12. Are you currently on probation, parole, or any other type of supervision?  If so, state the name of your supervising probation/parole officer and the address and telephone no. where he/she can be contacted:

13. Do you correspond or visit with other inmates?  If so, indicate the individual(s) and their location(s):

14. Driver's License No. and State of Issuance

                        AUTHORIZATION TO RELEASE INFORMATION

I hereby authorize release to the Warden of: _____ any record of criminal offenses for which I
                                         (Institution, Location)
have been arrested and convicted, and any information related to those convictions.

**Signature for Authorization to Release Information**   (Sign and Print Name)   **Parent or Guardian**

**(If applicant is under 18 years of age, signature of parent or guardian indicates consent of minor to visit inmate).**

                        If additional space is required, you may use the back of this form.
                                To be filed in Inmate Central File, FOI Section 2
(This form may be replicated via WP)                    Replaces BP-S629 of Sep 00



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*U.S. Penitentiary*
*Marion, IL 62959*

| | |
|---|---|
| # Institution<br><br>Supplement | **OPI:** Communication Management Unit<br>**NUMBER:** MAR-5321.07A<br>**DATE:** November 13, 2008<br>**SUBJECT:** Operation & Security of the Communication Management Unit ( I Unit) |

1. **PURPOSE AND SCOPE**  This institution supplement establishes guidelines and procedures for the operation and security of the Communication Management Unit (CMU) in I Unit, at the United States Penitentiary, Marion, Illinois.

   The CMU is established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and to protect the public.

   The CMU is a self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, unit management, and work programming within the confines of I Unit.  Additionally, the unit contains a block of cells located on B Range which are dedicated to segregated housing for those inmates in need of being placed in administrative detention or disciplinary segregation status.  All national policies applicable to general population inmates apply with conditions specified within the supplement.

2. **DIRECTIVES AFFECTED**

   A.  <u>Directives Referenced</u>

      P.S. 1330.16, Administrative Remedy Program (August 23, 2001)

   B.  <u>Directives Rescinded</u>

   _____MAR-5270.07A, Operation & Security of the Communication Management Unit (March 20, 2008)

3. **RESPONSIBILITY AND AUTHORITY**

   A. <u>ADMISSION & ORIENTATION / CLASSIFICATION AND REVIEWS</u>:  The executive assistant is responsible for administering the Admission and Orientation Program (A&O).  The purpose of the program is to familiarize each inmate with the unit staff, unit procedures, expected behavior, and programs available.  All items on the A&O Checklist will be covered and utilized for verification of participation.  As part of A&O, I Unit inmates will receive a copy of this institution supplement and an I Unit A&O Handbook.  A&O has been recorded on a DVD and will be presented to each inmate in I Unit.

Classification and reviews of I Unit inmates will occur according to national policy.  Additionally, within five calendar days of arrival, I Unit inmates will be provided a "NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT" form indicating the reasons for their placement in the unit.  A blank copy of the form is included with this Institution Supplement, Attachment "A".

B.  <u>CONTACT WITH PERSONS IN THE COMMUNITY</u>:  The purpose of the CMU in I Unit is to provide increased monitoring of communication of the inmates assigned to it.  By operating a self-contained housing unit, staff may adequately regulate and monitor all communications between inmates and persons in the community.

   **(a) Written Correspondence**.  Mail call is held Monday through Friday between the hours of 12:00 p.m. - 2:00 p.m.  You must be present to receive your mail.  Mail leaving the institution must be hand-delivered to unit management staff.  Mail leaving the institution must contain a return address which includes your name and register number.  Legal and special mail will ordinarily be delivered by the case manager.  Outgoing special mail (i.e., attorney, federal courts, probation officers, etc.) may be sealed, and delivered to the unit management staff during mail call hours.

   **(b) Telephone Communication**.  All telephone communication between inmates and persons in the community (except properly placed, unmonitored legal calls) will:
1.  be conducted using monitored ITS phone lines;
2.  be live-monitored by staff;
3.  be recorded;
4.  occur in English-only (by both the inmate and community call-recipient) unless previously scheduled for and conducted through simultaneous translation monitoring;
5.  be limited to a single 15-minute call per week;
6.  be scheduled Monday through Friday, excluding federal holidays between the hours of 8:00 a.m. and 2:30 p.m.

Persons from whom an inmate requests placement on the approved telephone list must complete the **"Acknowledgment of Conditions for Telephone Contact with Inmates in the Communication Management Unit, USP Marion,"** form included with this institution supplement as attachment "B", as proof of their acknowledgment and acceptance of these conditions.  Monitored calls where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted through simultaneous translation monitoring.  In the event of terminated calls, inmates may be subject to disciplinary action, and the person may be removed from the inmate's approved telephone list.

   **(c) Visiting.**  All visiting between inmates and persons in the community (except properly scheduled, unmonitored legal visits) will:
1.  be conducted in the main visiting room using non-contact facilities (i.e., secure partitioned rooms, telephone voice contact);
2.  be live-monitored;
3.  be subject to recording;

4. occur in English-only (by both inmate and visitor) unless previously scheduled for and conducted through simultaneous translation monitoring;

5. Nonverbal communication (i.e. hand signals, sign language) may result in termination of the visit;

6. be scheduled Monday through Friday, excluding federal holidays between the hours of 8:30 a.m. and 3:00 p.m. Each inmate is authorized four hours of visiting each month (two 2-hour visits or one 4-hour visit.)

Any violations may result in immediate termination of the visit. Persons for whom an inmate requests placement on the approved visiting list must complete the **"Acknowledgment of Conditions for Visiting with Inmates in the Communication Management Unit, USP Marion,"** form included with this institution supplement as attachment "C," as proof of their acknowledgment and acceptance of these conditions.

4. **HOUSING CONDITIONS / UNIT PROGRAMS / SERVICES:**

**(a) Cell Assignments:** Ordinally, I-Unit inmates will be housed in single bunk cells. The unit contains a range of cells dedicated to segregated housing of those inmates in need of being placed in administrative detention or disciplinary segregation status. Cells I02-010L thru I02-016L are designated as segregation housing for I Unit inmates placed in administrative detention status or disciplinary segregation status.

