**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YASSIN MUHIDDIN AREF, et al., | **Civil Action No. 10-539 (BJR)** |
| **Plaintiffs,** | **MEMORANDUM OPINION ON DEFENDANTS' CONSOLIDATED MOTION TO DISMISS** |
| **v.** | |
| ERIC HOLDER, *et al.*, | |
| **Defendants.** | |

GRANTING IN PART AND DENYING IN PART DEFENDANTS'
CONSOLIDATED MOTION TO DISMISS

Plaintiffs Yassin Aref, Kifah Jayyousi, and Daniel McGowan are or were inmates at

facilities operated by the Bureau of Prisons ("BOP") and were confined to Communications

Management Units ("CMUs"), in which their ability to communicate with the outside world was

seriously restricted. Plaintiffs allege violations of their First Amendment rights, claiming that

they were kept in the CMUs in retaliation for engaging in protected First Amendment activities.

Plaintiffs also allege violations of the Fifth Amendment's guarantee of Due Process. Plaintiffs

Aref, Jayyousi, and McGowan sue BOP and Defendants Eric Holder, Attorney General of the

United States, Charles E. Samuels, Director of the BOP, D. Scott Dodrill, Assistant Director of

the BOP Correctional Programs Division, and Leslie S. Smith, Chief of the BOP Counter

Terrorism Unit, in their official capacity, and Plaintiffs Jayyousi and McGowan sue Defendant

Smith in his individual capacity. Defendants now move to dismiss the First Amendment claims

under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The motion will be granted in part

and denied in part. Because Plaintiff Daniel McGowan has been released from BOP custody, his

claims against Defendants in their official-capacity will be dismissed as moot. Because Plaintiff

Kifah Jayyousi has alleged a plausible claim for retaliation for engaging in protected First

Amendment activity, his claim against Defendants in their official capacity will proceed. And

because the Prison Litigation Reform Act ("PLRA") bars claims by prisoners for mental or

emotional injury suffered while in custody, Plaintiffs McGowan and Jayyousi's claims against

Defendant Leslie Smith in his individual capacity for monetary damages will be dismissed.

## I.      BACKGROUND

### A.      Communications Management Units

The BOP established CMUs at the Federal Correctional Institutions in Terre Haute,

Indiana, and Marion, Illinois, in 2006 and 2008, respectively. *Aref v. Holder*, 774 F. Supp. 2d.

147, 152–53 (D.D.C. 2011) (Urbina, J.) ("*Aref I*"). According to the BOP, CMUs were

"established to house inmates who, due to their current offense of conviction, offense conduct, or

other verified information, require increased monitoring of communication between inmates and

persons in the community in order to protect the safety, security, and orderly operation of [BOP]

facilities, and protect the public." *Id.* at 153. An inmate may be placed in a CMU because

> (a) [t]he inmate's current offense(s) of conviction, or offense conduct, included
> association, communication, or involvement, related to international or domestic
> terrorism;
> (b) [t]he inmate's current offense(s) of conviction, offense conduct, or activity
> while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or
> otherwise act in furtherance of, illegal activity through communication with
> persons in the community;
> (c) [t]he inmate has attempted, or indicates a propensity, to contact victims of the
> inmate's current offense(s) of conviction;
> (d) [t]he inmate committed prohibited activity related to misuse/abuse of
> approved communication methods while incarcerated; or
> (e) [t]here is any other evidence of a potential threat to the safe, secure, and
> orderly operation of prison facilities, or protection of the public, as a result of the
> inmate's unmonitored communication with persons in the community.

*Id.* (alterations in original). "With the exception of attorney visits, all visits with inmates housed

in CMUs are 'non-contact' visits, meaning that the visit takes place in a room with a partition

2

separating the inmate from the visitor and both must communicate using a telephone." *Id.*
Furthermore, with the exception of legal phone calls, CMU inmates are limited to two fifteen-
minute phone calls per week. *Id.* "Within five calendar days of being transferred into a CMU, an
inmate must be provided a 'Notice to Inmate of Transfer to [CMU]' stating the reasons for his
placement in the CMU. An inmate may appeal his transfer to [a CMU], or any conditions of his
confinement, through the [BOP's] Administrative Remedy Program . . . ." *Id.* (internal quotation
marks omitted).

  **B.**  **History of Case**

  Plaintiffs Yassin Muhiddin Aref, Avon Twitty, Daniel McGowan, Jenny Synan, Royal
Jones, Kifah Jayyousi, and Hedaya Jayyousi filed this suit on April 1, 2010. Plaintiffs Aref,
Twitty, McGowan, Jones, and Kifah Jayyousi were prisoners assigned to CMUs, while Plaintiffs
Synan and Hedaya Jayyousi were married to Plaintiffs McGowan and Kifah Jayyousi,
respectively. *See Aref I*, 774 F. Supp. 2d at 154–56. Plaintiffs' complaint alleged a variety of
claims, including that their procedural due process rights were violated because they did not
receive adequate Notices of Transfer or an opportunity to challenge their designation to the
CMUs; that their placement in the CMUs violated their substantive due process and First
Amendment rights to "family integrity;" that the CMUs' conditions constituted cruel and unusual
punishment in violation of the Eighth Amendment; that Plaintiffs Jones and McGowan were
transferred into CMUs in retaliation for protected First Amendment activity; and that Plaintiffs
Aref, Kifah Jayyousi, and Jones were transferred to CMUs because they are Muslim and
therefore were unlawfully discriminated against in violation of the First and Fifth Amendment.
*See id.* at 156–57, 161–71.

