**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
Yassin Muhiddin AREF, et al.,            )
                                                        )
        Plaintiffs,                                 )
                                                        )          Case No. 1:10-cv-00539-BJR
               -v-                                  )
                                                        )          **Oral Argument Requested**
Eric HOLDER, et al.,                         )
                                                        )
        Defendants.                             )
_____)


**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h),

Plaintiffs submit the following statement of material facts as to which there are no genuine

disputes:

**Undisputed Facts Relevant to the Liberty Interest Analysis**

1.      The Communications Management Units (CMUs) are located at FCI Terre Haute

and USP Marion. Ex. 1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and

Security of the Communication Management Unit), 1, Ex. 2 (8/29/11 USP Marion Institution

Supplement: Operation and Security of the Communication Management Unit), 1.

2.      Non-CMU general population units in the Bureau of Prisons (BOP) give prisoners

access to, among other things, visitation, programming, education, religious programming, food

service, indoor and outdoor recreation, a law library, and a leisure library. Ex. 3 (Nalley Dep.),

37:4-37:10.

3.      BOP prisoners in non-CMU general population typically receive 300 minutes of social telephone calls per month. Ex. 4 (Telephone Regulations for Inmates), 9.

4.      Inmates in non-CMU general population at FCI Terre Haute are generally allowed seven visits per month, and there is no set limit on the duration of the visit provided it occurs within visiting hours and visiting conditions permit. This means that inmates in non-CMU general population at FCI Terre Haute are potentially allowed up to 49 hours of visits per month. Dkt. No. 88.1 (First Amended Complaint), ¶ 47; Dkt. No. 131 (Answer to First Amended Complaint), ¶ 47.

5.      Prisoners in non-CMU general population at USP Marion may generally receive visitors from 5:00 pm to 8:00 pm on Friday, and 8:30 am to 3:30 pm on Saturday, Sunday and Federal holidays. Dkt. No. 88.1 (First Amended Complaint), ¶ 131; Dkt. No. 131 (Answer to First Amended Complaint), ¶ 46. Prisoners in non-CMU general population at USP Marion are allowed up to 42 hours of visits per month. Ex. 5 (USP Marion Visiting Regulations), 3, 4.

6.      Inmates at the Administrative Maximum Facility ("ADX") are ordinarily afforded a minimum of ten hours of out-of-cell exercise per week, but are otherwise largely confined to their cells. Ex. 6 (ADX General Population and Step-Down Unit Operations), 2.

7.      Inmates at ADX are generally allowed five non-contact visits per month, each of which may last seven hours. ADX inmates are therefore potentially allowed up to 35 hours of visitation per month. Dkt. No. 88.1 (First Amended Complaint), ¶ 58; Dkt. No. 131 (Answer to First Amended Complaint), ¶ 58.

8.      ADX functions as a step-down program, with increasingly less-restrictive conditions to provide inmates with incentives. Ex. 6 (ADX General Population and Step-Down Unit Operations), 5-6.

9. Prisoners at ADX earn more telephone calls as they progress through the step-down program. Ex. 7 (ADX Telephone Regulations for Inmates), 4.

10. An inmate who is referred to the ADX control unit receives 24-hour notice of a placement hearing, advising the inmate of the specific act(s) or other evidence which forms the basis for a recommendation that the inmate be transferred to a control unit, unless such evidence would likely endanger staff or others. The inmate is provided with a full time staff member to represent the inmate, generally selected by the inmate. The inmate has the right to be present throughout the hearing, and may present documentary evidence and witnesses, if security and safety allow and if witnesses are available. After the hearing, the hearing administrator prepares a written decision as to whether placement is warranted, including a summary of the hearing and of all information presented upon which the decision is based, and indicating the specific reasons for the decision, including a description of the act, or series of acts, or evidence on which the decision is based. The inmate receives a written decision that includes this information, unless safety or security would be compromised. Within 20 days of the hearing, the decision is submitted to the Executive Panel. The inmate may also submit an appeal of the decision to that Executive Panel. The Executive Panel reviews the decision, and any information included in the inmate's appeal. The panel either accepts or rejects the decision within 30 days of receipt. The inmate has a right to appeal the decision directly to the Office of General Counsel (OGC). Ex. 8 (Control Unit Programs), 7-11.

11. Special Management Units (SMUs) are designed to house prisoners who, inter alia, participated in, or had a leadership role in, gang-related activities and present unique management and security concerns, or who have a history of serious and/or disruptive disciplinary infractions. Ex. 9 (Special Management Units), 1, 2.

12.     Conditions of confinement for SMU inmates are more restrictive than for general population inmates. Ex. 9 (Special Management Units), 5.

13.     The SMUs are designed as a step-down program, with the expectation that prisoners will be redesignated from a SMU after 18-24 months. Prisoners earn increasing privileges and programming (including access to social telephone calls and visitation), and less restrictive conditions of confinement, over time. Ex. 9 (Special Management Units), 7-10; Ex. 10 (Lara 30(b)(6) Dep.), 119:14-123:15, 136:3-136:11, 149:10-149:21.

14.     An inmate who is referred to an SMU receives a pre-hearing notice at least 24 hours before a hearing providing a sufficiently detailed explanation of the reasons for the referral and informing the inmate that a staff member is available to help the inmate compile documentary evidence and written witness statements to present at the hearing. The inmate may appear at the hearing, make an oral statement, and present documentary evidence and written witness statements, unless safety or security would be compromised. A Hearing Administrator then issues a report considering whether the inmate meets SMU criteria, providing detailed explanations for the reasons for the findings. The Regional Director then issues a recommendation on the report. If SMU referral is ultimately approved, the inmate receives a copy of the report and may appeal directly to the Office of General Counsel. Ex. 9 (Special Management Units), 2-4.

15.     The CMUs were designed to house prisoners who "require increased monitoring of communications with persons in the community to ensure the safe, secure and orderly running of Bureau facilities, and to protect the public." Ex. 11 (State of the Bureau 2007), 15.

16.     The CMUs are self-contained housing units where inmate reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work

4

programming, segregated from non-CMU inmates. Ex. 2 (8/29/11 USP Marion Institution

Supplement: Operation and Security of the Communication Management Unit), 1; Ex. 1 (5/31/12

FCI Terre Haute Institution Supplement: Operation and Security of the Communication

Management Unit), 1.

17.     There is no limit on the duration of CMU designation. Ex. 12 (Schiavone 30(b)(6)

Dep.), 100:12-100:25.

18.     In testimony before the Senate Judiciary Committee, Attorney General Eric

Holder stated that the BOP uses the CMUs to house inmates "who have a history of or nexus to

international terrorism." Ex. 13 (Statement of Eric H. Holder Jr., Committee on Senate Judiciary,

June 17, 2009), 3-4.

19.     The BOP recognizes the importance of social telephone calls and visitation in

maintaining community and family ties that will contribute to an inmate's personal development,

morale, and preparation for reentry into society. Ex. 4 (Telephone Regulations for Inmates), 1;

Ex. 14 (Visiting Regulations), 1; Ex. 10 (Lara 30(b)(6) Dep.), 34:17-37:12.

20.     Social visits at the CMUs are conducted using non-contact facilities which

employ secure partitioned rooms where inmates and their visitors speak over telephone lines.

Dkt. No. 88.1 (First Amended Complaint), ¶ 33; Dkt. No. 131 (Answer to First Amended

Complaint), ¶ 33.

21.     All social visits at the CMUs must occur in English only, unless previously

scheduled for, and conducted through, simultaneous translation. Ex. 2 (8/29/11 USP Marion

Institution Supplement: Operation and Security of the Communication Management Unit), 4; Ex.

1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and Security of the

Communication Management Unit), 3-4.

22.     Social visits at the CMUs are live-monitored by BOP staff. Ex. 2 (8/29/11 USP

Marion Institution Supplement: Operation and Security of the Communication Management

Unit), 4; Ex. 1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and Security of the

Communication Management Unit), 3-4.

23.     Prior to January 3, 2010, CMU inmates received four hours of social visits per

month, which could be taken in one four-hour or two two-hour sessions, Monday through Friday,

from 8:30 a.m. to 2:00 p.m. They were not allowed to receive any visits on weekends or

evenings. Dkt. No. 88.1 (First Amended Complaint), ¶ 49, Dkt. No. 131 (Answer to First

Amended Complaint), ¶ 49.

24.     As of January 3, 2010, CMU prisoners are allowed eight hours of visiting time per

month. No single visit can be scheduled for more than four hours. Visits are permitted Sunday

through Friday, 8:30 a.m. to 2:30 p.m. Dkt. No. 88.1 (First Amended Complaint), ¶ 54, Dkt. No.

131 (Answer to First Amended Complaint), ¶ 54.

25.     Social telephone calls at the CMUs are live-monitored by BOP staff. Ex. 2

(8/29/11 USP Marion Institution Supplement: Operation and Security of the Communication

Management Unit), 3; Ex. 1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and

Security of the Communication Management Unit), 3.

26.     All social telephone conversations at the CMUs must occur in English only,

unless previously scheduled for, and conducted through, simultaneous translation. Ex. 2 (8/29/11

USP Marion Institution Supplement: Operation and Security of the Communication Management

Unit), 3; Ex. 1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and Security of the

Communication Management Unit), 3.

27.     Prior to January 3, 2010, CMU inmates were authorized to make one 15-minute social telephone call per week. These calls could take place Monday through Friday between 8:30 a.m. and 2:00 p.m. Dkt. No. 88.1 (First Amended Complaint), ¶ 61, Dkt. No. 131 (Answer to First Amended Complaint), ¶ 61.

28.     As of January 3, 2010, CMU inmates are authorized to make two 15-minute social telephone calls per week. Dkt. No. 88.1 (First Amended Complaint), ¶ 62, Dkt. No. 131 (Answer to First Amended Complaint), ¶ 62.

29.     On April 6, 2010, the Bureau of Prisons published a Proposed Rule that proposes to establish and describe the CMUs by regulation. Ex. 15 (Proposed Rule), P003266.

30.     Former Regional Director Michael Nalley testified that the communications restrictions described in the Proposed Rule would be applied at the CMUs once formally adopted. Ex. 3 (Nalley Dep.), 35:24-36:24.

31.     The Proposed Rule states that communications at the CMUs may be limited in frequency and volume as follows: written correspondence to three double-sided pieces of paper once a week to and from a single recipient, telephone communications to a single 15-minute call per month, and visiting to one hour each calendar month. Ex. 15 (Proposed Rule), P003269.

32.     Counter-Terrorism Unit (CTU) staff monitor and analyze CMU inmates' written correspondence. Ex. 16 (Smith Dep.), 15:4-15:16.

33.     Kifah Jayyousi's immediate family consists of his wife, two sons, and three daughters. Ex. 17 (Jayyousi Dep.), 8:4-8:9.  His elderly parents did not visit him while he was at the CMU because the prospect of not being able to touch him made them too emotional. Ex. 17 (Jayyousi Dep.), 143:5-143:12.

34.     Before he was designated to a CMU, at FCI Sandstone, Daniel McGowan was able to "hug and kiss my wife when she got there and when she left . . . and have my arm around her and talk to her and eat with her and play games and have meaningful conversation without a piece of glass between us and without a phone." Ex. 18 (McGowan Dep.), 40:8-40:13.

35.     Yassin Aref described not being able to have any physical contact with his children at the CMUs as a "kind of torture." During visits, his children wanted to hug him but could not, and struggled to take turns speaking to him over a telephone in the partitioned visiting room. He worried so much about the effect the visiting conditions would have on his children that he reconsidered whether they should visit him at all. Ex. 19 (Aref Dep.), 202:1-204:21.

36.     Other CMU prisoners experience non-contact visits as deeply upsetting and disruptive to their relationships with their families. Ex. 19 (Aref Dep.), 204:22-205:4.

37.     The BOP publicly refers to the CMU as a "general population housing unit." Ex. 15 (Proposed Rule), P003267.

38.     In notes about a 2008 Executive Staff Meeting, the BOP states: "Restrictive conditions of confinement programs currently in use by this agency include the Communications Management Unit (CMU), Special Management Unit (SMU) and Administrative Maximum (ADX). Ex. 20 (Executive Staff Meeting Notes), 2.

39.     In notes about a 2012 Executive Staff Meeting, BOP officials describe an audit of "inmates confined in all forms of housing restricted from the general population, i.e., ADX, CMU, SMU." Ex. 20 (Executive Staff Meeting Notes), 3.

40.     Administrative segregation is a non-punitive administrative status that removes a prisoner from general population for a variety of reasons – for example, while a prisoner's

security classification is pending, or when a prisoner is in holdover status while being transferred from one prison to another. Ex. 21 (Special Housing Units), at 2-3.

41.     Prisoners in administrative segregation at FCI Terre Haute and USP Marion generally receive one 15-minute social phone call per month, but prison officials have discretion to provide more upon request. Ex. 22 (Def.'s Resp. to Pl.'s First Set of Interrog.), # 3, 6; Ex. 10 (Lara 30(b)(6) Dep.), 44:7-45:10, 48:25-49:23, 51:6-51:13; Ex. 23 (Lovett Memo.).

42.     Until March 1, 2013, prisoners in administrative segregation at FCI Terre Haute were routinely allotted seven contact visits per month, and there was no set limit on the duration of those visits provided they occur within the same visiting hours provided to general population prisoners. Ex. 24 (Terre Haute Visiting Regulations, Jul. 12, 2010), 5; Ex. 22 (Def.'s Resp. to Pl.'s First Set of Interrog.), # 4, 5; Ex. 10 (Lara 30(b)(6) Dep.), 79:10-80:9.

43.     In a Memorandum for Stanley Lovett dated February 21, 2013, the Warden for FCC Terre Haute announced that, beginning March 1, 2013, social visiting for inmates at the Special Housing Unit (SHU) at FCI Terre Haute would no longer take place in the institution visiting room, and would be non-contact. The memo does not specify the duration or frequency of visits. Ex. 23 (Lovett Memo.).

44.     As of March 1, 2013, SHU prisoners at FCI Terre Haute receive two 2-hour visits per month. Ex. 10 (Lara 30(b)(6) Dep.), 66:24-72:20.

45.     Inmates in administrative segregation at USP Marion are allowed a minimum of four hours of social non-contact visiting time per month and may receive more upon request. Ex. 22 (Def.'s Resp. to Pl.'s First Set of Interrog.), # 4, 5; Ex. 10 (Lara 30(b)(6) Dep.), 61:10-63:7.

46.     BOP policy provides for discretion in the number, duration, and contact/non-contact nature of social visits for prisoners in administrative segregation. Ex. 10 (Lara 30(b)(6) Dep.), 53:19-54:8.

47.     BOP prisoners in administrative segregation are held in Special Housing Units and receive the opportunity to exercise outside their individual cells for a minimum of five hours per week. They continue to have access to programming activities if safety, security, orderly operation of the facility, and public safety are not jeopardized. Ex. 21 (Special Housing Units), 8, 9, 11.

48.     The median time spent by low and medium security prisoners at the CMUs between February 1, 2012 and August 2, 2013, was 66.78 weeks. Ex. 25 (Beveridge Report), ¶¶ 14, 15; Ex. 26 (Beveridge Dep.), 39:8-39:19.

49.     The median time spent by low and medium security prisoners at the Terre Haute CMU between February 1, 2012 and August 2, 2013, was 59.57 weeks. Ex. 25 (Beveridge Report), ¶¶ 14, 16; Ex. 26 (Beveridge Dep.), 39:8-39:19.

50.     The median time spent by low and medium security prisoners at the Marion CMU between February 1, 2012 and August 2, 2013, was 61.43 weeks. Ex. 25 (Beveridge Report), ¶¶ 14, 16; Ex. 26 (Beveridge Dep.), 39:8-39:19.

51.     The median time spent by low, medium, and high security prisoners at the CMUs between February 1, 2012 and August 2, 2013, was 70.93 weeks. Ex. 25 (Beveridge Report), ¶ 15 n.2.

52.     The median aggregate time spent by prisoners in administrative segregation at FCI Terre Haute between February 1, 2012 and August 2, 2013, was 1.07 weeks. Ex. 25 (Beveridge Report), ¶ 16, Ex. 2.

53. The median aggregate time spent by prisoners in administrative segregation at USP Marion between February 1, 2012 and August 2, 2013, was 3.59 weeks. Ex. 25 (Beveridge Report), ¶ 16, Ex. 2.

54. Professor Beveridge used the median to calculate the relative duration of confinement in a CMU and in administrative segregation based on his belief that the median is the preferred unit to measure central tendency. Ex. 26 (Beveridge Dep.), 23:16-23:21, 24:20-25:23.

55. Professor Beveridge also ran his analysis of the relative duration of confinement in a CMU and in administrative segregation using the mean, and found the same pattern of "much less time" in administrative segregation than in the CMU. Ex. 26 (Beveridge Dep.), 40:14-41:6.

56. Because the data examined in Professor Beveridge's expert report is limited to the period between February 1, 2012 and August 2, 2013, it does not necessarily include the entire time that prisoners spent in a CMU. As a result, the total duration of time prisoners spend in a CMU is likely higher than the numbers presented there. Ex. 25 (Beveridge Report), ¶ 18.

57. Data from a longer reporting period (between January 1, 2007 and June 30, 2011) suggests that the duration of CMU confinement is longer than that suggested by looking at data from a shorter reporting period (between February 1, 2012 and August 2, 2013). Ex. 26 (Beveridge Dep.), 47:20-48:17. This data also is likely to undercount the actual duration of CMU confinement because prisoners may have arrived at the CMU before the reporting period start date, or may have been transferred out after the reporting period stop date. Ex. 25 (Beveridge Report), ¶ 18.

11

58.     The median time spent by low and medium security prisoners at the CMUs between January 1, 2007 and June 30, 2011, was 138.71 weeks. Ex. 25 (Beveridge Report), ¶ 17.

59.     The median time spent by low and medium security prisoners at the Terre Haute CMU between January 1, 2007 and June 30, 2011, was 102.07 weeks. Ex. 25 (Beveridge Report), ¶ 17.

60.     The median time spent by low and medium security prisoners at the Marion CMU between January 1, 2007 and June 30, 2011, was 106.15 weeks. Ex. 25 (Beveridge Report), ¶ 17.

61.     The BOP was not able to provide data regarding prisoners in administrative segregation in BOP facilities between January 1, 2007 and June 30, 2011. Ex. 26 (Beveridge Dep.), 48:9-48:25.

62.     Professor Beveridge's comparison of CMU confinement and administrative segregation between February 1, 2012 and August 2, 2013 (i.e. the same reporting period) allows for a statistical comparison of the relative amount of time a prisoner spends in the CMU as opposed to in administrative segregation. Ex. 26 (Beveridge Dep.), 46:12-47:13.

63.     Professor Beveridge's analysis demonstrating that CMU confinement vastly outlasts confinement in a comparable facility is robust, meaning that is reliable and would remain the same no matter what method or measurement was used to examine the durational difference between the two forms of confinement. Ex. 26 (Beveridge Dep.), 42:22-43:11, 67:8-23.

64.     Kifah Jayyousi was designated to the Terre Haute CMU from June 18, 2008 until October 1, 2010 (with the exception of a hospital stay from July 25, 2010 to August 2, 2010); he was then housed at the Marion CMU from October 1, 2010 to May 14, 2013. He spent more than 58 months at a CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 24-27.

65.     Yassin Aref was designated to the Terre Haute CMU from May 11, 2007 to March 26, 2009; he was then housed at the Marion CMU from March 26, 2009 to April 11, 2011. He spent 47 months in a CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 28, 29.

66.     Daniel McGowan was designated to the Marion CMU from August 22, 2008 to October 29, 2008, and then from February 2, 2009 to October 19, 2010. He was designated to the Terre Haute CMU from February 24, 2011 until December 11, 2012. Daniel McGowan spent 22 months at the Marion CMU and 21 months at the Terre Haute CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 20-22.

67.     Avon Twitty was designated to the Terre Haute CMU from May 30, 2007 to October 21, 2010. Mr. Twitty spent more than 39 months in a CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 31, 32.

68.     95 prisoners have spent more than 18 months at the CMUs without any unexpunged disciplinary infractions. Ex. 28 (Def.'s Resp. to Pl.'s Fifth Set of Interrog.), # 1.

69.     25 prisoners have spent more than 36 months at the CMUs despite a lack of unexpunged disciplinary infractions. Ex. 28 (Def.'s Resp. to Pl.'s Fifth Set of Interrog.), # 2.

70.     A BOP prisoner's security level is the most important factor in determining the BOP facility to which that prisoner is designated. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 226.

71.     Prisoners in BOP custody will be designated to a facility commensurate with their security level – minimum, low, medium, or high. Ex. 29 (Miller 30(b)(6) Dep.), 10:5-11:11.

72.     Security level accounts for a number of factors, including sentence. Ex. 29 (Miller 30(b)(6) Dep.), 11:22-12:5; Ex. 30 (Inmate Security Designation and Custody Classification Program Statement), Ch. 4, p.6; Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 225.

73.     Kifah Jayyousi was a low security prisoner for the entire duration of his confinement in a CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 35; Ex. 31 (Jayyousi In-Transit Data Form).

74.     Daniel McGowan was a low security prisoner for the entire duration of his confinement in a CMU. Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 33.

75.     Yassin Aref was a medium security prisoner when he arrived at the CMU, but was reclassified as a low security prisoner by March 2009. He remained a low security prisoner for the remainder of his confinement in a CMU. Ex. 32 (Aref Custody Classification Form); Ex. 33 (Aref Progress Report, Mar. 23, 2009), 1; Dkt. No. 88.1 (First Amended Complaint), ¶¶ 15, 110; Dkt. No. 131 (Answer to First Amended Complaint), ¶¶ 15, 110.

76.     Yassin Aref was transferred from USP Marion to FCI Allenwood. Ex. 19 (Aref Dep.), 13:15-14:11.

77.     In response to Plaintiffs' discovery requests regarding BOP settings to which Plaintiffs are eligible to be transferred and, once transferred, would face conditions that are more restrictive than the CMUs, Defendants produced information about administrative segregation at low and medium security BOP prisons. Ex. 25 (Beveridge Report), ¶ 17, Ex. 3.

78.     This information is comprised of data about administrative segregation at 95 institutions. Ex. 25 (Beveridge Report), Ex. 3; Ex. 27 (Def.'s' Resp. to Pl.'s' Requests for Admission), # 223.

79.     Between February 1, 2012 and August 2, 2013, 3.98% of low and medium security prisoners were in administrative segregation during regularly-performed headcounts at the low and medium security BOP facilities for which Defendants produced data. Ex. 25 (Beveridge Report), ¶ 19.

80.     Contact visits are permitted to prisoners in administrative segregation at 54 of the 95 institutions identified by defendants as BOP facilities to which plaintiffs could be transferred. Ex. 34 (Visiting Regulations Institution Supplements).

81.     Prisoners in administrative segregation at 8 of the 95 institutions identified by defendants as BOP facilities to which plaintiffs could be transferred are permitted 300 minutes of social telephone calls per month. Ex. 35 (Telephone Regulations Institution Supplements).

82.     The median aggregate time a low or medium security prisoner spent in administrative segregation in low and medium security facilities between February 1, 2012 and August 2, 2013, was 3.42 weeks. Ex. 25 (Beveridge Report), ¶ 15; Ex. 26 (Beveridge Dep.), 36:25-37:12.

83.     Between February 1, 2012 and August 2, 2013, low and medium security prisoners spent about 19.5 times longer in a CMU than in administrative segregation. Ex. 25 (Beveridge Report), ¶ 21.

### Undisputed Facts about the Process by which the BOP Designates Prisoners to a CMU

84.     The BOP established the first CMU at FCI Terre Haute in 2006. Dkt. No. 88.1 (First Amended Complaint), ¶ 131, Dkt. No. 131 (Answer to First Amended Complaint), ¶ 1.

85.     Prior to establishing the unit, the BOP did not put into writing any criteria or process for CMU designation. Ex. 36 (Schiavone Dep.), 37:8-39:6.

86.     The newly appointed Chief of the newly created Counterterrorism Unit ("CTU"), Leslie Smith, was tasked with identifying initial candidates for CMU designation, but he was not provided with any training, guidance, or other information to guide that process. Ex. 16 (Smith Dep.), 36:6-36:13, 37:18-37:25, 45:8-45:25.

87.     The first Warden of a CMU, Brian Jett, received no training specific to the CMU, nor did he ever receive any materials or policies about the CMU.  Ex. 37 (Jett Dep.), 16:19-17:10, 19:21-20:8.

88.     Over the next three years, the BOP continued to designate prisoners to the CMU in the absence of any explicit written criteria or process for CMU designation.  Ex. 12 (Schiavone 30(b)(6) Dep.), 25:5-25:10, 70:19-71:10.

89.     The only BOP policy document regarding CMU designation issued during this period was a short memo from Joyce Conley, the Assistant Director of the Correctional Programs Director, dated March 5, 2008.  Ex. 39 (Conley Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 17:6-20:24.

90.     The Conley memo informed Regional Directors that the CMU "was established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require enhanced monitoring of all communications with persons in the community." Ex. 39 (Conley Memo).

91.     The Conley memo invited regional staff aware of inmates who fit these general criteria to contact Les Smith, of the CTU, for "CMU referral information and procedures." However, there were no written CMU referral information or procedures in existence at that time. Ex. 39 (Conley Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 18:4-19:6, 21:5-21:8, 46:19-48:11; Ex. 16 (Smith Dep.), 70:12-71:16.

92.     The Conley memo also informed BOP staff that a second CMU would be established at USP Marion in the near future. Ex. 39 (Conley Memo).

93.     In response to questions about the CMU from the Deputy Attorney General, Conley characterized her memo as providing a clear articulation of the CMU designation process. Ex. 38 (Samuels 4/28/08 email); Ex. 40 (Def's Resp. to Pl.'s' Sixth Set of Interrog.), No. 9.

94.     The BOP developed a "more or less" formal process for designating prisoners to the CMU sometime after the initial wave of designations.  Ex. 36 (Schiavone Dep.), 50:14-51:12.

95.     The process has changed several times, is subject to change at the Regional Director's discretion, and will change again if the Proposed Rule is adopted.  Ex. 36 (Schiavone Dep.), 50:14-51:7; Ex. 12 (Schiavone 30(b)(6) Dep.), 77:13-80:14, 82:15-83:20, 195:16-196:6; Ex. 15 (Proposed Rule), 17328.

96.     To this day the BOP has not documented the process for CMU designation. Ex. 12 (Schiavone 30(b)(6) Dep.), 81:25-83:20.

97.     The CTU began operations on October 1, 2006, and provides language services and analytical support to all BOP facilities housing terrorist offenders. The CTU assists the BOP in identifying, developing, and implementing policies, programs, and protocols that are relevant to national security matters. Ex. 41 (Samuels 5/22/09 Email), 2; Ex. 11 (State of the Bureau 2007), P000217.

98.     Under the BOP's unwritten process, CMU referrals can come to the CTU from "just about any source." Ex. 36 (Schiavone Dep.), 53:11-53:16.

99.     The CTU collects information relevant to the referral, collates that information into a designation packet, and writes a referral memo with the CTU's recommendation as to

whether or not the prisoner should be designated to a CMU.  Ex. 36 (Schiavone Dep.), 53:2-53:4, 77:6-81:5.

100.    The BOP has never put into writing the required contents of the designation packet, but it is the CTU's practice to include within that packet the CTU referral memo, the prisoners' Presentence Investigation Report, the Judgment and Conviction, the Statement of Reasons (if available), along with any other relevant information regarding the prisoner's communications, including CTU intelligence reports, institution investigations, and discipline reports.  The packet also includes a draft "Notice to Inmate of Transfer to a CMU." Ex. 12 (Schiavone 30(b)(6) Dep.), 60:9-60:16, Ex. 36 (Schiavone Dep.), 77:12-78:2.

101.    The CTU referral memo summarizes the information that supports designation. Anything summarized should be included in the designation packet, unless it is law enforcement sensitive or classified. Ex. 12 (Schiavone 30(b)(6) Dep.), 64:12-65:12.

102.    Sometimes information relied on by the CTU, and summarized in the CTU referral memo is excluded from the designation packet. Ex. 12 (Schiavone 30(b)(6) Dep.), 203:25-205:16.

103.    Sometimes the CTU relies upon unproven information, like an indictment or a Department of Justice press release about an indictment, in coming to its recommendation. Ex. 12 (Schiavone 30(b)(6) Dep.), 207:4-207:6, 210:3-211:7.

104.    Once the CTU has created the designation packet, it forwards that packet to the Office of General Counsel ("OGC") for a legal sufficiency review. Ex. 12 (Schiavone 30(b)(6) Dep.) 76:7-77:12.

105.    Starting in 2010 or 2011, the BOP began forwarding the designation packet to the Correctional Programs Division at the Central Office of the BOP, after review by OGC, where the information is also reviewed. Ex. 12 (Schiavone 30(b)(6) Dep.), 77:13-80:3.

106.    After OGC review or, post 2010, OGC and Central Office review, the designation packet is sent to the North Central Regional Director for his review and final approval or disapproval.  The Regional Director is the deciding authority for CMU designations. Ex. 36 (Schiavone Dep.), 53:8-53:10; Ex. 12 (Schiavone 30(b)(6) Dep.), 77:13-80:3, 81:4-81:6.

107.    Prior to making a decision, the Regional Director routes the designation packet through several administrators in his office, who each opine on whether or not they concur with CMU placement. Ex. 12 (Schiavone 30(b)(6) Dep.), 81:10-81:12; Ex. 3 (Nalley Dep.), 81:24-82:19; Ex. 42 (Denney Dep.), 18:17-19:4.

108.    NCRO staff document their recommendation on a "CMU Review" form. Ex..42 (Denney Dep.), 19:5-19:23.

109.    An example of a CMU review form can be found at Exhibit 43. Ex. 43 (Sample CMU Review Form) BOP CMU 060741.

110.    The Regional Director makes the final decision about CMU designation. Ex. 3 (Nalley Dep.), 82:11-82:13, 84:20-84:23.

111.    The Regional Director can make his designation decision based on information that is not in the designation packet. Ex. 12 (Schiavone 30(b)(6) Dep.), 88:23-89:6.

112.    The Regional Director can make his designation decision based on some but not all the information in the designation packet. Ex. 12 (Schiavone 30(b)(6) Dep.), 89:7-89:14.

113.    BOP policy does not require the Regional Director to document the reason(s) for his decision to designate the prisoner to the CMU.  Ex. 12 (Schiavone 30(b)(6) Dep.), 89:17-90:8.

114.    In practice, the Regional Director did not document his reasons for approving CMU designation. Ex. 3 (Nalley Dep.), 250:14-250:19.

115.    The only way to tell why the Regional Director approved a given prisoner for CMU designation is to ask him. Ex. 3 (Nalley Dep.), 249:11-251:9.

116.    CTU staff lack knowledge of the NCRO's review process, and Regional Director Nalley lacked information about who reviewed the designation packets prior to his office. Ex. 36 (Schiavone Dep.), 86:7-86:11; Ex. 16 (Smith Dep.), 149:4-149:15; Ex. 3 (Nalley Dep.), 68:19-69:22.

117.    Some of the BOP facility staff responsible for day-to-day management of the units also lack any understanding of how or why prisoners are designated to the CMU. Ex. 37 (Jett Dep.), 28:25-29:4; Ex. 44 (Shoemaker Dep.), 14:19-15:12, 26:14-26:18; Ex. 45 (Coleman Dep.), 16:2-16:4.

118.    Prisoners are not provided with notice of their CMU designation prior to their transfer to a CMU. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 176.

119.    CMU prisoners are not provided with a hearing prior to their CMU designation. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 177.

120.    CMU prisoners are not provided with a hearing after their CMU designation. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 178.

121.    The BOP first formalized CMU criteria in writing in its proposed regulation for the Code of Federal Regulations. Ex. 15 (Proposed Rule), 17326; Ex. 12 (Schiavone 30(b)(6) Dep.), 22:17-22:22.

122.    The proposed rule has not yet been finalized, and thus is not yet official BOP policy. Ex. 12 (Schiavone 30(b)(6) Dep.), 53:20-54:7.

123.    To this day, there is no BOP policy document setting forth the process and criteria for CMU designation. Ex. 36 (Schiavone Dep.), 60:10-60:17.

124.    The only BOP policy document which includes the five CMU criteria is an October 14, 2009 memo from Defendant D. Scott Dodrill, Assistant Director of the Correctional Programs Division, dated October 14, 2009, regarding "Review of Inmates for Continued Communication Management Units (CMU) Designation." Ex. 46 (Dodrill Memo); Ex. 36 (Schiavone Dep.), 60:10-60:17.

125.    The Dodrill memo does not discuss the process for designating prisoners to the CMU; rather it lists CMU designation criteria in the context of describing the process BOP staff should undertake in deciding whether to recommend CMU prisoners for redesignation out of the CMU.  Specifically, the memo instructs staff to "consider whether the original reasons for CMU placement still exists," and then goes on to list five possible reasons for such placement.  These five reasons have been identified by the BOP as the official CMU criteria. Ex. 46 (Dodrill Memo), 1-2; Ex. 36 (Schiavone Dep.), 60:10-60:17.

126.    The five criteria for CMU designation according to the Dodrill memo are: "(a) the inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism; (b) The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a

propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity

through communications with persons in the community; (c) The inmate has attempted, or

indicates a propensity, to contact victims of the inmate's current offense(s) of conviction; (d) The

inmate committed prohibited activity related to misuse/abuse of approved communication

methods while incarcerated; or (e) There is any other evidence of a potential threat to the safe,

secure, and orderly operation of prison facilities, or protection of the public, as a result of the

inmate's unmonitored communication with persons in the community." Ex. 46 (Dodrill Memo),

1-2.

127.    These criteria were developed in response to the types of referrals sent to the CTU

over the first few years of the CMU's existence.  For example, the CTU began receiving referrals

for sex offenders who attempt to contact their victims, and they recommended a few for the

CMU who were later approved, so they decided to add such individuals to the criteria. Ex. 16

(Smith Dep.), 81:5-85:11.

128.    The BOP interprets criteria (a) to include individuals whose incarceration

conduct, rather than their offense conduct, involves some association, communication, or

involvement related to international and domestic terrorism. Ex. 12 (Schiavone 30(b)(6) Dep.),

72:25-73:23.

129.    There are currently more than 400 prisoners in BOP custody with a nexus to

terrorism. Ex. 36 (Schiavone Dep.), 24:4-24:12.

130.    As of March 12, 2012 there were 354 BOP prisoners whose current offense(s) of

conviction, or offense conduct, includes association, communication or involvement with

international or domestic terrorism, and 3,997 BOP prisoners who had more than one sustained

disciplinary report involving the misuse or abuse of approved communication methods. Ex. 47

(Defs' Supplemental Resp. to Interrogatory No. 33).

131.    There is no written guidance provided to individuals involved in the designation

process to guide their decision as to whether or not they should recommend and / or approve for

CMU placement prisoners who meet one or more CMU criteria.  Ex. 16 (Smith Dep.), 107:13-

108:15.

132.    Not all prisoners who fit within the five criteria are recommended or approved for

CMU designation. Ex. 12 (Schiavone 30(b)(6) Dep.), 56:13-56:22.

133.    Some North Central Regional Office staff involved in the designation process

relied on a different set of CMU "criteria." Ex. 3 (Nalley Dep.), 51:5-53:12; Ex. 48 (Potts Dep.),

10:10-10:18, 13:2-13:13, 22:11-24:15, 36:15-36:22, 40:11-40:22.

134.    A true and correct copy of the "criteria" used by some NCRO staff appears at

Exhibit 49. Ex. 49 (NCRO Criteria).

135.    The NCRO "criteria" provides "[e]xamples, although not an all-inclusive list, of

the types of inmates who may be housed in the CMU." This includes: "[a] Inmates who have

been convicted of, or associated with, international or domestic terrorism; [b] Inmates convicted

of sex offenses and who repetitively attempt to contact their victims; [c] Inmates who attempt to

coordinate illegal activities via approved communication methods while incarcerated; [d]

Inmates who have extensive disciplinary histories for the continue (sic) misuse/abuse of

approved communication methods." Ex. 49 (NCRO Criteria).

136.    One of the NCRO staff members who used these "criteria" hypothesized that an

inmate writing a letter stating that he thought jihad was a good idea had "links" to terrorism, and

warranted CMU designation. Ex. 48 (Potts Dep.), 58:15-59:19.

137.    According to the BOP, the document relied on by the NCRO is not criteria, and does not reflect BOP policy; it is merely a briefing summary for BOP executive staff. Ex. 12 (Schiavone 30(b)(6) Dep.), 26:10-27:21.

138.    According to CTU staff, the "criteria" used by the NCRO was not meant to be used in the designation process, and is too vague and general. Ex. 16 (Smith Dep.), 89:10-90:8; Ex. 36 (Schiavone Dep.), 71:2-71:14.

139.    David Schiavone, Senior Intelligence Analyst at the CTU, testified that it would concern him if individuals in the designation process were using the NCRO criteria. Ex. 36 (Schiavone Dep.), 73:7-74:6.

140.    Other NCRO staff-members did not receive or use any written criteria. Ex. 50 (George Dep.), 16:3-17:3; Ex. 51 (Pottios Dep.), 13:6-13:18.

141.    One NCRO staff-member tasked with making recommendations to the Regional Director described the CMU criteria as far as she understood it as "very vague," and "never really established formally" or "set."  The only guidance she received was just to look for prisoners who "needed their communication with the outside world limited." Ex. 50 (George Dep.), 13:5-13:13, 16:3-17:3.

142.    This NCRO staff member testified that "significant leadership abilities, high education and technical background and blatant disregard for government" are all characteristics that could potentially make a prisoner appropriate for CMU designation. Ex. 50 (George Dep.), 57:20-60:9.

143.    This NCRO staff member also testified that being a prolific writer, and communicating with others in the white separatist movement makes a prisoner appropriate for

CMU designation, regardless of whether he is writing about criminal activities. Ex. 50 (George Dep.), 60:10-61:15.

144.    Shortly after arrival at a CMU, a prisoner is provided a one-page "Notice to Inmate of Transfer to Communication Management Unit."  A true and correct copy of Avon Twitty's Notice can be found at Exhibit 52. Each Notice includes general information about the CMU, as well as box for inmate-specific text meant to notify the prisoner of the reason for his placement in the unit. Ex. 12 (Schiavone 30(b)(6) Dep.) 95:11-95:14; Ex. 52 (Twitty Designation Packet), P000944.

145.    The CTU drafts the Notice, but does not have a policy or practice of including on the form all of the reasons for the CTU's recommendation. Leslie Smith, chief of the CTU, sometimes omits one of the CTU's reasons for its recommendation, "because of space." Ex. 16 (Smith Dep.), 132:2-132:19.

146.    The Notice is not drafted, edited, or finalized by the Regional Director, and does not reflect his reason(s) for approving CMU designation. Ex. 36 (Schiavone Dep.), 89:9-89:18; Ex. 12 (Schiavone 30(b)(6) Dep.), 95:7-95:10, 264:10-264:18, 285:3-285:10.

147.    Rather than reflecting the reason(s) relied on by the actual decision maker, the Notice is intended to provide a prisoner with "information which supports . . . [his] placement in a CMU." Ex. 12 (Schiavone 30(b)(6) Dep.), 264:10-264:18, 285:3-285:10.

148.    The Regional Director responsible for the first four and a half years of CMU designations did not know if CMU prisoners received any other explanation of the reasons for their CMU placement. Ex. 3 (Nalley Dep.), 87:15-88:7.

149.     The Notice also informs prisoners that they can appeal their transfer decision through the BOP's Administrative Remedy Program. Ex. 52 (Twitty Designation Packet), P000944.

150.     The BOP's Administrative Remedy Program allows an inmate to seek formal review of an issue relating to any aspect of his BOP confinement. Ex. 53 (Program Statement: Administrative Remedy Program), BOP CMU 66857.

151.     The BOP's Administrative Remedy Program involves four levels of review, including the unit team, the Warden, the Regional Director, and the General Counsel. Ex. 53 (Program Statement: Administrative Remedy Program), BOP CMU 66860, 66862-63.

152.     No prisoner has ever been released from the CMU through the Administrative Remedy Process. Ex. 22 (Def's Resp. to Pl.'s' First Set Interrog.), # 19

153.     The NCRO responds to CMU appeals by reviewing the reasons for the prisoner's designation and reminding the prisoner of those reasons.  The Regional Office does not reconsider their decision to designate the prisoner to the CMU in response to Administrative Remedies. Ex. 50 (George Dep.), 24:9-24:20.

154.     The North Central Regional Office creates a CMU referral form every time a prisoner is considered for redesignation to or from a CMU. Ex. 51 (Pottios Dep.), 52:24-53:4; Ex. 48 (Potts Dep.), 31:15-31:23.

155.     The North Central Regional Office does not generate a CMU referral form in response to an Administrative Remedy requesting transfer out of the CMU. Ex. 3 (Nalley Dep.), 95:4-95:10.

156.     According to the BOP, even if the Regional Director "granted" a prisoner's appeal from CMU designation, there is no guaranty that the BOP's designation's center would

26

actually redesignate the prisoner. They could refuse, and keep the prisoner designated to the CMU. Ex. 54 (Albright 30(b)(6) Dep.), 66:19-68:14.

157.    The General Counsel is the final authority on administrative remedies, but if the Regional Director denied the remedy, and the prisoner appealed to the General Counsel, and the General Counsel "granted" the prisoner's remedy, all the General Counsel could do is recommend to the Regional Director that he reverse his earlier decision. Ex. 3 (Nalley Dep.), 125:1-126:9.

### Undisputed Facts Regarding Plaintiffs' and Other Prisoners' Designation to a CMU

158.    Yassin Aref was designated to the CMU on or around May 11, 2007. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 28.

159.    A true and correct copy of Yassin Aref's designation packet can be found at Exhibit 55. Ex. 55 (Aref Designation Packet); Ex. 12 (Schiavone 30(b)(6) Dep.), 256:5-257:22.

160.    The CTU recommended Aref for CMU designation because of his offense conduct, which they characterized as including "significant communication, association and assistance to Jaish-e-Mohammed (JeM)," a foreign terrorist organization. Ex. 55 (Aref Designation Packet), at 3; Ex. 12 (Schiavone 30(b)(6) Dep.), 260:5-261:9.

161.    The CTU based its understanding of Aref's offense conduct on his Presentence Investigation Report. Ex. 12 (Schiavone 30(b)(6) Dep.), 260:22-261:9.

162.    Aref's Presentence Investigation Report shows that his conviction resulted from a sting operation; he never had any actual contact with anyone from JeM, but rather with an undercover informant working with the FBI who pretended to be a member of JeM. Ex. 55 (Aref Designation Packet), 21-23, 12-48; Ex. 36 (Schiavone Dep.), 268:2-269:7.

163.     Aref's "significant communication" with JeM was "key" in the Regional

Director's decision to approve Aref's designation to the CMU. Ex. 3 (Nalley Dep.), 138:11-

139:9.

164.     Upon his transfer to the CMU, Aref received a Notice to Inmate of Transfer

indicating that his transfer to the CMU was based on the following specific information:  "Your

current offenses of conviction include Providing Material Support & Resources to a Foreign

Terrorist Organization, & Conspiracy to Use a Weapon of Mass Destruction. Your offense

conduct included significant communication, association and assistance to Jaish-e-Mohammed

(JeM), a group which has been designated as a foreign terrorist organization." Ex. 56 (Aref

Notice to Inmate of Transfer).

165.     The Regional Director who approved Aref's designation believes this statement is

accurate even though Aref did not actually communicate, associate or assist JeM, because "[Aref

thought] he [wa]s dealing with a terrorist. If he thinks it and believes it then he is dealing with a

terrorist." Ex. 3 (Nalley Dep.), 145:2-146:3.

166.     In response to Plaintiffs' requests that Defendants admit that Aref's offense

conduct did not include communication, association or assistance to JeM, or any member of

JeM, Defendants "interpreted" "JeM or any member of JeM" to "include individuals purporting

to be assisting the organization" and denied the requests. Ex. 27 (Def.'s Resp. to Pl.'s' Requests

for Admission), # 137-139.

167.     The CTU described Aref as being "linked" to several terrorists, terrorist

organizations, and terrorist sympathizers. Ex. 55 (Aref Designation Packet), at 3.

168.     Information about Aref's links to terrorism came from his Presentence Investigation Report, which indicates that much of the link information was disputed, and was not introduced at trial. Ex. 55 (Aref Designation Packet), 21-22 n.1.

169.     The Chief of the CTU stated that CTU referral memos disclose when information is disputed. Ex. 16 (Smith Dep.), 129:21-130:18.

170.     Aref's CTU referral does not indicate that the link information was disputed. Ex. 55 (Aref Designation Packet), 3-4.

171.     The Regional Director relied on Aref's links to terrorism in approving him for CMU designation. Ex. 3 (Nalley Dep.), 138:11-139:10.

172.     No information about the links appears in Aref's Notice to Inmate of Transfer because there was enough other information in the Notice to justify his placement in the CMU. Ex. 3 (Nalley Dep.), 154:21-155:20.

173.     Aref used the BOP's Administrative Remedy process to appeal his placement in the CMU and to bring to the BOP's attention the fact that he never had any actual communication or association with JeM. Ex. 57 (Aref Administrative Remedy re: Designation).

174.     Aref's Administrative Remedy was denied.  None of the BOP employees who responded to his Administrative Remedy addressed Aref's statement that he never had actual contact with JeM. Ex. 57 (Aref Administrative Remedy re: Designation), BOP CMU 76336, 76338, 76340, 76341.

175.     Aref did not know that his disputed links to other terrorists were relied on to designate him to the CMU, so he could not challenge that aspect of his designation. Ex. 58 (Aref Dec'l), ¶ 2.

176.    Kifah Jayyousi was designated to the CMU on or around June 18, 2008. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 24.

177.    A true and correct copy of Kifah Jayyousi's designation packet can be found at Exhibit 59. Ex. 59 (Jayyousi Designation Packet), Ex. 12 (Schiavone 30(b)(6) Dep.) 278:8-279:14.

178.    The CTU recommended Jayyousi for CMU designation based on his convictions, offense conduct, and the supporting information in his Presentence Report. Ex. 59 (Jayyousi Designation Packet), 64-67; Ex. 12 (Schiavone 30(b)(6) Dep.), 280:20-281:5.

179.    The Regional Director approved Jayyousi for CMU designation on April 21, 2008. Ex. 59 (Jayyousi Designation Packet), 63.

180.    The Regional Director did not document the reason(s) he approved Jayyousi for CMU designation. Ex. 59 (Jayyousi Designation Packet), 63.

181.    Upon his transfer to the CMU, Jayyousi received a Notice to Inmate of Transfer form indicating that his transfer was based on his convictions and his offense conduct. Ex. 60 (Jayyousi Notice of Transfer).

182.    The Notice to Inmate of Transfer listed as part of Jayyousi's offense conduct use of "religious training to recruit other individuals in furtherance of criminal acts in this country … and … significant communication, association and assistance to al-Qaida." Ex. 60 (Jayyousi Notice of Transfer).

183.    Jayyousi used the Administrative Remedy process to challenge his designation to the CMU, and to state that religious recruitment and connection to al-Qaida were not part of his convictions or offense conduct. Ex. 61 (Jayyousi Administrative Remedy re: Designation), BOP CMU 75916, 75918.

184.    The BOP did not respond to Jayyousi's specific questions in its responses to his Administrative Remedy, stating instead that Jayyousi's offense conduct included "significant communication and association with foreign terrorist organizations" and "association with terrorism." Ex. 61 (Jayyousi Administrative Remedy re: Designation), BOP CMU 75914, 75917; Ex. 37 (Jett Dep.), 70:9-71:10.

185.    Daniel McGowan was designated to the CMU on or around August 22, 2008.  Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 20.

186.    At McGowan's last BOP program review prior to his CMU designation, his unit team at FCI Sandstone indicated that he had clear conduct, and good work evaluations. Ex. 62 (McGowan Program Review).

187.    A true and correct copy of Daniel McGowan's CMU designation packet can be found at Exhibit 63. Ex. 63 (McGowan Designation Packet); Ex. 12 (Schiavone 30(b)(6) Dep.), 202:7-203:24.

188.    The CTU recommended McGowan for designation to the CMU based on his offense conduct and his communication while incarcerated. Ex. 63 (McGowan Designation Packet), 4-7; Ex. 12 (Schiavone 30(b)(6) Dep.), 211:24-213:10.

189.    The CTU summarized some of McGowan's incarceration communications in its referral memo, but did not include them in the designation packet. Ex. 63 (McGowan Designation Packet); Ex. 12 (Schiavone 30(b)(6) Dep.), 203:25-205:16.

190.    McGowan did not receive an incident report, or other prison discipline, for any of these communications. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), # 37, 59.

191.    McGowan was never told by any BOP staff member that these communications threatened institution security. Nor was he ever advised to cease communicating on issues relevant to the radical environmental movement. Ex. 64 (McGowan Dec'l), ¶¶ 2-4.

192.    A true and correct copy of McGowan's Notice to Inmate of Transfer to a Communications Management Unit appears at Ex. 65. Ex. 65 (McGowan Notice of Transfer).

193.    There is no mention of McGowan's communications while incarcerated in his Notice of Transfer, even though his prison communication "certainly was relevant" to his CMU referral. Ex. 12, (Schiavone 30(b)(6) Dep.), 213:20-214:3; Ex. 65 (McGowan Notice of Transfer).

194.    McGowan was not told by any BOP employee that his communications about environmental issues were part of the reason for his designation to the CMU. Ex. 64 (McGowan Dec'l), ¶ 4.

195.    McGowan's Notice of Transfer indicated that his CMU designation was based on his offense conduct, including "destruction of an energy facility," and "teaching others to commit arson." The Notice also indicated that he had been identified as a "member and leader in the Earth Liberation Front (ELF) and Animal Liberation Front (ALF)." Ex. 65 (McGowan Notice of Transfer).

196.    McGowan's Presentence Investigation Report establishes that he was a criminal participant in two arsons: one at Superior Lumber Company and one at Jefferson Poplar Farm. Ex. 63 (McGowan Designation Packet), 12-15.

197.    The Presentence Investigation Report does not indicate that McGowan destroyed (or had any involvement in arson at) an energy facility. Ex. 63 (McGowan Designation Packet), 8-43.

198.    McGowan's Presentence Investigation Report indicates that he attended meetings meant to train arsonists. It does not state whether McGowan was a trainer or trainee at such meetings, but it does indicate that two of McGowan's codefendants trained others to commit arson. Ex. 63 (McGowan Designation Packet), 16 (¶¶ 38-40).

199.    McGowan's Presentence Investigation Report states that three of McGowan's co-defendants played a leadership role in one or more arsons; one of these codefendants qualified for an aggravating role adjustment. Ex. 63 (McGowan Designation Packet), 16 (¶¶ 39-41).

200.    The Presentence Investigation Report states that the evidence does not support any role adjustments for McGowan. Ex. 63 (McGowan Designation Packet), 17 (¶ 44).

201.    David Schiavone, Senior Intelligence Analyst at the CTU, used a previous Notice of Transfer he had written for one of McGowan's co-Defendants as a template when he drafted McGowan's Notice of Transfer. Ex. 36 (Schiavone Dep.), 163:2-164:5.

202.    A true and correct copy of McGowan's Co-Defendants' Notice to Inmate of Transfer appears at Ex. 66. Ex. 66 (McGowan's Co-Defendant's Notice of Transfer).

203.    McGowan attempted to use the Administrative Remedy process to challenge his CMU designation. Ex. 67 (McGowan Administrative Remedy re: Designation).

204.    The BOP's responses to McGowan's grievances repeat the same information as appears in his Notice of Transfer. Ex. 67 (McGowan Administrative Remedy re: Designation); Ex. 65 (McGowan Notice of Transfer).

205.    McGowan challenged the factual information that appears in his Notice of Transfer through the BOP's Administrative Remedy process. Ex. 68 (McGowan Administrative Remedy re: Notice of Transfer).

206.    At each stage of the Administrative Remedy process, McGowan identified as inaccurate three pieces of information in his Notice of Transfer: that his offense conduct included destruction of an energy facility; that his offense conduct included teaching others to commit arson, and that he was a member and leader in ELF and ALF. Ex. 68 (McGowan Administrative Remedy re: Notice of Transfer), P000665, 661, 592, 657, 660.

207.    None of the BOP's responses address the question of whether the information identified by McGowan was true or false. Ex. 68 (McGowan Administrative Remedy re: Notice of Transfer), P000665, 593, 658, 610.

208.    The BOP's 30(b)(6) witness on Administrative Remedies stated that the administrative remedy process worked in this instance for McGowan because he "had the opportunity to file all the way up." Ex. 54 (Albright 30(b)(6) Dep.), 119:2-120:5.

209.    One of the BOP's responses directed McGowan to file a Freedom of Information Act request for information about his CMU placement. Ex. 68 (McGowan Administrative Remedy re: Notice of Transfer), P 000593.

210.    McGowan filed a Freedom of Information Act request seeking "all relevant documents and information related to my designation and transfer to the [CMU]." Ex. 69 (McGowan FOIA request and response), P000792.

211.    McGowan received two pages in response. Neither page provides any information about the basis for his CMU designation. Ex. 69 (McGowan FOIA request and response), P000790-1.

212.    Avon Twitty was designated to the CMU in May 2007. Ex. 52 (Twitty Designation Packet), P000944.

213.    In his April 16, 2007 program review, Twitty's unit team at USP Hazelton indicated that he had good work performance ratings, was not a management problem, had good rapport with staff and inmates, and had clear conduct since 2005. Ex. 70 (Twitty Program Review), P000915.

214.    Twitty's CTU referral memo and Notice to Inmate of Transfer indicate that he was designated to the CMU due to involvement in recruitment and radicalization efforts of other inmates through extremist, violence oriented indoctrination methods to intimidate or coerce others. Ex. 52 (Twitty Designation Packet).

215.    A chart of all CMU prisoners maintained by the CTU indicates that Twitty was referred to the CMU because of "Prohibited Activity Related to Communication." Ex. 71 (CMU Prisoners Chart), BOP CMU 76960.

216.    Twitty used the BOP's Administrative Remedy process to ask who he was accused of recruiting for, who he was accused of recruiting, and what evidence was being relied on. Ex. 72 (Twitty Administrative Remedy re: Designation), P001046.

217.    Twitty was told to file a Freedom of Information Act request for this information. Ex. 72 (Twitty Administrative Remedy re: Designation), P001048.

218.    Twitty did so, and received in response a Request for Transfer form dated 5/21/07 and filed out by the Warden at USP Hazelton indicating that Twitty had "average rapport" with staff and inmates and "is considered to be a management problem due to his involvement in the recruitment and radicalization of other inmates." Ex. 73 (Twitty FOIA Response).

219.    Twitty's transfer form indicated that he was being sent to the CMU pursuant to a "close supervision" transfer.  Ex. 73 (Twitty FOIA Response).

220.     A close supervision transfer is disciplinary in nature, and BOP policy indicates that it is to be based on a documented act of misconduct. Ex. 30 (Inmate Security Designation and Custody Classification Program Statement), Ch. 7, Pg. 5.

221.     Twitty did not receive any inmate discipline for recruitment and radicalization. Ex. 75 (Twitty Dep.), 107:15-109:4.

222.     In July 2007, Prisoner A was designated to the CMU. Ex. 76 (Prisoner A Designation Packet), BOP CMU 60158.

223.     Prisoner A's CTU referral memo, and NCRO review form recommended CMU placement based on his association with the recruitment and radicalization of other inmates. Ex. 76 (Prisoner A Designation Packet), BOP CMU 67364-65, 60715.

224.     Prisoner A's CTU referral memo and NCRO review form do not provide any underlying facts or details regarding the alleged recruitment and radicalization. Ex. 76 (Prisoner A Designation Packet), BOP CMU 67364-65, 60715.

225.     Prisoner A's NCRO review form indicates that "relevant info REDACTED and is not in the packet. It has been reviewed by CTU and OGC." Ex.76 (Prisoner A Designation Packet), BOP CMU 60715.

226.     One of the NCRO staff members who reviewed Prisoner A's CMU referral testified that the CTU's bare statement that "reliable evidence indicates that his incarceration conduct had included association with recruitment and radicalization of other inmates," provided her office with adequate information to review Prisoner A's CMU placement. Ex. 50 (George Dep.), 52:3-55:22.

227.     The Regional Director did not document his reason(s) for approving Prisoner A for CMU designation. Ex. 76 (Prisoner A Designation Packet), BOP CMU 60715.

228.   Prisoner A's Notice to Inmate of Transfer states that his designation was based on the following specific information: "Your current offense of conviction is Bank Robbery, 18 USC section 2113(a).  Reliable evidence indicates your incarceration conduct has included involvement in efforts to recruit and radicalize other inmates." Ex. 76 (Prisoner A Designation Packet), BOP CMU 60158.

229.   One former CMU warden testified that Prisoner A's notice was not complete, not meant to explain to the inmate why he was transferred to the CMU, and that Prisoner A would have gotten more than the notice to explain his designation. Ex. 77 (Lockett Dep.), 173:3-176:7.

230.   Prisoner A used the Administrative Remedy Process to attempt to gain information about who he was accused of recruiting, for what, and what evidence was used to make the determination. Ex. 76 (Prisoner A Designation Packet), P001934-37, 1940, 1951, 1947-48.

231.   The BOP's Administrative Responses did not provide Prisoner A with any answers to these questions. Ex. 76 (Prisoner A Designation Packet), P001937, 1939, 1952, 1949, 1966.

232.   Prisoner B was designated to the CMU in 2007. Ex. 78 (Prisoner B Designation Packet), BOP CMU 60913.

233.   Prisoner B's CTU referral memo and NCRO form discuss various communications violations, a conversation about Hamas, and Prisoner B's involvement in recruitment and radicalization. Ex. 78 (Prisoner B Designation Packet), BOP CMU 67422-23, 60913.

234.    Prisoner B's Notice to Inmate of Transfer refers only to his communications violations, and excludes mention of his support for Hamas, and his involvement in recruitment and radicalization. Ex. 78 (Prisoner B Designation Packet), BOP CMU 76144.

235.    One of the NCRO staff members who reviewed Prisoner B's CMU referral testified that she did not recall if she received the facts underlying his alleged involvement in recruitment and radicalization, but that her office did not need those facts to adequately review the Prisoner's designation, as she trusted that the CTU had them. Ex. 50 (George Dep.), 45:12-51:21.

236.    The Regional Director did not document his reason(s) for approving Prisoner B for CMU designation. Ex. 78 (Prisoner B Designation Packet), BOP CMU 60913.

237.    Prisoner C was designated to the CMU in July of 2008. Ex. 79 (Prisoner C Designation Packet), P000811.

238.    Prisoner C's CTU referral memo describes his continued communication, while incarcerated, of anti-government views, along with his offense conduct and one communications related incident report. Ex. 79 (Prisoner C Designation Packet), BOP CMU 67379-82.

239.    The Regional Director did not document his reason(s) for approving Prisoner C for CMU designation. Ex. 79 (Prisoner C Designation Packet), BOP CMU 60914.

240.    Prisoner C's Notice to Inmate of Transfer refers to his offense conduct and incident report, but omits any mention of his continued communication of anti-government views. Ex. 79 (Prisoner C Designation Packet), P000811.

241.    Prisoner D was designated to the CMU in June of 2008. Ex. 80 (Prisoner D Designation Packet), P005223.

242.     Prisoner D's CTU referral memo describes his involvement with Muslim groups in prison five to ten years earlier, his conversion to Islam, his desire to establish a Mosque, his "acceptance of a Jihad philosophy" through telephone and social interactions and a letter to his son-in-law in which he asks if the son-in-law would be interested in traveling to other countries to learn about Islam and to box. Ex. 80  (Prisoner D Designation Packet), BOP CMU 76121-22.

243.     The CTU describes Prisoner D's letter to his son-in-law as radicalization and recruitment. Ex. 80 (Prisoner D Designation Packet), BOP CMU 76122.

244.     Berna Potts, one of the NCRO staff members who recommended Prisoner D for CMU designation, stated that he qualified as someone associated with a terrorist organization because he expressed support for jihad on a telephone call. Ex. 48 (Potts Dep.), 51:21-54:4.

245.     The Regional Director did not document his reason(s) for approving Prisoner D for CMU designation. Ex. 80 (Prisoner D Designation Packet), BOP CMU 60780.

246.     Prisoner D's Notice to Inmate of Transfer indicates as the basis for his CMU designation: "Your current offense of conviction is Solicitation to Commit a Crime of Violence. Reliable evidence indicates your crimes and incarceration conduct have included involvement in recruitment and radicalization efforts, including of other inmates, through extremist, violence oriented indoctrination methods to intimidate or coerce others." Ex. 80 (Prisoner D Designation Packet), P005223.

247.     Prisoner E was designated to the CMU in October of 2008.  Ex. 81 (Prisoner E Designation Packet), BOP CMU 60088.

248.     Prisoner E's CTU referral memo and NCRO review form describe his possession and use of a cellular phone while incarcerated. Ex. 81 (Prisoner E Designation Packet), BOP CMU 67366-67, 60934.

249.    The CTU's referral of Prisoner E was based not just on his cell phone use, but also on other information that has been redacted from the referral memo. Ex. 36 (Schiavone Dep.), 283:17-284:14.

250.    The Regional Director did not document his reason(s) for approving Prisoner E for CMU designation. Ex. 81 (Prisoner E Designation Packet), BOP CMU 060935.

251.    Prisoner E's Notice to Inmate of Transfer refers only to his cell phone use, as the basis for his CMU designation. Ex. 81 (Prisoner E Designation Packet), BOP CMU 60088.

252.    BOP staff at the North Central Regional Office and the CTU disagree about whether being caught with a cellphone, without more, warrants CMU placement. Ex. 51 (Pottios Dep.), 124:7-125:15; Ex. 16 (Smith Dep.), 334:25-335:15.

253.    In 2008, BOP staff confiscated 1,519 unauthorized cell phones from federal prison camps and 255 cell phones from secure federal prisons. Dkt. No. 88.1 (First Am. Compl.), ¶ 31; Dkt. No. 131 (Answer to First Am. Compl.), ¶ 31.

254.    The CTU does not track cell phone usage, so a prisoner caught using a cell phone will be recommended and approved for CMU designation if he is referred by his institution, and not if he is not. Ex. 16 (Smith Dep.), 333:16-333:22; Ex. 50 (George Dep.), 71:2-72:14.

255.    Prisoner F was designed to the CMU in December of 2009. Ex. 82 (Prisoner F Designation Packet), BOP CMU 60734.

256.    The CTU referral memo recommends CMU designation based on (1) the prisoner's Security Threat Group assignments, (2) his "high-level of sophistication," (3) his international terrorism offense and conviction, (4) his "strong influence over the Muslim population at the ADX, and (5) his access to other influential international terrorism prisoners at ADX. Ex. 82 (Prisoner F Designation Packet), BOP CMU 67383.

257.    The Regional Director did not document his reason(s) for approving Prisoner F for CMU designation. Ex. 82 (Prisoner F Designation Packet), BOP CMU 60734.

258.    Prisoner F's Notice of Transfer indicates that his CMU designation was based on his offense of conviction and offense conduct. Ex. 82 (Prisoner F Designation Packet), BOP CMU 60055.

259.    Prisoner G was designated to the CMU in January of 2011. Ex. 83 (Prisoner G Designation Packet), BOP CMU 60135.

260.    Prisoner G's CTU referral memo recommended CMU placement based on his offense conduct (which has been redacted) his use of the internet to meet and communicate with other extremists, and his radical Islamic philosophy. Ex. 83 (Prisoner G Designation Packet), BOP CMU 67400-67403.

261.    The Regional Director did not document his reason(s) for approving Prisoner G for CMU designation.  Ex. 83 (Prisoner G Designation Packet), BOP CMU 60911.

262.    Prisoner G's Notice to Inmate of Transfer listed as the bases for his CMU designation his offense conduct, and his attempts to meet with other extremists. Ex. 83 (Prisoner G Designation Packet), BOP CMU 60135.

263.    The Chief of the CTU testified that Prisoner G's radical religious beliefs were one of the reasons he was recommended for CMU designation, but this was left off his Notice because of "limited space." Ex. 16 (Smith Dep.), 322:18-326:11.

264.    Prisoner H was designated to the CMU in September 2011. Ex. 84 (Prisoner H Designation Packet), BOP CMU 60104.

265.     Prisoner H's CTU referral memo and NCRO review form describe the leadership role Prisoner H holds in the Muslim community, his refusal to follow BOP orders, and his offense conduct. Ex. 84 (Prisoner H Designation Packet), BOP CMU 67404-8.

266.     The Regional Director did not document his reason(s) for approving Prisoner H for CMU designation. Ex. 84 (Prisoner H Designation Packet), BOP CMU 60736.

267.     Prisoner H's Notice to Inmate of Transfer provides as the bases for his CMU designation his refusal to follow BOP orders and his offense conduct. Ex. 84 (Prisoner H Designation Packet), BOP CMU 60104.

268.     Prisoner I was designated to the CMU in November of 2012. Ex. 85 (Prisoner I Designation Packet), BOP CMU 60048.

269.     Prisoner I's CTU referral memo and NCRO review form describe his white supremacist beliefs and his offense conduct. Ex. 85 (Prisoner I Designation Packet), BOP CMU 67358-63, 60771-72.

270.     The Regional Director did not document his reason(s) for approving Prisoner I for CMU designation. Ex. 85 (Prisoner I Designation Packet), BOP CMU 60772.

271.     Prisoner I's Notice to Inmate of Transfer states as the bases for his CMU designation his offense of conviction and offense conduct. Ex. 85 (Prisoner I Designation Packet), BOP CMU 60048.

272.      Of 178 total CMU designations, 101 are Muslim. Ex. 71 (CMU Prisoners Chart).

273.     Of the first 55 prisoners designated to the CMU, 45 were sent there because of their connection to terrorism. The other 10 were designated due to their involvement in prohibited activities related to communication. Of that 10, 8 are Muslim. Ex. 71(CMU Prisoners Chart), p. 1-12.

42

274.     Approximately 6% of prisoners in BOP facilities nationwide sought Muslim religious services in 2004. Ex. 86 (Review of BOP Selection of Muslim Religious Services Providers), 5.

## Undisputed Facts Regarding Review of CMU Placement

275.     The BOP has no general expectations as to the duration of CMU confinement. Ex. 12 (Schiavone 30(b)(6) Dep.), 100:3-100:25.

276.     CMU prisoners are not provided any information about how long they can expect to stay in the CMU. Ex. 12 (Schiavone 30(b)(6) Dep.), 100:17-100:25.

277.     A prisoner could theoretically be designated to the CMU for the entirety of his sentence. Ex. 36 (Schiavone Dep.), 48:13-49:19.

278.     During the first three years of the CMU's existence (12/06 – 12/09) not a single CMU prisoner was re-designated to a non-CMU general population unit. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #190.

279.     During these three years, some prisoners were told that they would remain in the CMU unless and until their criminal conviction was reversed. Ex. 57 (Aref Administrative Remedy re: Designation), BOP CMU 76338.

280.     During this same period, other prisoners were told that their continued housing in the CMU would be reviewed during each program review by their unit team. Ex. 61 (Jayyousi Administrative Remedy re: Designation), BOP CMU 75917; Ex. 67 (McGowan Administrative Remedy re: Designation), P00561.

281.     During this same period, prisoners were told that they would not be considered for a transfer out of the CMU until they had 18 months of clear conduct. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #194; Ex. 87 (Prisoner M Administrative Remedy), P001926,

1928, 1930; Ex. 88 (Twitty Administrative Remedy re: STG), BOP CMU 76103; Ex. 89 (Kelly

Dep.), 76:17-77:1.

283. Within the BOP, Institution Supplements set forth facility procedures to

implement national policy. Ex. 10 (Lara 30(b)(6) Dep.), 22:6-23:8.

283. The Marion and Terre Haute CMU Institution Supplements were made available

to prisoners on the unit, who read them to understand CMU policy. Ex. 64 (McGowan Dec'l), ¶

8-9.

284. USP Terre Haute issued the first CMU Institution Supplement on November 30,

2006. Ex. 90 (11/30/06 USP Terre Haute Institution Supplement: Operation and Security of the

Communication Management Unit).

285. The 11/30/06 Institution Supplement indicated that "classification and reviews of

…[CMU] inmates will occur according to national policy." Ex. 90 (11/30/06 FCI Terre Haute

Institution Supplement: Operation and Security of the Communication Management Unit),

P000321.

286. This same statement was repeated in Terre Haute's May 9, 2008 CMU Institution

Supplement and FCI Marion's March 20, 2008, November 13, 2008, and June 4, 2009 CMU

Institution Supplements. Ex. 91 (5/9/08 FCI Terre Haute Institution Supplement: Operation and

Security of the Communication Management Unit), BOP CMU 001763; Ex. 92 (3/20/08 USP

Marion Institution Supplement: Operation and Security of the Communication Management

Unit), P000329; Ex. 93 (11/13/08 USP Marion Institution Supplement: Operation and Security of

the Communication Management Unit), P000336; Ex. 94 (6/4/09 USP Marion Institution

Supplement: Operation and Security of the Communication Management Unit), P000552.

287.     The "national policy" referenced in the Marion and Terre Haute CMU Institution Supplements includes two BOP Program Statements: P5100.08, Inmate Security Designation and Custody Classification; and P5322.12, Inmate Classification and Program Review. Ex. 28 (Def.'s Resp. to Pl.'s' Fifth Set of Interrog.), #3.

288.     P5322.12, Inmate Classification and Program Review, provides no information about re-designation from one prison (or prison unit), to another. Ex. 12 (Schiavone 30(b)(6) Dep.), 105:16-110:2; Ex. 95 (P5322.12, Inmate Classification and Program Review).

289.     A BOP prisoner's unit team consists of a Unit Manager, Case Manager, and Correctional Counselor. Ex. 95 (P5322.12, Inmate Classification and Program Review), 5-7.

290.     A BOP prisoner's unit team conducts that prisoner's program review. At program reviews, progress in recommended programs is reviewed, and new programs recommended based upon skills the prisoner has gained during incarceration. Program Reviews occur at least once every 180 calendar days. Ex. 95 (P5322.12, Inmate Classification and Program Review), at 4-5.

291.     Under P5100.08, Inmate Security Designation and Custody Classification, prisoners are eligible for a "nearer release" transfer after spending 18 months with clear conduct in a given facility. Ex. 30 (Inmate Security Designation and Custody Classification Program Statement), Ch. 7, p. 4.

292.     No CMU prisoners were referred by their unit teams for "nearer release" transfers between 2006 and mid-2009. Ex. 12 (Schiavone 30(b)(6) Dep.), 141:4-143:17.

293.     According to the BOP, 18 months of clear conduct was not sufficient for re-designation out of the CMU. Ex. 12 (Schiavone 30(b)(6) Dep.), 115:24-116:14.

294.    Re-designation out of the CMU actually required a separate determination that the prisoner's communications no longer required the level of monitoring allowed by the CMU. Ex. 12 (Schiavone 30(b)(6) Dep.), 115:24-116:14.

295.    However, the BOP did not create a process for undertaking this separate determination until late 2009. Ex. 12 (Schiavone 30(b)(6) Dep.), 142:11-143:17, 146:24-147:23.

296.    This process was formalized in writing through a memorandum dated October 14, 2009 from D. Scott Dodrill to Michael Nalley. Ex. 46 (Dodrill Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 143:9-144:3.

297.    The Dodrill memo was issued to notify BOP staff that CMU prisoners were to be reviewed for continued CMU designation at every program review, not just after 18 months of clear conduct.  Ex.12 (Schiavone 30(b)(6) Dep.), 143:18-144:3.

298.    An earlier version of the Dodrill memo, setting forth the same CMU review process, was signed and issued by Joyce Conley on July 24, 2009.  The signed Memo was sent to the Regional Director, but the reviews described were not implemented. Ex. 97 (Conley 7/24/09 Memo);  Ex. 40 (Def's Resp. to Pl's' Sixth Set Interrog.), #3.

299.    On April 25, 2008, Conley informed the Deputy Attorney General that the BOP would "consider redesignating certain terrorist inmates currently at the CMU after 18-months of clear conduct." Ex. 38 (Samuels 4/28/08 Email).

300.    USP Marion's September 28, 2009 CMU Institution Supplement indicated that reviews for an inmate to be considered for transfer out of a CMU would commence with the first unit team meeting after the prisoner has spent a minimum of 18 months in the unit, but less than 24 months, and that subsequent reviews would be conducted at 6 month intervals. It indicated that inmates were expected to maintain clear conduct and have no sanctioned incident reports for

the 18-24 months period to be recommended for transfer. Ex. 98 (9/28/09 USP Marion

Institution Supplement: Operation and Security of the Communication Management Unit), at

BOP CMU 064133.

301.     The statements in Marion's September 28, 2009 CMU Institution Supplement

about when and how CMU prisoners will be reviewed for possible re-designation contradict

BOP policy. Ex. 12 (Schiavone 30(b)(6) Dep.), 147:24-149:11.

302.     USP Marion was notified of these errors by the CTU shortly after the Institution

Supplement was published. However, a new, correct, Institution Supplement was not issued until

August 29, 2011. Ex. 12 (Schiavone 30(b)(6) Dep.), 149:12-150:7; Ex. 2 (8/29/11 USP Marion

Institution Supplement: Operation and Security of the Communication Management Unit), BOP

CMU 0000307.

303.     FCI Terre Haute's October 22, 2009 CMU Institution Supplement also incorrectly

indicated that CMU prisoners would not be reviewed for transfer until they achieved 18 months

of clear conduct. Ex. 99 (10/22/09 FCI Terre Haute Institution Supplement: Operation and

Security of the Communication Management Unit), BOP CMU 076146; Ex. 12 (Schiavone

30(b)(6) Dep.), 151:24-153:3.

304.     FCI Terre Haute's next institution supplement also incorrectly described when

and how CMU prisoners were to be reviewed for continued CMU designation. The 9/1/11 CMU

Institution Supplement indicated that CMU prisoners would be reviewed "after the Unit Team

has had ample time to monitor the inmate's institutional adjustment…" and that "Inmates are

expected to maintain clear conduct and have no sanctioned incident reports for the 12 months

period prior to their review, regardless of designation, to be recommended for transfer."

According to the BOP, prisoners were to be reviewed at their first program review, and 12

months of clear conduct was not a requirement. Ex. 12 (Schiavone 30(b)(6) Dep.), 179:21-181:21; Ex. 100 (9/1/11 FCI Terre Haute Institution Supplement: Operation and Security of the Communication Management Unit), at BOP CMU 001527.

305.    The same errors persisted in the next FCI Terre Haute CMU Institution Supplement. Ex. 12 (Schiavone 30(b)(6) Dep.), 183:25-185:10; Ex. 1 (5/31/12 FCI Terre Haute Institution Supplement: Operation and Security of the Communication Management Unit), at BOP CMU 064124.

306.    The current FCI Terre Haute Institution Supplement also erroneously states that CMU prisoners would be reviewed "after the Unit Team has had ample time to monitor the inmate's institutional adjustment…." Ex. 101 (3/31/14 FCI Terre Haute Institution Supplement: Operation and Security of the Communication Management Unit), BOP CMU 077220.

307.    According to the BOP, CMU staff applied the Dodrill memo correctly, despite the Institution Supplements' incorrect statements. Ex. 12 (Schiavone 30(b)(6) Dep.), 150:8-150:13.

308.    Lisa Hollingsworth, the FCI Marion Warden from April 2008 until February of 2011, testified that CMU prisoners had to achieve 18 months of clear conduct prior to being considered for re-designation. Ex. 102 (Hollingsworth Dep.), 10:4-10:7, 43:17-44:7.

309.    Warden Hollingsworth understood the Dodrill memo to apply only to program reviews after CMU inmates had achieved 18 months of clear conduct. Ex. 102 (Hollingsworth Dep.), 65:22-66:6.

310.    Wendy Roal Warner, who replaced Hollingsworth as the warden, testified that the 18 month clear conduct requirement was followed until shortly before or right after Warner became warden. Ex. 103 (Roal Warner Dep.), 16:6-16:10, 34:4-35:1.

311.  Brian Jett, the FCI Terre Haute Warden from the time the CMU opened until June of 2009, testified that he did not recall a requirement that CMU prisoners serve 18 months with clear conduct prior to being considered for re-designation.  Ex.37  (Jett Dep.), 14:14-14:20, 119:10-119:13.

312.  Charles Lockett, who replaced Brian Jett as Warden of FCI Terre Haute, and remained there until February 2011, testified that CMU prisoners were considered for possible transfer after 18 months of clear conduct. Ex. 77 (Lockett Dep.), 13:10-13:25, 100:18-102:6, 127:5-127:16, 186:16-187:11.

313.  A July 21, 2011 memo listing agenda items for a meeting between the wardens and other BOP staff of the Terre Haute CMU and the Marion CMU listed as one agenda item: "Procedures for inmates requesting transfer. Are all inmates who secure 18 months clear conduct being processed?  Is the Warden using discretionary authority to deny some at the local level? How are the transfer denials being documented and what is provided to the inmate?" Ex. 104 (CMU Visit Agenda), BOP CMU 001772; Ex. 103 (Roal Warner Dep.), 75:16-80:8.

314.  A document created for use by BOP Executive Staff in the Central Office of the BOP, which necessarily postdates the 2009 creation of the CMU review process, indicates: "Ordinarily, inmates will need to spend a minimum of 18 months in a CMU. Time spent out of the unit for administrative or medical reasons will not be counted towards the minimum requirement." Ex. 105 (CMU Referral Process Talking Points), BOP CMU 076415; Ex. 40 (Def's Resp. to Pl's' Sixth Set Interrog.), # 2.

315.  A BOP "talking points" document with information "[a]s of September 1, 2010," states that "[t]he continued placement of inmates to the CMU is reviewed approximately every 18 months during a scheduled program review by the Unit Team." Ex. 106 (Talking Points).

316.    The Dodrill memo instructs the CMU unit teams to determine whether continued

CMU placement is necessary by "consider[ing] whether the original reasons for CMU placement

still exist" along with "whether the original rationale for CMU placement has been mitigated,

whether the inmate no longer presents a risk, and that the inmate does not require the degree of

monitoring and controls afforded at a CMU." Ex. 46 (Dodrill Memo), 1-2.

317.    There is no timeframe as to how long a prisoner must have refrained from the

behavior that led to CMU placement to be appropriate for transfer. Ex. 16 (Smith Dep.), 200:15-

200:22; Ex. 36 (Schiavone Dep.), 122:12-123:3.

318.    Under the Dodrill Memo, there is no requirement that prisoners achieve a set

period of time with clean conduct, but a prisoner's conduct is still relevant to the CMU review.

Ex. 12 (Schiavone 30(b)(6) Dep.), 155:15-155:25.

319.    Warden Jett did not provide the CMU unit teams with any guidance as to how

they should reviews prisoners for potential re-designation out of the CMU. Ex. 37 (Jett Dep.),

118:12-118:15.

320.    Warden Hollingsworth did not provide the CMU unit teams with any guidance as

to how they should reviews prisoners for potential re-designation out of the CMU. Ex. 102

(Hollingsworth Dep.), 56:18-57:1.

321.    CMU unit teams were not provided with any guidance about how long a prisoner

would have to refrain from the activity that led to his CMU designation in order to "mitigate"

that reason. Ex. 12 (Schiavone 30(b)(6) Dep.), 171:13-174:7.

322.    Bradley Shoemaker, the Terre Haute CMU Unit Manager at the time of the

Dodrill Memo testified that he did not consider whether the original reasons for CMU

designation still existed when reviewing CMU prisoners for potential transfer, and that he

wouldn't have known why they were originally designated. Ex. 44 (Shoemaker Dep.), 10:25-11:20, 45:11-45:23, 51:22-51:25.

323.    Paul Kelly, Marion CMU Unit Manager and chairperson of the program reviews, testified that the unit team couldn't fully determine whether the reasons for CMU placement still existed, because they might not have had all the information about those reasons. Ex. 89 (Kelly Dep.), 79:5-79:15.

324.    Kelly believed that a prisoner could mitigate the reasons for his initial placement by, for example, no longer believing in the ideology that motivated the activities that led to his CMU placement. Ex. 89 (Kelly Dep.), 101:7-101:16.

325.    Henry Rivas, the Intelligence Research Specialist at the USP Marion CMU, believed that an individual sent to the CMU for environmental extremism, who continued to receive extremist environmental publications, would qualify as needing continued CMU placement.  Ex. 107 (Rivas Dep.), 82:18-82:23.

326.    Under the procedure set forth in the Dodrill memo, the Unit Team makes an independent assessment of whether the prisoner requires continued CMU designation, and forwards that assessment to the Warden. Ex. 46 (Dodrill Memo), 2; Ex. 12 (Schiavone 30(b)(6) Dep.), 175:23-176:12.

327.    If the Warden disagrees with the Unit team's transfer recommendation, the review process ends there. Ex. 46 (Dodrill Memo), 2; Ex. 12 (Schiavone 30(b)(6) Dep.), 176:19-176:22.

328.    If the Warden agrees with the Unit team's transfer recommendation, s/he forwards the recommendation to the CTU. Ex. 46 (Dodrill Memo), 2; Ex. 12 (Schiavone 30(b)(6) Dep.), 176:13-176:18.

329.     Warden Roal Warner's process for considering CMU transfers was to meet with the unit team and discuss prisoners who were coming up for review.  She would listen to everyone's opinion and then make a final decision as to whether or not the prisoner would be recommended for transfer. Ex. 103 (Roal Warner Dep.), 68:14-69:1.

330.     Under the Dodrill policy, the CTU is to consider the Warden's recommendation, and make an independent assessment of whether the prisoner still requires CMU designation. Ex. 46 (Dodrill Memo), 2; Ex. 12 (Schiavone 30(b)(6) Dep.), 177:5-177:17.

331.     In 2013, the BOP began using a new review form to document the reviews. A true and correct copy of the review form can be found at Exhibit 43. Ex. 16 (Smith Dep.), 208:2-215:3; Ex. 43 (CMU Review Form).

332.     The form includes a box for "inmate comments/Statement" but Les Smith does not read that box prior to making his recommendation, as he believes it is not supposed to influence his decision.  Ex. 16 (Smith Dep.), 215:12-216:23.

333.     Under the Dodrill memo, the CTU is supposed to forward its recommendation, along with the facility recommendation, to the North Central Region for "further review and consideration." Ex. 46 (Dodrill Memo), 2.

334.     Sometime in the last couple of years, CTU began routing the recommendations through the administrator at the Central Office, Correctional Programs Division prior to sending it to the North Central Regional Office. Ex. 36 (Schiavone Dep.), 109:7-110:3.

335.     The Dodrill memo is silent as to the Correctional Programs Division's role in CMU reviews. Ex. 46 (Dodrill Memo).

336.     The Regional Director of the North Central Region has final authority to approve a prisoner's redesignation from a CMU. Ex. 46 (Dodrill Memo), 2.

337.     Regional Director Michael Nalley, who served in that role from 2006 until his retirement in 2011, did not know whether CMU prisoners were reviewed every 6 months, or whether nearer release transfers were available. Ex. 3 (Nalley Dep.), 8:22-9:9, 104:12-104:21, 106:10-107:17.

338.     Prisoners denied redesignation from the CMU are supposed to be notified in writing by the Unit team of the reason(s) for continued CMU designation. Ex. 46 (Dodrill Memo), 2.

339.     If a prisoner's conduct in the CMU is contributing to their need for continued CMU designation, the prisoner should be informed of this. Ex. 12 (Schiavone 30(b)(6) Dep.), 162:4-164:7.

340.     In practice, the BOP notifies prisoners of transfer denials by sending a form memo that does not disclose the specific reasons the prisoner was denied transfer. Ex. 108 (CMU Transfer Denial Form Memos); Ex. 12 (Schiavone 30(b)(6) Dep.), 191:9-192:24.

341.     Prisoners not satisfied with the decision can appeal it through the administrative remedy process. Ex. 46 (Dodrill Memo), 2.

342.     Under BOP policy, a prisoner should be able to learn the reasons for their transfer denial through the Administrative Remedy process, so long as the reason does not involve confidential information. Ex. 54 (Albright 30(b)(6) Dep.), 130:16-131:6.

### Undisputed Facts Regarding Review of Plaintiffs' and other Prisoners' CMU Placement

343.     Yassin Aref's first program review at the FCI Terre Haute CMU occurred on May 14, 2007. Ex. 109 (Aref 5/14/07 Program Review).

344.     The BOP's documentation of that program review does not indicate that Aref was considered for transfer from the CMU at that time. Ex. 109 (Aref 5/14/07 Program Review).

345.     Aref's next program review at the FCI Terre Haute CMU occurred on October 24, 2007. Ex. 110 (Aref 10/24/07 Program Review).

346.     The review indicates that Aref had clear conduct and good programming. Ex. 110 (Aref 10/24/07 Program Review), P001148, 49; Ex. 37 (Jett Dep.), 135:17-136:4.

347.     The BOP's documentation of that program review does not indicate that Aref was considered for transfer from the CMU at that time. Ex. 110 (Aref 10/24/07 Program Review).

348.     Aref's next program reviews at the FCI Terre Haute CMU occurred on April 29, 2008 and October 15, 2008. Ex. 111 (Aref 4/29/08 and 10/15/08 Program Reviews).

349.     The reviews indicate that Aref had clear conduct and good programming. Ex. 111 (Aref 4/29/08 and 10/15/08 Program Reviews), P001146, 43; Ex. 37 (Jett Dep.), 139:2-139:14, 140:20-140:25.

350.     Aref requested nearer release transfers at his 4/29/08 and 10/15/08 program reviews. Ex. 111 (Aref 4/29/08 and 10/15/08 Program Reviews), P001147, 44.

351.     At one or more of Aref's Terre Haute program reviews, he was told by Ms. Fortune, his case manager, that she would recommend his transfer out of the CMU, but that the final decision was not up to her. Ex. 58 (Aref Dec'l), ¶ 3.

352.     A March 20, 2009 memorandum to Assistant Director Conley indicates that Aref had been approved for transfer to the USP Marion CMU for "population management purposes." Ex. 112 (Conley 3/20/09 Memo).

353.     Aref was designated to the USP Marion CMU on or around March 26, 2009. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #28.

354.     Aref had a program review at the USP Marion CMU on April 21, 2009. Ex. 113 (Aref 4/21/09 Program Review).

355.    The program review indicates that Aref had clear conduct. Ex. 113 (Aref 4/21/09 Program Review), BOP CMU 003089.

356.    The BOP's documentation of Aref's 4/21/09 program review does not indicate that he was reviewed for transfer out of the CMU at that time. Ex. 113 (Aref 4/21/09 Program Review), BOP CMU 003096.

357.    Aref's next program review at the USP Marion CMU occurred on October 14, 2009. Ex. 114 (Aref 10/14/09 Program Review).

358.    The program review indicates that Aref had clear conduct. Ex. 114 (Aref 10/14/09 Program Review), BOP CMU 003009.

359.    Aref requested a transfer out of the CMU at his 10/14/09 program review, but it was denied because he had not yet been at the Marion CMU for 18 months. Ex. 114 (Aref 10/14/09 Program Review), BOP CMU 003017.

360.    Aref's next program review at the USP Marion CMU occurred on March 30, 2010. Ex. 115 (Aref 3/30/10 Program Review).

361.    The program review indicates that Aref maintained clear conduct. Ex. 115 (Aref 3/30/10 Program Review), BOP CMU 002998.

362.    The BOP's documentation of Aref's March 30, 2010 program review does not indicate that he was reviewed for transfer out of the CMU at that time. Ex. 115 (Aref 3/30/10 Program Review), BOP CMU 003006.

363.    Aref's next program review at the USP Marion CMU occurred on September 23, 2010. Ex. 116 (Aref 9/23/10 Program Review).

364.     At Aref's September 23, 2010 program review, his unit team indicated that they would recommend him for transfer out of the CMU. Ex. 116 (Aref 9/23/10 Program Review), BOP CMU 002995.

365.     An October 1, 2010 Memo from Kelly indicates that Aref's Unit team recommended him for transfer out of the CMU and Warden Hollingsworth concurred. Ex. 117 (Kelly 10/1/10 Memo).

366.     The CTU first considered Aref for possible transfer from the CMU on October 25, 2010. Ex. 118 (Smith 10/25/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 267:9-267:19.

367.     The CTU recommended Aref for transfer out of the CMU based on his conduct, behavior, and the CTU's correctional judgment. Ex. 12 (Schiavone 30(b)(6) Dep.), 267:20-268:5.

368.     On October 26, 2010 the CTU sent a new memo to the Regional Director, indicating that they no longer recommended that Aref be transferred from the CMU. Ex. 119 (Smith 10/26/10 Memo).

369.     The CTU's recommendation against Aref's transfer was based on law enforcement sensitive information the CTU received from the Joint Terrorism Task Force. Ex. 36 (Schiavone Dep.), 275:8-278:13; Ex. 12 (Schiavone 30(b)(6) Dep.), 268:6-268:20.

370.     The correctional programs narrative on Aref's NCRO referral form indicated that Aref's offense conduct included being "in constant contact with terrorist sympathies (sic)." Ex. 120 (Aref NCRO CMU Referral).

371.     On November 9, 2010 the Regional Director denied Aref's transfer request. Ex. 120 (Aref NCRO CMU Referral).

372.    The Regional Director documented an ongoing law enforcement sensitive investigation as one reason for keeping Aref in the CMU; there may have been other reasons. Ex. 120 (Aref NCRO CMU Referral), BOP CMU 005015; Ex. 3 (Nalley Dep.), 162:5-163:7.

373.    Aref was not informed that law enforcement sensitive information was relied on in connection to his transfer request. Ex. 58 (Aref Dec'l), ¶5.

374.    Aref received a short memo informing him that his transfer had been denied. Ex. 121 (Kelly 11/10/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 274:16-275:7.

375.    Aref's transfer denial notification did not comply with the Dodrill memo because it did not provide Aref with the reasons for his continued CMU placement, or any explanation of why his transfer had been denied.  Ex. 121 (Kelly 11/10/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 278:8-275:11.

376.    On November 15, 2010 Aref used the Administrative Remedy Process to request the reasons why his transfer was denied, as well as the criteria for a person like him, who had been in the CMU for three and a half years with clean conduct, to earn a transfer out of the CMU.  Ex. 122 (Aref Administrative Remedy re: Transfer), BOP CMU 075892.

377.    The BOP did not provide Aref with answers to these questions in its responses to his Administrative Remedy. Ex. 122 (Aref Administrative Remedy re: Transfer), BOP CMU 075888, 75890, 75906.

378.    Aref's next program review at the USP Marion CMU occurred on March 16, 2011. Ex. 123 (Aref 3/16/11 Program Review).

379.    The program review indicated that Aref had maintained clear conduct, and that the unit team would submit Aref for transfer out of the CMU. Ex. 123 (Aref 3/16/11 Program Review), BOP CMU 002974, 2983.

380.     A March 18, 2011 memo from Unit Manager Kelly indicates that the Unit Team recommended Aref for transfer out of the CMU and the Warden concurred. Ex. 124 (Kelly 3/18/11 Memo).

381.     The CTU concurred with Aref's transfer recommendation based on his institution conduct and the CTU's correctional judgment. Ex. 125 (Smith 3/22/11 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 276:11-277:2.

382.     On April 4, 2011 the Regional Director approved Aref's transfer from the CMU. Ex. 126 (Aref 3/25/11 NCRO CMU Referral).

383.     The Regional Director did not document the reasons for his decision to approve Aref for transfer out of the CMU. Ex. 126 (Aref 3/25/11 NCRO CMU Referral).

384.     Aref was transferred to a non-CMU general population unit at USP Marion on or around April 11, 2011.  Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #29.

385.     Aref was not told why he was transferred out of the CMU. Ex. 58 (Aref Dec'l), ¶ 6.

386.     Kifah Jayyousi's first three program reviews at the FCI Terre Haute CMU occurred on June 23, 2008, December 8, 2008, and June 18, 2009. Ex. 127 (Jayyousi Program Reviews).

387.     The BOP's documentation of these Program Reviews does not indicate that Jayyousi was considered for transfer at that time. Ex. 127 (Jayyousi Program Reviews).

388.     Jayyousi's next program review occurred on December 14, 2009. Ex. 128 (Jayyousi 12/14/09 Program Review).

389.   At his December 14, 2009 program review Jayyousi submitted a written request for transfer out of the CMU, stating that he had been there for 18 months. Ex. 129 (Jayyousi Transfer Request).

390.   A 12/23/09 memo from Unit Manager Shoemaker indicates that the Unit Team recommended against Jayyousi's transfer based on the nature and severity of his offense, the length of his sentence, and his offense conduct, and the warden concurred.  The memo also indicates that Jayyousi had no sanctioned incident reports while in the CMU. Ex. 130 (Shoemaker 12/23/09 Memo).

391.   Unit Manager Shoemaker testified that he based his recommendation on Jayyousi's offense conduct and the time left on his sentence. Ex. 44 (Shoemaker Dep.), 59:6-61:4.

392.   Prior to Jayyousi's Program Review, Jayyousi's case manager, Corey Shepherd, indicated in an email to David Schiavone that Shepherd would likely deny Jayyousi's transfer request based on his offense conduct. Ex. 131 (Shepherd 12/7/09 Email).

393.   Jayyousi used the Administrative Remedy program to challenge his transfer denial as arbitrary. Ex. 132 (Jayyousi Administrative Remedy re: Transfer Denial).

394.   In response to Jayyousi's Administrative Remedy, Warden Locket stated that it had been determined that Jayyousi's "current conviction, and offense" warranted his continued CMU placement. Ex. 132 (Jayyousi Administrative Remedy re: Transfer Denial), BOP CMU 75927.

395.   Jayyousi's next Program Review occurred on May 21, 2010.  Unit Manager Shoemaker's memo of that date to Warden Locket indicates that Jayyousi would not be

recommended for transfer out of the CMU because "the original reasons for CMU designation and placement still exist." Ex. 133 (Shoemaker 5/21/10 Memo).

396.    Shoemaker's recommendation against Jayyousi's transfer was based on the same reasons set forth in his December 23, 2009 memo. Ex.44 (Shoemaker Dep.), 62:5-62:16.

397.    Jayyousi used the Administrative Remedy Program to challenge his transfer denial, noting that he didn't understand the transfer review process, or why he was being kept in the CMU. Ex. 134 (Jayyousi Administrative Remedy re: Second Transfer Denial), P004899-4906.

398.    The BOP indicated in its responses that Jayyousi's Administrative Remedy challenging his May 2010 transfer denial was repetitive of his Administrative Remedy challenging his December 2009 transfer denial, and thus would not be responded to. Ex. 134 (Jayyousi Administrative Remedy re: Second Transfer Denial), P004902, 4904, 4906.

399.    On or around October 1, 2010 Jayyousi was transferred from the FCI Terre Haute CMU to the USP Marion CMU. Ex. 135 (Kelly 2/22/11 Memo).

400.    The transfer was made for administrative reasons, and was not based on any negative behavior on Jayyousi's part. Ex. 36 (Schiavone Dep.), 218:16-219:7; Ex. 136 (Hollingsworth 10/21/10 letter); Ex. 102 (Hollingsworth Dep.), 34:6-35:14.

401.    Jayyousi's Unit team recommended him for transfer out of the CMU on February 22, 2011, based on his clear conduct and good rapport with staff at both CMUs, and the Warden concurred.  Ex. 137 (Jayyousi Redesignation Packet), 3-4; Ex. 102 (Hollingsworth Dep.), 116:22-118:10.

402.    On March 22, 2011 the CTU recommended against Jayyousi's transfer from the CTU.  This marked the first time the CTU had considered whether or not Jayyousi should be

transferred out of the CMU.  Ex. 137 (Jayyousi Redesignation Packet), 5-7; Ex. 12 (Schiavone 30(b)(6) Dep.), 293:21-294:3.

403.    The CTU included in Jayyousi's Redesignation Packet, and in its Memo recommending against transfer, information about a 2008 Jumah prayer, led by Jayyousi while at the USP Terre Haute CMU. Ex. 137 (Jayyousi Redesignation Packet), 6, 8-23.

404.    After this incident, Mr. Jayyousi was charged with encouraging a group demonstration, a disciplinary hearing was held, the hearing officer decided that the sermon did not support the charge, and the charge was expunged. Ex. 138 (Discipline Hearing Officer Report), 1-2.

405.    The CTU considered Jayyousi's Jumah prayer in deciding to recommend against his transfer from the CMU. Ex. 16 (Smith Dep.), 268:17-270:22; Ex.36 (Schiavone Dep.), 254:11-254:15; Ex. 12 (Schiavone 30(b)(6) Dep.), 294:4-294:24.

406.    The Regional Director first reviewed Jayyousi for redesignation out of the CMU on April 13, 2011, and he denied Jayyousi's transfer request. Ex.137 (Jayyousi Redesignation Packet), 1-2; Ex. 12 (Schiavone 30(b)(6) Dep.), 304:19-305:2.

407.    The Regional Director did not document the reasons for his decision to deny Jayyousi's transfer. Ex. 137 (Jayyousi Redesignation Packet), 1-2.

408.    Jayyousi received a short memo informing him that his transfer from the CMU had been denied. Ex. 139 (Jayyousi Administrative Remedy re: Third Transfer Denial), BOP CMU 75958.

409.    The memo did not comply with BOP policy, in that it did not provide Jayyousi with the reasons for his continued CMU placement. Ex. 139 (Jayyousi Administrative Remedy re: Third Transfer Denial), BOP CMU 75958; Ex. 12 (Schiavone 30(b)(6) Dep.), 305:23-306:20.

410.     Jayyousi used the Administrative Remedy process to challenge his transfer denial and request the reasons for that denial. Ex. 139 (Jayyousi Administrative Remedy re: Third Transfer Denial), BOP CMU 075979.

411.     In response to Jayyousi's Administrative Remedy requests the BOP did not provide him with any information about the reasons for his transfer denial. Ex. 139 (Jayyousi Administrative Remedy re: Third Transfer Denial), BOP CMU 75955, 75957, 75962, 75965.

412.     Jayyousi was not informed that the Jumah prayer incident had any bearing on his continued CMU placement. Ex. 140 (Jayyousi Dec'l), ¶ 2.

413.     Jayyousi had program reviews at the USP Marion CMU on September 30, 2011, March 19, 2012, and September 19, 2012. Ex. 141 (Jayyousi Record of Program Review).

414.     He was not recommended for transfer from the CMU at any of these program reviews. Ex. 141 (Jayyousi Record of Program Review).

415.     At his March 19, 2012 program review, Jayyousi was told by the Unit team that Warden Roal Warner had decided that he would not be recommended for transfer. Ex. 140 (Jayyousi Dec'l), ¶ 3.

416.     BOP documentation indicates that Jayyousi was denied transfer from the CMU at these three program reviews because the reasons for original placement still exist. Ex. 141 (Jayyousi Record of Program Review).

417.     Jayyousi used the Administrative Remedy process to challenge each of these transfer denials. Ex. 140 (Jayyousi Dec'l), ¶ 4.

418.     On March 28, 2013 Jayyousi's unit team recommended him for transfer from the CMU, and Warden Walton concurred. Ex. 142 (Cardona 3/28/13 Memo).

419.     Jayyousi's unit team indicated that he clear conduct for the over four and a half years he was in a CMU.  Ex. 142 (Cardona 3/28/13 Memo).

420.     On April 22, 2013 the CTU recommended that Jayyousi be transferred out of the CMU. Ex. 143 (Smith 4/22/13 Memo).

421.     On May 10, 2013 the Regional director affirmed Jayyousi's transfer out of the CMU. Ex.144 (Jayyousi 5/2/13 NCRO CMU Referral).

422.     The Regional Director did not document the reasons for his decision to transfer Jayyousi out of the CMU. Ex. 144 (Jayyousi 5/2/13 NCRO CMU Referral).

423.     Jayyousi was transferred to a non-CMU general population unit at USP Marion on or around May 14, 2013. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #26.

424.     Jayyousi was not told why his CMU transfer was granted. Ex. 140 (Jayyousi Dec'l), ¶ 5.

425.     Daniel McGowan's first program review at the USP Marion CMU occurred on August 25, 2008. Ex. 145 (McGowan 8/25/08 Program Review), BOP CMU 004003; Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #20.

426.     McGowan requested transfer from the CMU at this review, and was told he would not be eligible until he had achieved 18 months of clear conduct. Ex. 64 (McGowan Dec'l), ¶ 10.

427.     McGowan was not informed that he should cease communications with environmental activists in order to be approved for transfer out of the CMU. Ex. 64 (McGowan Dec'l), ¶ 5.

428.     McGowan was not informed that he should cease publishing his thoughts about the environmental movement in order to be approved for transfer out of the CMU. Ex. 64 (McGowan Dec'l), ¶ 6.

429.     The BOP's documentation of that program review does not indicate that McGowan was considered for transfer from the CMU at that time. Ex. 145 (McGowan 8/25/08 Program Review).

430.     McGowan's next program review at the USP Marion CMU occurred on 2/10/2009.  Ex. 146 (McGowan 2/10/09 Program Review).

431.     The review indicated that McGowan had clear conduct. Ex.146 (McGowan 2/10/09 Program Review), BOP CMU 3994.

432.     McGowan requested transfer from the CMU at his 2/10/09 program review, and was told that he needed to achieve 18 months of clear conduct. Ex. 64 (McGowan Dec'l), ¶ 11.

433.     McGowan's next program review at the USP Marion CMU occurred on 8/4/09. Ex. 147 (McGowan 8/4/09 Program Review).

434.     The review indicated that McGowan had clear conduct. Ex. 147 (McGowan 8/4/09 Program Review), BOP CMU 3982.

435.     McGowan requested transfer from the CMU at his 8/4/09 program review, and was told that he needed to achieve 18 months of clear conduct. Ex. 64 (McGowan Dec'l), ¶ 12.

436.     The BOP's documentation of that program review does not indicate that McGowan was considered for transfer from the CMU at that time.  Ex. 147 (McGowan 8/4/09 Program Review).

437.     McGowan's next program review at the USP Marion CMU occurred on 2/5/10. Ex. 148 (McGowan 2/5/10 Program Review).

438.     The review indicated that McGowan had clear conduct.  Ex. 148 (McGowan 2/5/10 Program Review), BOP CMU 3970.

439.    McGowan's unit team recommended McGowan for transfer from the CMU in connection to his 2/5/10 program review, and Warden Hollingsworth concurred. Ex. 149 (Kelly 3/9/10 Memo).

440.    The CTU first considered McGowan for transfer from the CMU in March of 2010. Ex. 36 (Schiavone Dep.), 179: 1-179:12; Ex. 150 (Smith 3/22/10 Memo).

441.    The CTU recommended against McGowan's transfer out of the CMU because of his communications while incarcerated. Ex. 150 (Smith 3/22/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 240:11-241:8.

442.    Specifically, the CTU noted that McGowan "continues to correspond with numerous associates of [radical environmental and anarchist groups] . . . . Through his communications, McGowan continues to provide guidance, leadership, and direction for activities, publications and movement practices in order to further the goals of radical environmental groups." Ex. 150 (Smith 3/22/10 Memo).

443.    When first produced to Plaintiffs, some of this information was redacted, allegedly pursuant to the law enforcement privilege. Ex. 151 (Redacted Smith 3/22/10 Memo).

444.    Peter Pottios, who summarized the information relevant to McGowan's CMU transfer request on the NCRO's referral form, wrote that McGowan was "considered the leader/organizer of the groups, ALF/ELF…." Ex. 152 (McGowan 3/24/10 NCRO CMU Referral), BOP CMU 005032.

445.    The CTU did not have any evidence indicating that McGowan was the "overall leader" of either group, or even that the groups have an overall leader. Ex. 36 (Schiavone Dep.), 158:2-159:6.

446.     Pottios based his summary on the CTU's memo recommending against McGowan's transfer, and interpreted the CTU memo to indicate that McGowan continued to correspond with and provide guidance to ELF and ALF. Ex. 152 (McGowan 3/24/10 NCRO CMU Referral), BOP CMU 005032; Ex. 51 (Pottios Dep.), 63:16-65:16.

447.     Regional Director Nalley understood Pottios' summary to mean that McGowan continued to communicate in code with ELF and ALF from prison.  Ex. 3 (Nalley Dep.), 217:24-219:25.

448.     The North Central Regional Director denied McGowan's transfer from the CMU. Ex. 152 (McGowan 3/24/10 NCRO CMU Referral), BOP CMU 005033.

449.     The North Central Regional Director did not document the reasons for his decision. Ex. 152 (McGowan 3/24/10 NCRO CMU Referral), BOP CMU 005033.

450.     McGowan received a short memo informing him that his transfer had been denied.  Ex. 153 (Kelly 4/9/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 247:15-248:14.

451.     McGowan's transfer denial notification did not fully comply with the Dodrill memo because it did not provide McGowan with the reasons for his continued CMU placement, or any explanation of why his transfer had been denied.  Ex. 153 (Kelly 4/9/10 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 248:15-249:10.

452.     McGowan was never informed that his transfer out of the CMU was denied because of the nature of his communications with environmental activists and groups. Ex. 64 (McGowan Dec'l), ¶ 13.

453.     McGowan used the Administrative Remedy process to try to learn the reasons for his transfer denial. Ex. 154 (McGowan Administrative Remedy re: Transfer Denial).

454.    McGowan indicated that he had not been told the reason for his transfer denial, and asked how he could augment his behavior, or understand what aspects of his behavior were problematic, without any explanation for his continued placement. Ex. 154 (McGowan Administrative Remedy re: Transfer Denial), P000636, 638.

455.    The BOP's responses to his request did not provide him with the reasons for his transfer denial or any advice as to how he should change his behavior to earn his way out of the CMU. Ex. 154 (McGowan Administrative Remedy re: Transfer Denial), P000635, 637, 639, 641; Ex. 102 (Hollingsworth Dep.), 101:6-102:22.

456.    McGowan's next program review at the USP Marion CMU occurred on 7/29/10. Ex. 155 (McGowan 7/29/10 Program Review).

457.    The review indicated that McGowan had clear conduct. Ex. 155 (McGowan 7/29/10 Program Review), BOP CMU 003957.

458.    McGowan's unit team recommended McGowan for transfer from the CMU and Warden Hollingsworth concurred. Ex. 156 (Kelly 8/2/10 Memo).

459.    The CTU again recommended against McGowan's transfer from the CMU, again citing McGowan's communications. Ex. 157 (Smith 8/23/10 Memo).

460.    This time, the North Central Regional Director approved McGowan's transfer out of the CMU. Ex. 158 (McGowan 8/23/10 NCRO CMU Referral).

461.    The North Central Regional Director did not document the reasons for his decision. Ex. 158 (McGowan 8/23/10 NCRO CMU Referral), BOP CMU 003392.

462.    McGowan was transferred out of the CMU to a non-CMU general population unit at USP Marion on October 19, 2010. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission), #21.

463.    McGowan was not told why he was transferred out of the CMU, nor what he needed to do to avoid being transferred back. Ex. 64 (McGowan Dec'l). ¶ 13.

464.    On February 1, 2011, the CTU recommended that McGowan be transferred back to the CMU based on McGowan's prison communications continuing to demonstrate support for "anarchist and radical environmental terrorist groups" and on McGowan's alleged attempts to circumvent inmate mail monitoring. Ex. 159 (Smith 2/1/11 Memo); Ex. 12 (Schiavone 30(b)(6) Dep.), 254:10-254:23.

465.    McGowan's alleged mail monitoring circumvention involved his request, on a social call with his wife, that she ask his attorney to send him CTU documents mentioning him, that had been leaked on a public website. Ex. 159 (Smith 2/1/11 memo); Ex 160 (Intelligence Analyst 1/31/11 memo).

466.    On February 22, 2011 the Regional Director approved McGowan for redesignation to a CMU. Ex. 161 (McGowan 2/10/11 CMU NCRO Referral).

467.    The Regional Director did not document the reasons for McGowan's redesignation. Ex. 161 (McGowan 2/10/11 CMU NCRO Referral).

468.    Upon his transfer to the CMU, McGowan received a new Notice to Inmate of Transfer, repeating the same information as was included on his original Notice, and adding that his "incarceration conduct has included attempts to circumvent communication monitoring policies, specifically those governing attorney-client privileged correspondence." Ex. 162 (McGowan 2/24/11 Notice of Transfer).

469.    BOP policy requires staff who witness or reasonably believe a violation of Bureau regulations has been committed to prepare an incident report describing all non-confidential facts

relevant to the incident.  This triggers the BOP's official discipline process. Ex. 163 (BOP

Program Statement 5270.09: Inmate Discipline Program), BOP CMU 000216.

470.    Prisoners accused of disciplinary infractions receive due process, including notice

of the incident, an opportunity to be heard, and the opportunity to identify witnesses and

evidence. Ex. 163 (BOP Program Statement 5270.09: Inmate Discipline Program), BOP CMU

000217.

471.    Use or attempted use of the mail and telephone for abuses other than criminal

activity, which circumvent monitoring procedures, are prohibited acts, subject to Inmate

Discipline. Ex. 163 (BOP Program Statement 5270.09: Inmate Discipline Program), BOP CMU

000208, 247.

472.    McGowan did not receive an incident report or any disciplinary process for his

alleged circumvention of mail monitoring. Ex. 64 (McGowan Dec'l), ¶ 15.

473.    On March 8, 2011, McGowan used the Administrative Remedy Program to ask

why he was redesignated to the CMU, noting that the explanation in his Notice of Transfer was

so vague he could not know or rebut the allegation. Ex. 164 (McGowan Administrative Remedy

re: Redesignation), P000626-27.

474.    McGowan did not receive any further information about the facts underlying his

alleged circumvention in response to his Administrative Remedy. Ex. 164 (McGowan

Administrative Remedy re: Redesignation), P000626-34.

475.    McGowan remained in the CMU until he was transferred to a Residential Reentry

Center on or around December 11, 2012. Ex. 27 (Def.'s Resp. to Pl.'s' Requests for Admission),

#22.

476.    Prisoner M was designated to the FCI Terre Haute CMU on or around November 30, 2007. Ex. 165 (Prisoner M Notice to Inmate of Transfer).

477.    After 16 months at the Terre Haute CMU, Prisoner M was transferred to the Marion CMU. Ex. 87 (Prisoner M Administrative Remedy), at P001925.

478.    Prisoner M was told that he would have to spend 18 months with clear conduct in the Marion CMU, before he would be considered for transfer. Ex. 87 (Prisoner M Administrative Remedy), at P001930.

479.    Prisoner E incurred three incident reports while in the CMU: one for assault, one for fighting, and one for telephone abuse. Despite these incident reports, both the CTU and the Marion warden recommended Prisoner E for a transfer from the CMU. Ex. 81 (Prisoner E Designation Packet), BOP CMU 076138.

480.    The Regional Director approved Prisoner E for transfer out of the CMU on November 2, 2011.  He did not document the reasons for his decision.  Ex. 81 (Prisoner E Designation Packet), at BOP CMU 060935.

481.    Prisoner J was designated to the CMU in 2008 after he attempted to contact a hit man while incarcerated, to murder someone who owed him a debt. Ex.166 (Prisoner J Designation Packet), BOP CMU 67372.

482.    Prisoner J was released into a Marion non-CMU general population unit in 2011. Ex. 166 (Prisoner J Designation Packet), BOP CMU 067375.

483.    During his 6 month step-down program, Prisoner J was found guilty of phone abuse, involving circumvention of communication monitoring, and was sent back to the CMU. Ex. 166 (Prisoner J Designation Packet), BOP CMU 067375.

484.     After approximately eight months back in the CMU, the CTU recommended Prisoner J for transfer back into a non-CMU general population unit, noting that Prisoner J had "expressed in his communications and interaction with staff that he has been at odds with the inmate Muslim community." Ex. 166 (Prisoner J Designation Packet), BOP CMU 076131-32.

485.     In considering Prisoner J's potential transfer, the North Central Regional Office's summary of relevant information indicates that prisoner J "has maintained clear conduct, established good rapport with staff, and has distanced himself from the Muslim community." Ex. 166 (Prisoner J Designation Packet), BOP CMU 060851.

486.     The Regional Director approved Prisoner J for another transfer to a non-CMU general population unit on June 28, 2012. Ex. 166 (Prisoner J Designation Packet), at BOP CMU 060851.

487.     The Regional Director did not document the reasons for his decision. Ex. 166 (Prisoner J Designation Packet), BOP CMU 060851.

488.     Prisoner K is Daniel McGowan's co-Defendant, who received a sentencing enhancement for his role as an "organizer, leader, manager and/or supervisor in the offense conduct. Ex. 167 (Prisoner K Designation Packet), BOP CMU 76125, 26.

489.     The CTU recommended prisoner K for transfer out of the CMU after less than 19 months in the CMU. Ex. 167 (Prisoner K Designation Packet), BOP CMU 67350-51.

490.     The Regional Director approved Prisoner K's transfer from the CMU on Decemeber 10, 2010. Ex. 167 (Prisoner K Designation Packet), BOP CMU 60821.

491.     The Regional Director did not document the reasons for his decision. Ex. 167 (Prisoner K Designation Packet), BOP CMU 60821.

492.    Peter Pottios, the Correctional Programs Administrator at the NCRO tasked with reviewing potential CMU designations, recommended Prisoner L for CMU designation based on his offense conduct and his "continued militant beliefs." Ex. 168 (Prisoner L NCRO Referral Form). Ex. 51 (Pottios Dep.), 15:14-17:2.

493.    Pottios indicated that he thought Prisoner L "would have to change the militant portion of those beliefs" to be eligible for release from the CMU. Ex. 51 (Pottios Dep.), 133:9-133:20.

**Undisputed Facts Relevant to Defendants' Interests in the CMU**

494.    The CMU provides a means to control and monitor all of the inmates' communications. Ex. 36 (Schiavone Dep.), 297:8-298:12.

495.    One of the purposes of the CMU designation process is to ensure that inmates are not sent to the CMU based on faulty information or without need. Ex. 36 (Schiavone Dep.), 51:16-52:15; Ex. 30 (Inmate Security Designation and Custody Classification Program Statement), 1.

496.    Due process hearings for CMU prisoners would require fiscal and staffing resources. Ex. 12 (Schiavone 30(b)(6) Dep.), 98:6-98:10.

497.    The average cost of a hearing associated with designation to disciplinary segregation is $146.24. Ex. 22 (Def.'s Resp. to Pl.'s First Set of Interrog.), #25; Ex. 74 (Cost Analysis). The average cost of a hearing associated with designation to a control unit is $867, excluding the cost of the Regional Director attending the designations four times per year.  Ex. 22 (Def.'s Resp. to Pl.'s First Set of Interrog.), #25; Ex. 74 (Cost Analysis). The average cost of a hearing associated with designation to ADX is $478. Ex. 22 (Def.'s Resp. to Pl.'s' First Set of Interrog.), #25; Ex. 74 (Cost Analysis).

**Undisputed Facts Relevant to the Value of Additional Procedures
for CMU Designation and Review**

498.    It would not be problematic for the BOP to implement designation procedures

such as those in place at the SMU at the CMUs. Ex. 36 (Schiavone Dep.), 97:20-99:1.

499.    Walter Kautzky has worked in the criminal justice and corrections field for nearly

40 years, with experience in all aspects of correctional operations and administration. This

includes experience with standards, policies, practices, and procedures governing a wide range of

correctional settings, including control units. Ex. 96 (Kautzky Report), 2-3.

500.    Designating inmates to a CMU without notice and a hearing and providing no

effective means by which an inmate can demonstrate that such a designation is unnecessary is

inconsistent with contemporary correctional standards, BOP national policies, and practice in

other restrictive BOP settings such as ADX. Ex. 96 (Kautzky Report), 3, 4, 6-7.

501.    The loss of contact visitation or telephone access is usually associated with

disciplinary notice explaining the reasons that the prisoner is being subjected to the restrictions,

and a hearing at which those reasons can be addressed. Ex. 96 (Kautzky Report), 4.

502.    The purpose of instituting robust procedures at the CMUs include providing

inmates with a means by which they can demonstrate that CMU designation is unnecessary, and

to familiarize the inmate with specific behavioral objectives associated with the CMUs. Ex. 96

(Kautzky Report), 5-6.

503.    Using the procedures associated with the BOP's discipline program and

designation to and redesignation from the SMUs would bring designation and redesignation

procedures at the CMUs into line with sound correctional practice. Ex 96 (Kautzky Report), 5-6.

**Undisputed Facts Relevant to Kifah Jayyousi's Post-CMU Transfer**

504.    A management variable was assigned to Kifah Jayyousi's security level just prior to his transfer to general population at USP Marion from the CMU. Ex. 140 (Jayyousi dec'l), ¶ 7.

505.    Jayyousi has repeatedly requested transfer to FCI Milan, a low-security facility close to where his family lives. Ex. 140 (Jayyousi dec'l), ¶ 8.

506.    On March 24, 2014, Jayyousi was instead transferred to FCI Oxford, a medium security facility in Western Wisconsin, hundreds of miles from where his family lives. Ex. 140 (Jayyousi dec'l), ¶ 9.

507.    At FCI Oxford, Jayyousi has been told that he is forbidden from giving any Friday sermons or call to prayers, participating in religious group activities, assuming any leadership positions, or responding to questions from other prisoners about Islam. Ex. 140 (Jayyousi dec'l), ¶ 12.

508.    Allegations of his involvement in recruitment and radicalization of other inmates have followed Jayyousi from the CMUs to FCI Oxford. Ex. 140 (Jayyousi dec'l), ¶ 14.