**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

YASSIN MUHIDDIN AREF, *ET AL.*,

    **Plaintiffs**

    **v.**

ERIC H. HOLDER, JR., *ET AL.*,

    **Defendants.**

**Civil Action No. 10-0539 (BJR)**

**MEMORANDUM OPINION**

---

## I. INTRODUCTION

Before the Court are Cross-Motions for Summary Judgment brought by [138] Plaintiffs Yassin Muhiddin Aref and Kifah Jayyousi and [145] Defendants Eric H. Holder, Jr., D. Scott Dodrill, and the Federal Bureau of Prisons ("BOP"). Upon consideration of the parties' arguments, the relevant case law, and the entire record, the Court denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment.

## II. BACKGROUND

### A. Communication Management Units

The BOP established Communications Management Units ("CMUs") at the Federal Correctional Institutions in Terra Haute, Indiana, and Marion, Illinois, in 2006 and 2008, respectively. *Aref v. Holder*, 774 F. Supp. 2d. 147, 152–53 (D.D.C. 2011) (Urbina, J.) ("*Aref I*"). According to the BOP, CMUs were "established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of [BOP] facilities, and protect the public." *Id.* at 153. An inmate may be placed in a CMU because of:

1

(a) [t]he inmate's current offense(s) conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;

(b) [t]he inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a propensity to encourage, coordinate, facilitate, or otherwise act in furtherance of, illegal activity through communication with persons in the community;

(c) [t]he inmate has attempted, or indicates a propensity, to contact victims of the inmate's current offense(s) of conviction;

(d) [t]he inmate committed prohibited activity related to misuse/abuse of approved communication methods while incarcerated; or

(e) [t]here is any other evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's unmonitored communication with persons in the community.

*Id.* (alterations in original).

While in a CMU, inmates are separated from other general population inmates and live in a "self-contained general population housing unit where inmates reside, eat, and participate in all educational, recreational, religious, unit management, and work programming" within the unit. Defs.' Statement of Material Facts ("SUF") at ¶ 9. Similarly to general population inmates, inmates in a CMU typically are not confined to their cells (except at night and during security checks) and have access to common areas for up to sixteen hours per day. *Id.* at ¶¶ 11-12.

CMU inmates face restriction of their telephone and e-mail usage and in the time and manner of visitation, discussed in more detail below. "With the exception of attorney visits, all visits with inmates housed in CMUs are 'non-contact' visits, meaning that the visit takes place in a room with a partition separating the inmate from the visitor and both must communicate using a telephone." *Aref I*, 774 F. Supp. 2d at 153. All social communication by inmates in CMU, whether visitation, phone calls, or e-mail, is monitored by prison staff. Defs.' SUF ¶¶ 17-23.

"Within five calendar days of being transferred into a CMU, an inmate must be provided a 'Notice to Inmate of Transfer to [CMU]' stating the reasons for his placement in the CMU. An

inmate may appeal his transfer to [a CMU], or any conditions of his confinement, through the [BOP's] Administrative Remedy Program . . . ." *Id.* (internal quotation marks omitted).

### B. Procedural History

Plaintiffs Yassin Muhiddin Aref and Kifah Jayyousi, as well as several already-dismissed plaintiffs, filed this suit on April 1, 2010.  On March 8, 2007, Plaintiff Aref was sentenced to a fifteen-year term for money laundering, providing material support for terrorism, conspiracy, and making a false statement to the FBI.  Defs.' SUF ¶ 163.  He was housed in administrative detention from March 28, 2007, to May 11, 2007.  Defs.' Mot. for Summ. J., Ex. 5 (Miller Decl.) ¶ 14.  On May 11, 2007, Aref was transferred to the CMU at Terra Haute.  *Id.* ¶ 15.  On March 26, 2009, Aref was transferred to the CMU at Marion.  *Id.*  He remained there until April 11, 2011, when he was transferred to general population at Marion.  *Id.*

On January 22, 2008, Plaintiff Jayyousi was sentenced to a twelve-year and eight-month term for conspiracy to murder, kidnap, and maim in a foreign country, and conspiracy to provide material support to terrorism.  Am. Compl. ¶ 179.  Jayyousi was in administrative detention from April 16, 2007, to June 18, 2008.  Miller Decl. ¶ 16.  On June 18, 2008, Jayyousi was transferred to the CMU at Terra Haute.  *Id.*  On October 1, 2010, Jayyousi was transferred to the CMU at Marion.  *Id.* ¶ 18.  On May 14, 2013, Jayyousi was transferred to general population at Marion. *Id.* ¶ 18.

Plaintiffs' complaint alleged a variety of claims, including that their procedural due process rights were violated because they did not receive adequate Notices of Transfer or an opportunity to challenge their designation to the CMUs; that their placement in the CMUs violated their substantive due process and First Amendment rights to "family integrity;" that the CMUs' conditions constituted cruel and unusual punishment in violation of the Eighth

Amendment; that Plaintiffs were transferred into the CMU in retaliation for their litigation against the BOP; and that Plaintiffs were transferred to CMUs because they are Muslim and therefore were unlawfully discriminated against in violation of the First and Fifth Amendment. *See Aref I*, 774 F. Spp. 2d at 156–57, 161–71.  Plaintiffs sought declaratory relief and injunctive relief, transfer out of the CMUs, and an order requiring Defendants to allow Plaintiffs the same communication privileges as other general population prisoners.  *Id.* at 156.

On March 30, 2011, Judge Urbina[1] dismissed all but the procedural due process and retaliation claims.  *See Aref I*, 774 F. Supp. 2d at 161–71. Judge Urbina also dismissed Plaintiff Twitty's claims as moot because "he is no longer in BOP custody," as Twitty had been "placed in a halfway house in October 2007 and paroled in January 2011." *Id.* at 160–61. The case was transferred to the undersigned on November 5, 2012.  Plaintiffs Aref, Jayyousi, and McGowan filed an amended complaint on November 20, 2012.  *See* First Am. Compl. [88].  In the amended complaint, Plaintiff Jayyousi alleged that Defendants retaliated against him for his political and religious speech by recommending that he remain in CMU.[2]  First Am. Compl. ¶ 238.

On July 12, 2013, the Court dismissed Plaintiff McGowan's claims as moot because of his release from BOP custody and dismissed several other claims against individual Defendants. *See* Mem. Op. [114].  The Court declined to dismiss Plaintiff Jayyousi's retaliation claim.  *Id.*

Accordingly, the issues remaining before the Court are Plaintiffs Aref and Jayyousi's procedural due process claims and Plaintiff Jayyousi's retaliation claim.

## III. PROCEDURAL DUE PROCESS

### A.  Mootness

---

[1] This case was previously assigned to Judge Ricardo M. Urbina of the United States District Court for the District of Columbia.  The case was reassigned to the undersigned judge on November 5, 2012.
[2] Now-dismissed Plaintiff McGowan also alleged retaliation based on his political speech.  Am. Compl. ¶ 237.

Defendants initially argue that this Court lacks jurisdiction over Plaintiffs' procedural due process claims because the case is moot. Article III's case-or-controversy requirement prohibits courts from issuing advisory opinions on decisions based on hypothetical facts or abstract issues. *Flast v. Cohen*, 392 U.S. 83, 96 (1968). "The doctrine of mootness is a logical corollary of the case or controversy requirement . . . ." *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90 (D.C. Cir. 1986). As such, courts must evaluate mootness "through all stages" of the litigation in order to ensure that a live controversy remains. *21st Century Telesis Joint Venture v. Fed. Commc'ns Comm'n*, 318 F.3d 192, 198 (D.C. Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000)). Defendants contend that because Plaintiff Aref has been out of the CMU for more than three years, and Plaintiff Jayyousi has been out of the CMU for more than a year, they have received the injunctive relief they sought, and that the declaratory relief sought by the Plaintiffs would, at this point, amount to a mere advisory opinion.

Motions to dismiss a claim for mootness are filed under Federal Rule of Civil Procedure 12(b)(1). *Comm. in Solidarity with People of El Salvador v. Sessions,* 929 F.2d 742, 744 (D.C. Cir. 1991). A case is moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287 (2000). "An intervening event may render a claim moot if (1) there is no reasonable expectation that the conduct will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations." *Aref v. Holder*, 774 F. Supp. 2d 147, 160 (D.D.C. 2011) ("*Aref I*") (citing *Pharmachemie B.V. v. Barr Labs., Inc.,* 276 F.3d 627, 631 (D.C. Cir. 2002)).

There are, however, two exceptions to mootness.  "The first pertains to situations in which 'the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration,' yet there is a 'demonstrated probability that the same controversy will recur involving the same complaining party.'"  *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 647 (D.C. Cir. 2011) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam)).  This is also known as the "capable of repetition, yet evading review" exception to mootness.  *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975).

The second exception to mootness is voluntary cessation of the challenged activity by the defendant, which generally "does not deprive [a court] of power to hear and determine the case." *Am. Bar Ass'n*, 636 F.3d at 648.  A "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000).  Under voluntary cessation, a case will be found moot only when (1) "there is no reasonable expectation . . . that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).  The defendant carries the burden of demonstrating that there is no reasonable expectation that the wrong will be repeated," and "the burden is a heavy one."  *Am. Bar Ass'n*, 636 F.3d at 648 (citation omitted).  "A case might become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth*, 528 U.S. at 189.  In order for this exception to apply, "the defendant's voluntary cessation must have arisen because of the litigation."  *Pub. Util. Comm'n of Cal. v. FERC,* 100 F.3d 1451, 1460 (9th Cir.1996).

As both parties have addressed the standard for voluntary cessation in their arguments, the Court will evaluate the question of mootness through the prism of "voluntary cessation," and its requirement that mootness is found only when (1) "there is no reasonable expectation . . . that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *See* Defs.' Mot. for Summ. J. at 14 (discussing the two voluntary cessation factors; Pls.' Opp'n at 3-10 (same).[3]  The main point of contention involves whether there is a "reasonable expectation . . . that the alleged violation will recur." Defendants note that Plaintiffs Aref and Jayyousi are no longer in the CMU.  While it is undisputed that both Plaintiffs are still in BOP custody and thus remain eligible for CMU redesignation, Defs.' Mot., Ex. 3 (Nally Decl.) at ¶ 4,[4] Defendants argue that Aref and Jayyousi will not, in fact, be redesignated to the CMU unless some new event warranting redesignation occurs.  Defendants rely on the declaration of Leslie Smith, Chief of the Bureau of Prison's Counter-Terrorism Unit ("CTU") who declares that CTU will not recommend sending the plaintiffs back to the CMU based purely on their offense conviction; rather, according to Smith, "some newly obtained information would have to be presented to the CTU," prior to a recommendation[5] that Plaintiffs be returned to CMU.  Defs.' Ex. 2 (Smith Decl.) at ¶ 14.

In *Wills v. United States Parole Comm'n*, 882 F. Supp. 2d 60 (D.D.C. 2012), the court considered whether the plaintiff's claim that he had been incorrectly placed in a sex offender

---

[3] In their Reply Defendants challenge for the first time the factual basis of the Courts' use of the voluntary cessation standard, arguing that Plaintiffs Aref and Jayyousi were released from CMU pursuant to internal review procedures rather than as a response to litigation.  "As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply." *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008).  As such, the Court will assume for the sake of its mootness analysis that voluntary cessation applies.

[4] In *Aref I* the court found that the claims of one of the plaintiffs, Twitty, were moot because Twitty was on parole and was no longer in BOP custody and, as such, was not eligible for redesignation to the CMU. 774 F. Supp. 2d 147, 160-61.  At the same time, the court rejected Defendants' argument that plaintiff Jones lacked standing because he was no longer in the CMU.  Here, both Arej and Jayyousi are still in BOP custody.

[5] Smith does not make final decisions regarding designation to CMU; rather, it is the Regional Director who makes the ultimate decision regarding whether to approve or deny placement in the CMU. Defs.' SUF ¶¶ 108-118.

treatment program was moot when, during the course of litigation, plaintiff was removed from the program with assurances from the defendants that plaintiff would not be redesignated to the program." Specifically, the defendants in *Wills* assured the court that they did not "expect" the plaintiff to be redesignated "absent new sexual misconduct," and that they "w[ould] not recommend re-imposition of the [program] . . . ." 882 F. Supp. 2d at 70-71. However, as noted by the court, "[m]ere assurances that challenged conduct will not recur, however, have never been enough to sustain the 'heavy' burden borne by defendants in invoking the mootness doctrine." *Id.* at 71 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding that "disclaim[ing] any intention . . . does not suffice to make a case moot")). Similarly, in *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1352 (D.C. Cir. 1986), the court looked skeptically on an agency's pledge that it would cease to issue fuel economy standards in a tardy manner, labeling such a statement a "bald assertion." Here, Smith's declaration, however well-intentioned, is not a policy statement or proposed BOP regulation, but merely Smith's opinion that he will not "recommend" redesignation into the CMU absent new offenses. Such a statement is not sufficient to meet the "heavy burden" that there is no reasonable risk that Plaintiffs will be placed once more in the CMU.

In addition, even if it is true that Smith's declaration, made for the purposes of this litigation, can be seen as binding the Bureau of Prisons to a particular policy or course of action, Defendants still fail to demonstrate mootness because Plaintiffs' Procedural Due Process claims are premised upon defects in the *procedure* leading to their designation to the CMU and not merely the designation to the CMU itself. The fact that "newly obtained information" would be required for redesignation is of little relevance if, as Plaintiffs allege, the process of designation itself is procedurally flawed. As noted by Defendants themselves, cases are generally only moot

where "a party has already obtained all the relief that it has sought." *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014). Plaintiffs have not obtained all the relief they seek in their complaint. Plaintiffs' claims are not moot and, as such, the Court has jurisdiction and will consider the merits of Plaintiffs' claims.

### B.  Procedural Due Process Claim

### 1.  Legal Standard

The Fifth Amendment states that the government shall not deprive any person "of life, liberty, or property, without due process of law . . . ." U.S. Const., Amdt. 5. Generally, in considering the requirements of due process, courts follow the test set out in *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976): identify the private liberty interest that will be affected by the official action, consider the risk of an erroneous deprivation of the interest through the procedures being used as well as the value of additional or substitute procedural safeguards, and, finally, consider the government's interest and the fiscal and administrative burdens that additional process would require.

Here, because a prison inmate faces restrictions on his or her liberty as a matter of course, the first prong of the *Eldridge* test, that is, the identification of a liberty interest, becomes an exceedingly difficult obstacle and one which Plaintiffs in this case are unable to overcome.

An imprisoned plaintiff may establish the existence of a liberty interest by setting forth facts demonstrating that restrictions that have been imposed on him or her constitute an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Court has also referred to this as a need to demonstrate a departure from the "basic conditions" of prison. "[T]he touchstone of the inquiry . . . is . . . the

nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin*, 515 U.S. at 484).

After *Sandin* the key issue became identifying the baseline for determining what constitutes an "atypical and significant hardship from the ordinary incidents of prison life." In *Hatch v. District of Columbia*, 184 F.3d 846, 847 (D.C. Cir. 1999), this circuit determined that the baseline for comparison is "the usual conditions of administrative segregation,[6]" or "the most restrictive confinement conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences" at the same institution. 184 F.3d at 856. A court should look "not only to the nature of the deprivation (e.g., loss of privileges, loss of out-of-cell-time) but also to its length in evaluating its 'atypicality' and 'significance.'" *Id.*

## 2. Conditions in Administrative Detention[7] at Marion and Terra Haute

The conditions and restrictions in administrative detention are the baseline for comparison of the "atypicality" of conditions in the CMUs. Inmates in administrative detention (solitary confinement) at Marion and Terra Haute are typically housed either alone or with another inmate. Defs.' SUF ¶ 36. They typically remain in their cells for 23 hours per day. *Id.* SUF ¶ 34. They may exercise for five hours a week, usually in one-hour periods. *Id.* ¶ 38; Pls.' SUF ¶ 47.[8] When inmates in administrative detention do leave their cells, they must do so in restraints. Defs.' SUF ¶ 37. Inmates in administrative detention do not have access to TV and do not control whether lights remain on in their cell. Defs.' SUF ¶¶ 39-40. Inmates in administrative

---

[6] "Administrative segregation" was defined in *Hatch* as "a form of solitary confinement commonly used to separate disruptive prisoners." 184 F.3d at 848.

[7] Both parties refer to administrative segregation as administrative detention, and there is no dispute that these designations are synonymous.

[8] Defendants' SUF incorrectly states that inmates in administrative detention may exercise for one hour every five days; however, the declaration of Frank Lara, Defs.' Opp'n, Ex. 6, which is cited for this proposition, provides the actual amount of exercise as five hours per week. Lara Decl. ¶ 19.

detention are permitted fewer possessions in their cells than inmates in CMU.  *Id.* ¶ 42.  They

may not hold prison jobs and usually have no access to educational or recreational programming.

*Id.* ¶¶ 43-45.

Inmates in administrative detention at Terra Haute and Marion receive one 15-minute phone

call per month, although prison officials have discretion to provide more, or less, call time.  Pls.'

SUF ¶ 41; Defs.' SUF ¶¶ 46-49.  They do not have access to e-mail for social correspondence.

Defs.' SUF ¶ 53.

Currently, visits at Terra Haute are non-contact and are limited to two two-hour visits per

month, for four hours of visitation per month total  *Id.* ¶¶ 43-44; Defs.' SUF ¶ 52.  Inmates in

administrative detention at USP Marion are allowed a minimum of four hours of non-contact

visits per month and may receive more upon request.  Pls.' SUF ¶ 45.  Inmates in administrative

detention at Marion  are not permitted to be in the same room as their visitors, but instead

conduct visits through video monitors.  *Id.* ¶ 51

### 3.  Conditions in CMU at Marion and Terra Haute

While inmates in CMU face restrictions on their communication with persons outside CMU,

"the CMU is designed, and in fact functions, as a general population unit."  Defs.' SUF ¶ 7.[9]

While inmates in the CMUs are separated from the non-CMU population, CMU "inmates reside,

eat, and participate in all educational, recreational, religious, unit management, and work

programming" within the unit itself.  *Id.* ¶ 9; Pls.' SUF ¶ 16.  Like other general population units,

other than at night and during security checks, inmates in the CMUs are not typically confined to

---

[9] Plaintiffs dispute Defendants characterization of the CMUs as similar to general population units.  Plaintiffs point to the minutes of a 2008 Executive Staff Meeting of the BOP in which the CMUs are included in the list of "[r]estrictive conditions of confinement programs" along with restrictive programs such as the Special Management Unit and Administrative Maximum unit.  Pls.' SUF ¶ 38.  This appears to be mostly a semantic dispute, as Defendants provide evidence that the CMUs function like a general population unit in areas not related to communication.  Plaintiffs provide no evidence to the contrary.

their cells, and have access to common areas up to sixteen hours per day.  Defs.' SUF ¶¶ 11-12.

CMU inmates have access to educational and programming opportunities, legal and other

reading materials, religious services, health services (including mental health services),

commissary items for purchase, exercise equipment, and recreational activities, and may hold a

prison job and receive a salary.  *Id.* ¶¶ 13-14.  Transfer to the CMUs does not increase the length

of incarceration and inmates continue to earn good-conduct sentence credit.  *Id.* ¶ 15.  In short,

except where communication is concerned, CMUs function like a general population unit.

As of January 3, 2010, CMU inmates may make two fifteen-minute telephone calls per week,

or 120 minutes per month.  Pls.' SUF ¶ 28.[10]  Prior to January 3, 2010, phone calls were

restricted to 15-minutes per week, or 60 minutes per month.  *Id.* ¶ 27.  All calls in CMU are live-

monitored and must take place in English unless they have been scheduled for simultaneous

translation.  *Id.* ¶¶ 25-26.  Inmates in CMU have access to e-mail for social correspondence,

although their e-mail is screened before it is sent and before it is received at CMU.  *Id.* ¶¶ 29-31.

Prior to January 3, 2010, CMU inmates received four hours of non-contact visits per month,

although no visits were permitted on nights or weekends.  Pls.' SUF ¶ 23.  As of January 3,

2010, all CMU inmates are allowed up to eight hours of visitation time per month, Sunday

through Friday, 8:30 AM to 2:30 PM.  *Id.* ¶ 24.  The visits are live-monitored by BOP staff.  *Id.* ¶

22.

### 4.  Conditions in CMU as Compared to Administrative Detention

Plaintiffs contend that designation to the CMU represents an "atypical and significant

hardship" compared to the "the usual conditions of administrative segregation."  *Hatch*, 184 F.3d

at 856.   According to Plaintiffs "some aspects of CMU confinement are harsher than

---

[10] The Bureau of Prisons has published a Proposed Rule that would limit telephone calls to a single 15-minute call
per month.  However, according to the record this rule has not yet been finalized or implemented.  Pls.' SUF ¶¶ 29-
31.

administrative segregation, and vice versa." Pls.' Mot. at 14.[11]  However, as is obvious from the

descriptions of CMU and administrative detention, discussed *supra*, CMU does not approach the

restrictions imposed on inmates in administrative detention.  Inmates in CMU face relatively few

restrictions in their day-to-day activities; as noted above, CMU functions in many respects "as a

general population unit."  Even in terms of communication with persons outside the unit, where

inmates in CMU do face restrictions, these restrictions are not as onerous as those restrictions in

place for inmates in administrative detention.

Plaintiffs focus on the length of time spent in CMU compared to that spent in administrative

detention.  There is no fixed limitation on the duration of an inmate's placement in the CMU.

Pls.' SUF ¶ 17.  According to Plaintiffs' expert, the median time[12] spent in CMU by low and

medium-security inmates between February 1, 2012 and August 2, 2013, was 66.78 weeks, or

one year and one-and-a half months.  Pls.' SUF ¶ 48.  Plaintiffs' expert maintains that the median

aggregate time spent in administrative detention at Terra Haute during the same period was 1.07

weeks, while the median aggregate time spent in administrative detention at Marion was 3.59

weeks.  *Id.* ¶¶ 51, 53.  Defendants have also provided estimates of time spent in administrative

detention at Terra Haute and Marion. According to Defendants, from February 1, 2012 through

---

[11] Plaintiffs also reference the Tenth Circuit's statement that the CMUs are "other than [Administrative Maximum Prison] . . . the most restrictive facilities in the federal system."  *Rezaq v. Nalley*, 677 F.3d 1001, 1009 (10th Cir. 2012).  *Rezaq*, however, concerned conditions in ADX rather than the CMUs themselves, and contained no substantive discussion of the actual conditions of confinement at the CMUs.  In addition, the Tenth Circuit held that there was no liberty interest in transfer to the Administrative Maximum Prison, which appears to impose equivalent to administrative detention.  Because the Tenth Circuit explicitly stated that the CMUs were *not* as restrictive as ADX, *Rezaq* provides little support for Plaintiffs' claims.

[12] Plaintiffs argue that the median measurement, rather than mean, should be used to calculate relative duration of confinement in CMU and administrative detention because their expert believes "that the median is the preferred unit to measure central tendency."  Pls.' SUF ¶ 54.  Plaintiffs' expert also ran his analysis using the mean and stated that, compared to the median time in CMU, the mean was "about the same . . . the pattern was virtually the same."  Pls. Mot. for Summ. J., Ex. 26 (Beveridge Dep. at 40).

August 2, 2013, 24% of low and medium-security inmates[13] in administrative detention spent at least one month there, 13% spent at least two months there, 7% spent at least three months, and 4% spent at least four months. 52% of inmates in administrative detention spent less than one month there.

On close analysis, Plaintiffs' argument is that the length of time an inmate is placed in the CMU, which can number in the years, elevates the comparatively less-restrictive conditions of the CMU to a level of hardship equal to or greater than administrative detention at either Marion or Terra Haute.  Plaintiffs' argue that, when considering the baseline set by *Hatch*, this Court should compare the median length of stay in administrative detention, one to three weeks, to the median length of stay in the CMUs, sixty-seven weeks.  Plaintiffs argue that such a comparison illustrates that designation to the CMU is "atypical and significant" because of the limitations on visitation and phone time.

Plaintiffs' argument is unpersuasive.  Here, the *only* factor that establishes that designation to the CMU is equally harsh or harsher than administrative detention is the typical length of designation to the CMU.  While designation to the CMU for a long period of time clearly carries with it deprivations as to visitation and communication[14] compared to general population status,[15] these deprivations are limited in nature.  Furthermore, there is no question that CMU is less restrictive than administrative detention – for example, inmates in the CMU may have jobs,

---

[13] Plaintiffs provide median stay time in CMU that both includes and excludes high-security prisoners; given that most inmates are low and medium-security, the Court finds that the low and medium-security CMU statistics provide the best comparator.

[14] The Court notes that the need for restrictions on communication was precisely the reason the CMUs were created.

[15] Inmates in general population at Marion and Terra Haute are permitted 300 minutes of social telephone time per month.  Defs.' SUF ¶ 20.  BOP regulations specify that each inmate should be allowed at least four house of visitation time per month, 28 C.F.R. § 540.43, and that visits should be contact visits "unless there is clear and convincing evidence that such contact would jeopardize the safety or security of the institution," 28 C.F.R. § 540.51(h)(2).  Inmates in general population at Terra Haute are permitted seven visits per month, with no set duration outside of visiting hour, for a maximum of 49 hours of visitation per month.  Pls.' SUF ¶ 4.  Inmates in general population at Marion are allowed visitors on Fridays, Saturdays, Sundays, and federal holidays during visiting hours, for a maximum of 42 hours of visitation per month.  *Id.* ¶ 5.

are not restricted to their cells for 23 hours a day, may participate in various prison programs, and so on.  These conditions, which are far less restrictive than administrative detention, provide a counterbalance to the deprivations highlighted by Plaintiffs and make it clear that conditions in the CMU are significantly less restrictive than administrative detention.  Given *Hatch*'s comparative baseline of administrative detention, the Court finds that Plaintiffs do not possess a liberty interest that is implicated in their designation to the CMUs.

Other courts that have considered what establishes a liberty interest in a prison setting have reached a similar conclusion.  In *Henry v. Department of Corrections*, 131 F. App'x 847 (3d Cir. 2005) the Third Circuit considered whether a lifetime ban on contact visits violated an inmate's Due Process rights.  The court found that "the Due Process Clause does not itself guarantee any interest in . . . any particular form of visitation."  131 F. App'x at 849.  The court went on to hold that even a permanent ban on contact visits was not "atypical and significant" compared to ordinary prison life where loss of visitation privileges is an "ordinary incident[] of prison life." *Id.* (quoting *Sandin*, 515 U.S. at 484).  Thus, even where Pennsylvania regulations permitted contact visitations in most situations, the court did not find a liberty interest in any particular form of visitation.

Similarly, in *Perez v. Federal Bureau of Prisons*, 229 F. App'x 55 (3d Cir. 2007), the Third Circuit considered whether the restriction of an inmate to one telephone call per week (because of his conviction as the leader of a conspiracy that used telephones to further criminal activity) implicated a liberty interest and violated the Due Process Clause.  The Third Circuit found "changes in security classifications and limits on telephone usage are ordinary incidents of prison confinement," that did not implicate a liberty interest.  229 F. App'x at 58.

### 5.  Process Due

Because the Court finds that designation to CMU does not infringe on Plaintiffs' liberty interests, it does not reach the question of whether the process Plaintiffs received upon designation to the CMUs was adequate.

## IV. RETALIATION

Defendants move for summary judgment as to Plaintiff Jayyousi's retaliation claim. Plaintiff Jayyousi alleges that the Chief of BOP's Counter-Terrorism Unit ("CTU"), Leslie Smith, retaliated against him by recommending that Jayyousi should remain in CMU ss a result of a speech he gave on August 15, 2008, while serving as the rotational leader of a prayer meeting at the Terra Haute CMU.  Stipulation [142] at ¶ 6.  Jayyousi argues that his speech was protected by the First Amendment and, as such, his rights were violated by the recommendation that he remain in CMU.

### A.  General Retaliation Test

A prisoner bringing a First Amendment claim of retaliation must establish that (1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against him."  *Aref I,* 774 F. Supp.2d at 169 (citing *Banks v. York,* 515 F.Supp.2d 89, 111 (D.D.C. 2007); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001); *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000)).  "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Id.* (citing *Hartman v. Moore,* 547 U.S. 250, 256 (2006)).

Because the Court finds that Plaintiff Jayyousi's speech was not protected by the First Amendment, the Court need not address the second or third factors of the test.

## B. First Amendment Claims by Prison Inmates

It is well-established that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* Therefore, in considering "a First Amendment retaliation claim, [courts] examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests." *Watkins v. Kasper,* 599 F.3d 791, 794–95 (7th Cir. 2010) (citing *Turner v. Safley,* 482 U.S. 78 (1987)). Speech that is inconsistent with legitimate penological interests may be "unprotected as a matter of law." *Id.* at 797.

*Turney v. Safley* discusses at length the factors a court must consider to determine whether a prisoner has a First Amendment right to engage in particular speech: First, "there must be a 'valid, rational connection' between the prison [action] and the legitimate government interest put forward to justify it." *Safley*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, the court must evaluate "whether there are alternative means of exercising the right that remain open to prison inmates." *Safley*, 482 U.S. at 90. Third, the court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally . . . [w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials." *Id.* at 90.

Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

The factors "are intended as guides to a single reasonableness standard . . . [but] the first factor looms especially large.  Its rationality inquiry[16] tends to encompass the remaining factors . . . ." *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998).  Thus, "Safley directs courts to uphold a regulation, even one circumscribing constitutionally protected interests, so long as it 'is reasonably related to legitimate penological interests.'"  *Id.* (quoting *Safley*, 482 U.S. at 89).

### 1.  Valid Rational Connection

Defendants assert that Plaintiff Jayyousi's speech to other CMU inmates posed a security risk, and, therefore, CTU's recommendation that Jayyousi remain in CMU was justified because it identified "inmate communications that pose[d] a security risk warranting CMU monitoring." Defs.' Mot. at 35.  Defendants contend that their identification of security risks is a legitimate government interest.

In response, Plaintiffs' contend that there was no "valid, rational connection" between Smith's actions and a legitimate government interest because "Smith's (and other BOP officials') characterization of Jayyousi's speech is exaggerated, inaccurate, and purposefully deceptive," and "Smith's characterization of Jayyousi's conviction and offense conduct . . . is similarly flawed."  Pls.' Opp'n at 36-37.  In short, Plaintiffs urge the Court to find that Plaintiff Jayyousi did not pose a security risk that required his continued designation to CMU.  As a result, Plaintiffs contend, Defendants have not set forth a legitimate penological interest in Plaintiff Jayyousi's continued designation to CMU.

---

[16] This inquiry being the requirement that "there must be a 'valid, rational connection' between the prison [action] and the legitimate government interest put forward to justify it."  *Safley*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. at 586).

Plaintiffs invite the Court to substitute its judgment for that of prison administrators in determining what constitutes a security risk warranting continued CMU monitoring.  This the Court will not do.  Smith wrote a lengthy memorandum detailing the portions of Jayyousi's speech that he found to be "aimed at inciting and radicalizing the Muslim inmate population" in the CMU at Terra Haute.  Defs.' Opp'n, Ex. 4 (Pottios Decl.), Ex. E at 004614.  Smith expressed concern about Jayyousi's statement that Muslim inmates had been placed in the CMU not because of any action they had taken but simply because they were Muslim.  *Id.*  Smith also was concerned about Jayyousi's statements regarding "why we martyr."  *Id.*  Smith also discussed the offense for which Jayyousi had been convicted, namely, conspiracy to murder, kidnap, and maim in a foreign country, and conspiracy to provide material support to terrorism.  *Id.*; Am. Compl. ¶ 179.

The courts have repeatedly held that "[w]e must accord '[p]rison administrators . . . wide-ranging deference in the adoption and execution of policies and practices that *in their judgment* are needed to preserve internal order and discipline and to maintain institutional security.'" *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).  Having examined the speech and the rationale offered by Defendants, the Court finds that Defendants have articulated a valid, rational connection between their recommendation that Jayyousi remain in CMU and a legitimate government or penological interest.

## 2.  Other *Turner v. Safley* Factors

While both Plaintiffs and Defendants address the other *Turner v. Safley* factors, the Court will not do so.  As noted above, the factors "are intended as guides to a single reasonableness standard . . . [but] the first factor looms especially large. Its rationality inquiry tends to encompass the remaining factors . . . ."  *Amatel v. Reno*, 156 F.3d 192, 196 (D.C. Cir. 1998).

Thus, "Safley directs courts to uphold a regulation, even one circumscribing constitutionally protected interests, so long as it 'is reasonably related to legitimate penological interests.'" *Id.* (quoting *Safley*, 482 U.S. at 89).

Here, because Defendants have advanced a legitimate penological interest in limiting Plaintiff Jayyousi's speech, which they determined was a security risk, it makes little sense to inquire how Defendants could have accommodated said speech.  Defendants have already articulated the impact accommodation of the speech when they determined that "Jayyousi's comments encouraged activities which would lead to a group demonstration and are detrimental to the security, good order, or discipline of the institution."  Pottios Decl., Ex. E at 004614.

## V. CONCLUSION

Having considered the parties' arguments, the relevant case law, and the entire record, the Court finds that Plaintiffs have failed to establish that designation to the CMU is an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  As such, their Procedural Due Process claim fails.  Further, the Court finds that Plaintiff Jayyousi has failed to establish that his conduct was protected by the First Amendment and, as such, his retaliation claim fails.

An order consistent with this memorandum opinion will issue separately.

Signed on March 16, 2015.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE