**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
Yassin Muhiddin AREF, et al.,      )
                                )
        Plaintiffs,          )
                                )     Case No. 1:10-cv-00539-BJR
       -v-                  )
                                )     **ORAL ARGUMENT REQUESTED**
William BARR, et al.,           )
                                )
        Defendants.       )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

For nearly a decade, Plaintiffs Yassin Aref and Kifah Jayyousi have sought judicial review of the Bureau of Prisons' (BOP) decision to designate them to a Communications Management Unit (CMU), where they spent four to five years isolated from their families and the rest of the prison population. In 2016, the Court of Appeals endorsed their pursuit, ruling that the selectivity of CMU designation and the indefinite duration of its communications restrictions render the placement an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Aref v. Lynch¸* 833 F.3d 242, 252 (D.C. Cir. 2016); *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Circuit remanded for this Court to consider whether the BOP violated due process when it designated Aref and Jayyousi to the unit and reviewed them for release. 833 F.3d at 258.

Defendants have now moved to dismiss the case, arguing that the passage of time and a change in circumstances have rendered Plaintiffs' Constitutional challenge moot. *See* Defendants' Mot. to Dismiss ("MTD"), ECF No. 183. It is not. Plaintiffs' Complaint includes a request for expungement of CMU-related information from their prison files—material that

continues to impact them, and may cause further harm in the future despite their release from

BOP custody. Amended Complaint, ECF No. 88-1 at ¶ 12. Plaintiffs continue to seek summary

judgment on their due process claim. After all these years, this Court has the power and the

obligation to review the BOP procedures that resulted in Aref and Jayyousi's prolonged CMU

stay, and generated inflammatory and false information about the men. Should the Court find

those procedures infirm, it can order injunctive relief in the form of expungement to remedy, in

part, that Constitutional violation.

## BACKGROUND

Plaintiffs' Motion for Summary Judgment and supporting filings (ECF Nos. 138, 152)

sets forth painstakingly detailed evidence of the fundamentally flawed procedures used by the

Bureau of Prisons to designate Aref and Jayyousi to the CMU and to retain them there for years,

despite each man's clean disciplinary record. That motion is pending before the Court, and need

not be reiterated here.[1] Instead, we highlight the evidence from that motion that is most relevant

to the question of expungement.

---

[1] When the Circuit remanded, it did so with instructions for this Court to consider the evidence compiled by the parties in their 2014 cross-motions for summary judgment.  *Aref*, 833 F.3d at 258, 268-69. Portions of that summary judgment briefing—including the *Sandin* liberty-interest analysis, a different mootness argument, and Jayyousi's claim of retaliation—have been definitively addressed by the Circuit and are no longer relevant. The balance of the briefing sets forth the parties' evidence and legal argument relevant to the question on remand: whether the government's procedures comport with due process as applied to Aref and Jayyousi. For the Court's convenience, we identify the relevant sections of each brief: Plaintiffs' Mem. of Law in Support of Plaintiff's Mot. for Summary Judgment, ECF No. 138-1 at 1-12, 18-45; Defendants' Mot. for Summary Judgment and Opp. to Plaintiffs' Cross-Motion for Summary Judgement, ECF No. 146 at 1-13, 27-34; Plaintiffs' Mem. of Law in Opp. to Def. Mot. for Summary Judgement and in Further Support of Plaintiffs' Mot. for Summary Judgement ("Plts. Opp to SJ"), ECF No. 152 at 1-2, 20-33; and Defendants' Reply in Support of Mot. for Summary Judgement, ECF No. 157 at 1, 15-22. The question remanded by the Circuit is thus fully briefed and ready for the Court's decision, should it deny Defendants' instant Motion to Dismiss.

While there was no formal process for CMU designation at the time of Plaintiffs'

transfer, it was an unwritten practice for the BOP's Counterterrorism Unit (CTU) to draft a

"referral memo" summarizing the information supporting an individual's designation. *See*

Plaintiffs' Statement of Undisputed Material Facts in Support of their Motion for Summary

Judgement, ECF No. 138-2 (hereafter "SUF") at 85, 88, 100, 101. Aref's referral memo

recommends CMU designation based on his offense conduct, which is characterized as including

"significant communication, association and assistance to Jaish-e-Mohammed (JeM)" a foreign

terrorist organization. SUF 160. Defendants now acknowledge that statement was, and is, false;

Aref never had any communication with anyone from JeM; rather he communicated with an FBI

informant pretending to be affiliated with JeM. SUF 162, *see also* Defendants' Resp. to Plts.

Statement of Undisputed Material Facts, ECF No. 146-1 (not disputing SUF 162).

The CTU had a second reason for recommending Aref for CMU placement: "link[s]" to

several terrorists and terrorist organizations. SUF 167. This information came from Aref's

Presentence Investigation Report, which indicates that much of the link information was disputed

and not introduced at trial. SUF 168. The referral memo, however, fails to indicate that the links

were disputed. SUF 170. Compounding this error, when the North Central Regional Office

considered whether Aref should be designated to the CMU, their documentation stated that Aref

was "linked to individuals affiliated with al-Qaeda," though nothing of the sort appears in Aref's

referral packet. *See* Decl. of Peter D. Pottios, Exhibit A (2007 initial CMU designation packet for

Aref), ECF No. 148-1, at 2.

Aref was given a one-page "Notice to Inmate of Transfer" which purported to explain the

basis for his CMU designation, citing his supposed communication, association and assistance to

JeM. SUF 164. CMU prisoners do not get a hearing to challenge their CMU designation; instead,

they must use the Bureau of Prison's Administrative Remedy Program. SUF 119, 120, 149, 150. Aref could not challenge the BOP's reliance on his disputed links to terrorists, as he was never informed that it was one of the reasons for his CMU placement (*see* SUF 171, 172), but he did try to use the Administrative Remedy Process to explain to the BOP that the statement about JeM in his Notice of Transfer was erroneous. SUF 173. His administrative request was denied, and his statement about the factual error ignored. SUF 174.

Aref was not reviewed for release from the CMU for the next three years. SUF 343-364. Finally, in September of 2010, Aref's unit team and warden recommended his release from the CMU, but the request was denied based on confidential information that has never been disclosed to counsel. 833 F.3d at 248. Aref was notified of the denial but not provided an explanation. *Id.* Documentation of this review repeated the same erroneous information already described, and added that "Aref was in constant contact with known terrorist sympathies [sic]" without any support for that extreme claim. *See* Exhibit 120, ECF No. 138-28 at 85.  Six months later Aref was recommended for transfer again, and this time the transfer was granted. 833 F.3d at 248.

As far as Plaintiffs know, all the unreliable, confidential, and false information about Aref created through this CMU designation process remains in BOP files and may be shared with other law enforcement agencies. Indeed, as David Schiavone, Senior Intelligence Analyst with the CTU explained in his deposition, part of the reason for the CTU's existence is to "monitor and continue to track inmates and share intelligence with other law enforcement agencies." *See* Excerpts from the Deposition of David Schiavone, Aug. 8, 2013 (attached hereto

as Exhibit 1) at 22; *see also id.* at 19, 57 (describing information sharing between CTU and federal courts); 286-87 (describing FBI and BOP intelligence sharing).[2]

Jayyousi's story is similar. His CMU referral memo and Notice of Transfer indicate that his offense conduct involved use of "religious training to recruit other individuals in furtherance of criminal acts in this country . . . and  . . . [included] significant communication, association and assistance to al-Qaida." SUF 181, 182. Jayyousi appealed his designation through the Administrative Remedy program, arguing that neither his conviction nor offense conduct included religious recruitment or assistance to al-Qaida. SUF 183. Again, the BOP failed to respond to these factual questions, and merely parroted the purported reasons for his designation. SUF 184, *see also Aref,* 833 F.3d at 249.

After nearly three years in the CMU, Jayyousi's unit team and warden recommended him for transfer out of the CMU based on his clear conduct and good rapport with staff. SUF 401. The CTU, however, recommended against Jayyousi's transfer, reiterating the same erroneous information about Jayyousi's supposed support for al-Qaida, and including in their re-designation memo additional false statements that, while in the CMU: (1) Jayyousi was precluded from acting as the unit Muslim prayer leader and this restriction was never lifted; (2) Jayyousi "continued to espouse anti-Muslim [sic] beliefs. . . and made inflammatory comments regarding the United States and other non-Muslim countries and cultures; and (3) Terre Haute staff who reviewed Jayyousi's placement decided not to recommend him for transfer from the CMU "due to his continued radicalized beliefs and associated comments." Plts. Opp. to SJ at 38-39. None of these statements are true. *Id.* Jayyousi received a short memo informing him that his

---

[2] Certain testimony unrelated to the issue at hand has been redacted from the Schiavone Deposition Transcript at the Bureau of Prisons' request.

transfer had been denied without any explanation of why. SUF 408, 409. Jayyousi was finally released from the CMU in 2013, but the CTU's final redesignation memo noted that he "is likely to radicalize or recruit other inmates while in Bureau custody" and "does warrant continued monitoring and supervision to preclude illicit activity." Exhibit 143, ECF No. 138-30 at 73. All this erroneous information remains in the BOP's files, and may be shared with other law enforcement agencies.

It is too late for the Court to order much of the relief Aref and Jayyousi originally sought, but that does not mean the Court lacks the power to declare that their rights were violated, and to order relief to ameliorate the lingering effects of that violation. *See generally*, Declaration of Kifah Jayyousi, attached hereto as Exhibit 2 ("Jayyousi Decl."); Declaration of Yassin Aref, attached hereto as Exhibit 3 ("Aref Decl."). Jayyousi is under a 20-year term of supervised release and wants to move for its modification (Jayyousi Decl. at ¶ 3, 4); the erroneous and extremely prejudicial information developed through the flawed CMU designation and review procedures will negatively impact his chances for success on that motion. Aref is in immigration detention at York County Prison, where he is being held in restrictive confinement and treated differently than the other detainees. Aref Decl. at ¶ 3-5. Both men continue to struggle with the emotional toll of what was done to them and the practical impacts of having been singled out for placement in a restrictive unit. Jayyousi Decl. at ¶ 1, 6, 7; Aref Decl. at ¶ 1, 8, 10-12. It is for this reason that Plaintiffs continue to devote themselves to this litigation so many years after their release from the CMU, and today seek expungement of all CMU-related information about them from the BOP's files.

Pursuant to the Court's Feb. 14, 2019 Order, on Mar. 4, 2019 undersigned counsel sent counsel for Defendants a list of the categories of documents Plaintiffs seek expunged. That correspondence is attached hereto as Exhibit 4.

## ARGUMENT

### I.    Plaintiffs' Due Process Claim is Not Moot

Defendants argue that Plaintiffs' procedural due process claim for declaratory and injunctive relief has been mooted by their release from BOP confinement, because there is no form of meaningful relief left for this Court to provide. MTD at 4. To the contrary, expungement of information created through constitutionally flawed procedures is a common remedy, which frequently saves a claim that might otherwise have become moot. Plaintiffs continue to be harmed by their CMU placement, and expungement of the information created about them through the CMU designation and review procedures would ameliorate that harm; thus Defendants' motion to dismiss must be denied.

A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000,* 567 U.S. 298, 307 (2012) (internal quotation marks omitted). "As long as the parties have a concrete interest, *however small*, in the outcome of the litigation, the case is not moot." *Id.* at 307-308 (emphasis added). That means that a case is not moot "when there is some possible remedy, even a partial remedy or one not requested by the plaintiff." *Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012) (citing *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992)). *See also Aref v. Holder*, No. 10-0539, 2015 WL 3749621, at *4 (D.D.C. Mar. 16, 2015) ("cases are generally only moot where 'a party has already obtained all the relief that it has sought'") (*citing*

*Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014)) , *aff'd in part, rev'd in part*, 833 F.3d 242 (D.C. Cir. 2016).

Defendants begin with the proposition that *normally* a prisoner's transfer or release from a prison moots any claim for injunctive relief, but none of the cases Defendants cite involve a request for expungement. *See* MTD at 2 (*citing Scott v. District of Columbia,* 139 F.3d 940, 941 (D.C. Cir. 1998); *Dorman v. Thornburgh*, 955 F.2d 57, 58 (D.C. Cir. 1992); *Cameron v. Thornburgh*, 983 F.2d 253, 254-57 (D.C. Cir. 1993)). Such requests are commonly made in prison cases. *See e.g., Binsz v. Cody*, 38 F.3d 1220 (10th Cir. 1994) (table; text at 1994 WL 577558, at *3) (request for expungement of disciplinary finding); *Gant v. Dutton*, 922 F.2d 841 (6th Cir. 1991) (table, text at 1991 WL 1112, at *3) (request for expungement of administrative segregation report and all references to same in prison records). And while transfer or release from prison renders other forms of injunctive relief moot (*see* MTD at 2), expungement is the exception to that rule. *See Black v. Warden*, 467 F.2d 202, 204 (10th Cir. 1972) (procedural due process challenge to placement in isolation unit not mooted by transfer because "there may be a continuing effect in the penal institutions from the use of records maintained concerning this punishment."); *Dorn v. Mich. Dep't of Corr.,* No. 1:15-CV-359, 2017 WL 2436997, at *9 (W.D. Mich. June 6, 2017) (release from prison does not moot prisoner's request for expungement of disciplinary offense from prison records); *Freidland v. Otero*, No. 3:11-CV-606, 2014 WL 1247992, at *15 (D. Conn. Mar. 25, 2014) (same); *Lira v. Cate*, No. C 00-0905 SI, 2009 WL 10677792, at *22 (N.D. Cal. Sept. 30, 2009), *aff'd sub nom. Lira v. Herrera*, 448 F. App'x 699 (9th Cir. 2011) (release from prison does not moot prisoner's request for expungement of gang validation).

There is scant precedent in the D.C. Circuit specific to prison expungement claims, but analogous cases outside the prison context suggest no deviation from this general rule. *Abdelfattah v. U.S. Dept. of Homeland Sec.*, 787 F.3d 524 (D.C. Cir. 2015), for example, involved a non-citizen's due process claims arising from inclusion of information about him in a government database that negatively impacted various immigration proceedings. While Abdelfattah eventually obtained LPR status and a green card, he argued expungement was necessary based on the threat posed by continued maintenance of the records. *Id.* at 534-35. The Government argued that Abdelfattah's claims were moot, that he was not entitled to expungement, and that "his allegations of future harm are mere speculation." *Id*. The Court disagreed, holding the request for expungement resulted in a live controversy between the parties. *Id. See also, Hedgepath ex rel, Hedgepath v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 (D.C. Cir. 2004) (12-year-old's request for expungement of arrest records not mooted by change in policy that led to her arrest).

Defendants acknowledge the general principle that a request for expungement maintains a live controversy, but imply it would require an evidentiary showing that the individual in question "*will be harmed*" without the relief sought. MTD at 7 (emphasis added).  However, absolute proof of harm is not required. Rather, expungement must have a "more-than-speculative chance of affecting [the plaintiff] in the future." *Abdelfattah*, 787 F.3d at 534.

*Anyanwutaku v. Moore*, 151 F.3d 1053 (D.C. Cir. 1998), relied on by Defendants, demonstrates this principle. There, the Court of Appeals held that a plaintiff must identify *some* continuing adverse consequence which could be cured by expungement; if the plaintiffs fails to identify any interest at all, expungement is unavailable. *Id.* at 1057. Importantly, the Circuit contrasted *Anyanwutaku's* failure to claim any adverse consequence necessitating expungement

9

with *Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir. 1996), in which a prisoner was found to have standing to request expungement from his prison records of references to his unwillingness to attend an NA program. *Anyanwutaku*, 151 F.3d at 1057. Kerr was not required to prove that he *would* suffer an adverse consequence, all that was required was an explanation of how the records *might* affect him in the future. *Kerr*, 95 F.3d at 476. Other cases are in accord. *See e.g., Lazor v. Ingle*, 97 F. App'x 739, 740 (9th Cir. 2004) (case not moot where plaintiff sought expungement of disciplinary record; the record affected the plaintiff's parole determination in the past "and there is no showing that it will not be of consequence in the future"); *Del Raine v. Carlson*, 826 F.2d 698, 707 (7th Cir. 1987) (case not moot despite defendant's argument that disciplinary record is too old to affect parole chances as there is nothing in the Parole Commission's regulations to suggest it will ignore disciplinary record); *West v. Cunningham*, 456 F.2d 1264, 1265-66 (4th Cir. 1972) ("Where there remains a 'possibility' that 'adverse collateral legal consequences' will inure to the complaining party" case is not moot), *citing Sibron v. New York*, 392 U.S. 40, 55 (1968); *Black*, 467 F.2d at 204 (procedural due process challenge to placement in isolation unit not mooted by transfer out of unit because "there may be a continuing effect in the penal institutions from the use of records maintained concerning this punishment").

While it may be easier to identify a potential adverse consequence stemming from prison records while the prisoner remains in custody, so long as a released prisoner can explain how expungement could affect him, a case will not be dismissed as moot. For example, in *Lira v. Cate*, 2009 WL 10677792, at *22, a prisoner brought a procedural due process challenge to his gang validation and related placement in the Pelican Bay Special Housing Unit. During the course of the proceedings the prisoner was released on parole, prompting defendants to argue his

case should be dismissed as moot. *Id.* at *2, *21. The court held otherwise for two reasons. First, the court found that a judicial declaration Lira was validated in violation of due process—and expungement of that validation—would mitigate Lira's risk of physical attack, as improperly validated gang members are at a risk of reprisal, even post-release. *Id.* at *22. Second, the court credited testimony that Lira's gang validation had a continuing adverse impact on his mental health that could be mitigated by a constitutional ruling and expungement. *Id.* The Ninth Circuit affirmed on both grounds. *Lira v. Herrera,* 448 F. App'x 699, 700 (9th Cir. 2011).

A released prisoner-plaintiff identified similar adverse consequences in *Dorn v. Mich. Dep't of Corr.*, 2017 WL 2436997, at *9. Dorn was found guilty of violating a prison policy against sexual conduct by a prisoner with HIV. *Id.* at *1-2. Like Lira, Dorn was released from prison during the course of his procedural due challenge, alleged that he suffered ongoing emotional distress, and argued that his request for expungement showed a concrete, continuing injury. The court found his claim for expungement not moot (*id.* at *9), relying on *Hewitt v. Helms*, 482 U.S. 755, 766 n.1 (1987) (Marshall, J., dissenting) ("Petitioners have offered no authority, nor can they, for the remarkable proposition that the request for expungement of respondent's record became moot upon his parole. Nor, since the expungement would have depended upon the finding that respondent's due process rights were violated, have they explained how the request for declaratory relief supposedly became moot."))[3] *See also, Friedland v. Otero*, No. 3:11CV606 JBA, 2014 WL 1247992 at *15 (D. Conn. Mar. 25, 2014) (expungement available to prisoner challenging disciplinary offense despite release from prison);

---

[3] *Hewitt v. Helms* involved the question of whether a prisoner-plaintiff was a prevailing party entitled to attorneys' fees under 42 U.S.C. § 1988; a five-Justice majority ruled he was not. 482 U.S. at 763-64. The availability of expungement as a form of relief post-release was not directly at issue in the case, and the majority decision does not address it. Thus there is no indication the majority disagreed with the legal proposition cited in *Dorn*.

*cf. Thompson v. Thalacker*, 950 F. Supp. 1440, 1453 (N.D. Iowa 1996) (released prisoner's habeas corpus petition challenging disciplinary finding not moot, as mootness would prevent subsequent damages case).

A.   <u>Expungement Would Provide Meaningful Relief to Kifah Jayyousi</u>

Under this clear precedent, Plaintiffs' claims are not moot. Jayyousi has been released from prison, but his CMU designation continues to affect him and meaningful relief is possible, as he plans to seek modification of a 20-year term of supervised release, he continues to be treated like a person-of-interest by the FBI, and his unlawful designation to the CMU continues to cause him emotional injury.

First, and most importantly, Jayyousi's claims are not moot because he plans to move for modification of his 20-year term of supervised release (Jayyousi Decl. at ¶ 3, 4), and his CMU designation is likely to harm his prospects for relief on that motion. 18 U.S.C. § 3583(e) allows a court to authorize modification of supervised release after considering *inter alia* "(1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) deterrence of criminal conduct; [and] (3) protection of the public from further crimes of the defendant." *United States v. King*, No. 03-CR-249 (BAH), 2019 WL 415818, at *2 (D.D.C. Feb. 1, 2019). One's behavior in prison is relevant to these factors. *See e.g., United States v. Harris,* 258 F. Supp. 3d 137, 141 (D.D.C. 2017) (considering prison disciplinary record, among other factors, in ruling on § 3583(e) motion).

As evidenced above, sharing information is one of the main reasons for the CTU's existence. *See supra,* p. 4, *citing* Exhibit 1. In fact, while Jayyousi was in the CMU, a BOP staff member suggested sending a video of Jayyousi leading a *Jumah* prayer service to Jayyousi's federal court judge, who was then considering his resentencing motion. *See* Exhibit 1 at 226-27.

And CTU staff have testified that they are sometimes obligated to provide to a Probation Office information about individuals on supervised release that is gleaned from CMU communications monitoring. *Id.* at 310. Thus there can be no question that Jayyousi's CMU designation itself— along with the erroneous information that Jayyousi supported al-Qaida and spouted vitriol about the United States—could be shared with the court, and could harm his chances to prevail on a § 3583(e) motion.

A determination by this Court that Jayyousi's CMU designation violated due process, and an order requiring that the extremely prejudicial information created through those flawed procedures be expunged, ameliorates this risk. Indeed, the same type of reasoning has been relied on to defeat mootness in the habeas corpus context. *See United States v. Epps*, 707 F.3d 337, 345 (D.C. Cir. 2013) (habeas challenge not mooted by petitioner's release from prison, as determination of whether he overserved his sentence might influence the court's decision on a § 3583 modification motion). *Epps* is not an outlier, but rather built on precedent from sister circuits recognizing "the enhanced prospects for a reduced term of supervised release under § 3583 as adequate to hold non-moot" various released prisoner claims. *Id., citing Levine v. Apker,* 455 F.3d 71, 76-77 (2d Cir. 2006); *Mujahid v. Daniels,* 413 F.3d 991, 993-95 (9th Cir. 2005); *Townes v. Jarvis,* 577 F.3d 543, 546–49 & n.3 (4th Cir. 2009).

Defendants will no doubt object that the possibility that Jayyousi's modification prospects will be enhanced by expungement is too speculative to save the case from mootness (*see* MTD at 6), but that same argument has been made and rejected in the habeas context. *See In re Sealed Case,* 809 F.3d 672, 674-75 (D.C. Cir. 2016) (rejecting Government's argument that potential modification of term of supervised release is "unlikely in the extreme" and "simply too speculative to give rise to a case or controversy" and holding case not moot). And certainly, the

potential that Jayyousi's CMU records could harm his chance at modification is far less speculative than the grounds relied upon by other courts to support expungement and reject mootness. *See Lazor*, 97 F. App'x at 740 (relying on absence of evidence that disciplinary records would not be of consequence in future); *Del Raine*, 826 F.2d at 707 (same); *West*, 456 F.2d at 1265-66 ("[w]here there remains a 'possibility' that 'adverse collateral legal consequences' will inure to the complaining party" case is not moot).[4]

Defendants' citation to a BOP rule regarding certain documents the Unit Team is to forward to the district of supervision (MTD at 6), does not alter the analysis. The rule does not limit the information the Government may rely on to oppose modification of supervised release and provides no protection against the CTU, an office mandated to share information with other federal (and state and local) agencies (*see* Exhibit 1 at 21), from sharing the extremely prejudicial information developed through the CMU's flawed procedures.

---

[4] In the school and employment contexts, courts seem to presume that negative records have enough potential to harm plaintiffs so as to routinely order expungement and reject arguments of mootness without any evidentiary inquiry into how the information might cause injury in the future. *See, e.g., Flint v. Dennison*, 488 F.3d 816, 823–24 (9th Cir. 2007) (university student's case for injunctive and declaratory relief not mooted by graduation, as student sought expungement of censure and student senate seat denial, and "such expungement is certainly a form of meaningful relief")(internal quotation marks omitted); *Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 496 & n.15 (4th Cir. 2005) (finding student's claims for injunctive relief moot upon graduation from law school, except for her request that the school expunge her failing grade from her record); *Commc'ns Workers of Am. v. Ector Cty. Hosp. Dist.,* 241 F. Supp. 2d 617, 633–34 (W.D. Tex. 2002), *aff'd,* 392 F.3d 733 (5th Cir. 2004), *rev'd on other grounds en banc,* 467 F.3d 427 (5th Cir. 2006) (ordering expungement of employment records which could impact plaintiff's ability to gain promotion or seek a positive recommendation). *See also Sullivan v. Murphy*, 478 F.2d 938, 958, 961 (D.C. Cir. 1973) (case not moot because expungement of police records related to arrests avoids impact which may result from their dissemination to other public and private institutions); *Norman-Bloodsaw v. Lawrence Berkeley Lab.,* 135 F.3d 1260, 1274-75 (9th Cir.1998) (claim for injunctive and declaratory relief for unconstitutional blood and urine tests not mooted despite cessation of testing because defendant retained the test results and could be ordered to expunge them). There is no reason why this jurisdictional question should operate differently in the different contexts.

Moreover, Defendants assume that Plaintiffs are concerned solely with the "Notice of Transfer" (MTD at 6), but that is not the case. Even information about Jayyousi's CMU placement itself could harm his prospects for relief from supervised release, and the "Final Progress Report" listed in the BOP rule likely includes information about that designation. *See* Exhibit 127, ECF No. 138-29 at 49 (2009 Progress Report for Jayyousi, listing CMU designation).

While Jayyousi's plan to move for modification of supervised release is clearly adequate on its own to save his claim from mootness, his CMU designation continues to impact him in other legally significant as ways as well. He was interviewed by the FBI post-release (*see* Jayyousi Decl. at ¶ 5), suggesting that he continues to be considered a potential threat. Moreover, and perhaps more fundamentally, he continues to be emotionally impacted by his CMU designation in ways that could be alleviated by a determination that his rights were violated along with expungement of the resulting information. *Id.* at ¶ 1, 7; *see also, Lira*, 2009 WL 10677792, at *22; *Dorn*, 2017 WL 2436997, at *9.

B.  Expungement Would Provide Meaningful Relief to Yassin Aref

Like Jayyousi, Aref continues to be negatively impacted by his CMU designation in ways that may be ameliorated by expungement. Aref is currently in immigration detention at York County Prison. Aref Decl. at ¶ 3. At York, he is being treated differently than other detainees, even other detainees with serious criminal records. *Id.* at ¶ 2 – 4. He has been held in the lockdown unit of the facility with no explanation, and for a longer period of time than any of the other detainees around him. *Id.* at ¶ 4. While he cannot prove that his harsh treatment results from information about him being shared by the BOP with ICE, there is reason to suspect that to be the case, given the CTU's mandate to share information among various law enforcement

agencies. *See* Exhibit 1 at 21. The Declaration of Heather Sponsoro—which notably excludes any testimony as to whether the CTU has shared information about Aref's CMU placement with ICE—does nothing to alleviate this strong possibility. *See Lazor*, 97 F. App'x at 740; *Del Raine*, 826 F.2d at 707; *West*, 456 F.2d at 1265-66.

As well, Aref continues to suffer emotionally from his CMU designation, and, like Jayyousi, seeks a determination as to the unconstitutionality of his treatment, and expungement of CMU information for the same reason: to finally have closure on what was done to him and his family. Aref Decl. at ¶ 1, 8, 9, 11. Aref continues to be preoccupied with the question of why he was singled out for CMU designation and whether he could have done something to avoid it. Amended Compl., ECF No. 88-1 at ¶ 123; Aref Decl. at ¶ 8. A determination that he was sent to the CMU in violation of due process would give him some peace, as would the knowledge that no one else could be subjected to harsh conditions through the same infirm procedures; it would give meaning to his ordeal. Aref Decl. at ¶ 8, 12. A determination that his rights were violated would also give him a satisfying response should he be asked about his CMU designation when he is removed to Iraq, or when he applies for a job or travel visa in the future. *Id.* at ¶ 10. Those impacts are real and worthy of the court's consideration. *See e.g., Lira*, 2009 WL 10677792, at *22; *Dorn*, 2017 WL 2436997, at *9.

C.  This Court has the Power to Grant Aref and Jayyousi Meaningful Relief

Aref and Jayyousi's declarations set forth multiple ways in which their CMU designation and the erroneous information created through CMU procedures continues to haunt them and could be ameliorated by expungement. This evidence distinguishes Plaintiffs' case from *Anyanwutaku v. Moore*, relied on by Defendants (MTD at 7-8), in which a plaintiff seeking expungement failed to identify *any* continuing adverse consequences. 151 F.3d at 1057

16

("Anyanwutaku has nowhere explained what adverse impact he continues to suffer as a result of the Parole Board's alleged failure to give him a timely parole eligibility date, and we can think of none"). Defendants also seek to rely on *Spencer v. Kenma*, 523 U.S. 1 (1998), in which the Supreme Court considered whether a challenge to parole revocation under 28 U.S.C. § 2254 was mooted by the petitioner's release from incarceration. MTD at 8. The Court declined to presume collateral consequences, and also found that none of the specific collateral consequences alleged were sufficiently likely to prevent mootness. *Spencer,* 523 U.S. at 14. *Spencer* does not control here, as precedent from habeas context is not binding on this Court's determination. Moreover, even within the habeas context, the D.C. Circuit has already explicitly distinguished the mootness inquiry required by *Spencer*-style parole revocation habeas cases with that applicable to modification of supervised relief described above. *Epps*, 707 F.3d at 344-45. *See also Pope v. Perdue,* 889 F.3d 410, 414 n.1 (7th Cir. 2018) (rejecting applicability of *Spencer* to an individual serving a term of supervised release, as that term is—itself—a form of custody, which changes the mootness inquiry).

Nor is Plaintiffs' mootness argument foreclosed by any prior decision of this Court. Defendants are correct that the Court found two previous plaintiffs' claims moot after their release from BOP custody, but those plaintiffs did not seek to refute mootness based on the potential relief of expungement; instead, they sought to rely on the voluntary cessation doctrine. *See Aref v. Holder*, 774 F. Supp. 2d 147, 160-61 (D.D.C. 2011) (rejecting applicability of voluntary cessation doctrine to Plaintiff Avon Twitty's release from CMU custody because Twitty had been approved for halfway house placement prior to the filing of the lawsuit and the exception only applies when voluntary cessation arises "*because of* the litigation"); *Aref v. Holder,* 953 F. Supp. 2d 133, 143-44 (D.D.C. 2013) (applying same reasoning to find Daniel

McGowan's claims moot).[5] This Court has not previously considered whether Plaintiffs' request for expungement saves their claims from mootness; thus it is not bound by prior mootness decisions made on other grounds. *Cf, United States v. Miller*, 890 F.3d 317, 326 (D.C. Cir. 2018) ("Law-of-the-case doctrine applies only to issues upon which decisions were actually rendered, and is inapposite where an issue merely went unraised.")

## II.     Plaintiffs Have Standing to Seek Expungement

Defendants also argue that Plaintiffs lack standing to seek the remedy of expungement. This is nothing but a repackaging of their mootness argument, and can be easily rejected. Under Article III's standing requirements, a plaintiff must show that "at the time the suit is filed" he has (1) suffered an "'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61(1992)).

Defendants are correct that a plaintiff must maintain standing throughout the course of litigation. "If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.,* 264 F.3d 52, 55 (D.C. Cir. 2001). But this merely raises the same question addressed above: would expungement provide meaningful relief? If the

---

[5] It is not clear that this reasoning survives the Court of Appeals decision. *See Aref,* 833 F.3d at 251 n.6 ("We are . . . unpersuaded by the government's argument that [plaintiffs] must prove their transfers were 'because of' this litigation"). But even if it does, Plaintiffs here do not seek to rely on the voluntary cessation exception to mootness, but rather on the continued viability of meaningful prospective relief.

answer is yes, as Plaintiffs establish above, all that matters is that Plaintiffs had standing to seek injunctive relief when they filed the case, and also have standing to seek it now; it does not matter that details about the type of injunctive relief that is meaningful have changed since the case was filed.

Nevertheless, Defendants argue that Plaintiffs did not have standing to seek the specific injunctive relief *of expungement* in 2012, and thus cannot rely upon the remedy now. MTD at 5. This argument fails on its own terms, and also misunderstands the nature of a court's remedial powers. First, there is no question that Plaintiffs had standing to seek declaratory and injunctive relief when the case was filed. *See Aref*, 774 F. Supp. 2d at 157-59 (Defendants' motion to dismiss only challenged one plaintiff's standing; Court held Plaintiff Jones, who had been released from CMU prior to filing of the suit, nevertheless had standing to advance claims for injunctive and declaratory relief). And to the extent a plaintiff must specifically delineate each form of injunctive relief he seeks (but see below), Plaintiffs had the foresight to seek expungement when they filed their Amended Complaint. ECF No. 88-1 ¶ 12.

Defendants object that this request for expungement was not included in the prayer for relief, but only in the body of the complaint. MTD at 5. In a different context, the Court of Appeals has already held this does not matter. *Aref*, 833 F.3d at 266-67 (Plaintiffs could seek nominal damages despite failing to include the specific request in their prayer for relief).

Defendants also argue that the Amended Complaint fails to allege that Aref and Jayyousi were experiencing ongoing injury due to the existence of BOP records about their CMU placement. MTD at 5. To the contrary, both Plaintiffs alleged that their CMU designation documents included erroneous information (*id.* at ¶ 111-112, 187-188) and that information impacted their continued CMU designation (*id.* at ¶ 8, 192, 196-199). *See also Aref*, 833 F.3d at

251 (noting that plaintiffs have "challenged BOP's reliance on flawed information used to justify their CMU designations, which remains in their prison files.").

Second, and more importantly, all that is required is for a plaintiff to have standing to seek injunctive relief at each stage of a case; even if the Court were to find that Plaintiffs did not have standing to seek *expungement* specifically when they filed the case, if that form of injunctive relief is all that is meaningful to them now, that is adequate. *Cf Aref*, 833 F.3d at 267, *citing* Fed. R. Civ. P. 54 ("every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); *Fox v. District of Columbia*, 851 F. Supp. 2d 20, 25 n.5 (D.D.C. 2012) (noting court's power to construe non-specific request for injunctive relief as request for expungement); *cf Rezaq*, 677 F.3d at 1010 (case is not moot "when there is some possible remedy, even a partial remedy or one not requested by the plaintiff.") This is especially true in a case where a party has included a broad prayer for relief. *See Aref*, 833 F.3d at 267 (interpreting Plaintiffs' request for "such other relief as this Court deems just and proper" to allow them to seek nominal damages).

To hold otherwise would mean that a plaintiff must not only maintain standing throughout a 10-15 year course of litigation but must also accurately predict the exact injury he or she will suffer in each year of the case, how it can be remedied, and include all that information in the complaint. Defendants can cite no precedent for such an absurd rule. In the real world, negative information may impact a prisoner one way when he is *in* a challenged unit, a different way when he has been released from the unit but faces a threat of return, and an altogether different way after release from prison. All standing requires is that each injury is concrete and capable of redress.

### III.      Plaintiffs are Entitled to Expungement

Defendants' final argument is that even if Plaintiffs' due process claim is not moot, they have no "equitable entitlement to expungement under the facts of the case." MTD at 9. The case Defendants rely on—*Chastain v. Kelley*, 510 F.2d 1232 (D.C. Cir. 1975)—demonstrates the opposite.

In *Chastain*, the Circuit reaffirmed that "federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute" and "expungement, no less than any other equitable remedy, is one over which the trial judge exercises considerable discretion." *Id.* at 1235-36. Importantly, the *Chastain* court recognized there may be a "right not to be adversely affected by" information maintained by a government agency "if the information (1) is inaccurate, (2) was acquired by fatally flawed procedures, or (3) . . . is prejudicial without serving any proper purpose." *Id.* at 1236.

Unlike Plaintiffs here, the plaintiff in *Chastain* did not allege the information he sought expunged was inaccurate, prejudicial, or acquired through flawed procedures, and thus his case was remanded for a determination as to whether the FBI had any interest in maintaining the information in question. *Id.* (noting plaintiff "has made no objection to the manner in which the Bureau carried out its inquiry, and he has admitted the substantial truth of what it found with respect to the misuse of his credentials"). *Chastain* does not support the proposition that an agency may have an interest in maintaining information "acquired by fatally flawed procedures." *Compare* MTD at 10 *with Chastain*, 510 F.2d at 1236-37.

Because Plaintiffs' information meets the requirements for expungement set forth in *Chastain*, they are entitled to that equitable remedy.

**CONCLUSION**

For nearly ten years now, Aref and Jayyousi have sought a court determination as to whether the BOP used fatally flawed procedures to designate them to a CMU and retain them in that restricted unit. This court has the power to decide the issue and the discretion to order injunctive relief in the form of expungement.

For the reasons set forth above, this Court should deny Defendants' Motion to Dismiss in full, and then proceed to determine the question remanded by the Court of Appeals on the full briefing set forth in the parties' 2014 summary judgement papers (*see supra*, n.1): whether the BOP's procedures comport with due process. Justice demands nothing less.

Dated: May 10, 2019

By:      /s/ *Rachel Meeropol*
RACHEL MEEROPOL, *pro hac vice*
PARDISS KEBRIAEI
SHAYANA D. KADIDAL
(D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6432
Fax: (212) 614-6499
rachelm@ccrjustice.org

GREGORY SILBERT, *pro hac vice*
LARA TRAGER
EILEEN CITRON (D.C. Bar No. 995117)
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-1000
Fax: (212) 310-8007
gregory.silbert@weil.com

KENNETH A. KREUSCHER
Kenneth A. Kreuscher Law LLC

1130 SW Morrison Street, Suite 407
Portland, OR 97205
Tel: 971-303-9453
KennethKreuscher@gmail.com

*Attorneys for Plaintiffs*