UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YASSIN MUHIDDIN AREF, *et al.*

**Plaintiffs,**

v.

WILLIAM BARR, *et al.*,

**Defendants.**

CASE NO. 1:10-cv--00539 (BJR)

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

## I.   INTRODUCTION

Plaintiffs Yassin Muhiddin Aref and Kifah Jayyousi instituted this action against the Bureau of Prisons ("BOP"), several BOP officials, and the Attorney General (collectively "Defendants") nearly a decade ago.[1] Dkt. No. 1. At the time, Plaintiffs were federal prisoners who had been placed in specially designed Communication Management Units ("CMU") within the federal prison system, which meant that their ability to communicate with the outside world was significantly curtailed. Plaintiffs argue that they were placed in the CMUs without being afforded procedural due process in violation of their Fifth Amendment rights.[2]

Currently before the Court is Defendants' motion to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1). Dkt. No. 183. Defendants argue that the procedural due

---

[1] As will be explained below, eight individuals initiated this lawsuit; Aref and Jayyousi are the only remaining Plaintiffs.
[2] Again, as will be explained below, Plaintiffs alleged several other violations; the Fifth Amendment due process claim is the only remaining claim.

1

process claim is now moot because both Plaintiffs have since been released from BOP custody. Plaintiffs counter that the claim is not moot because the Amended Complaint includes a request for expungement of CMU-related information from their prison files—material that they allege continues to impact them despite their release from BOP custody. Dkt. No. 184. Plaintiffs argued that should this Court determine that the CMU-designation procedures in place at the time of their placement in the CMU were constitutionally deficient, this Court can order relief for the constitutional violation in the form of expungement of the CMU-related records.

Having reviewed the motion, the opposition thereto, the record of this case, as well as the relevant legal authorities, the Court will grant in part and deny in part Defendants' motion.

## II.   BACKGROUND

### A.   Procedural History

Plaintiffs initiated this lawsuit on April 1, 2010. Dkt. No. 1. At the time, Plaintiffs were joined by six other individuals who alleged several claims, each related to CMU placement: (1) violation of their procedural due process rights due to inadequate notice and lack of opportunity to be heard; (2) violation of their substantive due process and First Amendment rights to "family integrity"; (3) violation of the Eighth Amendment's prohibition against cruel and unusual punishment; (4) retaliatory transfer into the CMU in violation of the First Amendment; and (5) unlawful discrimination on the basis of religion in violation of the First and Fifth Amendments. *Aref v. Lynch*, 883 F.3d 242, 249 (D.C. Cir. 2016).

Defendants moved to dismiss the original complaint pursuant to Federal Rule 12(b)(1) and (6), arguing that Plaintiffs had not sufficiently pled their constitutional claims, that some of the claims were moot, and that at least one Plaintiff lacked standing. *Aref v. Holder*, 774 F. Supp. 2d 147, 153 (D.D.C. 2011). In March 2011, the Honorable Ricardo Urbina dismissed all but the

procedural due process and First Amendment retaliation claims.[3] *Id*. At that point only four Plaintiffs remained in the litigation: Aref, Jayyousi, Daniel McGowan, and Royal Jones. The remaining Plaintiffs filed an amended complaint in November 2011 adding individual-capacity claims (dkt. no. 86) that Defendants moved to dismiss in February 2013 (dkt. no. 99). In July 2013, this Court dismissed the newly added individual-capacity claims as barred by the Prison Litigation Reform Act and dismissed McGowan's equitable claims as moot. *See Aref v. Holder*, 953 F. Supp. 2d 133, 138 (D.D.C. 2013). Plaintiffs' procedural due process claim and their First Amendment retaliation claim remained. *Id*.

Thereafter, Defendants moved for summary judgment on the procedural due process and retaliation claims.[4] Aref and Jayyousi were the only Plaintiffs who remained in the litigation, Jones having been dismissed for failure to comply with Court orders. Dkt. No. 110. In March 2015, this Court granted summary judgment to Defendants, concluding that Aref and Jayyousi lacked a liberty interest sufficient to trigger due process protections under the Fifth Amendment and that Jayyousi's First Amendment rights were not violated. Plaintiffs timely appealed to the D.C. Circuit and the Circuit Court affirmed in part and reversed in part. *Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016). Relevant to the instant motion, the D.C. Circuit reversed this Court's dismissal of the procedural due process claim, holding that federal prisoners do have a liberty interest in avoiding placement in a CMU. Because this Court had not addressed whether Aref and Jayyousi were afforded procedural due process before being placed in the CMU, the D.C. Circuit remanded the issue to be determined in the first instance by this Court. *Id*. at 301.

---

[3] This case was reassigned to this District Judge in November 2012. Dkt. No. 82
[4] Plaintiffs also filed for summary judgment. *See* Dkt. No. 138.

In accordance with the mandate from the D.C. Circuit, this Court instructed the parties to file a status report as to whether additional briefing was needed before this Court assessed whether the CMU-designation procedures in effect at the time of Plaintiffs' designation comported with due process. Plaintiffs contended that the issue is fully brief and ready for this Court's resolution; Defendants countered that supplemental briefing is necessary because this "case is now in a significantly different posture from the time the parties briefed summary judgment in 2012"; specifically, both Aref and Jayyousi have been released from BOP custody. Dkt. No. 173 at 2. After considering the parties' arguments, the Court instructed the parties to brief the issue. The instant motion to dismiss followed.

### B. Factual Background

The BOP established CMUs at the Federal Correctional Institutions in Terre Haute, Indiana and Marion, Illinois in 2006 and 2008, respectively. *Aref v. Holder*, 953 F. Supp. 2d 133, 137 (D.D.C. 2013). According to the BOP, CMUs were "established to house inmates who, due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communication between inmates and persons in the community in order to protect the safety, security, and orderly operation of [BOP] facilities, and to protect the public." *Id*. (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 152-53 (D.D.C. 2011)). Thus, CMUs house inmates who require communications monitoring beyond that which can feasibly be provided in the general prison population. *Aref v. Lynch*, 833 F.3d 242, 247 (D.C. Cir. 2016). A CMU inmate's ability to communicate with the outside world, including family members, is significantly curtailed. *Id*.

Plaintiff Yassin Aref is an Iraqi refugee convicted of helping a terrorist organization prepare to launch a missile attack on American soil by helping to finance the operation. *United*

*States v. Aref*, 285 Fed. Appx. 784, 790 (2d Cir. 2008). He was given a fifteen-year sentence for money laundering, providing material support for terrorism, conspiracy, and making a false statement to the FBI. *Aref*, 774 F. Supp. 2d at 154. Aref was initially classified as a "low security" inmate but was transferred to the Terre Haute CMU in May 2007. He was later transferred to the Marion CMU. He remained in the Marion CMU until March 2011 when he was transferred to the general prison population where he remained until his release in October 2018. Thereafter, Aref was deported from the United States. *See* Dkt. No. 187.

Plaintiff Kifah Jayyousi was sentenced to a 152-month term for conspiracy to murder, kidnap, and maim in a foreign country and conspiracy to provide material support to terrorism. *Aref*, 883 F.3d at 248. Like Aref, Jayyousi was originally classified as a "low security" inmate but was transferred to the Terre Haute CMU in June 2008. *Id*. In October 2010, he was transferred to the Marion CMU. *Id*. In March 2013, Jayyousi was transferred to Marion's general population where he remained until he was released from prison in September 2017. Jayyousi is now under a 20-year term of supervised release. Dkt. No. 184, Ex. 2 at ¶¶ 3-4.

### III.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge the subject-matter jurisdiction of a federal court to hear a claim. A motion to dismiss under Rule 12(b)(1) is properly granted when the court lacks the statutory or constitutional power to adjudicate the case. *Cause of Action Institute v. Internal Revenue Service*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019). The party asserting jurisdiction bears the burden of proving that subject-matter jurisdiction exists. *Id*. (quoting *Whiteru v. Wash. Metro. Area Transit Auth.*, 258 F. Supp. 3d 175, 182 (D.D.C. 2017)). When ruling on a Rule 12(b)(1) motion, the court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts

alleged"; however, factual allegations receive "closer scrutiny" in the 12(b)(1) context than in the 12(b)(6) context. *Delta Air Lines, Inc. v. Exp.–Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (internal quotation marks and citation omitted). Moreover, a court may look to documents outside of the complaint to evaluate whether it has jurisdiction to entertain a claim. *Cause of Action Institute*, 390 F. Supp. 3d at 91.

### IV.    DISCUSSION

As set forth above, Defendants argue that this Court lacks jurisdiction over this case because Plaintiffs' procedural due process claims are moot. Article III of the Constitution grants federal courts the authority to adjudicate only actual cases or controversies. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013); *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 534 (D.C. Cir. 2015) (citation omitted) (federal courts "may only adjudicate actual, ongoing controversies"). As the Supreme Court has noted, "[i]n our system of government, courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy." *Id.* (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). The "actual controversy" must exist not only "at the time the complaint is filed," but through "all stages" of the litigation. *Nike*, 568 U.S. at 90-91 (quoting *Alverez v. Smith*, 558 U.S. 87, 92 (2009)).

A case is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Thus, a case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted). However, "[a]s long as the parties have a concrete interest, however small, in the

outcome of the litigation, the case is not moot." *Id.* at 307-308 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)).

"Normally, a prisoner's transfer or release from a prison moots any claim he might have for equitable relief arising out of the conditions of his confinement in that prison." *Scott v. Dist. of Columbia*, 139 F.3d 940, 941 (D.C. Cir. 1998). However—and relevant to the instant motion—an exception to this general principle exists if the prisoner seeks equitable relief in the form of expungement of records concerning the conditions of confinement and he alleges "continuing adverse consequences from the challenged [] records." *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. 1998). Thus, while the prisoner's other requests for injunctive relief may be mooted by his release from custody, the request for expungement remains viable for Federal Rule 12(b)(1) purposes so long as he alleges continuing adverse effects from the challenged records. *See e.g. Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir. 1996) (inmate's request for relief from the prison's mandatory Narcotics Anonymous meetings was mooted by his parole, but he still had standing to pursue request "to have the alleged negative references about his attendance at the NA meetings expunged from his prison records, because any such references may have a continuing adverse impact on him"); *Black v. Warden*, 467 F.2d 202, 204 (10th Cir. 1972) (procedural due process challenge to placement in isolation while in federal prison not mooted by transfer to state prison because "there may be a continuing effect in the penal institutions from the use of records maintained concerning this punishment"); *Freidland v. Otero*, 2014 WL 1247992, at *15 (D. Conn. March 25, 2014) (request for injunctive relief pertaining to administrative custody mooted by plaintiff's removal from "high security status", but "request for injunctive relief pertaining to the expungement of the disciplinary report" remained viable); *Dorn v. Mich. Dep't of Corr.*, 2017 WL 2436997 (W.D. Mich. June 6, 2017) (plaintiff's

declaratory and injunctive requests were mooted by his release from custody but his release did not moot expungement request).

Here, Plaintiffs allege that their request for injunctive relief in the form of expungement of the CMU-related information from their prison records remains a live controversy because they continue to be impacted by the existence of the information in their prison files. Specifically, Plaintiffs allege while there was no formal process for designating a prisoner to the CMU at the time of their designation, it was the practice of BOP's Counterterrorism Unit to draft a "referral memo" justifying a prisoner's designation to the CMU. Both Aref and Jayyousi claim that their referral memos contain inaccurate and highly prejudicial information. For instance, Aref's memo links him to al-Qaeda and other terrorists organizations; Jayyousi's referral memo links him to al-Qaeda and claims he expressed negative views regarding the United States and other non-Muslim cultures. Both Plaintiffs assert that each time the prison warden recommended that they be returned to the general prison population, the BOP Counterterrorism Unit would oppose the transfer and generate further documentation that was added to their prison records. Plaintiffs charge that these documents also contain highly prejudicial, inflammatory, and inaccurate information.

Plaintiffs allege that not only did the inaccurate and prejudicial information in their prison files cause them to be unjustifiably designated to the CMU for years, but those records still haunt them even after they have been released from BOP custody. For instance, after his release from BOP custody, Aref was transferred to York County Prison while he awaited his deportation proceedings. He claims that he was "treated differently from other detainees, even other detainees with serious criminal records" the entire time he was housed at York County Prison and believes he was treated this way because he was "singled out as being someone extra

8

dangerous" because of his CMU-related records. Declaration of Yassin Aref dated April 9, 2019, Dkt. No. 184, Ex. 3 at ¶¶ 2, 6. He asserts that he was transported to the prison by a 4-car convey with snipers and further alleges that he was housed in the lockdown unit at the prison for over six months. Aref is fearful that the CMU-related records will follow him once he is removed to Iraq and will continue to affect him there. *Id*. at ¶ 9. He is also fearful that the records will impact his future ability to travel and/or obtain employment. *Id*. at ¶ 10.

Jayyousi alleges that he was interviewed by the FBI not long after he was released from BOP custody and that the agents ask him "all sorts of questions about [his] life now, [his] prison time at the CMU and other facilities, and whether [he] is involved in anything political and who [he has] contact with." Declaration of Kifah Jayyousi dated May 3, 2019, Dkt. No. 184, Ex 2 at ¶ 5. Like Aref, he is also concerned that the existence of the CMU-related records will impact his ability to obtain employment and "return[] to teaching at the university" as an engineer. *Id*. at ¶ 6. Lastly, Jayyousi is currently serving a 20-year term of supervised release. Dkt. No. 184, Ex. 2 at ¶ 3. He intends to move for modification of the terms of his supervised release and contends that the "erroneous and extremely prejudicial information developed through the flawed CMU designation and review procedures will negatively impact his chances for success." Dkt. No. 184 at 6. He asserts that the presiding judge will have access to his prison files, including the records related to his designation to the CMU, and the inaccurate information may influence her decision. *Id*., Ex. 2 at ¶ 4.

Defendants counter that Plaintiffs' alleged ongoing impact from the CMU-related records amount to nothing more than mere speculation that is insufficient to maintain a live controversy. Defendants argue that Plaintiffs have presented no evidence that Aref's treatment in the York County Prison or Jayyousi's visit from the FBI had anything to do with the CMU-related records.

Rather, Defendants point out, the actions were more likely because both Plaintiffs have been convicted of serious terrorism-related offenses. Defendants also dispute that the Counterterrorism Unit documents in Plaintiffs' prison files are erroneous. As for Jayyousi's concern that the records will be supplied to the federal judge adjudicating his request to modify his supervised release, Defendants assert that "there is no reason to believe" that such records "would even be before the supervising court." Dkt. No. 183 at 6. And, if the records were provided to the supervising court, Defendants argue, "there is no reason to believe these records would negatively impact Jayyousi's chances of receiving a shortened period of supervised release." Dkt. No. 185 at 7.

The Court finds the D.C. Circuit's recent decision in *Abdelfattah v. U.S. Dep't of Homeland Sec*. instructive. 787 F.3d 524 (D.C. Cir. 2015). *Abdelfattah* involved a Jordanian citizen who had spent several years trying to obtain permanent resident status in the United States. At some point in the process, he discovered that the Department of Homeland Security ("DHS") had a file on him that included documents he felt were both prejudicial and inaccurate. He sued DHS alleging that the creation and maintenance of the file violated his constitutional rights and impacted his ability to find employment and obtain permanent resident status. Among other claims for relief, he sought expungement of DHS's file.

At some point after he instituted the lawsuit, the plaintiff was granted permanent resident status and found work as a software engineer. DHS moved to dismiss the lawsuit, arguing that the plaintiff's claim was moot because he had achieved the two things he claimed the file's existence prohibited him from doing. Abdelfattah countered that the expungement claim remained viable because the DHS records may still "lead to future deprivation of his rights." The D.C. Circuit concluded that the expungement claim remained viable. In doing so, the Circuit

Court rejected DHS' argument that Abdelfattah's allegations of future harm "were mere speculation." *Id*. at 535.

Here, Plaintiffs—like the plaintiff in *Abdelfattah*—allege that the government has created and is maintaining documents that are both inaccurate and highly prejudicial to them. They assert—like the plaintiff in *Abdelfattah*—that the continued existence of the records may impact them in the future. Drawing all reasonable inferences in favor of Plaintiffs as the Court is required to do on a motion to dismiss, the Court concludes that Jayyousi alleges sufficient ongoing consequences from the continued existence of the CMU-related documents such that his request for expungement constitutes a live controversy. Jayyousi alleges that he has been interviewed by the FBI at least once since his release from BOP custody and further alleges that the CMU-related records will impact his request to modify the terms of his supervised release. He submits deposition testimony from a BOP official who suggests that information gathered on inmates such a Jayyousi is shared with outside government agencies. *See* Dkt. No. 184, Ex. 1, Deposition of David Schiavone, dated August 8, 2013. Thus, Jayyousi's procedural due process claim is not moot. *Abdelfattah*, 787 F.3d at 534-35.[5,6]

---

[5]  Even though Defendants bring this motion pursuant to Federal Rule 12(b)(1), they argue in a footnote that this Court should treat the motion as one for summary judgment and require that Plaintiffs set forth by affidavit or other specific evidence that supports their claim of injury. First, as set forth above, Jayyousi has done so. Second, even if this were a motion for summary judgment, the Court is still required to draw all reasonable inferences in favor of Plaintiffs as the non-moving party. *Banks v. District of Columbia*, 377 F. Supp. 2d 85, 89 (D.D.C. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000) (the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence")).

[6]  Nor is Jayyousi's mootness argument foreclosed by any prior decision by this Court. Defendants are correct that earlier in this litigation the Court found the claims of two individuals previously involved in this lawsuit moot after their release from BOP custody. *See Aref v. Holder*, 774 F. Supp. 2d 147, 160-61 (D.D.C. 2011) and *Aref v. Holder*, 953 F. Supp. 2d 133, 143-44 (D.D.C. 2013). However, the issue before the Court at the time was whether the doctrine of voluntary cessation was applicable to the individuals' claims; the issue of expungement was

In reaching this conclusion, the Court does not determine at this time that Jayyousi is entitled to the remedy of expungement. "A court does not fashion equitable remedies without first finding a violation of an established legal right has occurred or is imminent." *Abdelfattah*, 787 F.3d at 536. Nevertheless, Jayyousi has sufficiently alleged that the continued existence of the CMU-related documents has ongoing consequences on him to keep alive the question of whether there was a procedural due process violation.

However, the Court concludes that Aref's claims of future harm by the existence of the CMU-related records are simply too remote and speculative to maintain a live controversy as to him. Aref was deported, presumably to Iraq, after Defendants' filed the instant motion. Dkt. No. 187. Therefore, not only is he no longer in BOP custody, he is now beyond the reach of all United States government agencies. It is a stretch too far for this Court to infer that CMU-related documents will negatively impact Aref in Iraq.

---

not raised. Thus, this Court is not bound by prior mootness decisions made on other grounds. *Cf, United States v. Miller*, 890 F.3d 317, 326 (D.C. Cir. 2018) ("Law-of-the-case doctrine applies only to issues upon which decisions were actually rendered, and is inapposite where an issue merely went unraised."). Defendants also argue that Jayyousi lacks standing to seek the remedy of expungement and/or is not entitled to expungement even if the due process claim is not moot. *See* Dkt. No. 183 at 5-7, 8-11. These arguments are nothing more than a repackaging of Defendants' mootness argument and are rejected for the same reasons.

## V. CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss. Dkt. No. 183. Plaintiff Aref is HEREBY DISMISSED from this case.

Dated this 1st day of November 2019.

Barbara Jacobs Rothstein
U.S. District Court Judge