UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

YASSIN MUHIDDIN AREF,
KIFAH JAYYOUSI *et al*.,

          *Plaintiffs,*

WILLIAM BARR, *et al*.,

          *Defendants,*

Case No. 1:10-cv-00539-BJR

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

This matter comes before the Court on remand from the D.C. Circuit for resolution of a single remaining procedural due process claim, brought by the sole remaining plaintiff in this case, Kifah Jayyousi. Over a decade ago, Jayyousi and a number of other now-dismissed plaintiffs initiated this action against the Federal Bureau of Prisons ("BOP"), several BOP officials, and the Attorney General (collectively "Defendants"). At the time, Jayyousi was a federal prisoner. Along with his fellow plaintiffs, he claimed, *inter alia*, that the process under which he was designated to a segregated unit known as the Communication Management Unit ("CMU") within the federal prison system did not provide constitutionally guaranteed safeguards, in violation of his right to

1

due process.  *See* First Am. Compl. ("FAC"), Dkt. No. 86.

On March 16, 2015, this Court held that "Plaintiffs do not possess a liberty interest that is implicated in their designation to the CMUs," and dismissed Plaintiffs' due process claims. Mem. Op. at 15, Dkt. No. 161. The Court also noted that "[b]ecause the Court finds that designation to CMU does not infringe on Plaintiffs' liberty interests, it does not reach the question of whether the process Plaintiffs received upon designation to the CMUs was adequate." *Id*. at 16. On appeal, the D.C. Circuit reversed, finding that although the question "is admittedly a close call," the indefinite and atypical nature of the designation "pushes CMU designation over the . . . threshold" articulated by the Supreme Court. *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir. 2016) (citing *Sandin v. Conner*, 515 U.S. 472, 473 (1995)). The circuit court remanded the case for further proceedings on whether Plaintiffs had received the process they were due.

Before the Court, therefore, is a single issue that the Court did not have occasion to reach in its March 16, 2015 ruling: whether Defendants followed constitutionally sufficient procedures in designating Jayyousi to confinement in the CMU. Jayyousi claims, in sum, that Defendants failed to provide him adequate notice of the transfer, an opportunity to rebut the grounds for the designation, or meaningful periodic review of his placement in the CMU. Having reviewed the briefs filed in support of and opposition to the motions, the exhibits attached thereto, the record of the case, and the relevant legal authorities, the Court concludes that the process by which Jayyousi was designated to the CMU was constitutionally adequate, and grants Defendants' motion for summary judgment, for the reasons that follow.

## II.     BACKGROUND

### A.  Communication Management Units ("CMUs")

The BOP established CMUs at the Federal Correctional Institutions in Terra Haute, Indiana, and Marion, Illinois, in 2006 and 2008, respectively. Decl. of David Schiavone, ¶ 20, Dkt. No. 149. The CMUs were intended to address a perceived deficiency in the Department of Justice's ability to monitor inmates with terrorism-related convictions and their communications with contacts outside of prison. *Id.* ¶ 2. Defendants have described the CMUs as "self-contained general population housing unit[s]," in which a prisoner is allowed to reside, eat, and participate in all activities within the unit, much as in general population. *Id.* ¶6. Once an inmate is transferred to a CMU, however, his communications with the outside world are highly restricted and closely monitored. For example, phone calls and visits are limited, and must be "conducted in English, live-monitored, and recorded by BOP." *Aref v. Lynch*, 833 F.3d at 247.

As of June 2008, when Jayyousi was designated to the CMU, there was no written policy outlining either the criteria or the process for designation. *See* Dep. of David Schiavone, 37:8-11, Pls.' Ex. 36, Dkt. No. 138; 30(b)(6) Dep. of David Schiavone, 25:5-10, Pls.' Ex. 12 ("Q. So is it accurate to say that prior to April 6th, 2010, the BOP did not have written documentation of CMU criteria available either to the public or for use for -- for internal BOP purposes? A. That would be accurate, yes."). Instead, at that time, the BOP's Counter Terrorism Unit ("CTU") had the discretionary authority to identify and evaluate appropriate candidates, and to forward recommendations on to various officials for comment. *See* Schiavone Dep., 53:11-16; Schiavone Decl. ¶ 20. The recommendations ultimately reached the final decision-maker, the North Regional Director, who at the time of Jayyousi's designation was Michael Nalley. Nalley was tasked with reviewing the recommendations and making the final determination, based largely on his

"experience and expertise." *See* Schiavone 30(b)(6) Dep. at 89:23-90:4 ("The Regional Director has to document a decision in order for it to be communicated for the designation to be made, but the reasons, that would be up to the Regional Director is what he felt was pertinent to include in that decision.").

The BOP eventually articulated criteria for reviewing a CMU prisoner's continued designation in a policy memorandum dated Oct. 14, 2009. *See* Memorandum from D. Dodrill, Assistant Director of the Correctional Programs Division ("Dodrill Memo"), Pls. Ex. 46. The Dodrill Memo called for regular review of an inmate's CMU placement to "determine whether CMU designation remains necessary," and outlined several factors for consideration, including, relevant to Plaintiff Jayyousi's claim, whether "[t]he inmate's current offense(s) conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism." *Id.* at 1-2. Although on its face the Dodrill memo pertained to *continued* designation, Defendants have testified that the criteria outlined in that memo are the same as those used for initial designation. *See* Schiavone Decl., ¶ 17. The BOP put criteria for initial CMU designation in writing on April 6, 2010, when it issued a proposed rule for public notice and comment. *See* 80 Fed. Reg. 3168 (Jan. 22, 2015), Pls.' Ex. 15, at 196.[1]

**B.  Plaintiff Jayyousi's Designation to the CMU**

In 2008, Jayyousi was sentenced to a 152-month term for conspiracy to murder, kidnap, and maim in a foreign country and conspiracy to provide material support to terrorism. FAC ¶ 179. He and his co-conspirators were found to have communicated in code and posed as a charitable organization to further these goals. *See United States v. Jayyousi*, 657 F.3d 1085, 1091–92 (11th

---

[1] The final rule did not go into effect until February 23, 2015, almost a decade after the first CMU opened, and after Jayyousi had been transferred out. *See Aref*, 833 F.3d at 248, n.1.  Because Plaintiff is challenging only the procedures under which he was designated, the final rule is not at issue in this case.

Cir. 2011). Although he was originally classified as a "low security" prisoner, he was transferred to the Terre Haute CMU in June 2008. Decl. of Ralph Miller ¶ 16, Defs.' Ex. 5.

Within several days of his placement in the CMU, Jayyousi received a Notice of Transfer, outlining the basis for his designation. *See* Notice of Transfer, Pls.' Ex. 60. The Notice stated:

> Your current offenses of conviction are for Conspiracy to Commit Murder in a Foreign Country; Conspiracy to Kidnap, Maim, and Torture; and Providing Material Support to a Terrorist Organization. You acted in a criminal conspiracy to raise money to support mujahideen operations and used religious training to recruit other individuals in furtherance of criminal acts in this country as well as many countries abroad. Your offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization. *Id*.

Jayyousi challenged the designation through BOP's administrative appeal process, claiming that information contained in his Notice of Transfer was inaccurate. *See* Regional Administrative Remedy Appeal, Pls.' Ex. 61. Nalley denied the appeal and informed Jayyousi that his placement in the CMU was deemed necessary in light of his terrorism convictions, and stated "you maintained significant communication and association with foreign terrorist organizations." *Id*.

Over the next five years, Jayyousi's CMU designation was subject to a number of periodic reviews, approximately every six months. His requests for transfer were denied, until May 14, 2013, when his request was approved by the Regional Director without explanation. *Id.* He was then transferred to the general prison population, where he remained until his release from prison in September 2017. Miller Decl. ¶ 18. Jayyousi is currently serving a 20-year term of supervised release. Sposato Decl. ¶¶ 3-4, Dkt. No. 184, Ex. 2.

### C.  Procedural History[2]

In April 2010, Jayyousi, along with eight other federal prisoners who had been placed in CMUs, filed this action. Plaintiffs argued, among other things, that designation to the CMUs took place without due process, in violation of their Fifth Amendment rights.  By 2014, the Court had dismissed all plaintiffs but Jayyousi and Yassin Aref from the case. In 2015, this Court granted Defendants' motion for summary judgment and dismissed these two remaining Plaintiffs, concluding among other things that they lacked a liberty interest sufficient to trigger due process protections under the Fifth Amendment.  *See* Mem. Op., Dkt. No. 161.  Plaintiffs appealed to the D.C. Circuit, which reversed the dismissal of the due process claim, holding that federal prisoners "have a liberty interest in avoiding transfer into the CMU." *Aref v. Lynch*, 833 F.3d at 268, 257 (designation triggers liberty interest because "it is exercised selectively; the duration is indefinite and could be permanent; the deprivations—while not extreme—necessarily increase in severity over time."). Noting that the record on appeal was incomplete regarding what process Plaintiffs were due and actually afforded, the circuit court remanded Plaintiffs' claims to this Court to determine "whether the government's procedures comport with due process as applied to appellants." *Id*. at 268-69.

In September 2017, Jayyousi was released from BOP custody, and Defendants filed a motion to dismiss, contending that his procedural due process claim was therefore moot.[3] Plaintiff responded that his claims continued to present a live controversy, as one of the remedies he sought

---

[2] This case has a long and complex procedural history, much of which is not directly relevant to the issues presented in these motions. That history is laid out in more detail in the Court's November 1, 2019 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, Dkt. No. 189, pp. 2-4.

[3] Defendants also sought dismissal of Jayyousi's one remaining co-Plaintiff Aref, who had also been released from BOP custody, but had been deported from the U.S., presumably to Iraq. The Court granted Defendants' motion as to Aref, concluding that his "claims of future harm by the existence of the CMU-related records are simply too remote and speculative to maintain a live controversy as to him."  Order at 12, Dkt. No. 189.

was expungement from his record of any reference to his designation to the CMU. This Court agreed, and denied Defendants' Motion to Dismiss, ruling that Jayyousi's claim was not moot because he "alleges sufficient ongoing consequences from the continued existence of the CMU-related documents [in his record] such that his request for expungement constitutes a live controversy." Order at 11, Dkt. No. 189.

The Court has observed, and the parties agree, that Jayyousi's challenge is to the actual procedures that were used in both his initial and his continuing designation to the CMU—not to Defendants' designation policy and procedures generally in place at the time, and not to the new rules as they exist today. *See* Trans. of Feb.14, 2019 Status Conf., Dkt. No. 188, 6:1-3; 9:16-18. On this question, the parties agree that briefing is complete. *See* Nov. 4, 2019 Minute Order (giving parties opportunity to submit additional briefing, which neither party did).

### III.    LEGAL STANDARD

Summary Judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it might affect the outcome of the case." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *See Anderson*, 477 U.S. at 248.  A movant is entitled to judgment "as a matter of law" where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

1   with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

2   fact." *Id.* (internal quotation marks omitted).

3   ## IV.   DISCUSSION

4   ### A.  Jayyousi's Procedural Due Process Claim

5         The Fifth Amendment to the Constitution guarantees that no individual is "deprived of life,

6   liberty, or property, without due process of law."  U.S. CONST. amend. V.  Assessment of an

7   alleged procedural due process violation comprises two steps.  First, a court must determine

8   whether the government's conduct in question impairs a liberty interest protected by the Due

9   Process Clause.  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).  Because the circuit court has

10  already determined it does in this case, the Court turns to the second step: determining what process

11  is due, and whether such process has been afforded.  *See Wilkinson v. Austin*, 545 U.S. 209 (2005).

12        In a prison context, "the requirements of due process are flexible and [call] for such

13  procedural protections as the particular situation demands." *Wilkinson*, 545 U.S. at 224 (alteration

14  in original, internal quotation marks omitted). In evaluating the sufficiency of the process afforded

15  in this context, courts balance the three concerns outlined by the Supreme Court in *Mathews v.*

16  *Eldridge*: First, the private interest that will be affected by the official action; second, the risk of

17  an erroneous deprivation of such interest through the procedures used; and finally, the

18  Government's interest, including the function involved and the fiscal and administrative burdens

19  that the additional or substitute procedural requirement would entail. 424 U.S. 319, 335 (1976).

20        In balancing these three competing considerations, the Court is mindful of the D.C.

21  Circuit's admonition that Jayyousi is "challenging fundamentally predictive judgments in an area

22  where administrators are given broad discretion and the government's legitimate interests in

23  maintaining CMUs must be accorded substantial weight. Because the cardinal principle in due

process analysis is flexibility—*i.e.*, attention to relevant context and consideration of competing interests—only minimal process is likely due." *Aref v. Lynch*, 833 F.3d at 258. The Court now turns to whether that "minimal process" was given.

### 1. *Private Interest Affected by Official Action*

The first *Mathews* factor calls upon the Court to consider "the private interest that will be affected by the official action." *Wilkinson*, 545 U.S. at 224 (quoting *Mathews*, 424 U.S. at 335). The Court begins with the premise that Jayyousi's "private interest is considerably lessened because of his status as an inmate." *Isby v. Brown*, 856 F.3d 508, 525 (7th Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 473 (1983)). "The private interest at stake here, while more than minimal, must be evaluated, nonetheless, within the context of the prison system and its attendant curtailment of liberties." *Wilkinson*, 545 U.S. at 225. Furthermore, although the D.C. Circuit determined that this lawsuit does implicate a cognizable liberty interest sufficient to trigger a due process analysis, it must be noted that "CMU confinement involves significantly less deprivation than administrative segregation," more commonly known as solitary confinement. *Aref v. Lynch*, 833 F.3d at 256, 257 ("Whether a liberty interest exists here is admittedly a close call."). This is because, among other things, "CMU inmates are allowed in common spaces with other CMU inmates for sixteen hours a day. They have access to educational and professional opportunities, can keep as many possessions as inmates in the general population, and have no added restrictions on exercise." *Id*.

Accordingly, the weight of the interest in this case must be assessed as something less than that in *Wilkinson* and other solitary confinement cases, in which inmates are subjected to "extreme isolation," and deprived "of almost any environmental or sensory stimuli and of almost all human contact." *Id*.; s*ee also Incumaa v. Stirling*, 791 F.3d 517 (2015) (involving designation to

segregated unit in which plaintiff confined to cell 24 hours a day, subjected to strip searches, served smaller portions of food than inmates in the general population, and denied educational opportunities and mental health treatment).

### 2. Risk of Erroneous Deprivation

The second factor to be weighed under *Mathews v. Eldridge* is "the risk of an erroneous placement under the procedures" that BOP used in designating Plaintiff to the CMU and "the probable value, if any, of additional or alternative procedural safeguards" to reduce the risk. *Wilkinson*, 545 U.S. at 225 (citing *Mathews*, 424 U.S. at 335). The three traditional hallmarks of fair process in this context include "notice of the factual basis" for the deprivation; "a fair opportunity for rebuttal"; and periodic review of the exigency of ongoing confinement. *Wilkinson*, 545 U.S. at 225. The record reveals that Jayyousi was accorded all three.

### a. Notice of Transfer

It is undisputed that Jayyousi received a Notice of Transfer within hours of his designation to the CMU. *See* Notice of Transfer, Pls.' Ex. 61. That Notice included the "factual basis" of his designation: specifically, that he had "acted in a criminal conspiracy to raise money to support mujahideen operations and used religious training to recruit other individuals in furtherance of criminal acts," and that his "offense conduct included significant communication, association and assistance to al-Qaida, a group which has been designated as a foreign terrorist organization." *Id.* at 1. Regional Director Nalley confirmed that these facts formed the basis of his decision to designate Jayyousi to the CMU, and under standards later memorialized in the Dodrill Memo, these facts met the criteria for CMU designation. *See* Decl. of Michael Nalley, Defs.' Ex. 2, ¶ 10 (Jayyousi's Notice of Transfer "accurately summarized the reasons why I ordered [his] placement in a CMU."); Dodrill Memo, Pls.' Ex. 46 at 1-2 (one factor in designation was whether "[t]he

inmate's current offense(s) conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism"). Plaintiff complains that the Notice contained some, but perhaps not all, of the reasons for his designation. The standard in this context, however, is not so exacting. As the Supreme Court has held, the Due Process Clause requires that "[a]n inmate must *merely receive some notice* of the charges against him." *Hewitt*, 459 U.S. at 476 (emphasis added). That the "some notice" standard was met here can hardly be denied.

### b. *Opportunity for Rebuttal*

Defendants also provided Jayyousi an opportunity to rebut his designation, which he availed himself of within weeks of his transfer. *See* Regional Administrative Remedy Appeal ("Admin. App."), Pls.' Ex. 61. In the context of a prisoner contesting an administrative segregation, all that is required is that the inmate be given "an opportunity to present his views to the prison official charged with deciding whether to transfer him," and that "the the decisionmaker reviews the charges and then-available evidence against the prisoner." *Hewitt*, 459 U.S. at 476. In his appeal, Jayyousi claimed "the information used as a basis for my transfer to CMU [is] not correct." Admin. App. at 11. The record reveals that in response to the appeal, Defendants reviewed available information related to Jayyousi's terrorism-associated conviction, and found it sufficient to support CMU placement. As the written Response to the appeal noted, Jayyousi's designation was made in reliance on, among other things, the terrorism enhancement associated with his sentencing, and the presentence report, which "clearly define[d his] association with terrorism." *Id.* at 12. The appeal was reviewed and denied by the warden, by acting North Regional Director Charles Lockett, and by administrator of National Inmate Appeals, who determined that Jayyousi had been "appropriately designated to the CMU." *Id.* at 5, 9. Lockett's written Response referred to Jayyousi's offense conduct, including conspiracy to provide support to terrorism and

terrorists, and communication with foreign terrorist organizations. *Id*. The process by which Jayyousi appealed his designation provided him a chance to "present his views." The decisionmakers reviewed the charges and "then-available evidence." This process was constitutionally sufficient. *Hewitt*, 459 U.S. at 476.

### c. Periodic Review

Finally, the Court concludes that Defendants' "periodic review" of Jayyousi's designation to the CMU met the standard for the "informal and nonadversary" and "minimal procedural process" required by the Constitution. *Isby*, 856 F.3d at 525, citing *Westefer v. Neal,* 682 F.3d 679, 684–86 (7th Cir. 2012); *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993). As courts have made clear, while periodic review is constitutionally required to "keep[] administrative segregation from becoming a pretext for indefinite confinement," "broad discretionary authority is necessary because the administration of a prison is at best an extraordinarily difficult undertaking." *Hewitt,* 459 U.S. at 467, 477 n.9 ("[Periodic] review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner . . . and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner."). Because "'a prison's internal security is ... a matter normally left to the discretion of prison administrators,' . . . elaborate procedural safeguards like an adversary proceeding [are] unnecessary." *Isby*, 856 F.3d at 525 (quoting *Hewitt* at 474–75). As noted *supra* § IV.A.1., these relevant precedents arise in the context of a far more restrictive administrative segregation, in which "[i]ncarceration . . . is synonymous with extreme isolation." *Wilkinson*, 545 U.S. at 214; *see also, e.g., Westefer*, 682 F.3d at 682 ("Inmates are kept in almost constant

1    isolation."); *Isby*, 856 F.3d at 515 ("solitary confinement" inmate kept in "prolonged and isolated

2    detainment.").

3        Here, as outlined in the Dodrill Memo, designation to the CMU was subject to review every

4    six months. Pls.' Ex. 46; *see also* Schiavone Decl. ¶¶ 28-32. That memo outlined fairly specifically

5    both the criteria and the procedures by which a CMU inmate's designation would be reviewed,

6    directing staff to provide inmates with "at least" 48 hours notice before a review, to allow inmates

7    to "personally raise questions and concerns with the Unit Team regarding their placement in the

8    CMU," and to determine whether the placement remained necessary, relying on "sound

9    correctional judgement and security threat management practices." *Id*. at 1. According to the

10   program review policy, and procedures laid out in the Dodrill Memo, Defendants were obligated

11   to conduct a twice-yearly process involving multiple levels of review, beginning with an interview

12   and information-gathering conducted by the unit team. After that,

13       [t]he Unit Team staff will forward their recommendations to the Warden. With the
         concurrence of the Warden, recommendations will then be forwarded to the
14       Bureau's Counter Terrorism Unit (CTU) for review of individual inmate cases. The
         CTU will forward the final recommendation to the Regional Director, North
15       Central Region, for further review and consideration. The Regional Director, North
         Central Region, has final authority to approve an inmate's re-designation from a
16       CMU.

17       Inmates denied re-designation from a CMU will be notified in writing by the Unit
         Team of the reason(s) for continued CMU designation. Inmates not satisfied with
18       the re-designation decision, or any other aspect of confinement in the CMU, can
         appeal the decision or situation through the administrative remedy program.

19

20   Dodrill Memo at 2. That administrative remedy program, as outlined *supra* § IV.A.2.b., affords an

21   inmate an additional round of appeals. The procedural safeguards of this process are at least as

22   procedurally adequate as those evaluated in *Wilkinson*, which the Supreme Court held met the

23

1   standard for the "informal and nonadversary periodic review" required by the Constitution. 545

2   U.S. at 217 (approving a three-tiered review conducted annually).

3          It is undisputed that Jayyousi's designation was reviewed in December 2008, within

4   approximately six months of his original designation, and again on June 18, 2009, on December

5   14, 2009, on May 21, 2010, and so on, approximately every six months, until he was released, in

6   conjunction with the periodic review process, in May 2013. *See, e.g.,* Pls.' Exs. 127, 128.

7   Plaintiff's critique demands too much of the review process; the Constitution requires only

8   "minimal procedure" at this stage, and does not require that an inmate be given a review in any

9   "formal" or "structured manner." *Hewitt*, 459 U.S. at 477 n.9. It is precisely in this context that

10  courts are repeatedly reminded both that prison officials must be given broad discretion and

11  "flexibility," and that "only minimal process is likely due." *Aref v. Lynch*, 833 F.3d at 258. The

12  Court concludes that these reviews were constitutionally adequate as applied to Jayyousi.

13         Given the three levels of safeguards that Defendants provided in designating and confining

14  Plaintiff to the CMU—notice, opportunity for rebuttal, and periodic review—the Court concludes

15  that the risks of erroneous deprivation in Jayyousi's case were minimal.

16         *3.   Government's Interest; and Burdens and Value of Additional Process*

17         The final factor to be weighed under *Mathews* is the government's interest, including "the

18  fiscal and administrative burdens that the additional or substitute procedural requirement would

19  entail." *Wilkinson*, 545 U.S. at 225. As the D.C. Circuit prescribed in remanding this case, "the

20  government's legitimate interests in maintaining CMUs must be accorded substantial weight."

21  *Aref v. Lynch*, 833 F.3d at 242. This admonition has been repeatedly emphasized in other cases.

22  *See, e.g., Isby v. Brown*, 856 F.3d at 526 ("[T]he government's interests . . . are substantial.

23  Maintaining institutional security and safety are crucial considerations in the management of a

14

prison, and, to the extent that an inmate continues to pose a threat to himself or others, ongoing segregation may well be justified.") (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)); *see also Wilkinson*, 545 U.S. at 227 ("In the context of prison management, [the government's] interest is a dominant consideration."). Under the circumstances presented by Jayyousi's challenge to the CMU designation process, it cannot be denied that the government's interest in this case is "substantial."

## V.    CONCLUSION

Having weighed the three factors outlined in *Mathews* and successive precedents, the Court concludes that the balance of interests favors upholding the constitutionality of the process as it was applied to the Plaintiff in this case. For the foregoing reasons, the Court concludes that Defendants did not violate Jayyousi's procedural due process rights in designating and confining him to the CMU, and hereby DENIES Plaintiff's motion for summary judgment, GRANTS Defendants' motion for summary judgment, and dismisses this case.

**IT IS SO ORDERED.**

DATED this 13th day of October, 2020.

Barbara Jacobs Rothstein
U.S. District Court Judge