**(b) Health Services:** Health Services staff will provide sick call in the morning on Monday, Tuesday, Thursday and Friday in the unit examination room. Medications will be delivered and/or administered in the unit twice daily. Inmates may request to be seen by a physician. Specialized services may be provided in the institutions's main health services unit as needed.

**(c) Mental Health Services:** Psychology staff will make regular rounds within the unit. Inmates may request to be seen by psychology staff, which will occur within the unit.

**(d) Meals:** All inmate meals will be served and consumed in the unit.

**(e) Education/Recreation Services:** Inmates will ordinarily be permitted to leave their cells and participate in activities in the unit from 6:00 a.m. to 9:45 p.m., except during counts.

A basic leisure and law library are located within the unit. Additional materials may be requested from the main leisure and law library. A photocopier has been provided for inmate use at their expense.

Inmates will be provided table games such as chess, checkers and cards. Hobby craft

opportunities will also be provided.
Earphones will be utilized when playing radios at all times.  Radios may be played on the
recreation yard, walkways during off-duty hours, and in individual inmate cells.  Alteration
of a radio is not permitted and will be confiscated as contraband.

Televisions are available in the unit for viewing.  The recreational areas contain various
recreation activities to include handball, basketball courts, sit-up benches, stationary bikes,
stair-stepping machines, and walking.

**(f) Religious Services.**  Religious service opportunities will be provided in the unit.

**(g) Ice Machine:**  An ice machine is provided.  This area must be kept clean at all times.
Water drainage lines must remain unclogged and will not be used to dispose of food items.
The ice machine may be turned off for an indeterminate amount of time if contraband is
found in this area.

**(h) Commissary/Trust Fund Operations.**  Commissary purchase forms will be issued on
Tuesday of each week by Unit Management staff.  After completion of the forms, they will
be hand-delivered by staff to the commissary for processing by COB Wednesday.  The
commissary items will be delivered to the unit and distributed by commissary staff on
Thursday of each week.  Any special purchases (personal radios, etc.) must be approved
by Unit Management staff.  Commissary items will be neatly stored in your assigned locker
ONLY.  Under no circumstances are commissary items to be stored on the floor.  Items not
stored in their original container are considered contraband and will be confiscated.
Original containers are to be disposed of when empty and will not be used for other
purposes.

**(i) Sanitation/Personal Hygiene.**  I-Unit inmates are responsible for sanitation of their
living areas.  Unit orderly job assignments will be made by the unit staff.  Clean,
serviceable clothing will be issued to each inmate upon his arrival to the unit.  Unit laundry
service are available in the unit.  I-Unit inmates are responsible for laundering their own
personal clothing.  Barber services for I Unit will be conducted in the all inmates are
required to make their beds, clean their rooms, empty their trash containers and turn off
their lights prior to leaving for work, on a daily basis.  Daily inspections will be made by unit
staff for cleanliness and sanitation unit.

Each inmate will be issued basic hygiene items.  Additional items may be purchased by the
inmate from the institution commissary.  Inmate showers are available.  Staff will make
regular rounds within the unit to assure proper sanitation is being maintained.

**(j)  Work Assignments.**  All work assignments will be made by the unit team.

5.   **ADMINISTRATIVE REMEDY PROGRAM**:  You may appeal your transfer to I Unit, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. 542.10 through 542.19, and Program Statement 1330.16.  Unit staff will provide you with the necessary form upon request.

6.   **EFFECTIVE DATE:**  This supplement is effective upon issuance.

_____                    _____//s//_____
        Date                                                    Lisa J. W. Hollingsworth, Warden

MAR-5321.07A
Page 6

November 13, 2008

Attachment A

## NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| Warden (print and signature):<br><br>Lisa J. W. Hollingsworth, Warden | Institution:<br><br>USP Marion, Illinois |

**NOTICE:** This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your unit team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

**OPPORTUNITY TO APPEAL TRANSFER DECISION** - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your unit team will provide you with the necessary form upon request.

**INSTRUCTIONS TO STAFF** - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): | Staff Member (signature): | Date Issued: |
|---|---|---|
|  |  |  |

November 13, 2008

Attachment B

## ACKNOWLEDGMENT OF CONDITIONS FOR TELEPHONE CONTACT
## WITH INMATES IN THE COMMUNICATION MANAGEMENT UNIT,
## USP MARION, ILLINOIS

_____, _____, an inmate housed in the CMU
(Inmate Name)                        (Reg. No.)

at the United States Penitentiary, Marion, Illinois, requests your name be placed on his approved telephone list.

As a condition of being placed on this inmate's approved telephone list, you agree to the following conditions:

(1)   All telephone communication between you and the inmate will be subject to monitoring and recording by Bureau of Prisons' staff;

(2)   Your telephone conversation with the inmate will occur in English-only, unless previously scheduled for, and conducted through, simultaneous translation monitoring; and

(3)   Monitored calls where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted through simultaneous translation monitoring.  In such cases, inmates may be subject to disciplinary action, and you may be removed from the inmate's approved telephone list.

_____                    _____

Signature                                                                                              Date Signed

_____                    _____

Printed Name                                                                                     Phone Number

Attachment C

## ACKNOWLEDGMENT OF CONDITIONS FOR VISITING
## WITH INMATES IN THE COMMUNICATION MANAGEMENT UNIT,
## USP MARION, ILLINOIS

_____, _____, an inmate housed in the CMU
(Inmate Name)                          (Reg. No.)

at the United States Penitentiary, Marion, Illinois, requests your name be placed on his approved visiting list.

As a condition of being placed on this inmate's approved visiting list, you agree to the following conditions:

(1)   All communication between you and the inmate will be subject to monitoring and recording by Bureau of Prisons' staff;

(2)   Your conversations with the inmate during the visit will occur in English-only, unless previously scheduled for, and conducted through, simultaneous translation monitoring; and

(3)   Monitored conversations where either party speaks in non-English will be immediately terminated by the staff monitor unless previously scheduled and conducted through simultaneous translation monitoring.  In such cases, inmates may be subject to disciplinary action, and you may be removed from the inmate's approved visiting list.

_____
Signature                                                    Date Signed


_____
Printed Name

# EXHIBIT C

## NOTICE TO INMATES

### Social Telephone and Social Visiting

Effective January 3, 2010, inmates will be permitted, unless under documented restriction, to communicate through the telephone and social visiting as follows.

Social Telephone Calls:

- Inmates will be allowed two, fifteen (15) minute telephone calls per week.

- Monday through Friday, except federal holidays, telephone calls may be scheduled between 8:00 a.m. and 8:00 p.m., local time.

- Sundays and federal holidays, telephone calls may be scheduled between 8:00 a.m. and 2:30 p.m., local time.

Social Visiting:

- Inmates will be allowed up to eight (8) hours of visiting time per month.

- Visits may be scheduled in increments up to four (4) hours, at the discretion of the institution. No single visit may be scheduled for a period longer than four hours.

- Visits will be permitted Sunday through Friday, 8:30 a.m. to 2:30 p.m., local time.

- Social visiting will be conducted as non-contact.

No social telephone calls or social visiting will be scheduled for Saturdays.

# EXHIBIT D



**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, DC 20534*
March 5, 2008

MEMORANDUM FOR ALL REGIONAL DIRECTORS

FROM:          Joyce K. Conley, Assistant Director
               Correctional Programs Division

SUBJECT:       Referrals for the Communications Management Units

The Bureau has operated the Communications Management Unit (CMU)
at FCC Terre Haute, Indiana since December 2006.  Currently the
need for CMU bed space has exceeded the capacity of the existing
CMU and a second CMU will be established at USP Marion, Illinois
in the near future.

The CMU was established to house inmates who, due to their
current offense of conviction, offense conduct, or other verified
information, require enhanced monitoring of all communications
with persons in the community.  This will allow staff to protect
the safety, security, and orderly operation of Bureau facilities,
and protect the public.

The activation of the additional CMU will increase the Bureau's
capacity for managing inmates who require enhanced communication
monitoring.  The CMUs operate as open housing units where inmates
reside, and participate in all educational, recreational,
religious, visiting, unit management, and work programming within
the confines of the housing unit.

Should your staff be aware of inmates who may meet the CMU
criteria, they should contact Les Smith, Chief, Counter Terrorism
Unit at (b)(2)High or (b)(2)High for CMU referral
information and procedures.

# EXHIBIT E

NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| Aref, Yassin Muhiddin | 12778-052 |
| Warden (print and signature): B. R. Jett, Warden | Institution: FCI Terre Haute, Indiana |

**NOTICE:** This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Your current offenses of conviction include Providing Material Support & Resources to a Foreign Terrorist Organization, & Conspiracy to Use a Weapon of Mass Destruction. Your offense conduct included significant communication, association and assistance to Jaish-e-Mohammed (JeM), a group which has been designated as a foreign terrorist organization.

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

**OPPORTUNITY TO APPEAL TRANSFER DECISION** - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.

**INSTRUCTIONS TO STAFF** - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): | Staff Member (signature): | Date Issued: |
|---|---|---|
| LFortune | N Fortune | 5/11/07 |

NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| Twitty, Avon | 00281-000 |
| Warden (print and signature): B. R. Jett, Warden | Institution: FCI Terre Haute, Indiana |

NOTICE: This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Your current offense of conviction is Murder While Armed, 22 USC section 2101. Reliable evidence indicates your incarceration conduct has included involvement in recruitment and radicalization efforts of other inmates through extremist, violence oriented indoctrination methods to intimidate or coerce others.

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

OPPORTUNITY TO APPEAL TRANSFER DECISION - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.

INSTRUCTIONS TO STAFF - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): L Fortune | Staff Member (signature): N Fortune | Date Issued: 5/30/07 |
|---|---|---|

NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| Inmate Name (Last, First, Middle):<br><br>McGowan, Daniel | Register Number:<br><br>63794-053 |
|---|---|
| Warden (print and signature):<br><br>Lisa J. W. Hollingsworth, Warden | Institution:<br><br>USP Marion, Illinois |

**NOTICE:** This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Your offense conduct included acts of arson, destruction of an energy facility, attempted arson, and conspiracy to commit arson. You have been identified as a member and leader in the Earth Liberation Front (ELF) and Animal Liberation Front (ALF), groups considered domestic terrorist organizations. Your offense conduct included communicating in code and teaching others how to commit crimes of arson. Your actions had the primary purpose to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion. Your contact with persons in the community requires heightened controls and review.

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

**OPPORTUNITY TO APPEAL TRANSFER DECISION** - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.

**INSTRUCTIONS TO STAFF** - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed):<br><br>J.S. Wilson | Staff Member (signature): | Date Issued:<br><br>9/3/08 |
|---|---|---|

## NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| Jones, Royal | 04935-046 |
| Warden (print and signature): | Institution: |
| Lisa J. W. Hollingsworth, Warden | USP Marion, Illinois |

**NOTICE:** This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Your current offense of conviction is Solicitation to Commit a Crime of Violence. Reliable evidence indicates your crimes and incarceration conduct have included involvement in recruitment and radicalization efforts, including of other inmates, through extremist, violence oriented indoctrination methods to intimidate or coerce others.

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

**OPPORTUNITY TO APPEAL TRANSFER DECISION** - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.

**INSTRUCTIONS TO STAFF** - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): | Staff Member (signature): | Date Issued: |
|---|---|---|
| J.S. Wilson, CSW | | 6/17/08 |

NOTICE TO INMATE OF TRANSFER TO COMMUNICATION MANAGEMENT UNIT

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| Inmate Name (Last, First, Middle): | Register Number: |
|---|---|
| JAYYOUSI, Kifah | 39551-039 |
| Warden (print and signature): B. R. Jett, Warden | Institution: FCI Terre Haute, Indiana |

**NOTICE:** This notice informs you of your transfer to a Federal Bureau of Prisons (Bureau) facility that allows greater management of your communication with persons in the community through more effective monitoring of your telephone use, written correspondence, and visiting. Your communication by these methods may be limited as necessary to allow effective monitoring. Your general conditions of confinement in this unit may also be restricted as necessary to provide greater management of your communications. Your transfer to this unit, by itself, will have no effect on the length of your incarceration. You will continue to earn good-conduct sentence credit in accordance with Bureau policy.

Your transfer to this facility under these conditions is based on the following specific information:

Your current offenses of conviction are for Conspiracy to Commit Murder in a Foreign Country; Conspiracy to Kidnap , Maim, and Torture; and Providing Material Support to a Terrorist Organization. You acted in a criminal conspiracy to raise money to support mujahideen operations and used religious training to recruit other individuals in furtherance of criminal acts in this country as well as many countries abroad. Your offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization.

Based on this information, your transfer to this facility for greater communication management is necessary to the safe, secure, and orderly operation of Bureau institutions, or protection of the public. Your continued designation to this facility will be reviewed regularly by your Unit Team under circumstances providing you notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

OPPORTUNITY TO APPEAL TRANSFER DECISION - You may appeal this transfer decision, or any conditions of your confinement, through the Bureau's Administrative Remedy Program, 28 C.F.R. §§ 542.10 through 542.19, and corresponding policy. A member of your Unit Team will provide you with the necessary form upon request.

INSTRUCTIONS TO STAFF - Provide the inmate a copy of this form and complete the following information documenting delivery.

| Staff Member Name and Position (printed): | Staff Member (signature): | Date Issued: |
|---|---|---|
| L Fortune | M Fortune | 6-18-08 |

# EXHIBIT F

## NOTICE TO INMATES

## Review of Inmates for Continued Communication Management Unit (CMU) Designation

(1)   A review of inmates for continued CMU designation will be conducted by the Unit Team in connection with regularly scheduled program reviews.   Inmates are provided at least 48 hours prior notice of scheduled program reviews, are expected to attend, and can personally raise questions and concerns with Unit Team regarding their placement in the CMU.

(2)   When determining whether continued CMU placement is necessary, the Unit Team will consider whether the original reasons for CMU placement still exist, including whether:

(a)   The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

(b)   The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;

(c)   The inmate has attempted, or indicates a propensity, to contact victims of the inmate's current offense(s) of conviction;

(d)   The inmate committed prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or

(e)   There is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's unmonitored communication with persons in the community.

(3)   Reviews for continuing CMU designation are done in a manner consistent with sound correctional judgement and security threat management practices.   Additional information to be considered includes whether the original rationale for CMU designation has been mitigated, whether the inmate no longer

-1-

presents a risk, and that the inmate does not require the degree of monitoring and controls afforded at a CMU.

(4)     Unit Team staff will forward their recommendations to the Warden.  With the concurrence of the Warden, recommendations will then be forwarded to the Bureau's Counter Terrorism Unit (CTU) for review of individual inmate cases.  The CTU will forward the final recommendation to the Regional Director, North Central Region, for further review and consideration.   The Regional Director, North Central Region, has final authority to approve an inmate's re-designation from a CMU.

(5)     Inmates denied re-designation from a CMU will be notified in writing by the Unit Team of the reason(s) for continued CMU designation.  Inmates not satisfied with the re-designation decision, or any other aspect of confinement in the CMU, can appeal the decision or situation through the administrative remedy program.  The inmate's Unit Team can provide the necessary form(s).

# EXHIBIT G

proposes to amend 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, CLASS B, CLASS C, CLASS D, AND CLASS E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

1. The authority citation for 14 CFR part 71 continues to read as follows:

Authority: 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### § 71.1   [Amended]

2. The incorporation by reference in 14 CFR 71.1 of Federal Aviation Administration Order 7400.9T, *Airspace Designations and Reporting Points,* signed August 27, 2009, and effective September 15, 2009, is to be amended as follows:

\*      \*      \*      \*      \*

*Paragraph 5000   General.*
\*      \*      \*      \*      \*

**AAL AK D   Big Delta, AK [Removed]**
\*      \*      \*      \*      \*

*Paragraph 6002   Class E Airspace Designated as Surface Areas.*
\*      \*      \*      \*      \*

**AAL AK E2   Big Delta, AK [Removed]**
\*      \*      \*      \*      \*

*Paragraph 6004   Class E Airspace Areas Designated as an Extension to a Class D or Class E Surface Area.*
\*      \*      \*      \*      \*

**AAL AK E4   Big Delta, AK [Removed]**
\*      \*      \*      \*      \*

*Paragraph 6005   Class E Airspace Extending Upward From 700 Feet or More Above the Surface of the Earth.*
\*      \*      \*      \*      \*

**AAL AK E5   Big Delta, AK [Removed]**

Issued in Anchorage, AK, on March 9, 2010.

**Anthony M. Wylie,**
*Manager, Alaska Flight Services Information Area Group.*

[FR Doc. 2010–7775 Filed 4–5–10; 8:45 am]

**BILLING CODE 4910–13–P**

---

## DEPARTMENT OF JUSTICE

### Bureau of Prisons

### 28 CFR Part 540

[BOP Docket No. 1148–P]

RIN 1120–AB48

### Communication Management Units

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** In this document, the Bureau of Prisons (Bureau) proposes to establish and describe Communication Management Units (CMUs) by regulation. CMUs are designed to provide an inmate housing unit environment that enables staff monitoring of all communication between CMU inmates and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protect the public. The Bureau currently operates CMUs in two of its facilities. This rule would clarify existing Bureau practices with respect to CMUs.

**DATES:** Comments are due by June 7, 2010.

**ADDRESSES:** Written comments should be submitted to the Rules Unit, Office of General Counsel, Bureau of Prisons, 320 First Street, NW., Washington, DC 20534. You may view an electronic version of this regulation at www.regulations.gov. You may also comment by using the *www.regulations.gov* comment form for this regulation. When submitting comments electronically you must include the BOP Docket No. in the subject box.

**FOR FURTHER INFORMATION CONTACT:** Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 307–2105.

**SUPPLEMENTARY INFORMATION:**

### Posting of Public Comments

Please note that all comments received are considered part of the public record and made available for public inspection online at *www.regulations.gov.* Such information includes personal identifying information (such as your name, address, etc.) voluntarily submitted by the commenter.

If you want to submit personal identifying information (such as your name, address, *etc.*) as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONAL IDENTIFYING INFORMATION" in the first paragraph of your comment. You must also locate all the personal identifying information you do not want posted online in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS

INFORMATION" in the first paragraph of your comment. You must also prominently identify confidential business information to be redacted within the comment. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on www.regulations.gov.

Personal identifying information identified and located as set forth above will be placed in the agency's public docket file, but not posted online. Confidential business information identified and located as set forth above will not be placed in the public docket file. If you wish to inspect the agency's public docket file in person by appointment, please see the **FOR FURTHER INFORMATION CONTACT** paragraph.

### Discussion

This proposed rule codifies and describes the Bureau's procedures for designating inmates to, and limiting communication within, its Communication Management Units (CMU). Currently, the Bureau operates two CMUs, separately located at the Federal Correctional Complex (FCC), Terre Haute, Indiana (established in December 2006), and the United States Penitentiary (USP), Marion, Illinois (established in March 2008).

*Current regulatory authority.* The Bureau currently has regulatory authority to restrict the communications of high-risk inmates. *See, e.g.* 28 CFR 540.12 (authorizing Wardens to establish and exercise controls to protect individuals, security, discipline, and the good order of the institution); 28 CFR 540.14 (a) (indicating that institution staff shall open and inspect all incoming general correspondence.); 28 CFR 540.100 *et seq.* (authorizing limitations upon an inmate's telephone privileges consistent with ensuring the security or good order of the institution or protection of the public, and authorizing Wardens to establish procedures that enable monitoring of telephone conversations); 28 CFR 540.40, *et seq.* (authorizing Wardens to limit inmate visiting when necessary to ensure the security and good order of the institution).

*Purpose of the CMU regulations.* The CMU regulations establish specific parameters for Bureau staff when operating CMUs while putting inmates and the public on notice of CMU operation.

The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between CMU inmates

and persons in the community. The CMU concept allows the Bureau to monitor inmates for whom such monitoring and communication limits are necessary, whether due to a terrorist link or otherwise, such as inmates who have previously committed an infraction related to mail tampering from within an institution, or inmates who may be attempting to communicate with past or potential victims. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protect the public. The volume, frequency, and methods of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.

A CMU is a general population housing unit where inmates will ordinarily reside, eat, and participate in educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. Additionally, CMUs may contain a range of cells dedicated to segregated housing of inmates in administrative detention or disciplinary segregation status.

Under this regulation, initial consideration of inmates for CMU designation begins when the Bureau becomes aware of information relevant to the criteria described in § 540.201. The Bureau's Assistant Director, Correctional Programs Division, will then make a determination based on a review of the evidence presented, and a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public.

Upon arrival at the designated CMU, inmates will receive written notice from the Warden of the facility in which the CMU exists. The written notice will explain that designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart. The written notice will also explain that general conditions of confinement in the CMU may be limited as necessary to provide greater management of communications, and that designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration. CMU inmates

continue to earn sentence credit in accordance with law and Bureau policy.

Through the written notice, inmates will also be informed that designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate will be provided an explanation of the decision in sufficient detail, unless providing specific information would jeopardize the safety, security, or orderly operation of the facility, or protection of the public.

Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates. The inmate may challenge the CMU designation decision and any aspect of confinement therein, through the Bureau's administrative remedy program. While this regulation may allow for limiting the communication of inmates to whom it is applied, it will not extinguish their monitored communication abilities absent abuse or violations committed by the inmate.

With this regulation, the Bureau seeks, when warranted, on a case-by-case basis, to more effectively monitor communication while still accommodating the rights guaranteed by the First Amendment to petition for redress of grievances. By limiting the communications of these inmates, the Bureau seeks to balance First Amendment rights with its correctional mission.

The proposed regulation would clarify current authority for imposing limits and restrictions on the communications of inmates in the Bureau's custody based on evidence, either from outside sources (such as other federal agencies) or from internal sources (such as intelligence gained through observation of inmates in Bureau custody). Communications would be limited if such evidence indicates, inter alia, a high degree of potential risk to national security.

The approach of this rule will also provide a more effective means to implement a previously-published proposed rule (BOP Docket No. 1135) providing for limiting the communication opportunities of inmates who are: (1) Charged with, convicted of, or detained in relation to an offense under title 18 U.S. C. chapters 113B or 115; or (2) charged with having engaged in, have engaged in, are detained in relation to, or are linked in any way to terrorist-related

activity as part of their current or previous offense conduct or conduct while incarcerated.

BOP 1135 contemplated limiting the communications of inmates in a general population prison setting who were identified as having an identifiable link to terrorist-related activity. It is difficult to police inmate communication in the "open" context of a general population setting because it is harder to detect activity such as inmates sending mail under another inmate's name, or using another's PIN number, without constant monitoring.

By physically separating out the properly classified prisoners who need comprehensive communication monitoring, and involving the Assistant Director of the Bureau's Correctional Programs Division in addition to the Warden in the initial decision to restrict communications, we hope to lessen any adverse impact on the vast majority of the other prisoners not subject to comprehensive monitoring but still only subject to random monitoring.

After taking into consideration any public comment received after publication of this proposed rule, the Bureau will adopt a consolidated final rule.

This regulation, however, will be applied differently from regulations in 28 CFR part 501, which authorize the Attorney General to impose special administrative measures (SAMs). Under 28 CFR part 501, SAMs are imposed after approval by the Attorney General and are generally based on information from the FBI and the U.S. Attorney's Office (USAO), but are typically not based solely on information from internal Bureau of Prisons sources. Unlike 28 CFR part 501, the proposed regulations allow the Bureau to impose communication limits based on evidence from FBI or another federal law enforcement agency, or if Bureau of Prisons information indicates a similar need to impose communication restrictions, evidence which does not rise to the same degree of potential risk to national security or risk of acts of violence or terrorism which would warrant the Attorney General's intervention by issuance of a SAM.

Furthermore, while SAMs have the potential to restrict communication entirely, this regulation delineates a floor of limited communication, beneath which the Bureau cannot restrict unless precipitated by the inmate's violation of imposed limitations, and then only as a disciplinary sanction following due process procedures in 28 CFR part 541.

Also, the comprehensive monitoring provided by the new regulation would lead to greater protection for the public,

since reconstruction of communications from random monitoring may not provide a full scenario if dangerous communications are discovered.

Likewise, there would be greater protection for inmates as a result of the new proposed rule. The initial decision regarding which inmates to more closely monitor is made by the Assistant Director of the Bureau's Correctional Programs Division, who has a broad scope of authority and a global understanding of the security concerns prevalent in the Bureau's correctional setting. In addition, the inmate can challenge this classification-based treatment decision through the Bureau's administrative remedy program. Further, the CMU inmate's regular inmate associates will not be general population inmates. In the new proposed rule, the only inmates being specially monitored are the inmates placed in the CMU.

Further, CMU monitoring would result in a fuller record that would more readily show whether an inmate's use of words may have been taken out of context and whether the inmate might not need to remain under close communications scrutiny.

Another advantage of CMU monitoring is that closer scrutiny and finer monitoring distinctions can be applied or removed in "stages" from the defined CMU inmate population, so that work and leisure opportunities can be adjusted for the population instead of simply excluding them from such opportunities. Also, consolidating high-risk inmates in the CMU would make it more operationally feasible to minimize the adverse consequences such as the communication delay to the monitored inmates, since the marshaling and organizing of resources into a standard approach should make it easier for translators and officials responding to requests for special exceptions to act quickly.

Under the proposed regulation, inmates may be designated to a CMU if:

• The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

• The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;

• The inmate has attempted, or indicates a propensity, to contact victims of the inmate's current offense(s) of conviction;

• The inmate committed a prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or

• There is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

One important category of inmates which might be designated to a CMU is inmates whose current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism. Past behaviors of terrorist inmates provide sufficient grounds to suggest a substantial risk that they may inspire or incite terrorist-related activity, especially if communicated to groups willing to engage in or to provide equipment or logistics to facilitate terrorist-related activity. The potential ramifications of this activity outweigh the inmate's interest in unlimited communication with persons in the community.

Communication related to terrorist-related activity can occur in codes which are difficult to detect and extremely time-consuming to interpret. Inmates involved in such communication, and other persons involved or linked to terrorist-related activities, take on an exalted status with other like-minded individuals. Their communications acquire a special level of inspirational significance for those who are already predisposed to these views, causing a substantial risk that such recipients of their communications will be incited to unlawful terrorist-related activity.

The danger of coded messages from prisoners has been recognized by the courts. *See Turner* v. *Safley*, 482 U.S. 78, 93 (1987) ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); *United States* v. *Salameh*, 152 F.3d 88, 108 (2nd Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); *United States* v. *Johnson*, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); *United States* v. *Hammoud*, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); *United States* v. *Moncivais*, 401 F.3d 751, 757 (6th Cir. 2005) (noting that

seemingly nonsensical conversations could be in code and interpreted as indicative of drug dealing activity). Also, an Al Qaeda training manual contains the following advice regarding communications from prison: "Take advantage of visits to communicate with brothers outside prison and exchange information that may be helpful to them in their work outside prison. The importance of mastering the art of hiding messages is self evident here."

There have been cases of imprisoned terrorists communicating with their followers regarding future terrorist activity. For example, after El Sayyid Nosair assassinated Rabbi Kahane, he was placed in Rikers Island, where "he began to receive a steady stream of visitors, most regularly his cousin El-Gabrowny, and also Abouhalima, Salameh, and Ayyad. During these visits, as well as subsequent visits once Nosair was at Attica, Nosair suggested numerous terrorist operations, including the murders of the judge who sentenced him and of Dov Hikind, a New York City Assemblyman, and chided his visitors for doing nothing to further the jihad against the oppressors. Nosair also tape recorded messages while in custody * * *" *United States* v. *Rahman*, 189 F.3d 88, 105–06 (2d Cir. 1999). Imprisoned, Sheikh Abdel Rahman had urged his followers to wage jihad to obtain his release. Violent attacks and murders followed. *United States* v. *Sattar*, 314 F.Supp.2d 279, 288–89 (S.D.N.Y. 2004).

To minimize the risk of terrorist-related communication and other similar dangerous communication to or from inmates in Bureau custody, this regulation clarifies the Bureau's current authority to limit and monitor the communication of CMU inmates to immediate family members, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the Bureau, other federal law enforcement entities, and the inmate's attorney. The Bureau allows communication with these individuals to help inmates maintain family ties, and protect inmates' access to courts and other government officials in order to raise issues related to their incarceration or their conditions of confinement, while minimizing potential internal or external threats.

Particular consideration has also been given to the ability of CMU inmates to communicate via special mail. Special mail is defined in 28 CFR part 540. For the purposes of CMUs, however, this rule would limit special mail to privileged communication with the inmate's attorney. Correspondence from the correspondents listed in 28 CFR 540.2(c) as "special correspondence,"

other than attorneys. (e.g. President and Vice President of the United States, the Department of Justice, members of Congress, Governors, State legislatures, courts, media etc.) will be treated as "general correspondence" for the purposes of CMUs. There is no frequency or volume limitation on correspondence with an inmate's attorney, unless necessary as a result of the inmate's abuse or violation of these regulations.

To effectively and efficiently allow monitoring and review of the general correspondence communications of CMU inmates, those communications may be limited in frequency and volume as follows:

• Written correspondence may be limited to three pieces of paper, double-sided, once per week to and from a single recipient;

• Telephone communication may be limited to a single completed call per calendar month for up to 15 minutes; and

• Visiting may be limited to one hour each calendar month.

Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities: U.S. courts, Federal judges, U.S. Attorney's Offices, Members of U.S. Congress, The Bureau of Prisons, other federal law enforcement entities, or, as stated earlier, the inmate's attorney (privileged communications only). Correspondence with these entities is not limited under these regulations in furtherance of inmates' access to courts and their ability to defend in litigation.

By limiting the frequency and volume of the communication to/from inmates identified under this regulation, we will reduce the amount of communication requiring monitoring and review. Reducing the volume of communications will help ensure the Bureau's ability to provide heightened scrutiny in reviewing communications, and thereby increasing both internal security within correctional facilities, and the security of members of the public.

Inmates may incur additional limitations on their communications as the direct result of abusing or violating individualized communication limits imposed under this subsection, but additional limitations will occur only to the extent possible under this regulation and according to the procedures in this subsection. Unmonitored communications with verified attorneys may be limited in the form of monitoring only as provided in 28 CFR

part 501 (regarding national security cases and prevention of acts of violence and terrorism) and part 543 (regarding inmate legal activities). Inmates may also be subject to disciplinary action or criminal prosecution for abusing or violating limits imposed under this subsection.

### Executive Order 12866

This regulation falls within a category of actions that the Office of Management and Budget (OMB) has determined to constitute "significant regulatory actions" under section 3(f) of Executive Order 12866 and, accordingly, it was reviewed by OMB. The Bureau of Prisons has assessed the costs and benefits of this regulation as required by Executive Order 12866 Section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs. There will be no new costs associated with this regulation.

### Executive Order 13132

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, under Executive Order 13132, we determine that this regulation does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

### Regulatory Flexibility Act

The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this regulation and by approving it certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This regulation pertains to the correctional management of offenders and immigration detainees committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

### Unfunded Mandates Reform Act of 1995

This regulation will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This regulation is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This regulation will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### List of Subjects in 28 CFR Part 540

Prisoners.

**Harley G. Lappin,**
*Director, Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we amend 28 CFR part 540 as follows:

### SUBCHAPTER C—INSTITUTIONAL MANAGEMENT

### PART 540—CONTACT WITH PERSONS IN THE COMMUNITY

1. The authority citation for 28 CFR part 540 continues to read as follows:

**Authority:** 5 U.S.C. 301, 551, 552a; 18 U.S.C. Chapters 113b and 115, 1791, 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to offenses committed after that date), 5039; 28 U.S.C. 509, 510, 530C(b)(6).

2. Add a new subpart J, to read as follows:

### SUBPART J—COMMUNICATION MANAGEMENT HOUSING UNITS

Sec.
540.200   Purpose and scope.
540.201   Designation criteria.
540.202   Designation procedures.
540.203   Written correspondence limitations.
540.204   Telephone communication limitations.
540.205   Visiting limitations.

### § 540.200   Purpose and scope.

(a) *Purpose of this subpart.* This subpart authorizes and defines the Federal Bureau of Prisons' (Bureau) authority to operate, and designate inmates to, Communication Management Housing Units (CMUs) within Bureau facilities.

(b) *CMU.* A CMU is a general population housing unit where inmates

ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU. Additionally, CMUs may contain a range of cells dedicated to segregated housing of inmates in administrative detention or disciplinary segregation status.

(c) *Purpose of CMUs.* The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between CMU inmates and persons in the community. The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protect the public. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart.

(d) *Application.* Any inmate (as defined in 28 CFR § 500.1(c)) meeting criteria prescribed by this subpart may be designated to a CMU.

(e) *Relationship to other regulations.* The regulations in this subpart supercede and control to the extent they conflict with, are inconsistent with, or impose greater limitations than the regulations in 28 CFR Part 540, or any other regulations in this chapter, except 28 CFR Part 501.

### § 540.201  Designation criteria.

Inmates may be designated to a CMU if evidence of the following criteria exists:

(a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

(b) The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;

(c) The inmate has attempted, or indicates a propensity, to contact victims of the inmate's current offense(s) of conviction;

(d) The inmate committed prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or

(e) There is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.

### § 540.202  Designation procedures.

Inmates may be designated to CMUs only according to the following procedures:

(a) *Initial consideration.* Initial consideration of inmates for CMU designation begins when the Bureau becomes aware of information relevant to the criteria described in § 540.201.

(b) *Assistant Director authority.* The Bureau's Assistant Director, Correctional Programs Division, has authority to approve CMU designations. The Assistant Director's decision must be based on a review of the evidence, and a conclusion that the inmate's designation to a CMU is necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public.

(c) *Written notice.* Upon arrival at the designated CMU, inmates will receive written notice from the facility's Warden explaining that:

(1) Designation to a CMU allows greater Bureau staff management of communication with persons in the community through complete monitoring of telephone use, written correspondence, and visiting. The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited as necessary to achieve the goal of total monitoring, consistent with this subpart;

(2) General conditions of confinement in the CMU may also be limited as necessary to provide greater management of communications;

(3) Designation to the CMU is not punitive and, by itself, has no effect on the length of the inmate's incarceration. CMU inmates continue to earn sentence credit in accordance with law and Bureau policy.

(4) Designation to the CMU follows the Assistant Director's decision that such placement is necessary for the safe, secure, and orderly operation of Bureau institutions, or protection of the public. The inmate will be provided an explanation of the decision in sufficient detail, unless providing specific information would jeopardize the safety, security, and orderly operation of correctional facilities, or protection of the public.

(5) Continued designation to the CMU will be reviewed regularly by the inmate's Unit Team under circumstances providing the inmate notice and an opportunity to be heard, in accordance with the Bureau's policy on Classification and Program Review of Inmates.

(6) The inmate may challenge the CMU designation decision, and any aspect of confinement therein, through

the Bureau's administrative remedy program.

### § 540.203  Written correspondence limitations.

(a) *General correspondence.* General written correspondence as defined by Part 540, may be limited to three pieces of paper (not larger than 8.5 x 11 inches), double-sided writing permitted, once per calendar week, to and from a single recipient at the discretion of the Warden, except as stated in (c) below. This correspondence is subject to staff inspection for contraband and for content.

(b) *Special mail.*

(1) Special mail, as defined in Part 540, is limited to privileged communication with the inmate's attorney.

(2) All such correspondence is subject to staff inspection in the inmate's presence for contraband and to ensure its qualification as privileged communication with the inmate's attorney. Inmates may not seal such outgoing mail before giving it to staff for processing. After inspection for contraband, the inmate must then seal the approved outgoing mail material in the presence of staff and immediately give the sealed material to the observing staff for further processing.

(c) *Frequency and volume limitations.* Unless the quantity to be processed becomes unreasonable or the inmate abuses or violates these regulations, there is no frequency or volume limitation on written correspondence with the following entities:

(1) U.S. courts;

(2) Federal judges;

(3) U.S. Attorney's Offices;

(4) Members of U.S. Congress;

(5) The Bureau of Prisons;

(6) Other federal law enforcement entities; or

(7) The inmate's attorney (privileged communications only).

### § 540.204  Telephone communication limitations.

(a) *Monitored telephone communication* may be limited to immediate family members only. The frequency and duration of telephone communication may also be limited to a single connected call per calendar month, lasting no longer than 15 minutes. The Warden may require such communication to be in English, or translated by an approved interpreter.

(b) *Unmonitored telephone communication* is limited to privileged communication with the inmate's attorney. Unmonitored privileged telephone communication with the inmate's attorney is permitted as

necessary in furtherance of active litigation, after establishing that communication with the verified attorney by confidential correspondence or visiting, or monitored telephone use, is not adequate due to an urgent or impending deadline.

**§ 540.205  Visiting limitations.**

(a) *Regular visiting* may be limited to immediate family members. The frequency and duration of regular visiting may also be limited to a one hour visit each calendar month. The number of visitors permitted during any visit is within the Warden's discretion. Such visits must occur through non-contact visiting facilities.

(1) Regular visits may be simultaneously monitored and recorded, both visually and auditorily, either in person or electronically.

(2) The Warden may require such visits to be conducted in English, or simultaneously translated by an approved interpreter.

(b) *Attorney visiting* is limited to attorney-client privileged communication as provided in Part 540. These visits may be visually, but not auditorily, monitored. Regulations and policies previously established under 28 CFR part 543 are applicable.

(2) For convicted inmates (as defined in 28 CFR part 551), regulations and policies previously established under 28 CFR part 543 are applicable.

[FR Doc. 2010–7728 Filed 4–5–10; 8:45 am]

BILLING CODE 4410–05–P

---

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

**33 CFR Part 165**

[Docket No. USCG–2010–0109]

RIN 1625–AA00

**Safety Zone; Big Bay Fourth of July Fireworks, San Diego Bay, San Diego, CA**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes establishing a temporary safety zone on the navigable waters of the San Diego Bay in support of the Big Bay July Fourth Show to Benefit the San Diego Armed Services YMCA. This temporary safety zone is necessary to provide for the safety of crew, spectators, and other users and vessels of the waterway. Persons and vessels are prohibited from entering into, transiting through, or anchoring within this temporary safety zone unless authorized by the Captain of the Port or his designated representative.

**DATES:** Comments and related material must be received by the Coast Guard on or before May 6, 2010. Requests for public meetings must be received by the Coast Guard on or before May 6, 2010.

**ADDRESSES:** You may submit comments identified by docket number USCG–2010–0109 using any one of the following methods:

(1) Federal eRulemaking Portal: *http://www.regulations.gov*.

(2) *Fax:* 202–493–2251.

(3) *Mail:* Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590–0001.

(4) *Hand delivery:* Same as mail address above, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

To avoid duplication, please use only one of these four methods. See the "Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section below for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this proposed rule, call or e-mail Petty Officer Corey McDonald, Waterways Management, U.S. Coast Guard Sector San Diego, Coast Guard; telephone 619–278–7262, e-mail *Corey.R.McDonald@uscg.mil*. If you have questions on viewing or submitting material to the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

## Public Participation and Request for Comments

We encourage you to participate in this rulemaking by submitting comments and related materials. All comments received will be posted without change to *http://www.regulations.gov* and will include any personal information you have provided.

## Submitting Comments

If you submit a comment, please include the docket number for this rulemaking (USCG–2010–0109), indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online (via *http://www.regulations.gov*) or by fax, mail, or hand delivery, but please use only one of these means. If you submit a comment online via *www.regulations.gov*, it will be considered received by the Coast Guard when you successfully transmit the comment. If you fax, hand deliver, or mail your comment, it will be considered as having been received by the Coast Guard when it is received at the Docket Management Facility. We recommend that you include your name and a mailing address, an e-mail address, or a telephone number in the body of your document so that we can contact you if we have questions regarding your submission.

To submit your comment online, go to *http://www.regulations.gov*, click on the "submit a comment" box, which will then become highlighted in blue. In the "Document Type" drop down menu select "Proposed Rule" and insert "USCG–2010–0109" in the "Keyword" box. Click "Search" then click on the balloon shape in the "Actions" column. If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit comments by mail and would like to know that they reached the Facility, please enclose a stamped, self-addressed postcard or envelope. We will consider all comments and material received during the comment period and may change the rule based on your comments.

## Viewing Comments and Documents

To view comments, as well as documents mentioned in this preamble as being available in the docket, go to *http://www.regulations.gov*, click on the "read comments" box, which will then become highlighted in blue. In the "Keyword" box insert "USCG–2010–0109" and click "Search." Click the "Open Docket Folder" in the "Actions" column. You may also visit the Docket Management Facility in Room W12–140 on the ground floor of the Department of Transportation West Building, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. We have an agreement with the Department of Transportation to use the Docket Management Facility.

## Privacy Act

Anyone can search the electronic form of comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on