This case was assigned to Judge Urbina of this district, who, upon Defendants' motion, dismissed all but the procedural due process and retaliation claims. *See Aref I*, 774 F. Supp. 2d at 161–71. Judge Urbina also dismissed Plaintiff Twitty's claims as moot because "he is no longer in BOP custody," as Twitty had been "placed in a halfway house in October 2007 and paroled in January 2011." *Id.* at 160–61. The case was transferred to the undersigned on November 5, 2012, and Plaintiffs Aref, Kifah Jayyousi, and McGowan filed an amended complaint on November 20, 2012. *See* First Am. Compl. (Dkt. #88-1).[1] In addition to the procedural due process claim, *see id.* ¶¶ 228–32, the amended complaint reformulates Plaintiffs' First Amendment retaliation claims. Specifically, Plaintiffs McGowan and Jayyousi each bring a retaliation claim for declaratory and injunctive relief against all the Defendants in their official capacities, and each also bring a claim for monetary relief against Defendant Leslie S. Smith in his individual capacity. *See id.* ¶¶ 228–40. The three remaining plaintiffs seek a declaration that Defendants' actions violated Plaintiffs' First and Fifth Amendment rights, an injunction that they either be transferred from the CMU to the general prison population or be afforded due process to ensure that their designation to the CMU was "appropriate and devoid of discriminatory animus," and an injunction that they be afforded the same opportunities for communication as general population prisoners. *Id.* at 69–70. Plaintiffs also seek attorney's fees and costs. *Id.* at 70. Finally, Plaintiffs McGowan and Jayyousi seek "compensatory and punitive damages" from Defendant Smith in his individual capacity "in an amount to be determined at trial." *Id.*

On February 19, 2013, the Court denied Defendants' motion for summary judgment on one of Plaintiff McGowan's retaliation claims. *See* Mem. Order (Feb. 19, 2013) (Dkt. #101).

---

[1] Plaintiff Jones was also party to the amended complaint, but this Court dismissed him from the case on May 1, 2013 for failing to comply with the Court's Order or otherwise prosecute his case. *See* Order Dismissing Case (Dkt. #110).

## II.     FACTS

### A.     Plaintiff Jayyousi

Plaintiff Kifah Jayyousi was convicted in August 2007 of conspiracy to murder, kidnap

and maim in a foreign country and conspiracy to provide material support to a terrorist

organization. First Am. Compl. ¶ 179. [2] Jayyousi was sentenced to twelve years and eight months

imprisonment. *Id.* After Jayyousi began serving his sentence in the general prison population,

Defendant Leslie Smith recommended that Jayyousi be designated to a CMU. *Id.* ¶ 185. In June

2008, Jayyousi was transferred to the Terre Haute CMU. *Id.* ¶ 187. Upon arriving at the CMU,

he was a given a written Notice of Transfer, which stated:

> Your current offenses of conviction are for Conspiracy to Commit Murder in a
> Foreign Country; Conspiracy to Kidnap, Maim, and Torture; and Providing
> Material Support to a Terrorist Organization. You acted in a criminal conspiracy
> to raise money to support mujahideen operations and used religious training to
> recruit other individuals in furtherance of criminal acts in this country as well as
> many countries abroad. Your offense conduct included significant
> communication, association and assistance to al-Qaida, a group which has been
> designated as a foreign terrorist organization

*Id.*

In August 2008, Jayyousi served as a Muslim prayer leader and gave a sermon

transcribed by the BOP. *Id.* ¶ 189. According to the transcription, Jayyousi stated in the sermon

in part:

> My brothers in this place, as you are aware this concentrated Muslim community,
> this Muslim community is a Prison and is not a prison. . . . This is a very unique
> prison and even BOP employees and some of the CO's and some of the Officers
> wonder where did this place come from. It's like a place that fell from some hell,
> some evil created this place because it does not belong to anything that BOP has
> done in the past 300 year history and you know what is happening here. . . .
> [E]ach one of you have been brought[,] whether your case was started with a
> fabrication or the reason that brought you here was the fabricator[, y]ou were

---

[2] "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations
contained in the complaint." *Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)
(internal quotation marks omitted).

brought here because you are Muslim and we have our response to that, has to be to stand firm, stand strong, to stand steadfast. . . . [T]hey turned a few[] good American citizens into [criminals]. . . . [Y]ou are not the target, I am not the target, it is not US vs. Jayyousi, it is US vs. [I]slam. . . . John McCain is a presidential can[d]idate and in two months he could be our president where was he 20 years ago? He was being to[rtu]red in a Vietnamese prison for many years with no hope . . . [H]e stood fast he stayed firm he came through[. I]f the people of (Minion?) are doing this shouldn't we as beli[e]vers do the same. There is a famous story of . . . Nelson Mandel[]a . . .  [S]omeone comes [with] an offer to you; oh you will get out but hey we would like to . . . ask you to help us get more people into the CMU[,] entrap more Muslims and get them in jail; tarnish the image of Islam in America. Mandel[]a refused them. . . . There was another story of Admiral Jim Scotsdale. . . . Admir[a]l Jim Scotsdale was the highest ranking US officer to be Captain in Vietnam[;] he was shot down. He was a three star General and they tortured him for eight years. . . . . [H]e said that if you want to survive a very bad situ[]ation like that and we are not being tortured here except psychologically but if you want to survive he said retain faith that you will prevail at the end. It is hard but it is the way which Allah created us. . . . [Y]ou are going to return to your lord to meet him with your hard work and the hardships that you have faced and done in this life; this is why we mart[y]r. . . .[Y]ou have to brave this life you have to face this life and remember that no matter what happens to us . . . [it] is what Allah has pre-ordained . . . .

Memorandum from John Bair, Intelligence Analyst (Apr. 12, 2011) at 4901–03 (Dkt. #111-2).[3]

For giving the sermon, Jayyousi was charged with a disciplinary infraction, "Encouraging a Group Demonstration." First Am. Compl. ¶¶ 190–91. After a disciplinary hearing, the charge was dismissed and expunged from Jayyousi's record. *Id.* ¶ 191.

In October 2010, Jayyousi was transferred from the Terre Haute CMU to the Marion CMU. First Am. Compl. ¶ 194. In February 2011, the Marion CMU Unit Manager wrote a memorandum requesting that Jayyousi be transferred out of the CMU. *Id.* ¶ 195. The memorandum stated that "[s]ince his arrival in the Terre Haute CMU and continuing while at USP Marion, Jayyousi has maintained clear conduct and a good rapport with staff and other inmates. . . . [Staff has] noted no continuation of actions which precipitated his placement in the

---

[3] "[W]here a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) (citing *Greenberg v. The Life Insurance Company of Va.*, 177 F.3d 507, 514 (6th Cir.1999)).

CMU." *Id.* In a subsequent memorandum, Defendant Smith opposed this recommendation.

Smith's memorandum stated:

> While in [the] CMU, inmate Jayyousi was the rotational Muslim prayer leader for Jumah prayer. During one such prayer, which was directly observed by staff, inmate Jayyousi made statements which were aimed at inciting and radicalizing the Muslim inmate population in [the] CMU. Characteristics, behaviors and unacceptable activities which describe an individual involved in prison radicalization and recruitment were displayed by inmate Jayyousi and included: a charismatic individual, who makes highly inflammatory commentaries which elicit violence, terrorism or intimidation, and speech that disrespects or condemns other religious, ethnic, racial, or regional groups. Inmate Jayyousi's comments encouraged activities which would lead to a group demonstration and are detrimental to the security, good order, or discipline of the institution. Specifically, inmate Jayyousi claimed the inmates were sent to CMU because they were Muslim, and not that they were criminals. Inmate Jayyousi purported that the unit was created by something evil, and not even the staff understood or accepted the purpose of the unit. Inmate Jayyousi directed the Muslim inmates to stand together in response to being sent to CMU, that Muslims should not compromise their faith by cooperating with the government and Muslims should martyr themselves to serve Allah and meet hardships in their lives. Claiming Muslim inmates in CMU are being tortured psychologically, inmate Jayyousi further purported that criminal cases against Muslim inmates were fabricated, intended to destroy good U.S. citizens and to tear them away from their families.

*Id.* ¶ 197. Jayyousi remained in the CMU until May 2013, when he was transferred to the general

prison population. *Id.* ¶ 201; Declaration of Kerry P. Kemble, Assistant Administrator,

Residential Reentry Management Branch, Federal Bureau of Prisons (June 7, 2013) ¶ 6 (Dkt.

#113-1).

Jayyousi alleges that the restrictions placed on his visitation and telephone access were

"extremely painful and onerous," requiring him to "struggle[] to maintain a close relationship

with his wife and children." *Id.* ¶¶ 200–03. Jayyousi alleges that designation to the CMU has

caused him "significant psychological and emotional harm." *Id.* ¶ 204.

## B.     Plaintiff McGowan

Plaintiff Daniel Gerard McGowan pled guilty in November 2006 to conspiracy and two

counts of arson. First Am. Compl. ¶ 125. McGowan was sentenced to seven years in prison. *Id.* ¶

125. After McGowan began serving his sentence in an ordinary facility, Defendant Smith recommended that he be designated to a CMU. *Id.* ¶ 134. In March 2010, the warden of the Marion facility and the Unit Manager at the Marion CMU recommended that McGowan be transferred from the CMU to the general population. *Id.* ¶ 142. Defendant Smith opposed this recommendation, and McGowan remained in the CMU. *Id.* ¶¶ 143–44. In August 2010, CMU staff again recommended that McGowan be transferred from the CMU to the general population. *Id.* ¶ 145. In October 2010, McGowan was transferred from the CMU to the general population. *Id.* In February 2011, Defendant Smith recommended that McGowan be redesignated to a CMU. *Id.* ¶ 146. McGowan was then transferred to the CMU at the Terre Haute facility. *Id.* ¶ 147. As described in more detail below, in December 2012 McGowan was transferred from prison to a halfway house and in June 2013 was released altogether from BOP custody.

McGowan alleges that his placement in the CMU "limit[ed] his ability to receive information regarding developments in progressive causes" and "interfere[d] with his ability to maintain a meaningful relationship with his family." First Am. Compl. ¶¶ 150–53. He also alleges that the "complete lack of physical contact has also proved detrimental to [his] mental, emotional and physical health." *Id.* ¶ 156.

### C.    Plaintiff Aref

Plaintiff Yassin Aref was convicted in 2007 of money laundering, material support to a terrorist organization, conspiracy, and making a false statement to the FBI. First Am. Compl. ¶ 105. He was sentenced to 15 years imprisonment. *Id.* Aref began serving his sentence in an ordinary facility, but was later transferred to the Terre Haute CMU. *Id.* ¶ 110. Aref was transferred to the Marion CMU in March 2009 and then was transferred to the general population in April 2011. *Id.* ¶ 114.

Aref alleges that his confinement in the CMU "severely interfered with his ability to maintain a meaningful relationship with his family." First Am. Compl. ¶ 116–22. Aref alleges that his designation to the CMU "also had a profound effect on his psychological and emotional health." *Id.* ¶ 123.

## III.   STANDARD OF REVIEW

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *In re Interbank Fund. Corp. Sec. Litig.*, 668 F. Supp. 2d 44, 47–48 (D.D.C. 2009) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Moreover, ambiguities must be resolved in favor of the plaintiffs, giving them the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint. *See id.* (citing *Scheuer*, 416 U.S. at 236; *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).

To survive a Rule 12(b)(6) motion, the complaint must plead sufficient facts, taken as true, to provide "plausible grounds" that discovery will reveal evidence to support the plaintiff's allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009). Moreover, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted).

When a party files a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the plaintiffs bear the burden of proving by a preponderance of the evidence that the

Court has subject matter jurisdiction." *Biton v. Palestinian Interim Self–Gov't Auth.*, 310 F.

Supp. 2d 172, 176 (D.D.C. 2004). Because subject matter jurisdiction focuses on a court's power

to hear the plaintiffs' claim, a Rule 12(b)(1) motion imposes on the court an affirmative

obligation to ensure that it is acting within the scope of its jurisdictional authority. *Grand Lodge*

*of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). A plaintiff's

factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than

resolving a 12(b)(6) motion for failure to state a claim. *See id.* at 13–14.

## IV.    ANALYSIS

### A.    McGowan's Official-Capacity Claims Are Moot

As noted, Plaintiffs McGowan and Jayyousi each allege both individual-capacity and

official-capacity claims against Defendants. McGowan has been released from BOP custody and

Jayyousi has been transferred from the CMU to the general prison population, raising the issue of

whether their official-capacity claims for injunctive relief have now become moot.[4] The Court

finds that McGowan's release requires dismissal of his official-capacity claims, but Jayyousi's

transfer does not.

A party moves to dismiss a claim for mootness under Federal Rule of Civil Procedure

12(b)(1). *Aref I*, 774 F. Supp. 2d at 159–60 (citing *Comm. in Solidarity with People of El*

*Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991); *Super Sack Mfg. Corp. v. Chase*

*Packaging Corp.*, 57 F.3d 1054, 1060 (Fed. Cir. 1995); *Am. Historical Ass'n v. Peterson*, 876 F.

Supp. 1300, 1308 (D.D.C. 1995)). "A case is moot when 'the issues presented are no longer live

---

[4] McGowan and Jayyousi's individual-capacity claims for monetary damages do not raise the issue of mootness, since damages could be recovered regardless of their current status. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 370–71 (1982) ("Given respondents' continued active pursuit of monetary relief, this case remains definite and concrete, touching the legal relations of parties having adverse legal interests." (internal quotation marks omitted)); *Qassim v. Bush*, 466 F.3d 1073, 1077 (D.C. Cir. 2006) ("[W]hile damages claims may survive release from incarceration, equitable claims do not.").

or the parties lack a legally cognizable interest in the outcome.'" *Id.* at 160 (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). "Courts must evaluate mootness 'through all stages' of the litigation in order to ensure that a live controversy remains." *Id.* (quoting *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 198 (D.C. Cir. 2003)). "An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations." *Id.* (citing *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002); *Sellers v. Bureau of Prisons*, 959 F.2d 307, 310 (D.C. Cir. 1992)). But a "'defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Id.* at 161 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). In order for this exception to apply, "'the defendant's voluntary cessation must have arisen because of the litigation.'" *Id.* (quoting *Pub. Util. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996)).

### 1. McGowan's Release from BOP Custody

On December 11, 2012, prior to the filing of the parties' briefing regarding this motion to dismiss, Plaintiff McGowan was released from prison and transferred to a Residential Reentry Center, commonly known as a "halfway house." *See* Declaration of Kerry P. Kemble (Feb. 11, 2013) ¶ 8 (Dkt. #99-1). On April 4, 2013, McGowan was taken into custody at a detention center because he published an article on an Internet website about his detention in a CMU. *See* Declaration of Kerry P. Kemble (May 22, 2013) ¶ 4 (Dkt. #112-1). About a day later, McGowan was released from the detention center when BOP officials realized that McGowan had been detained pursuant to a BOP regulation that had been rescinded after a federal court found that it was unconstitutional. *See id.* ¶¶ 5–6; *Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1126 (D. Colo.

2007).[5] On June 5, 2013, after completion of briefing on this motion to dismiss, McGowan was released altogether from BOP custody. *See* Kemble June 7, 2013 Declaration ¶ 4. McGowan is under the supervision of the U.S. Probation Office for a term of three years and is no longer under BOP control or subject to BOP rules or regulations. *Id.* ¶ 5.

Defendants contend that McGowan's claims for equitable relief have been rendered moot by his release. The Court agrees. Judge Urbina previously ruled that Plaintiff Twitty's equitable claims became moot when he was placed in a halfway house and subsequently paroled. *See Aref I*, 774 F. Supp. 2d at 159–61. The same logic applies to McGowan's official-capacity claims. Under the law of the case doctrine, "the same issue presented a second time in the same case in the same court should lead to the same result," *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (emphasis and internal quotation marks omitted), and there is no meaningful distinction between McGowan's present situation and Plaintiff Twitty's. While on supervision by the U.S. Probation Office, McGowan is beyond the reach of the BOP and is several meaningful steps away from being returned to the restrictions of the CMU. Likewise, there is no allegation that McGowan was released because of this litigation, and so the "voluntary cessation exception" is similarly inapplicable. *See Aref I*, 774 F. Supp. 2d at 161. Accordingly, McGowan's claims for equitable relief against defendants in their official-capacity are now moot and will be dismissed.

### 2.  Jayyousi's Transfer from the CMU

Defendants do not argue that Jayyousi's official-capacity claims are moot due to his transfer from the CMU into the general prison population. And, indeed, the claims are not, in fact, moot. Judge Urbina previously found that Plaintiff Jones, who was also transferred out of the CMU, had "demonstrate[d] a realistic threat that he might be redesignated to a CMU." *Aref I*,

---

[5] After McGowan was released, a "case note" was issued prohibiting McGowan from "writing articles, [or] appearing in any type of [media] without prior BOP approval." Kemble May 22, 2013 Declaration ¶ 7. This note was subsequently removed after the BOP realized that it too was inconsistent with BOP regulations. *Id.*

774 F. Supp. 2d at 158-59. Judge Urbina found that Jones "was placed in the CMU because of the nature of his underlying conviction and because of his alleged efforts to radicalize other inmates," and "it appears entirely plausible that Jones will be redesignated to the CMU for the very reasons that he was sent there in the first place." *Id.* So, too, for Plaintiff Jayyousi, who was placed in the CMU because of the nature of his conviction and was held there due to his "statements which were aimed at inciting and radicalizing the Muslim inmate population in [the] CMU." First Am. Compl. ¶¶ 187, 197.

### B.    Jayyousi's Official-Capacity First Amendment Claim

"A prisoner alleging a First Amendment claim of retaliation must allege that (1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref I*, 774 F. Supp. 2d at 169 (citing *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C.2007); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

Jayyousi contends that, although his initial designation to the CMU was based on the nature of his conviction, his continued designation there was in retaliation for his religious and political speech — specifically, the prayer he led while in the CMU. *See* Pls.' Opp. at 4–5. Defendants argue that this claim should be dismissed because Jayyousi's speech was not protected by the First Amendment. *See* Mot. at 17–19. Furthermore, Defendants contend that Jayyousi has not plausibly alleged that his continued placement in the CMU did not advance

legitimate penological goals. *See id.* at 13–17. Given the presumption in favor of the Plaintiff that exists on a motion to dismiss, the Court will deny Defendants' motion with respect to Jayyousi's official-capacity First Amendment claim.

"'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (internal quotation marks omitted). Therefore, in considering "a First Amendment retaliation claim, [courts] examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests." *Watkins v. Kasper*, 599 F.3d 791, 794–95 (7th Cir. 2010) (citing *Turner v. Safley*, 482 U.S. 78 (1987)). Speech that is inconsistent with legitimate penological interests may be "unprotected as a matter of law." *Id.* at 797; *see also Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 131–32 (1977); *Pilgrim v. Luther*, 571 F.3d 201 (2d Cir. 2009); *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 864 (5th Cir. 2004); *Goff v. Dailey*, 991 F.2d 1437 (8th Cir. 1993); *Nickels v. White*, 622 F.2d 967 (8th Cir. 1980).

Defendants argue that Jayyousi's retaliation claim must be dismissed because Defendant Smith articulated legitimate penological reasons for keeping Jayyousi in the CMU. Defendants contend that a prisoner bringing a First Amendment retaliation claim must show that the retaliatory action did not advance legitimate penological goals. And Defendants maintain that Smith provided legitimate penological reasons for keeping Jayyousi in the CMU by citing his convictions for terrorism and the statements he made in the sermon. Defendants also argue that

"it is not plausible that Mr. Smith's concerns about security were merely a pretext and that he was in fact motivated by a disagreement with Jayyousi's speech." Defs.' Reply at 15.

The problem with Defendants' argument is that Jayyousi has alleged that he was actually kept in the CMU in retaliation for his religious and political speech, not for any legitimate penological reason. *See* First Am. Compl. ¶ 7 ("Plaintiffs' CMU designation was discriminatory, retaliatory, and/or punitive in nature and not rationally related to any legitimate penological purpose or substantiated information. Instead, it was based on their religion and/or perceived political beliefs, or in retaliation for other protected First Amendment activity."). Defendants accurately cite cases indicating that "[t]o state a claim for retaliation, the plaintiff must allege that 'he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals.'" *Byrd v. Moseley*, 942 F. Supp. 642, 645 (D.D.C. 1996) (quoting *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994) (per curiam)); *see also Rizzo v. Dawson*, 778 F.2d 527, 532 (9th. Cir. 1985) ("For [plaintiff] to state a cause of action, therefore, he must do more than allege retaliation because of the exercise of his first amendment rights in bringing and assisting in civil rights litigation; he must also allege that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals."). But here Jayyousi has made just such an allegation.

Jayyousi accurately notes that the question is not whether he *could* have been kept in the CMU for a legitimate penological reason, but whether he actually was. "An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." *Toolasprashad v. BOP*, 286 F.3d 576, 585 (D.C. Cir. 2002) (internal quotation marks omitted). The fact that Smith offered legitimate

penological reasons for Jayyousi's continued placement in the CMU does not settle the issue,

since Jayyousi has alleged that the reasons were pretextual. As the D.C. Circuit has stated with

respect to consideration of a First Amendment retaliation claim at the summary judgment stage,

"even if [Defendants] provide an objectively valid reason for their actions in this case, the

District Court must still inquire into whether there is a disputed issue of fact as to whether

[Defendants] were actually motivated by an illegitimate purpose." *Kimberlin*, 199 F.3d at 502;

*see also Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) ("[P]rison officials may not defeat a

retaliation claim on summary judgment simply by articulating a general justification for a neutral

process, when there is a genuine issue of material fact as to whether the action was taken in

retaliation for the exercise of a constitutional right."). At the motion to dismiss stage, the Court

must accept, so long as it is plausible, Jayyousi's claim that the penological reasons offered for

his continued placement in the CMU were pretextual and that he was actually kept there in

retaliation for his religious and political speech.

Furthermore, contrary to Defendants' protests, Jayyousi's claim is plausible. As

Defendants note, Judge Urbina did reject Plaintiffs' claim that Defendants discriminated against

them on the basis of religion in part because "Aref and Jayyousi were convicted of terrorism-

related offenses . . . — a fact which provides an 'obvious alternative explanation' for their

designation to a CMU." *Aref I*, 774 F. Supp. 2d at 170 (quoting *Iqbal*, 129 S. Ct. at 1951). But

even if his convicted offense explains Jayyousi's initial placement in the CMU, it fails to explain

his continued designation in the unit despite prison officials' recommendation that he be

removed. Granting Jayyousi "the benefit of all inferences that can be derived from the facts

alleged," *Sparrow*, 216 F.3d at 1113, the other officials presumably knew of Jayyousi's

convicted offense, yet they nonetheless recommended that he be transferred out of the CMU. The

16

BOP's continued holding of Jayyousi in the CMU despite this recommendation provides enough "by way of factual content to 'nudge' his claim of [retaliation] 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570).

Jayyousi's claim also survives dismissal in light of the content of the sermon that he gave and the BOP's treatment of that sermon. As transcribed, Jayyousi's speech does not obviously "confront institutional authority," *Freeman*, 369 F.3d at 864, as the speech or actions did in the cases cited by Defendants. Defendant Smith stated that the sermon "made statements which were aimed at inciting and radicalizing the Muslim inmate population," "elicit[ing] violence, terrorism or intimidation" and "disrespect[ing] or condemn[ing] other religious, ethnic, racial, or regional groups." First Am. Compl. ¶ 197. While the sermon was arguably inflammatory, it does not, on its face, advocate "violence, terrorism or intimidation" or "disrespect or condemn other religious, ethnic, racial, or regional groups." One interpretation of a large portion of the sermon as transcribed is that it is dedicated to an inspirational comparison with U.S. government officials John McCain and Jim Scotsdale, as well as Nelson Mandela. The sermon therefore does not provide an "obvious alternative explanation," *Iqbal*, 129 S. Ct. at 1951, for Jayyousi's continued placement in the CMU. Indeed, again granting Jayyousi the benefit of all inferences, there is arguably a disparity between the actual content of the sermon and Smith's description of it. Thus Jayyousi's claim of retaliation will survive the motion to dismiss.

Of course, Defendants may well have actually been motivated by legitimate penological goals in deciding that Jayyousi's continued placement in the CMU was justified. And since a plaintiff bears the "burden of proving a constitutional violation," in a retaliation case he bears the "burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 588, 600 (1998). Accordingly, in order for his claim to survive the summary judgment stage of this litigation,

Jayyousi will be required to "identif[y] affirmative evidence from which a [finder-of-fact] could

find that he has carried his burden of proving the pertinent motive." *Kimberlin*, 199 F.3d at 498.

Moreover, a "mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the [finder-of-fact] could reasonably find for the

plaintiff," and "if the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–255 (1986). It

may be very difficult for Jayyousi to produce such evidence here. Nonetheless, he must be

afforded that opportunity. Accepting the allegations of the complaint as true, Jayyousi's

allegations are sufficient to withstand a motion to dismiss.

## C.    McGowan and Jayyousi's Individual-Capacity Claims

Defendant Smith contends that McGowan and Jayyousi's individual-capacity claims

against him should be dismissed pursuant to the Prison Litigation Reform Act. The PLRA states

that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other

correctional facility, for mental or emotional injury suffered while in custody without a prior

showing of physical injury." 42 U.S.C. § 1997e(e).[6] Smith argues that McGowan's and

Jayyousi's claims for monetary relief should be dismissed because Plaintiffs allege only mental

or emotional injury and no physical injury. The Court agrees.

Plaintiffs appear to concede that claims in whole paragraphs of their complaint are barred

by the PLRA. *See* Pls.' Opp. at 33 ("To the extent that Plaintiffs have pled emotional injury, *see,*

*e.g.,* [First Am. Compl.] ¶¶ 156, 204, Defendants are correct that the PLRA bars compensatory

---

[6] The PLRA applies to Plaintiff McGowan's claim despite his subsequent release from BOP custody because he "brought" the claim while "confined in a jail, prison, or other correctional facility." 42 U.S.C. § 1997e(e); *see Banks v. York*, 515 F. Supp. 2d 89, 106 n.7 (D.D.C. 2007) (citing cases); *see also Talamantes v. Levya*, 575 F.3d 1021, 1024 (9th Cir. 2009) (collecting cases). Furthermore, after the filing of Defendants' motion, this provision was amended to include an additional exception for "the commission of a sexual act." *See* Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, § 1101(a), 127 Stat. 134. This addition has no relevance here.

damages for this harm."). Plaintiffs argue, however, that they have alleged other injuries that are neither mental nor emotional, and their compensatory and punitive damage claims for these injuries are not barred by the PLRA. Plaintiffs contend that these injuries "includ[e] lost educational opportunity, ruptured family relations, restrictions on liberty, and chilled First Amendment speech and activity." Pls.' Opp. at 33. Plaintiffs argue that they sustained monetary damages from the lack of educational programming available to CMU inmates as well as lasting harm to their family relations. Plaintiffs also maintain that their loss of liberty and infringement of their First Amendment rights are distinct injuries. Plaintiffs contend that they likewise may recover punitive damages. Further, plaintiffs argue that even if the Court were to find that they are barred from recovering compensatory and punitive damages, dismissal of their individual-capacity claims would still not be warranted because they can collect nominal damages.

Plaintiffs' claim of "lost educational opportunity" is too speculative to provide a valid basis for compensatory damages. Plaintiffs state only that they "fear that their post-release prospects will be . . . compromised" by the possibility that they will be denied "the opportunity to participate in release preparation programming." First Am. Compl. ¶ 68. But it is not clear either that Plaintiffs will actually be unable to participate in this programming or that such a contingency would actually have an effect on their employment prospects. Plaintiffs claim that denial of such programming "has a significant negative impact on Plaintiffs' ability to gain placement a halfway house," *id.*, but of course Plaintiff McGowan was placed at just such a facility, and Plaintiff Jayyousi, having been released from the CMU, presumably has access to the programming, *see id.* ("The BOP requires that all eligible prisoners receive the opportunity to engage in release preparation programming to facilitate their ability to gain employment post-release."). In any event, Plaintiffs have failed to articulate that they were actually harmed by the

denial of educational opportunities while in the CMU. The claim may not proceed based on the "fear" that they might be harmed by the possibility that they might not receive the programming.

Plaintiffs have also failed to articulate how their other alleged injuries constitute compensable harms, apart from nominal damages, that are distinct from "mental or emotional injury." Plaintiffs claim that their placement in the CMU has inflicted harm on their "family relations" that is "a category of harm separate from mental and emotional distress," but their only support for this proposition is a treatise from the 19th century. *See* Pls.' Opp. at 34. Plaintiffs' argument seems to be that the violation of their constitutional rights — be it their right to see their family, their First Amendment rights, or their "loss of liberty" — must be compensable, even without any harm that they can articulate or quantify. Yet the Supreme Court has been clear that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986); *see also id.* at 309 ("[D]amages must always be designed 'to *compensate injuries* caused by the constitutional deprivation.'" (quoting *Carey v. Piphus*, 435 U.S. 247, 265 (1978)).

Contrary to Plaintiffs' brief, D.C. Circuit case law confirms that "our inquiry of course must not wander from the quantum of injury to protected interests into a consideration of the 'inherent value' of the constitutional right;" "the court must bear in mind that injury that is not reasonably quantifiable is to be compensated with nominal damages." *Hobson v. Wilson*, 737 F.2d 1, 61–62 (D.C. Cir. 1984). In other words, even with respect to the violation of one's constitutional rights, the plaintiff must articulate how that violation actually causes him injury, or else receive only nominal damages. Claiming mental or emotional injuries is generally fair game for constitutional violations. *See Hobson*, 737 F.2d at 62 ("In reaching its conclusion, the court

or jury may consider, as elements of compensable injury for emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish." (footnotes omitted)). But when the PLRA applies, claims for mental or emotional injuries are barred, even if they spring from constitutional violations. *See Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998) ("[Section] 1997e(e) precludes claims for emotional injury without any prior physical injury, regardless of the statutory or constitutional basis of the legal wrong."). In this Circuit, punitive damages are also not available under the PLRA when the only compensable harms are mental or emotional. *Id.* at 1348 ("Nor do we think the punitive claim can survive. . . . [Section 1997e(e)] simply prevents suits 'for' mental injury without prior physical injury. . . . [M]uch if not all of Congress's evident intent would be thwarted if prisoners could surmount § 1997e(e) simply by adding a claim for punitive damages and an assertion that the defendant acted maliciously.").

With respect to nominal damages, the Court notes that plaintiffs' complaint makes no mention of seeking nominal damages. Plaintiffs contend only that they "have sought nominal damages through their broad prayer for relief," Pls.' Opp. at 36 n.7, not that their complaint actually references nominal damages specifically. Plaintiffs are correct that the court in *Yniguez v. State*, 975 F.2d 646, 647 n.1 (9th Cir. 1992), found that a complaint's request for "all other relief that the Court deems just and proper under the circumstances" was "sufficient to permit the plaintiff to pursue nominal damages." The complaint here contains similar language. *See* First Am. Compl. at 69–70 ("Plaintiffs respectfully request the Court . . . Order such other relief as this Court deems just and proper.").

As the Court understands it, however, the law in this Circuit is that, in order for a prisoner to avoid dismissal under the PLRA of a claim based only on mental or emotional injury, a

request for nominal damages must actually be specifically pled in the complaint. In *Davis v. District of Columbia*, 158 F.3d at 1345, the court affirmed dismissal of a prisoner's constitutional claims when he "alleged resulting emotional and mental distress, but no other injury." Although "[a]t oral argument the issue of a possible claim for nominal damages arose," the court found "nothing in his complaint that can survive the pleading stage" because the plaintiff "never sought nominal damages." *Id.* at 1349. Accordingly, since similarly here Plaintiffs' complaint does not seek nominal damages, the possibility of a claim for nominal damages cannot save Plaintiffs' individual-capacity claims.

To be sure, *Davis* noted not only that the plaintiff "never sought nominal damages," but also that neither "his [n]or amicus's submissions to this court ever mentioned a claim to nominal relief." *Davis*, 158 F.3d at 1349. Although here Plaintiffs have raised the issue of nominal damages in their "submissions to this court" (i.e., in their briefs), the Court does not believe this is sufficient to save their individual-capacity claims. In coming to the conclusion that it would be "inappropriate" to confront the nominal damages issue by "strain[ing] to find inferences that are not available on the face of the complaint or in the briefs submitted to this Court," 158 F.3d at 1349, the *Davis* court approvingly cited *Coates v. Illinois State Bd. of Educ.*, 559 F.2d 445, 447 (7th Cir. 1977). And in *Coates*, the court focused on what was actually in the complaint itself, stating clearly that "we will not strain to find inferences favorable to the plaintiffs which are not apparent on the face of this civil rights complaint." *Id.* Applying the same principle here means looking at what is actually sought by Plaintiffs' complaint, and nominal damages are not.

Because Plaintiffs' claims against Defendant Smith in his individual capacity are barred by the PLRA, the Court need not consider Defendant Smith's argument that the claims against him should be dismissed because of qualified immunity.

## V.    CONCLUSION

For the reasons explained above, the Court finds as follows:

(1)     Plaintiff McGowan's claims against Defendants in their official capacity are moot, and the motion to dismiss will be granted with respect to these claims.

(2)     Plaintiff Jayyousi has alleged a plausible claim of retaliation against Defendants in their official capacity, and the motion to dismiss will be denied with respect to this claim.

(3)     Plaintiffs McGowan and Jayyousi's claims against Defendant Leslie Smith in his individual capacity are barred by the PLRA, and the motion to dismiss will be granted with respect to these claims.

A separate Order consistent with this opinion will follow.


July 12, 2013


BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE